1  EDMUND G. BROWN JR.
   Attorney General of the State of California
2  DANE R. GILLETTE
   Chief Assistant Attorney General
3  JULIE L. GARLAND
   Senior Assistant Attorney General
4  JENNIFER A. NEILL
   Supervising Deputy Attorney General
5  AMANDA J. MURRAY, State Bar No. 223829
   Deputy Attorney General
6   455 Golden Gate Avenue, Suite 11000
    San Francisco, CA  94102-7004
7   Telephone:  (415) 703-5741
    Fax:  (415) 703-5843
8   Email:  Amanda.Murray@doj.ca.gov

9  Attorneys for Respondent

10

11              IN THE UNITED STATES DISTRICT COURT

12            FOR THE NORTHERN DISTRICT OF CALIFORNIA

13                   SAN FRANCISCO DIVISION

14

15  **ALFONSO CARRANZA,**                    C 08-2511 PJH

                                Petitioner,   **ANSWER TO PETITION FOR
16                                            WRIT OF HABEAS CORPUS;
                                              MEMORANDUM OF POINTS
17        **v.**                              AND AUTHORITIES**

18  **ROBERT AYERS, JR., Warden,**

                                Respondent.   Judge:      The Honorable
19                                                         Phyllis J. Hamilton

20

21

22

23

24

25

26

27

28

Answer and Supporting Memorandum of Points and Authorities                 *Carranza v. Ayers*
                                                                            C 08-2511 PJH

1

**TABLE OF CONTENTS**

2

|  |  |  | Page |
|---|---|---|---|
| 3 | MEMORANDUM OF POINTS AND AUTHORITIES | | 5 |
| 4 | INTRODUCTION | | 5 |
| 5 | ARGUMENT | | 5 |
| 6 7 | I. | CARRANZA HAS NOT SHOWN THAT HE IS ENTITLED TO RELIEF UNDER AEDPA. | 5 |
| 8 | | A. Carranza Has Not Shown that the State Court Decisions Was Contrary to Clearly Established Federal Law. | 5 |
| 9 10 | | B. Carranza Has Not Shown that the State Courts Unreasonably Applied Clearly Established Federal Law. | 7 |
| 11 | | C. Carranza Has Not Shown that the State Court Decisions Were Based on an Unreasonable Determination of the Facts. | 8 |
| 12 13 | II. | CARRANZA HAS NOT SHOWN THAT THE BOARD FAILED TO PROPERLY CONSIDER THE STATUTORY AND REGULATORY CRITERIA FOR SETTING A PAROLE RELEASE DATE. | 9 |
| 14 | CONCLUSION | | 11 |

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1                           **TABLE OF AUTHORITIES**

2                                                                              **Page**

3   **Cases**

4   *Baja v. Ducharme*
    187 F.3d 1075 (9th Cir. 1999)                                               4
5
    *Benny v. U.S. Parole Comm'n*
6   295 F.3d 977 (9th Cir. 2002)                                                4

7   *Biggs v. Terhune*
    334 F.3d 910 (9th Cir. 2003)                                              6, 7
8
    *Carey v. Musladin,* ___ U.S. ___
9   127 S. Ct. 649 (2007)                                                     5, 6

10  *Crater v. Galaza*
    491 F.3d 1119 (9th Cir. 2007)                                            6, 7
11
    *Duhaime v. Ducharme*
12  200 F.3d 597 (9th Cir. 2000)                                               7

13  *Earp v. Ornoski*
    431 F.3d 1158 (9th Cir. 2005)                                              7
14
    *Foote v. Del Papa*
15  492 F.3d 1026 (9th Cir. 2007)                                              6

16  *Greenholtz v. Inmates of Neb. Penal & Corr. Complex*
    442 U.S. 1 (1979)                                                    2, 3, 5-8
17
    *Gutierrez v. Griggs*
18  695 F.2d 1195 (1983)                                                      10

19  *Hayward v. Marshall*
    527 F.3d 797 (9th Cir. 2008)
20                                                                             3

    *In re Dannenberg*
21  34 Cal. 4th 1061 (2005)                                                    3

22  *In re Rosenkrantz*
    29 Cal. 4th 616 (2002)                                                     8
23
    *Irons v. Carey*
24  505 F.3d 846 (9th Cir. 2007)                                               6

25  *Johnson v. Zerbst*
    304 U.S. 458 (1938)                                                       10
26
    *Langford v. Day*
27  110 F.3d 1380 (9th Cir. 1984)                                              4
28

## TABLE OF AUTHORITIES  (continued)

|  | Page |
|---|---|
| *Lockyer v. Andrade*<br>538 U.S. 63 (2003) | 5, 7 |
| *Middleton v. Cupp*<br>768 F.2d 1083 (9th Cir. 1985) | 10 |
| *Nguyen v. Garcia*<br>477 F.3d 716 (9th Cir. 2007) | 6 |
| *Pulley v. Harris*<br>465 U.S. 37 (1984) | 4, 10 |
| *Rose v. Hodges*<br>423 U.S. 19 (1975) | 10 |
| *Sandin v. Connor*<br>515 U.S. 472 (1995) | 3, 6 |
| *Sass v. California Board of Prison Terms*<br>461 F.3d 1123 (9th Cir. 2006) | 3, 6 |
| *Schriro v. Landrigan*<br>___U.S.___, 127 S. Ct. 1933 (2007) | 6 |
| *Superintendent v. Hill*<br>472 U.S. 445 (1985) | 6, 8 |
| *Wilkinson v. Austin*<br>545 U.S. 209 (2005) | 3, 6 |
| *Williams v. Taylor*<br>529 U.S. 362 (2000) | 5, 7 |
| *Wright v. Van Patten*<br>___U.S.___ 128 S. Ct. 743 (2008) | 6 |
| *Ylst v. Nunnemaker*<br>501 U.S. 797 (1991) | 8 |

**Statutes**

| United States Code, Title 28 | |
|---|---|
| § 2254 | 2 |
| § 2254(a) | 10 |
| § 2254(d) | 7 |
| § 2254(d)(1-2) | 5, 7, 8 |
| § 2254(e)(1) | 8 |

**TABLE OF AUTHORITIES  (continued)**

|  | Page |
|---|---|
| California Code of Regulations, Title 15 | |
| § 2407 | 11 |
| § 2402 | 10 |
| § 2402 (a) | 10 |
| § 2281 (a) | 10 |
| | |
| California Penal Code | |
| § 3041, subd. (a) | 10 |
| § 3042 | 10 |
| § 3043 | 10 |
| | |
| United States Code, Title 28 | |
| § 2244(d)(1) | 2 |

**Other Authorities**

| | |
|---|---|
| Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) | 5-7, 10 |

1  EDMUND G. BROWN JR.
   Attorney General of the State of California
2  DANE R. GILLETTE
   Chief Assistant Attorney General
3  JULIE L. GARLAND
   Senior Assistant Attorney General
4  JENNIFER A. NEILL
   Supervising Deputy Attorney General
5  AMANDA J. MURRAY, State Bar No. 223829
   Deputy Attorney General
6    455 Golden Gate Avenue, Suite 11000
     San Francisco, CA  94102-7004
7    Telephone:  (415) 703-5741
     Fax:  (415) 703-5843
8    Email:  Amanda.Murray@doj.ca.gov

9  Attorneys for Respondent

10

11                 IN THE UNITED STATES DISTRICT COURT

12             FOR THE NORTHERN DISTRICT OF CALIFORNIA

13                      SAN FRANCISCO DIVISION

14

15  **ALFONSO CARRANZA,**                    C 08-2511 PJH

16                              Petitioner,   **ANSWER TO PETITION FOR
                                             WRIT OF HABEAS CORPUS;**
17         **v.**                             **MEMORANDUM OF POINTS
                                             AND AUTHORITIES**
    **ROBERT AYERS, JR., Warden,**
18                                            Judge:     The Honorable
                              Respondent.               Phyllis J. Hamilton
19

20        As an Answer to the Petition for Writ of Habeas Corpus filed by inmate Alfonso Carranza,

21  Respondent, admits, alleges, and denies that:

22        1.    Carranza is in the lawful custody of the California Department of Corrections and

23  Rehabilitation following his 1989 conviction for second degree murder, attempted murder, and

24  attempted manslaughter with use of a firearm.  (Pet. at 3.)  Carranza is serving a sentence of

25  seventeen years to life in prison.  (*Id.*)

26        2.    In 2006, Carranza filed a petition for writ of habeas corpus in Los Angeles County

27  Superior Court, alleging that the Board of Parole Hearings' 2006 decision denying him parole

28  was arbitrary and capricious, and violated his due process rights.  (Ex. A, Super. Ct. Pet.; Ex. B,

1 | Super. Ct. Order.) Carranza also alleged that the Board failed to properly apply the statutory and

2 | regulatory criteria in denying him parole, that the Board's reliance on multiple victims as a basis

3 | his four-year parole denial violated his double jeopardy rights, and that he was denied a fair

4 | hearing because the Board relied on opposition from the district attorney and the victims'

5 | families. The superior court denied the petition, finding that "the record contains 'some

6 | evidence' to support the Board's finding that Petitioner is unsuitable for parole." (Ex. B at 1.)

7 |     3.    Carranza then raised the same claims in petitions to the California Court of Appeal and

8 | the California Supreme Court. (Ex. C, Ct. App. Pet.; Ex. D, Ct. App. Order; Ex. E, Sup. Ct. Pet;

9 | Ex. F, Sup. Ct. Order.) Both petitions were summarily denied. (Ex. D; Ex. F.)

10 |     4.    Respondent admits that Carranza exhausted his state court remedies regarding his

11 | claims that the Board's 2006 decision denying him parole was arbitrary and capricious, that it

12 | violated his due process rights, that the Board failed to properly apply the statutory and

13 | regulatory criteria, that the Board's reliance on multiple victims as a basis for his four-year parole

14 | denial violated his double jeopardy rights, and that he was denied a fair hearing because the

15 | Board relied on opposition from the district attorney and the victims' families. Respondent

16 | denies that Carranza has exhausted his claims to the extent they are interpreted more broadly to

17 | encompass any systematic issues beyond this claim.

18 |     5.    Respondent admits that the Petition is timely under 28 U.S.C. § 2244(d)(1).

19 | Respondent admits that the Petition is not subject to any other procedural bar.

20 |     6.    Respondent denies that Carranza is entitled to federal habeas relief under 28 U.S.C. §

21 | 2254 because the state court decisions were not contrary to, or an unreasonable application of

22 | clearly established federal law as determined by the United States Supreme Court, or based on an

23 | unreasonable determination of the facts.

24 |     7.    Respondent denies that Carranza has a federally protected liberty interest in parole and,

25 | therefore, alleges that he has not a stated a federal question invoking this court's jurisdiction.

26 | The Supreme Court has not clarified the methodology for determining whether a state has created

27 | a federally protected liberty interest in parole. *See Greenholtz v. Inmates of Neb. Penal & Corr.*

28 | *Complex*, 442 U.S. 1, 12 (1979) (liberty interest in conditional parole release date created by

Answer and Supporting Memorandum of Points and Authorities

*Carranza v. Ayers*
C 08-2511 PJH

1 | unique structure and language of state parole statute); *Sandin v. Connor*, 515 U.S. 472, 484

2 | (1995) (federal liberty interest in correctional setting created only when issue creates an "atypical

3 | or significant hardship" compared with ordinary prison life); *Wilkinson v. Austin*, 545 U.S. 209,

4 | 229 (2005) (*Sandin* abrogated *Greenholtz's* methodology for establishing the liberty interest).

5 | California's parole statute does not contain mandatory language giving rise to a protected liberty

6 | interest in parole under the mandatory-language approach announced in *Greenholtz*. *In re*

7 | *Dannenberg*, 34 Cal. 4th 1061, 1087 (2005) (California's parole scheme is a two-step process

8 | that does not impose a mandatory duty to grant life inmates parole before a suitability finding).

9 | And continued confinement under an indeterminate life sentence does not impose an "atypical or

10 | significant hardship" under *Sandin* since a parole denial does not alter an inmate's sentence,

11 | impose a new condition of confinement, or otherwise restrict his liberty while he serves his

12 | sentence. Thus, Respondent asserts that Carranza does not have a federal liberty interest in

13 | parole under either *Greenholtz* or *Sandin*. Respondent acknowledges that in *Sass v. California*

14 | *Board of Prison Terms*, 461 F.3d 1123, 1128 (9th Cir. 2006) the Ninth Circuit held that

15 | California's parole statute creates a federal liberty interest in parole under the mandatory-

16 | language analysis of *Greenholtz*, but preserves the argument, which is pending en banc in

17 | *Hayward v. Marshall*, 527 F.3d 797 (9th Cir. 2008).

18 |     8. Even if Carranza has a federal liberty interest in parole, he received all due process to

19 | which he is entitled under clearly established federal law because he was provided with an

20 | opportunity to be heard and a statement of reasons for the Board's decision. *Greenholtz*, 442

21 | U.S. at 16.

22 |     9. Respondent denies that the some-evidence test is clearly established federal law in the

23 | parole context.

24 |     10. Respondent denies that the Board's decision denying Carranza parole was arbitrary and

25 | capricious, or that it violated his due process rights.

26 |     11. Respondent denies that the Board failed to properly apply the statutory and regulatory

27 | criteria in determining his parole suitability.

28 |     12. Respondent denies that the Board's reliance on multiple victims as a basis for denying

1   him parole for four years violated Carranza's double jeopardy rights.

2      13.   Respondent denies that Carranza was denied a fair hearing because the Board relied on

3   opposition from the district attorney and the victims' families in denying him parole.

4      14.   Respondent denies that the Board has a no-parole, or predetermined policy to deny

5   parole.

6      15.   Respondent alleges that Carranza fails to present a federal question when he contends

7   that the state courts improperly applied or interpreted state law.  Alleged errors in the application

8   of state law are not cognizable in federal habeas corpus.  *Pulley v. Harris*, 465 U.S. 37, 41

9   (1984); *Langford v. Day*, 110 F.3d 1380, 1389 (9th Cir. 1984).

10     16.   Respondent submits that an evidentiary hearing is not necessary because the claims

11  can be resolved on the existing state court record.  *Baja v. Ducharme*, 187 F.3d 1075, 1078 (9th

12  Cir. 1999).

13     17.   Respondent denies that Carranza is entitled to release.  Carranza's remedy is limited to

14  the process that is due, which is a new review by the Board comporting with due process.  *See*

15  *e.g. Benny v. U.S. Parole Comm'n*, 295 F.3d 977, 984-85 (9th Cir. 2002) (a liberty interest in

16  parole is limited by the Board's exercise of discretion, and a due process error does not entitle an

17  inmate to a favorable parole decision).

18     18.   Carranza fails to state or establish any grounds for habeas corpus relief.

19     19.   Except as expressly admitted in this Answer, Respondent denies the allegations of the

20  Petition.

21  //

22  //

23  //

24  //

25  //

26  //

27  //

28  //

Answer and Supporting Memorandum of Points and Authorities

*Carranza v. Ayers*
C 08-2511 PJH

4

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

Carranza claims that the Board's 2006 decision finding him unsuitable for parole violated his due process rights. But Carranza merely alleges a disagreement with the Board's decision, and fails to establish that the state court decisions denying his due process claims were contrary to, or an unreasonable application of clearly established federal law as determined by the United States Supreme Court, or were based on an unreasonable determination of the facts. Thus, there are no grounds for federal habeas relief.

## ARGUMENT

## I.

### CARRANZA HAS NOT SHOWN THAT HE IS ENTITLED TO RELIEF UNDER AEDPA.

Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) a federal court may not grant a writ of habeas corpus unless the state court's adjudication was either: 1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or 2) "based on an unreasonable determination of the facts in light of the evidence presented at the State Court proceeding." 28 U.S.C. § 2254(d)(1-2) (2000). Carranza has not demonstrated that he is entitled to relief under this standard.

### A. Carranza Has Not Shown that the State Court Decisions Was Contrary to Clearly Established Federal Law.

As a threshold matter, the Court must decide what, if any, "clearly established Federal law" applies. *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003). In making this determination, the Court may look only to the holdings of the United States Supreme Court governing at the time of the state court's adjudication. *Carey v. Musladin*, ___ U.S. ___, 127 S. Ct. 649, 653 (2007) (quoting *Williams v. Taylor*, 529 U.S. 362 (2000)). The only case in which the Supreme Court has addressed the process due in state parole proceedings is *Greenholtz*. *Greenholtz*, 442 U.S. 1. The Supreme Court there held that due process is satisfied when the state provides an inmate an

1    opportunity to be heard and a statement of the reasons for the parole decision. *Id.* at 16. "The

2    Constitution does not require more." *Id.*[1] No other Supreme Court holdings require more at a

3    parole hearing.

4        Carranza does not contest that he received the *Greenholtz* protections. (*See generally* Pet.)

5    Because *Greenholtz* was satisfied and *Greenholtz* is the only Supreme Court authority regarding

6    an inmate's due process rights during parole proceedings, the state court decision upholding the

7    Board's decision was not contrary to clearly established federal law. Thus, the Petition should be

8    denied.

9        Although the Ninth Circuit has held that the Board's decision must be supported by some

10   evidence, there is no clearly established federal law applying this standard to parole decisions.

11   The Supreme Court has held that under AEDPA a test announced in one context is not clearly

12   established federal law when applied to another context. *Wright v. Van Patten*, ___U.S.___ 128

13   S. Ct. 743, 746-47 (2008); *Schriro v. Landrigan*, ___U.S.___, 127 S. Ct. 1933 (2007); *Musladin*,

14   127 S. Ct. at 652-54; *see also*, *Foote v. Del Papa*, 492 F.3d 1026, 1029 (9th Cir. 2007); *Nguyen*

15   *v. Garcia*, 477 F.3d 716, 718, 727 (9th Cir. 2007); *Crater v. Galaza*, 491 F.3d 1119, 1122 (9th

16   Cir. 2007). The Supreme Court developed the some-evidence standard in the context of a prison

17   disciplinary hearing, *Superintendent v. Hill*, 472 U.S. 445, 457 (1985), which is a fundamentally

18   different context than a parole proceeding. Because the tests and standards developed by the

19   Supreme Court in one context cannot be transferred to distinguishable factual circumstances for

20   AEDPA purposes, it is not appropriate to apply the some-evidence standard of judicial review to

21   parole decisions.

22       Thus, the Ninth Circuit's application of the some-evidence standard to parole decisions is

23   improper under AEDPA. *See, e.g.*, *Biggs v. Terhune*, 334 F.3d 910 (9th Cir. 2003); *Sass*, 461

24   F.3d at 1128; *Irons v. Carey*, 505 F.3d 846, 851 (9th Cir. 2007). Moreover, AEDPA does not

25   _____

26       1. The Supreme Court has cited *Greenholtz* approvingly for the proposition that the "level
     of process due for inmates being considered for release on parole includes an opportunity to be heard
27   and notice of any adverse decision" and noted that, although *Sandin* abrogated *Greenholtz's*
     methodology for establishing the liberty interest, *Greenholtz* remained "instructive for [its]
28   discussion of the appropriate level of procedural safeguards." *Austin*, 545 U.S. at 229.

Answer and Supporting Memorandum of Points and Authorities                    *Carranza v. Ayers*
                                                                              C 08-2511 PJH

1 permit relief based on circuit caselaw. *Crater*, 491 F.3d at 1123, 1126 (§ 2254(d)(1) renders

2 decisions by lower courts non-dispositive for habeas appeals); *Earp v. Ornoski*, 431 F.3d 1158,

3 1182 (9th Cir. 2005) ("Circuit court precedent is relevant only to the extent it clarifies what

4 constitutes clearly established law." . . ."Circuit precedent derived from an extension of a

5 Supreme Court decision is not clearly established federal law as determined by the Supreme

6 Court."); *Duhaime v. Ducharme*, 200 F.3d 597, 600-01 (9th Cir. 2000). Therefore, the Ninth

7 Circuit's use of the some-evidence standard is not clearly established federal law and is not

8 binding on this Court.

9          Similarly, Carranza's related claim that the Board's reliance on the immutable factor of

10 his commitment offense violates due process finds no support in Supreme Court precedent.

11 Although the Ninth Circuit has suggested that this might amount to an additional due process

12 claim, *Biggs*, 334 F.3d at 917, because there is no clearly established federal law precluding

13 reliance on unchanging factors federal habeas relief is not available. 28 U.S.C. § 2254(d).

14          Moreover, Carranza's claim that the Board's decision was arbitrary and capricious fails

15 because the Board and the state courts gave him individualized consideration and evaluated the

16 positive and negative factors in considering his eligibility for parole. (Ex. B.)

17          In sum, the only clearly established federal law setting forth the process due in the parole

18 context is *Greenholtz*. Carranza does not allege that he failed to receive these protections.

19 Therefore, Carranza has not shown that the state court decisions denying habeas relief were

20 contrary to clearly established federal law.

21      **B.      Carranza Has Not Shown that the State Courts Unreasonably**
            **Applied Clearly Established Federal Law.**
22

23          Habeas relief may only be granted based on AEDPA's unreasonable-application clause

24 where the state court identifies the correct governing legal rule from Supreme Court cases but

25 unreasonably applies it to the facts of the particular state case. *Williams*, 529 U.S. at 406. The

26 petitioner must do more than merely establish that the state court was wrong or erroneous. *Id.* at

27 410; *Lockyer*, 538 U.S. at 75. Respondent recognizes that the Ninth Circuit applies the some-

28 evidence standard as clearly established federal law, but even accepting that premise, Carranza is

Answer and Supporting Memorandum of Points and Authorities                    *Carranza v. Ayers*
                                                                              C 08-2511 PJH

1    not entitled to federal habeas relief. Indeed, the California Supreme Court has adopted *Hill*'s

2    some-evidence test as the judicial standard to be used in evaluating parole decisions, *In re*

3    *Rosenkrantz*, 29 Cal. 4th 616 (2002), and Carranza has not shown that the state courts

4    unreasonably applied the standard.

5       Here, the superior  applied the some-evidence test and issued a reasoned decision finding

6    that Carranza's commitment offense and the trivial motive for his crime was some evidence to

7    support denying him parole. *Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991) (federal court

8    looks to the last reasoned state court decision as the basis for the state court judgment); (Ex. B at

9    1-2.) The court also noted that the Board properly considered Carranza's prior offenses, his

10   substance abuse problems, his limited programming, his failure (until recently) to participate in

11   substance abuse-related self-help programs, his parole plans, and opposition from the district

12   attorney and victims' families. (*Id.*)

13      Although Carranza invites the Court to re examine the facts of his case and re-weigh the

14   evidence presented to the Board, there is no Supreme Court law permitting this degree of judicial

15   intrusion. Indeed, the Supreme Court has recognized the difficult and sensitive task faced by the

16   Board in evaluating the advisability of parole release. *Greenholtz*, 442 U.S. at 9-10. Thus,

17   contrary to Carranza's belief that he should be paroled, the Supreme Court has stated that in

18   parole release, there is no set of facts which, if shown, mandate a decision favorable to the

19   inmate. *Id.* Thus, Carranza has not demonstrated that the state court reasonably applied the

20   minimal some-evidence test. *Hill*, 472 U.S. at 457.

21      **C.**      **Carranza Has Not Shown that the State Court Decisions Were**
                 **Based on an Unreasonable Determination of the Facts.**

22

23      Under § 2254(d)(2), habeas corpus can not be granted unless the state courts' decisions

24   were based on an unreasonable determination of the facts in light of the evidence presented in the

25   state court. The state court's factual determinations are presumed to be correct, and the petitioner

26   has the burden of rebutting that presumption by clear and convincing evidence. 28 U.S.C. §

27   2254(e)(1).

28      Although Carranza alleges that the Board's decision is not supported by the evidence, he

1    does not show that the state court made factual errors. Specifically, the court found that some

2    evidence supported the Board's finding that Carranza's murder offense showed an exceptionally

3    callous disregard for human suffering in that Carranza fatally shot one victim and seriously

4    injured another when Carranza shot him in the neck at close range and continued shooting at him

5    as he fled, hitting him in leg. (Ex. B at 1-2.) The court noted that Carranza then fled the crime,

6    leaving both victims to die. (*Id.* at 2.)

7         The court also found that there was some evidence that the motive for Carranza's crime

8    was trivial in relationship to the offense because a minor confrontation regarding who was next

9    in line to play pool, was the impetus for Carranza shooting at three men, killing one and severely

10   injuring another. (Ex. B at 2.) Further, the court found that because of these facts, the Board's

11   finding that there were multiple victims was supported by some evidence. (*Id.*)

12        Finally, the court found that the Board properly considered Carranza's prior offenses, his

13   substance abuse problems, his limited programming, his failure (until recently) to participate in a

14   substance abuse-related self-help program, his parole plans, and opposition from the district

15   attorney and the victims' families. (Ex. B at 2.) Likewise, the court found that the Board was

16   justified in denying Carranza parole for four years based on Carranza's commitment offense, his

17   trivial motive for the crime, and his failure to participate in substance abuse-related self-help

18   programs or vocation programs until recently. (*Id.*)

19        Thus, for the foregoing reasons, Carranza has not alleged by clear and convincing

20   evidence that the factual determinations are incorrect. Carranza simply disagrees with the weight

21   the Board assigned to the evidence. This disagreement does not entitle Carranza to federal

22   habeas relief.

23                                          **II.**

24   **CARRANZA HAS NOT SHOWN THAT THE BOARD FAILED TO
     PROPERLY CONSIDER THE STATUTORY AND REGULATORY**

25   **CRITERIA FOR SETTING A PAROLE RELEASE DATE.**

26        Carranza alleges that the Board failed to apply the statutory and regulatory criteria for

27   setting a parole release date by failing to follow the Board's regulations, by relying on multiple

28   victims to deny parole for four years in violation of his double jeopardy rights, and by denying

Answer and Supporting Memorandum of Points and Authorities                    *Carranza v. Ayers*
                                                                              C 08-2511 PJH

                                            9

1   him a fair hearing by relying on opposition from the district attorney and victims' families.  Yet

2   Carranza fails to allege a federal claim entitling him to federal habeas relief.

3        First, Carranza fails to allege a federal claim to the extent his allegations are based on a

4   construction of the state statutes and regulations regarding the manner in which the parole

5   authority determines suitability for parole.  Accordingly, his claims are predicated on state law

6   and not cognizable in federal habeas corpus.  28 U.S.C. § 2254(a); *Rose v. Hodges*, 423 U.S. 19,

7   21 (1975); *Gutierrez v. Griggs,* 695 F.2d 1195, 1197-98 (1983).  Moreover, even if Carranza is

8   alleging that the state court erroneously rejected these claims, a federal court may not challenge a

9   state court's interpretation or application of state law, *Middleton v. Cupp*, 768 F.2d 1083, 1085

10  (9th Cir. 1985), or grant relief "on the basis of a perceived error of state law." *Pulley* 465 U.S. at

11  41.

12       Moreover, Carranza's allegation that the Board failed to set a parole release date based on

13  the statutory and regulatory criteria fails because there is no United States Supreme Court law

14  mandating that a release date be calculated before an inmate is found suitable for parole.  Indeed,

15  while the Board's regulations set forth a matrix of factors used in setting a parole date (Cal. Code

16  Regs., tit. 15, § 2402), they also specify that the matrix is invoked only after a life inmate is

17  "found suitable for parole." (*Id.* at § 2402 (a), § 2281 (a); *see also* Pen. Code, § 3041, subd. (a).)

18  Similarly, there is no United States Supreme Court law prohibiting the Board from considering

19  opposition from the district attorney or the victim's next of kin.  In fact, California law requires

20  it.  Cal. Penal Code, §§ 3042, 3043.  Accordingly, Carranza cannot state a claim for relief under

21  AEDPA.

22       Finally,  Carranza has not shown any evidence that the Board's decision to rely on

23  multiple victims to deny Carranza parole for four years violated his double jeopardy rights.  *See*

24  *Johnson v. Zerbst*, 304 U.S. 458, 468-69 (1938) (the petitioner bears the burden of proving his

25  allegations in a habeas corpus proceeding).  Again, United States Supreme Court law does not

26  prohibit the Board from considering whether multiple victims were injured or killed as part of the

27  commitment offense in assessing a prisoner's eligibility for parole.  Indeed, the state court

28  concluded that there was some evidence supporting the Board's finding that there were multiple

1  victims because Carranza fatally shot one victim and seriously injured another.  (Ex. B.)  And,

2  contrary to Carranza's argument, the Board may adjust a prisoner's sentence for other offenses

3  only after he has been found suitable for parole.  (Cal. Code Regs., tit. 15, § 2407.)  Thus,

4  because Carranza fails to state a claim for federal habeas relief, the Petition must be denied.

**CONCLUSION**

6      Carranza has not demonstrated that the state court decisions denying habeas relief were

7  contrary to, or an unreasonable application of, United States Supreme Court authority, or based

8  on an unreasonable determination of the facts.  Thus, the Petition should be denied.

9      Dated:  September 2, 2008

Respectfully submitted,

EDMUND G. BROWN JR.
Attorney General of the State of California

DANE R. GILLETTE
Chief Assistant Attorney General

JULIE L. GARLAND
Senior Assistant Attorney General

JENNIFER A. NEILL
Supervising Deputy Attorney General

AMANDA J. MURRAY
Deputy Attorney General
Attorneys for Respondent

20120454.wpd
SF2008401810

## DECLARATION OF SERVICE BY U.S. MAIL

Case Name:    **Carranza v. Ayers**

No.:    **C 08-2511 PJH**

I declare:

I am employed in the Office of the Attorney General, which is the office of a member of the California State Bar, at which member's direction this service is made. I am 18 years of age or older and not a party to this matter. I am familiar with the business practice at the Office of the Attorney General for collection and processing of correspondence for mailing with the United States Postal Service. In accordance with that practice, correspondence placed in the internal mail collection system at the Office of the Attorney General is deposited with the United States Postal Service that same day in the ordinary course of business.

On **September 3, 2008**, I served the attached

### ANSWER TO PETITION FOR WRIT OF HABEAS CORPUS; MEMORANDUM OF POINTS AND AUTHORITIES

by placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid, in the internal mail collection system at the Office of the Attorney General at 455 Golden Gate Avenue, Suite 11000, San Francisco, CA 94102-7004, addressed as follows:

**Alfonso Carranza, E-30803**
**San Quentin State Prison**
**1 Main Street**
**3-N-96L**
**San Quentin, CA 94964**
In Pro Per

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on **September 3, 2008**, at San Francisco, California.

| M.M. Argarin | _M. M. Argarin_ |
|---|---|
| Declarant | Signature |

20139058.wpd

# EXHIBIT A

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

**DEPT 100**

| | | |
|---|---|---|
| Date: | AUGUST 7, 2007 | |
| Honorable: PETER ESPINOZA | Judge | JOSEPH M. PULIDO | Deputy Clerk |
| NONE | Bailiff | NONE | Reporter |

(Parties and Counsel checked if present)

BH004213
In re,
ALFONSO CARRANZA,
        Petitioner,
On Habeas Corpus

Counsel for Petitioner:

Counsel for Respondent:

---

Nature of Proceedings: ORDER RE: WRIT OF HABEAS CORPUS

    The Court has read and considered the Petition for Writ of Habeas Corpus filed on August 18, 2006 by Petitioner. Having independently reviewed the record, giving deference to the broad discretion of the Board of Parole Hearings ("Board") in parole matters, the Court concludes that the record contains "some evidence" to support the Board's finding that Petitioner is unsuitable for parole. See Cal. Code Reg. Tit. 15, §2402; *In re Rosenkrantz* (2002) 29 Cal.4th 616, 667.

    Petitioner was received in the Department of Corrections in 1989 after convictions for murder in the second-degree, attempted murder, and attempted manslaughter with the use of a firearm. He was sentenced to 17 years to life, plus a consecutive 14 years. His minimum parole eligibility date was March 15, 2007. The record reflects that on November 30, 1985, Petitioner argued with Raul Munoz at a bar over who had the next game of pool. Petitioner threatened Raul and the two engaged in a shoving match. Raul then left the bar and picked up his brothers, Juan and Pedro. The three brothers returned to the bar to confront Petitioner. Petitioner's friend attempted to hit Raul, but was stopped by Pedro. The owner of the bar threatened to kick the entire group out if they did not stop fighting, so they separated and the Munoz brothers began to leave. As they were leaving, Petitioner's friend told Raul that he wanted to speak to him outside. When they reached the door, Petitioner pointed a gun at Raul and shot him in the neck from approximately 12 inches away. Raul began to run away and Petitioner shot him again in the leg. Petitioner then turned the gun on Juan, who was standing nearby in the parking lot and shot him once, killing him. Finally, Petitioner shot two times at Pedro as he ran away. Pedro was not hit by either shot. Petitioner and his friend then fled the scene and Petitioner later moved out of California. He began serving his sentence for this offense in 1989, after serving another sentence in another state.

    The Board found Petitioner unsuitable for parole after a parole consideration hearing held on April 19, 2006. Petitioner was denied parole for four years. The Board concluded that Petitioner was unsuitable for parole and would pose an unreasonable risk of danger to society and a threat to public safety. The Board based its decision primarily upon the commitment offense.

    The Court finds that there is some evidence to support the Board's finding that Petitioner's offense demonstrated an exceptionally callous disregard for human suffering. Cal. Code Regs., tit. 15, §2402, subd. (c)(1)(D). Petitioner shot Raul in the neck at close range and then continued shooting at him as he fled, hitting

1

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

**DEPT 100**

Date: AUGUST 7, 2007
Honorable: PETER ESPINOZA
NONE

Judge | JOSEPH M. PULIDO
Bailiff | NONE

Deputy Clerk
Reporter

(Parties and Counsel checked if present)

BH004213
In re,
ALFONSO CARRANZA,
        Petitioner,

On Habeas Corpus

Counsel for Petitioner:

Counsel for Respondent:

---

him again in the leg. Petitioner also fatally shot Juan, although Juan was merely standing nearby. Petitioner then fled the scene, leaving each of his victims to die. These actions demonstrated an exceptionally callous disregard for human suffering.

The Court also finds that there is some evidence to support the Board's finding that Petitioner's motive was very trivial in relation to the offense. Cal. Code Regs., tit. 15, §2402, subd. (c)(1)(E). The entire altercation began with an argument over who was next in line to play pool at a bar. Although the victims did provoke Petitioner by confronting him after the initial argument, they were leaving the bar at the time he began shooting them and were no longer posing a threat. The minor confrontation was a very trivial motive for shooting at three men, killing one and severely injuring another. Because of these facts, the Court also finds that there is some evidence to support the Board's finding that there were multiple victims. Cal. Code Regs., tit. 15, §2402, subd. (c)(1)(D).

The Board also considered Petitioner's prior offenses and substance abuse problems, his limited programming; his failure, until recently, to participate in a substance abuse-related self-help program; his parole plans; and the opposition from the District Attorney and the victims' family members. While these are not factors tending to show unsuitability under Cal. Code Regs., tit. 15, §2402, subd. (c) and, therefore, may not justify a finding of unsuitability on their own, the Board may properly consider them.

Finally, the Court finds that the Board did not err in denying Petitioner parole for a period of four years. The Board must articulate reasons that justify a postponement of two to five years in a separate finding, but those reasons need not be completely different from those justifying the denial of parole. See *In re Jackson* (1985) 39 Cal.3d 464, 479. The Board indicated that Petitioner was denied parole for four years because his commitment offense involved multiple crimes against multiple victims, demonstrated an exceptionally callous disregard for human suffering, and had a trivial motive and because until recently, Petitioner has failed to participate in substance abuse-related self-help programs or vocational programs. These reasons were sufficient to justify a four-year denial.

Accordingly, the petition is denied.

The court order is signed and filed this date. The clerk is directed to give notice.

2

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

**DEPT 100**

| | | |
|---|---|---|
| Date: AUGUST 7, 2007 | | |
| Honorable: PETER ESPINOZA | Judge | JOSEPH M. PULIDO | Deputy Clerk |
| NONE | Bailiff | NONE | Reporter |

(Parties and Counsel checked if present)

BH004213
In re,
ALFONSO CARRANZA,
         Petitioner,

On Habeas Corpus

Counsel for Petitioner:

Counsel for Respondent:

A true copy of this minute order is sent via U.S. Mail to the following parties:

Alfonso Carranza
E-30803
San Quentin State Prison
San Quentin, California 94974

Department of Justice- State of California
Office of the Attorney General
110 West A Street, Suite 1100
San Diego, California 92101
Attn: Ms. Cynthia Lumely

Minutes Entered
08-07-07
County Clerk



THE DOCUMENT TO WHICH THIS CERTIFICATE IS ATTACHED IS A FULL TRUE
AND CORRECT COPY OF THE ORIGINAL ON FILE AND OF RECORD IN MY OFFICE.
JOHN A CLARKE EXECUTIVE OFFICER/CLERK OF THE SUPERIOR COURT OF
THE STATE OF CALIFORNIA FOR THE COUNTY OF LOS ANGELES.

ATTEST: AUG 1 0 2007 BY: _____ DEPUTY

JOSEPH M. PULIDO, S.C.C.
238219

| SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF LOS ANGELES | Reserved for Clerk's File Stamp |
|---|---|
| COURTHOUSE ADDRESS<br>Clara Shortridge Foltz Criminal Justice Center<br>210 West Temple Street<br>Los Angeles, CA 90012 | CONFORMED COPY<br>AUG 1 0 2007<br>LOS ANGELES<br>SUPERIOR COURT<br>Joseph M. Pulido |
| PLAINTIFF/PETITIONER<br><br>ALFONSO CARRANZA | |
| **CLERK'S CERTIFICATE OF MAILING**<br>CCP, § 1013(a)<br>Cal. Rules of Court, rule 2(a)(1) | CASE NUMBER<br><br>BH004213 |

I, the below-named Executive Officer/Clerk of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that this date I served:

☐ Order Extending Time            ☒ Order re: Writ of Habeas Corpus
☐ Order to Show Cause            ☐ Order to Serve Responding Party
☐ Order for Informal Response    ☐ Order re:
☐ Order for Supplemental Pleading ☐ Copy of Petition for Writ of Habeas Corpus for the
                                       Attorney General

I certify that the following is true and correct: I am the clerk of the above-named court and not a party to the cause. I served this document by placing true copies in envelopes addressed as shown below and then by sealing and placing them for collection; stamping or metering with first-class, prepaid postage; and mailing on the date stated below, in the United States mail at Los Angeles County, California, following standard court practices.

August 10, 2007
DATED AND DEPOSITED

JOHN A. CLARKE, Executive Officer/Clerk

By: _Joseph M. Pulido_ , Clerk
         Joseph M. Pulido

Alfonso Carranza
E-30803
San Quentin State Prison
San Quentin, California 94974

Department of Justice- State of California
Office of the Attorney General
110 West A Street, Suite 1100
San Diego, California 92101
Attn: Ms. Cynthia Lumely



UNITED STATES POSTAGE
$ 00.41⁰
02 1M
0004225483    AUG 21 2007
MAILED FROM ZIP CODE 90012

SUPERIOR COURT OF CALIFORNIA
COUNTY OF LOS ANGELES

CENTRAL DISTRICT-CLARA SHORTRIDGE FOLTZ
CRIMINAL JUSTICE CENTER
210 WEST TEMPLE STREET
LOS ANGELES, CALIFORNIA 90012

92101$3702 CODE

Department of Justice- State of California
Office of the Attorney General
110 West A Street, Suite 1100
San Diego, California 92101
Attn: Ms. Cynthia Lumely

DEPT 100

| | | | | |
|---|---|---|---|---|
| Date: | APRIL 19, 2007 | | | |
| Honorable: | STEVEN R. VAN SICKLEN | Judge | J. PULIDO | Deputy Clerk |
| | NONE | Bailiff | NONE | ☒ ☐ ☐ ☐ Reporter |

(Parties and Counsel checked if present)

BH 004213

In re,

ALFONSO CARRANZA,
            Petitioner,

On Habeas Corpus

Counsel for Petitioner:

Counsel for Respondent:

Los Angeles Superior Court

**MAY 1 0 2007**

John A. Clarke, Executive Officer/Cl

By _____, Dep

Nature of Proceedings: ORDER RE: WRIT OF HABEAS CORPUS

The Court acknowledges the receipt of the petitioner's Writ of Habeas Corpus (herein "petition") on August 18, 2006.

A review of the petition reveals that the petition has not been served on the responding party. (Penal Code, § 1475) The Warden, who is the respondent, is represented in parole suitability matters by the Office of the Attorney General and must be served with any and all papers filed in this matter. (Id; See also, *In re Scott* (1994) 27 Cal. App. 4th 946; *People vs. Romero* (1994) 8 Cal. 4th 728 [custodian has a due process right to notice and an opportunity to be heard.] )

Petitioner is ordered to lodge a complete copy of the petition, along with all exhibits, and a copy of this minute order, directly to: Clara Shortridge Foltz Criminal Justice Center, Department 100, 210 West Temple Street, Los Angeles, California 90012. After receipt, the clerk will serve the Office of the Attorney General with the lodged petition. In the event petitioner fails to lodge a complete copy of the petition with this Court within 60 days of receipt of this order, the petition will be dismissed.

Furthermore, if an Order to Show Cause issues, petitioner will be required to mail an additional copy of his petition to the Court for service on counsel if one is appointed.

In light of the above, the Court extends time to rule on this matter. After a copy of the complete petition is lodged by petitioner and served on respondent by the clerk, the Court will rule on the matter within 60 days of that date, unless the Court finds it necessary to further extend ruling on the matter. (Cal. Rules of Court, rule 4.551(h).)

The clerk is directed to give notice to petitioner and the Office of the Attorney General.

The court order is signed and filed this date.

A true copy of this minute order is sent via U.S. Mail to the following parties:

1

| Minutes Entered |
|---|
| 04-19-07 |
| County Clerk |

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

DEPT 100

| Date: | MAY 11, 2007 | | | |
|---|---|---|---|---|
| Honorable: | STEVEN R. VAN SICKLEN | Judge | J. PULIDO | Deputy Clerk |
| | NONE | Bailiff | NONE | Reporter |

(Parties and Counsel checked if present)

BH 004213
In re,
ALFONSO CARRANZA,
            Petitioner,
On Habeas Corpus

Counsel for Petitioner:

Counsel for Respondent:

Nature of Proceedings: ORDER RE: WRIT OF HABEAS CORPUS

The clerk is directed to mail a copy of the petition for writ of habeas corpus, along with notice of this order, to the Office of the Attorney General, P.O. Box 85266, San Diego, CA 92186-5266 to the attention of Ms. Cynthia Lumely.

This petition is forwarded to the Office of the Attorney General for safe-keeping and for future use. The petition should be kept in the event an Order to Show Cause should issue by this Court or in the event the petition is required for any purpose by this or any other Court. This Court will not reproduce any portion of the record in the future.

The court order is signed and filed this date. The clerk is directed to give notice.

A true copy of this minute order is sent via U.S. Mail to the following parties:

Alfonso Carranza
E-30803
San Quentin State Prison
San Quentin, CA 94974

Department of Justice
Office of the Attorney General of the State of California
P.O. Box 85266
San Diego, CA 92186-5266
Attn: Ms. Cynthia Lumely

1

Minutes Entered
05-11-07
County Clerk



THE DOCUMENT TO WHICH THIS CERTIFICATE IS
ATTACHED IS A FULL, TRUE, AND CORRECT COPY
OF THE ORIGINAL ON FILE AND OF RECORD IN
MY OFFICE.

ATTEST ____ JUN 2 9 2007

JOHN A. CLARKE, Executive Officer/Clerk of the
Superior Court of the State of California for the County
of Los Angeles

By _____

JOSEPH M. PULIDO, S.C.C.
233219

, Deputy

| SUPERIOR COURT OF CALIFORNIA COUNTY OF LOS ANGELES | Reserved for Clerk's File Stamp |
|---|---|
| COURTHOUSE ADDRESS:<br>Clara Shortridge Foltz Criminal Justice Center<br>210 West Temple Street<br>Los Angeles, CA 90012 | CONFORMED COPY<br>OF ORIGINAL FILED<br>Los Angeles Superior Court<br><br>JUN 2 9 2007<br><br>John A. Clarke, Executive Officer/Clerk<br>By _____, Deputy<br>Joseph M. Pulido |
| PLAINTIFF/PETITIONER:<br><br>ALFONSO CARRANZA | |
| **CLERK'S CERTIFICATE OF MAILING**<br>CCP, § 1013(a)<br>Cal. Rules of Court, rule 2(a)(1) | CASE NUMBER:<br><br>BH004213 |

I, the below-named Executive Officer/Clerk of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that this date I served:

- ☐ Order Extending Time
- ☐ Order to Show Cause
- ☐ Order for Informal Response
- ☐ Order for Supplemental Pleading

- ☑ Order re: Writ of Habeas Corpus
- ☐ Order
- ☐ Order re:
- ☑ Copy of Petition for Writ of Habeas Corpus for the Attorney General

I certify that the following is true and correct: I am the clerk of the above-named court and not a party to the cause. I served this document by placing true copies in envelopes addressed as shown below and then by sealing and placing them for collection; stamping or metering with first-class, prepaid postage; and mailing on the date stated below, in the United States mail at Los Angeles County, California, following standard court practices.

June 29, 2007
DATED AND DEPOSITED

JOHN A. CLARKE, Executive Officer/Clerk

By: _____, Clerk
        Joseph M. Pulido

Alfonso Carranza
E-30803
San Quentin State Prison
San Quentin, CA 94974

Department of Justice
Office of the Attorney General of the State of California
P.O. Box 85266
San Diego, CA 92186-5266
Attn: Ms. Cynthia Lumely

# EXHIBIT B
# Part 1 of 2

Address   SAN QUENTIN STATE PRISON

SAN QUENTIN, CA 94974

CDC or ID Number   E-30803

## CALIFORNIA SUPERIOR COURT

## IN AND FOR THE COUNTY OF LOS ANGELES
*(Court)*

| | |
|---|---|
| ALFONSO CARRANZA, <br><br> Petitioner <br><br>          vs. <br><br> ROBERT AYERS JR., Warden,* <br><br> Respondent | **PETITION FOR WRIT OF HABEAS CORPUS** <br><br> No. *BH004213* <br> *(To be supplied by the Clerk of the Court)* |

### INSTRUCTIONS – READ CAREFULLY

- If you are challenging an order of commitment or a criminal conviction and are filing this petition in the Superior Court, you should file it in the county that made the order.

- If you are challenging the conditions of your confinement and are filing this petition in the Superior Court, you should file it in the county in which you are confined.

- Read the entire form *before* answering any questions.

- This petition must be clearly handwritten in ink or typed. You should exercise care to make sure all answers are true and correct. Because the petition includes a verification, the making of a statement that you know is false may result in a conviction for perjury.

- Answer all applicable questions in the proper spaces. If you need additional space, add an extra page and indicate that your answer is "continued on additional page."

- If you are filing this petition in the Superior Court, you need file only the original unless local rules require additional copies. courts require more copies.

- If you are filing this petition in the Court of Appeal, file the original and four copies.

- If you are filing this petition in the California Supreme Court, file the original and thirteen copies.

- Notify the Clerk of the Court in writing if you change your address after filing your petition.

- In most cases, the law requires service of a copy of the petition on the district attorney, city attorney, or city prosecutor. See Penal Code section 1475 and Government Code section 72193. You may serve the copy by mail.

Approved by the Judicial Council of California for use under Rules 56.5 and 201(h)(1) of the California Rules of Court [as amended effective January 1, 1999]. Subsequent amendments to Rule 44(b) may change the number of copies to be furnished the Supreme Court and Court of Appeal.

Page one of six

Form Approved by the
Judicial Council of California
MC-275 [Rev. January 1, 1999]

PETITION FOR WRIT OF HABEAS CORPUS

Penal Code, § 1473 et seq.;
Cal. Rules of Court, rules 56.5, 201(h)

| | | | |
|---|---|---|---|
| ☐ A conviction | | ☒ Parole | |
| ☐ A sentence | | ☐ Credits | |
| ☐ Jail or prison conditions | | ☐ Prison discipline | |
| ☐ Other (specify): | | | |

1. Your name: Alfonso Carranza

2. Where are you incarcerated? San Quentin State Prison, San Quentin, CA 94974

3. Why are you in custody? ☐ Criminal Conviction    ☐ Civil Commitment

   *Answer subdivisions a. through i. to the best of your ability.*

   a. State reasons for civil commitment or, if criminal conviction, state nature of offense and enhancements (for example, "robbery with use of a deadly weapon").

      Second degree murder, attempted murder, and attempted manslaughter with use of gun.

   b. Penal or other code sections: Penal Code § 187

   c. Name and location of sentencing or committing court: California Superior Court, in and for the county of Los Angeles

   d. Case number: LA539854

   e. Date convicted or committed: October 31, 1988

   f. Date sentenced: November 1988

   g. Length of sentence: 14 years and a consecutive 17 years-to-life.

   h. When do you expect to be released? Minimum Eligible Parole Date: March 15, 2007

   i. Were you represented by counsel in the trial court? ☒ Yes. ☐ No. If yes, state the attorney's name and address:

4. What was the LAST plea you entered? *(check one)*

   ☒ Not guilty  ☐ Guilty  ☐ Nolo Contendere  ☐ Other:

5. If you pleaded not guilty, what kind of trial did you have?

   ☒ Jury  ☐ Judge without a jury  ☐ Submitted on transcript  ☐ Awaiting trial

MC-275 [Rev. January 1, 1999]          PETITION FOR WRIT OF HABEAS CORPUS          Page two of six

_Commencement. (If you have additional grounds for relief, use a separate page for each ground. State ground 2 on page four. For additional grounds make copies of page four and number the additional grounds in order.)_

SEE "INSERT A" attached pages 1 through 12

a. Supporting facts:
Tell your story briefly without citing cases or law. If you are challenging the legality of your conviction, describe the facts upon which your conviction is based. _If necessary, attach additional pages._ CAUTION: You must state facts, not conclusions. For example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or failed to do and how that affected your trial. Failure to allege sufficient facts will result in the denial of your petition. (See _In re Swain_ (1949) 34 Cal.2d 300, 304.) A rule of thumb to follow is: _who_ did exactly _what_ to violate your rights at what time (_when_) or place (_where_). (_If available, attach declarations, relevant records, transcripts, or other documents supporting your claim._)

b. Supporting cases, rules, or other authority (optional):
(_Briefly discuss, or list by name and citation, the cases or other authorities that you think are relevant to your claim._ If necessary, attach an extra page.)

PETITION FOR WRIT OF HABEAS CORPUS           Page three of six

Grounds 2 through Grounds 4, pages 13 through 24.

_____

_____

_____

a.  Supporting facts:

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

b.  Supporting cases, rules, or other authority:

_____

_____

_____

_____

_____

MC-275 [Rev. January 1, 1999]          PETITION FOR WRIT OF HABEAS CORPUS          Page four of six

PETITIONER'S RIGHTS TO STATE AND FEDERAL DUE PROCESS WERE
VIOLATED BY THE BOARD ... PAROLE HEARINGS ... HIM PAROLE
BECAUSE NO EVIDENCE SUPPORTS THE BOARD'S FINDING AND DECISION
THAT PETITIONER IS UNSUITABLE FOR PAROLE AND POSES A CURRENT
UNREASONABLE THREAT TO PUBLIC SAFETY

On April 19, 2006, Alfonso Carranza ("Petitioner"), appeared before
the Board of Parole Hearings ("BPH") for his initial "Life Term Parole
Consideration Hearing." The BPH found petitioner unsuitable for parole and
that he would pose an unreasonable risk to society or a threat to public
safety if released from prison. The BPH stated that "Nothing that happens
here today will change the findings of the court, we are not here to retry
your case. Our purpose is solely to determine your suitability for parole."
(Exhibit A, Hearing Transcripts ("HT"), p. 9.) However, the record indicates
that the BPH did relitagate the case, mischaracterized it as a first degree
murder, being calculated, and based its decision on unchanging factors, while
ignoring factors that support a finding of rehabilitation and suitability
for parole. The BPH based its decision to deny parole on the following:

1.  The offense itself is of sufficient severity for the denial.
    And for that reason the inmate is being denied.

2.  The inmate is also being denied because he has an escalating
    pattern of criminal conduct.

3.  The inmate has failed at previous grants of probation and
    cannot be counted upon to avoid criminality.

4.  The inmate has failed to profit from societies previous
    attempts to correct his criminality such attempts include
    adult probation as well as your drug rehab.

5.  The prisoner has failed to sufficiently participate in self-
    help and therapy programming.

6.  [T]he panel notes opposition to your finding of suitability
    both from the District Attorney's office of Los Angeles County
    as well as the victim's next of kin.

7.  The prisoner needs therapy, programming and self-help in
    order to face, discuss, understand, and cope with stress
    in a non destructive manner as well as to get further insight

1.

into the crime. Until progress is made the prisoner continues to be unpredictable and a threat to others.

Case 3:08-cv-02511-PJH    Document 8-3    Filed 09/03/2008    Page 7 of 73

(Exhibit A, HT at p. 83-86.)

After denying Petitioner parole, Deputy Commissioner Thompson commended Petitioner for the following:

> [H]e did remain disciplinary free and he has been involved in counseling his peers and the Spanish speaking inmates as well as adjustment issues. And he was noted and commended for that by the church group, I believe it is Jubilee Christian church. And he has a number of letters thanking him for his help and his cooperation in various events. I think they all show a willingness to be socialized and try to have empathy for other people. Which is to be commended and hopefully built on as a good foundation for future life or future contacts. And I think all in all he has made some educational efforts, he did get an equivalency degree. And he has taken English as a second language which makes him a good role model for Spanish speaking inmates who are trying to interface and interrelate to an English speaking, American English admittedly, but an English speaking community. And I think that is all commendable.

(Exhibit A, HT at 86-87.)

The BPH's reason to deny parole must be supported by "some evidence" pertinent to the "relevant standards" promulgated by the BPH to comply with constitutional due process. (In re Rosenkrantz, supra, 29 Cal.4th at pp. 657-658 & 675-677; see also In re Dannenberg, supra, 34 Cal.4th at pp. 1071, 1084, 1095, fn. 16.) This requires a BPH panel's decision to deny parole to "have some rational basis in fact." (Scott II, 133 Cal.App.4th at p. 590, fn. 6.) As the administrative record of the BPH's review and consideration of the pleadings make clear, there simply is no such rational basis supporting the BPH's decision to deny Petitioner parole.

This is another case which demonstrates the BPH's boiler-plate denial of using the gravity of the offense as the basis to deny parole regardless of a prisoner's efforts and showing of rehabilitation. Putting aside the pre-commitment factors and, commitment offense, "all other factors indicate

2.

Cal.App.4th at 594.) The California First Appellate District Court cautioned

the Governor about a reversing a grant of parole based solely on the

commitment offense or other pre-commitment factors:

> Reliance on such an immutable factor "without regard to or
> consideration of subsequent circumstances" may be unfair
> [citation] and "runs contrary to the rehabilitative goals
> espoused by the prison system and could result in a due
> process violation." [Citation.] The commitment offense can
> negate suitability only if circumstances of the crime reliably
> established by evidence in the record rationally indicate
> that the offender will present an unreasonable public safety
> risk if released from prison. Yet, the predictive value of
> the commitment offense may be very questionable after a long
> period of time. [Citation.] Thus, denial of release solely
> on the basis of the gravity of the commitment offense warrants
> especially close scrutiny.

(Id. at pp. 594-595.) Where such scrutiny reveals that the [BPH] "did not

fulfill" the requirement "to consider all other relevant factors," the

decision cannot stand. (Id. at p. 595.) Such is the case here.

1. The Facts of the Commitment Offense Do Not Provide a Reasonable
Basis to Deny Parole.

The BPH's mischaracterization of Petitioner's commitment offense does

not make it "some evidence" to support a finding of unsuitability for parole.

In relying on the commitment offense to deny parole, the BPH stated:

> Multiple victims were attacked, injured and one was killed
> during the offense. The offense was carried out in a
> dispassionate and calculated manner, which demonstrates an
> exceptional callous disregard for human suffering. The motive
> for the crime was inexplicable. The sad part of my position
> [Commissioner Lee] is that I truly do not know what occurred
> out on the street nor does the Deputy Commissioner. We are
> only privy to what is submitted before us. The inmate's
> version is totally at odds with the information we have
> received in our packets.

(Exhibit A, HT p. 82.)

The BPH cannot base their decision on uncertainty and then used that

uncertainty to recharacterize the second degree murder, commitment offense,

3.

Michael Satris:

> We don't have two counts of attempted murder in this case,
> as the District Attorney characterized it. We have a finding
> of attempted voluntary manslaughter and that is critical
> because that shows that this isn't the kind of cold calculated
> attempt to kill three people that the District Attorney is
> now trying to promote in a retrial of the case. The
> manslaughter finding or attempted manslaughter does indicate
> apparent acceptance either a provocation or unreasonable
> belief in the need for self-defense. And there is substantial
> evidence of course in the record that would support this
> (HT 61-62). ... All right so I would ask the board to do
> what it indicated in the vary outset of this hearing of what
> it was going to do. Which is to consider Mr. Carranza
> [Petitioner] for parole in accordance with Penal Code Section
> 3041 and its own rules and regulations. That Penal Code
> Section provides that the board should normally grant a
> prisoner or set a parole date for a prisoner at his first
> parole hearing (HT 64). ... Under the boards rules in terms
> of multiple victims to start with that is a factor that leans
> toward a finding of unsuitability for parole. But what is
> important is that is only if that offense shows he presents
> a continuing danger at this point. Because we are talking
> about present dangerousness when we are talking about
> suitability for parole. The record makes it very plain in
> this case that kind of entrenched criminality at that time
> was a the product of a kind of destructive lifestyle he was
> living involving drugs and weapons (HT 65). ... In terms
> of pre offense factors. You have no juvenile record, ...
> lacks any significant history of violent crime. And what
> you have is no violent criminality outside of this offense.
> This is his single act of criminal violence (HT 66). ...
> Institutional behavior has institution activities indicated
> an enhanced ability to function within the law upon release.
> And you see that first of all with the behavior of the
> remarkable record he has of being disciplinary free (HT 67).
> ... He has his plans for what is most realistic, really the
> only realistic plan for the future is he is going to be
> deported to Mexico. And he is fully prepared for that. He
> has his wife ready to move as need to be back there (HT 69.)

(Exhibit A, HT 61-69.)

"[T]he [BPH] is required to consider whether the prisoner committed

the crime as the result of significant stress in his or her life." (Scott

~~II, supra, 133 Cal.App.4th at 596, quoting with emphasis In re Rosenkrantz,~~

supra, 29 Cal.4th at p. 679.) a failure to do so "is arbitrary and capricious

...." (Ibid.) The BPH's denial here was thus arbitrary and capricious, for they failed to consider the evidence of the considerable stress that Petitioner was experiencing at the time, which includes being addicted to drugs and alcohol, while being confronted by the victims in a altercation. As petitioner explained in his written version of the offense, Petitioner was not the instigator and was under influence:

> On the evening of November 30, 1985 I went to the La Casa Blanca bar. I started to play pool, drink beer, and snort cocaine. When I got into an argument with Raul Munoz [victim] instead of trying to calm the situation down I responded at his [the victim's] level. In my macho mentality I thought it was considered we[a]k to back down from violence. After the heated argument Mr. Munoz left the bar and I stayed to continue to play pool. Just before the bar closed I went outside and saw Mr. Munoz and two men coming at me. Mr. Munoz was cursing at me and I reached over and I was quick to shoot — And I overreacted, []. ... I was living a life that was out of control. ...

(Exhibit A, HT 21-22.)

Though the BPH did mention that "[t]he information apparently in the packets seem to indicate at trial the witnesses did indicate there was an ongoing dispute that apparently on at least two occasions an attempt to solve this particular dispute in fact it seems to indicate there was a point and time where both sides shook hands[]" (HT 82-83), and that "the victim left the bar and went and got his brothers," (HT 16), the BPH ignored the fact that the jury rejected the prosecutor's version of the crime when it found Petitioner guilty of a less capable offense than charged and argued by the District Attorney's office. Furthermore, the BPH recognized that Petitioner's "usage in regards to cocaine[]" (HT 84), at the time of the offense, the BPH decision studiously avoided notice of the evidence of stress that the record spread before them. The BPH not only ignored the evidence that Petitioner was experiencing a significant amount of stress at the time of the offense, but that the stress had built up over a long period of time.

Regs., tit. 15, §2402, subd. (d)(4) ["the prisoner's 'motivation' for the
offense tends to show suitability when it was the result of significant stress
in his life, especially if the stress has built over a long period of
time'"].)

The fact that the BPH describes the commitment offense as
"dispassionate and calculated" (HT 82), does not change the analysis. As
the on Court has stated: "'All second degree murders by definition involve
some callousness - i.e., lack of emotion or sympathy, emotional insensitivity,
indifference to the feelings and suffering of others. [Citation.] As noted,
however, parole is the rule, rather than the exception, and a conviction
of second degree murder does not automatically render one unsuitable.'" (Scott
II, supra, 119 Cal.App.4th at p. 891.)

As brutal as Petitioner's homicidal conduct may have been, it did
not go beyond what caused that conduct to constitute second degree murder,
he did nothing beyond what accomplished the killing to "cruelly or callously
exacerbate[] the victim's suffering." Parole authorities may use the factors
in Petitioner's case, shooting the victim, to aggravate his term, but that
manner of death does not disqualify a prisoner from parole. As the California
Court of Appeals, First Appellate District, noted, the BPH's observation
that "[t]he offense itself is of sufficient severity for the denial" (HT
83), "could be repeated annually until [Petitioner] dies or is rendered
helpless by the infirmities of sickness or age." (Scott II, supra, 133
Cal.App.4th at p. 595.) The manner in which Petitioner shot at the victim
is not atypical for a murder case, and hardly acts to "distinguish this crime
from other ... murders as exceptionally callous." (In re Smith, supra, 114
Cal.App.4th at p. 367.) As the California Supreme Court has noted on more

than a score of occasions, murder is seldom proved. (See, e.g., *People*

*v. Hinton* (2006) 37 Cal.4th 839, 896.) The BPH's denial of parole to such

murders is contrary to the statute.

The BPH failed to conduct an individualized assessment of all required factors. Clearly, the facts at hand do not meet the requirements set forth by the regulations and the courts to justify the BPH's finding of unsuitability for parole. As the record shows, Petitioner's crime merely satisfies the bare minimum requirements for finding of a second degree murder. He did not torture Mr. Munoz, or lie in wait for him; he did not prolong his suffering, or kill him in order to rob him or incite a race war. His crime, while terrible, does not rise to the level of callousness present in *Dannenberg*, where after a long period of marital disharmony, the defendant bludgeoned his wife repeatedly with a pipe wrench and then drowned her or allowed her to drown in the bathtub; or *Rosenkrantz*, where defendant purchased an Uzi and, one week after provocation, shot the victim numerous times at close range and then remained a fugitive for 24 days; or *Van Houten*, where defendant assisted with multiple stabbings of the victim with a knife and bayonet, after the victim witnessed her husband receiving the same fate, all an effort to incite a race war. See *Van Houten*, 116 Cal.App.4th at 365. Not only does Petitioner's crime fail on its own to constitute "some evidence" that he is a continuing threat to public safety, but the BPH erred by failing to consider all of factors required by the regulations. Post-commitment facts are essential to determining suitability of parole. The BPH failed to consider Petitioner's perfect post-commitment record, positive psychological and forensic evaluations, exemplary in-prison work record, extensive self-help and therapy, and post release offer of housing and employment in Mexico, and therefore cannot justify his denial of parole.

7.

In another recent opinion, the Honorable Judge Marilyn H. Patel in Martin v. Marshall, No. C-05-3486 MHP, ---F.Supp.2d---, 2006 WL 1344584 (N.D. Cal. May 17, 2006), Judge Patel held that (1) sole reliance on the circumstances of petitioner's offense and conduct prior to the offense in denying parole constituted a due process violation, and (2) denial or parole under California's then-existing no-parole policy for murderers denied the inmate his due process right to be heard by an impartial decision-maker. Judge Patel further found that California inmates have a federally-protected due process liberty interest in parole.

    2.  The Facts of Petitioner's Escalating Pattern of Criminal
    3.  Conduct; His Failure at Previous Grants of Probation; and
    &  His Failure to Profit from Societies Previous Attempts to
    4.  Correct His Criminality, Do Not Provide Some Evidence That
        Petitioner is a Current Unreasonable Risk to Public Safety.

The BPH also points to Petitioner's pre-commitment offense behavior. "The inmate began to use cocaine heavily in California. And began to sell cocaine apparently to support his habit. As far as previous contacts the inmate as far as we know has no juvenile contacts. ... 1980. He also has, was arrested I should say for drunk driving in the following month in April. The inmate was ordered to attend a drug and alcohol program at that time. In 1984 the inmate was in possession of a controlled sustains. ..." (HT 14.) In 1984 Petitioner was arrested for possession of gun and cocaine. In 1987 Petitioner was arrested for possession of cocaine and received six years in Federal Prison. (HT 15.) These charges do not rise to the level anticipated in the Regulations which define "Previous Record of Violence" as "previous occasions [prisoner] inflicted or attempted to inflict serious injury on a victim." 15 CCR § 2402(b)(2); see also Van Houten, 116 Cal. App.4th at 353. Possession of cocaine is not assault and Petitioner's arrest for possession of weapon was not an attempt to inflict injury, of any severity,

on anyone. No reasonable interpretation (<u>Rosenkrantz</u>, 29 Cal.4th at 680) of these facts can transform them into becoming "some evidence" of a "Previous Record of Violence."(15 CCR § 2402(b)).

Courts have also made clear that the evidence cited by the Executive must be relevant and probative to the factors that such evidence is being used to support. For instance, in <u>Smith</u>, the Governor had pointed to evidence indicating that "the crime was not an isolated incident, but rather the culmination of 'a continuing pattern' of personal drug use, social instability, and violence against Garner." <u>Smith</u>, 114 Cal.App.4th at 367. The court held that though there was some evidence of drug use, such evidence was not relevant to a determination of the key inquiry -- whether the inmate would pose a current, unreasonable threat to public safety.

> [T]he observation is more historical backdrop than a reflection of the circumstances surrounding commission of the offense: its manner, scope, and motivation. Indeed, there is no evidence that Smith shot Garner while he was under the influence, and no evidence that he abused her immediately before the shooting or even during the days and weeks before it. Thus, the Governor's observation does not tend to distinguish Smith's offense as especially grave.

(<u>Id</u>. at 368.)

5. There No Evidence That Petitioner Has Failed to Sufficiently Participate in Self-Help and Therapy Programming to Support a Finding of Unsuitability for Parole.

In another recent parole case, the court held that the Board's observation that the inmate had not gained an ability to speak English and that he had failed to upgrade his vocational training was not relevant to support a conclusion that "'he would pose an unreasonable risk of danger to society or threat to public safety if released from prison.' Nothing in the record indicates that defendant's criminality or ability to support himself was affected by any limitation of his vocational or language skills." In re Deluna (2005) 126 Cal.App.4th 585, 598; Cf. <u>Van Houten</u>, 116 Cal.App.4th

at 353 (inmate's previous arrest record did not constitute "some evidence" of a threat to public safety because the alleged acts did not involve serious injury or attempted serious injury to a victim).

6. The Fact That The District Attorney's Office and Victim's Next of Kin Opposes Parole Does Not Constitute "Some Evidence" That Petitioner Currently Poses An Unreasonable Risk to Public Safety.

The BPH cited the District Attorney' Office and Victim's next of kin opposition to a finding of suitability to deny Petitioner parole. (HT 86.) Public outcry cannot be used to determine whether an inmate is suitable for parole. (In re Powell (1988) 248 Cal.Rptr. 431; In re Fain (1983) 139 Cal.App.3d 295.) Furthermore, because Petitioner had no notice that this factor would be used against him, this factor is unconstitutionally vague. (United States v. Doremus, 888 F.2d 630, 634 (9th Cir. 1989) [A statute (or regulation) is void for vagueness : if it fails to give adequate notice to people of ordinary intelligence concerning the conduct it proscribes, or if it invites arbitrary and discriminatory enforcement.].)

7. There is No Evidence to Support the BPH's Finding that Petitioner Needs Programming and Self-Help in Order to Face, Discuss, Understand, and Cope With Stress in a Non Violent Manner.

Finally, the BPH panel found that Petitioner "needs therapy, programming, and self-help in order to face, discuss, understand and cope with stress in a non destructive manner as well as to get further insight into the crime. Until progress is made the prisoner continues to be unpredictable and a threat to others." (HT 86.)

Petitioner has been disciplinary free his entire time in prison. He has shown that he can cope with stress in a non-destructive manner. In ~~In re Smith, Cal.App.4th at page 371, the court held that evidence that~~ a prisoner used intoxicating substance 20 years prior is not some evidence

10.

> [W]e conclude that Smith's past desire for and use of drugs
> not by itself reasonably established current unsuitability
> because there is no additional evidence to complete a chain
> of reasoning between his past drug use and a finding that
> because of it he currently poses an unreasonable risk of
> danger if released. In other words, in the absence of some
> evidence to support a reasonable belief that Smith might
> start using drugs again, the fact that he used drugs
> extensively more than 20 years ago does not by itself
> represent some evidence that he is currently dangerous.

Same holds true in the instant case. There is no reasonable basis to believe that Petitioner might start using alcohol and drugs if released. The BPH is asserting authority that it does not possess, denying parole because a prisoner continues to be unpredictable. "According to a Task Force of the American Psychiatric Association, '[n]either psychiatrist nor anyone else have demonstrated an ability to predict the future violence or dangerousness. [Citation] As our Supreme Court has also noted, 'the same studies which proved the inaccuracy of psychiatric prediction [of dangerousness] have demonstrated beyond dispute the no less disturbing manner in which such prophecies consistently err: they predict acts of violence which will not in fact take place ('false positive'), thus branding as 'dangerous' many persons who are in reality totally harmless. [Citation]" (People v. Burnick (1975) 14 Cal.3d 306, 327.)

Under the clearly established framework of Allen and Greenholtz, "California's parole scheme gives rise to a cognizable liberty interest in release on parole." McQuillion v. Duncan, 306 F.3d 895, 902 (9th Cir. 2002). The scheme creates a presumption that parole release will be granted unless the statutorily defined determinations are made. (Id.; Biggs v. Terhune, 334 F.3d 910, 915-916 (9th Cir. 2003) (finding initial refusal to set a parole date for prisoner with 25-to-life sentence implicated prisoner's liberty interest.) In sum, the structure of California's parole scheme, with its

11.

protected liberty interest in parole such that an inmate has a federal right

to due process in parole proceedings.

For the foregoing reasons, the Court should reverse the BPH's findings

and order the BPH to set Petitioner's term within the Matrix guidelines for

second degree murder. (See Exhibit B, CCR-15 § 2403(c).)

On April 19, 2006, Alfonso Carranza ("Petitioner"), appeared before

the Board of Parole Hearings ("BPH") for his initial "Life Term Parole

Consideration Hearing." In its decision to deny Petitioner parole for four-

years, the BPH stated:

> The panel has reviewed all information received from the
> public and relied on the following circumstances in
> concluding the prisoner is not suitable for parole and
> would pose an unreasonable risk to society or a threat
> to public safety if released from prison. Multiple victims
> were attacked, injured and one killed during the offense.
> The offense was carried out in a dispassionate and
> calculated manner. The offense was carried out in a manner,
> which demonstrates an exceptional callous disregard for
> human suffering. The motive for the crime was inexplicable
> or very trivial in relationship to the offense. The sad
> part of my position is that I truly do not know what
> occurred out on the street nor does the Deputy Commissioner.
> We are only privy to what is submitted before us. The
> inmate's version is totally at odds with the information
> we have received in our packets. ... The inmate is also
> denied because he has an escalating pattern of criminal
> conduct. .... The inmate failed at previous grants of
> probation and cannot be counted upon to avoid criminality.
> ... The prisoner has failed to sufficiently participate
> in self-help and therapy programming. ... In regards to
> inmate's parole plans I think they are sufficient. ...
> However the panel notes opposition to your finding of
> suitability both from the District Attorney's office of
> Los Angeles County as well as the victim's next of kin.
> ...

(Exhibit A, Hearing Transcripts, pp. 82-85.)

This case presents interesting issues concerning the procedures and

guidelines used by the BPH in reaching and explaining its decisions

concerning parole. The issues arise because the BPH has designed procedures

(Pursuant to Cal. Penal Code §3041 (a)) that are suppose promote rationality

in its decision-making process and to enhance understanding of the that

process by all concerned, especially prisoners. The key ingredients of

13.

the procedures are (a) the use of a Matrix table of guidelines as an aid in deciding the appropriate length of time a prisoner should serve without good-time credit, and then calculating the good-time credit toward that term; and (b) a requirement that a prisoner denied parole receive in writing the reasons for the decision. These aspects of the BPH's guidelines and procedures are detailed in In re Rosenkrantz (2002) 29 Cal.4th 616, 653-654; Cal. Codes of Regs. tit. 15 ("CCR-15") § 2400-2411.(Exhibit B.)

The guideline table sets forth suggested length of time to be served prior to parole for various combinations of two variables: 1) the severity of the offense, and 2) the characteristics of the offender in relation with the victim. The precise issues raised by this case are (a) whether, in determining suitability for parole, the BPH must use the offense for which the prisoner was convicted, or can use the offense the BPH concludes he or she has committed based on the BPH's understanding of facts that allegedly occurred, and (b) whether the BPH can use factors that went into formulating the guidelines for setting terms (in mitigation or aggravation) as the stated reason for denying parole.

As brutal as Petitioner's homicidal conduct may have been, by the BPH's own guidelines, petitioner's term "shall normally" be set at his initial parole hearing, which was held in April 19, 2006. Petitioner Minimum Eligible Parole Date (MEPD) is set at March 15, 2007. As will be shown below, Petitioner should have been found suitable for parole and his term should have been set somewhere in the range of 15 to 19 years, which can be reduced with good conduct credit. (Exhibit B, CCR-15 § 2410.)

The BPH's own guidelines requires the BPH to determine the category most closely related to the circumstances of the crime, and impose the middle base term reflected in the matrix unless the panel finds

14.

set forth in 15 CCR-15 § 2403(c) describes three circumstances and victim
situations to be used in determining the category most closely related
to the crime being reviewed for setting terms:

CIRCUMSTANCES

A.  Indirect

Victim died of causes related to the act of the prisoner
but was not directly assaulted by prisoner with deadly
force; e.g., shock producing heart attack; a crime partner
actually did the killing.

B.  Direct or Victim Contribution

Death was almost immediate or resulted at least partial
from contributing factors from the victim; e.g., victim
initiated struggle or had goaded the prisoner. This does
not include victim acting in defense of self or property.

C.  Severe Trauma

Death resulted from severe trauma inflicted with deadly
intensity; e.g., beating, clubbing, stabbing, strangulation,
suffocation, burning, multiple wounds inflicted with a
weapon not resulting in immediate death or actions
calculated to induce terror in the victim.

OFFENDER'S AND VICTIM'S RELATIONSHIP

I.  Participating Victim

Victim was accomplished or otherwise implicated in a
criminal act with the prisoner during which or as a result
of which the death occurred, e.g., crime partner, drug
dealer, etc.

II.  Prior Relationship

Victim was involved in a personal relationship with prisoner
(spouse, family member, friend, etc.) which contributed
to the motivation for the act resulting in death. If the
victim had a personal relationship but prisoner hired and/or
paid to commit the offense, see Category IV.

III.  No prior relationship

Victim had little or no relationship with prisoner, or
motivation for act resulting in death was related to the
accomplishment of another crime, e.g., death of victim
during robbery, rape, or other felony.

15.

(CCR-15 § 2403(c), Matrix of Base Terms for Second Degree Murder on or
Case 3:08-cv-02511-PJH   Document 8-3   Filed 09/03/2008   Page 21 of 73
after November 8, 1978.) (Exhibit B, p. 76.)

CCR-15 § 2407 provides Adjustments for Other Offenses:

(a) General. Effective January 1, 1979, Penal Code Section 669 was amended to permit the court to impose sentences for other crimes to be served consecutively to a life sentence (Stats. 1978, Ch. 579). Since the court has discretion to order that the sentences for more than one crime be served consecutively, the board shall consider the court's action in determining the adjustment pursuant to this section.

(b) Multiple Convictions.

(1) General. The board shall not add adjustments for convictions for which the prisoner has been pardoned or which have been reversed by an appellate court.

(2) Consecutive Life Sentences Imposed by the Court. If the court imposed consecutive life sentences the board shall determine the base crime and base term as provided in Section 2403(a). The board shall add adjustments for remaining life crimes. The adjustment for each remaining life crime shall be a period of time commensurate with the nature of the crime but no less than the period of parole ineligibility for the crime. In no case will the parole date for consecutive sentences be earlier than the parole date for the concurrent sentences.

(3) Concurrent Life Sentences Imposed by the Court. If the court imposed concurrent life sentences, the board may add an adjustment because prisoner has been convicted of more than one crime. The suggested adjustment is greater of:

(A) Time served on the nonbase life crime prior to reception on the base offense; or

(B) The following adjustment:

1. First degree murder: 13 years for a first degree murder committed on or after November 8, 1978.

2. Second degree murder: 8 years for second degree murder committed on or after November 8, 1978.

3. One-half the period of parole ineligibility for other life crimes.

(4) Consecutive Nonlife Sentences Imposed by the Court. If the court imposed consecutive nonlife sentences the Board shall not add additional adjustment for nonlife crime.

(5) Concurrent Nonlife Sentences Imposed by the Court. If the court imposed concurrent nonlife sentences, the board may add an adjustment because the prisoner has been convicted of more than one crime. The suggested adjustment is the greater of:

(A) Time served for nonlife crime prior to reception on the life offense; or

(B) One-half the determinate term imposed by the court; or

(C) One-half the term that would be established under Section 227(e) for crimes which carry a sentence of one year and one day.

16.

The record shows that the BPH did not follow its own guidelines and Matrix. Instead, the BPH based its decision to deny parole on the same factors that went into formulating the guidelines.

The BPH's guidelines recognize that there will be adjustment to be made for elements that go beyond what is necessary to convict for second degree murder. These factors do not preclude a finding of suitability. (See CCR-15 § 2411, Fixing a Parole Date.) (Exhibit B, p. 77-78.)

In Little v. Hadden, 504 F.supp. 558, 561, a federal court addressed the same type of abuse that occurred in this case:

> [I]t is unreasonable and impermissible for the Commission to base a decision to continue beyond the guidelines on the same factors that went into formulating the guidelines in the first place. No one disputes that this was a serious crime, but the factors of seriousness indicated by this record are included in the guidelines themselves. ... It is clear to the Court from the record in this case that the Commission has attempted to continue Little in custody beyond the guidelines because of its ad hoc decision regarding the seriousness of the offense, but the factors relied upon are either unsupported by the record or were already considered in formulating the guidelines. ... In short, the Commission's decision is arbitrary and capricious because it is not based on anything in the record before it. Moreover, it reflects an abuse of discretion because it attempts to continue Little's confinement beyond the guidelines without the statutory required good cause.

(See also, Lupo v. Norton, 371 F.Supp. 156 (1974).)

Petitioner's right to a presumption parole release date, Legislative intent, includes "behavioral" credits for participation with "good conduct" under California Penal Code § 2900.5 and CCR-15 § 2900. The BPH's failure to set petitioner's parole release date abrogates this whole Legislative mandate for prisoners with term-to-life sentences. Failure to set a term at the earliest possible time, initial hearing, also precludes Petitioner from participating in self-help programs located at the minimum security

17.

level part of the prison, including family visits, which are attended to keep family ties strong and to help with reentry into the family and community.

In sum, the executive's implementation of the parole system in California has turned upside down the legislative contemplation that murderers normally be found suitable for parole at their earliest eligibility and released at a time proportionate to the individual's culpability. Instead of honoring the legislative mandate to normally parole murderers, the BPH has arbitrarily established a policy of almost never permitting parole to them. Consequently, Petitioner has not been afforded federal and state constitutional due process guaranties in the course of the executive's refusal to follow their own guidelines. (See Hicks v. Oklahoma (1980) 447 U.S. 343 [arbitrary deprivation of a state statute affecting life or liberty constitutes a violation of federal due process].)

The BPH may not replace the legal standards for parole with its own personal and political ones. (See, e.g., United States v. Lee (1882) 106 U.S. 196, 220.)

For the foregoing reasons, this court should find that the BPH violated Petitioner's state and federal due process when it failed to follow its own guidelines and based its decision to deny parole on the same factors that went into formulating the guidelines in the first place. The court should order the BPH to hold a new hearing within 30 days, follow its own guidelines, stop using factor that went into formulating the guidelines as factors to deny parole, and set Petitioner's term within the guidelines set forth for second degree murderers. (See Exhibit B, § 2403(c).)

THE BOARD OF PAROLE HEARINGS' RELIANCE ON MULTIPLE VICTIMS
WHERE ONLY ONE IS KILLED AS A REASON TO DENY PAROLE FOR
FOUR-YEARS VIOLATES THE STATE AND FEDERAL DOUBLE JEOPARDY
AND PETITIONER'S DUE PROCESS BECAUSE PETITIONER HAS ALREADY
RECEIVED AND SERVED SEPARATED TERMS FOR THE MULTIPLE-COUNTS.
BY THE DOCTRINES OF RES JUDICATA AND COLLATERAL ESTOPPEL,
THE BOARD IS PROHIBITED FROM USING MULTIPLE VICTIMS AS A
REASON TO DENY PAROLE FOR MULTIPLE-YEARS.

On October 31, 1988, in the Los Angeles County Superior Court, a jury convicted Petitioner of second-degree, attempted murder, and attempted manslaughter. Petitioner was sentenced to a determinate term of 14 years and a consecutive, indeterminate term of 17 years-to-life.

On March 15, 1997, after serving his determinate sentence, Petitioner began to serve his 17 years-to-life sentence for the second degree murder. Petitioner's Minimum Eligible Parole Date ("MEPD") is set at March 15, 2007.

On April 19, 2006, pursuant to California Penal Code § 3041(a), Petitioner appeared before the Board of Parole Hearings ("BPH") and was denied parole for four years. In their decision, the BPH stated:

> This is the inmate initial hearing. The District Attorney has indicated that five years is the appropriate denial time. I will indicate in a separate decision the hearing panel finds that the prisoner has been convicted of murder as well as attempted homicide and it is not reasonable to expect parole would be granted in the next four years. Sir I will tell you we had discussions about this particular area. But Mr. Satris does indicate the obvious. You were not given the sentence of life without possibility of parole, you are attempting at this point and time to better yourself. I don't believe five years is appropriate. I think four years is the appropriate amount to get together the things that you need to get together.

(Exhibit A, HT 87.)

The California Code of Regulation Title 15 ("CCR-15") § 2407(b)(4) mandates that "If the court imposed consecutive nonlife sentences the Board shall not add an additional adjustment for the nonlife crime." CCR-15 § 2407(b)(5) states, "If the court imposes concurrent nonlife sentences, the board may add an adjustment because the prisoner has been convicted of more

19.

than one crime. The suggested adjustment is the greater of: (A) Time served for the nonlife crime prior to reception on the life offense; or (B) One-half the determinate term imposed by the court; or (C) One-half the term that would be established under Section 2271(e) for crimes which carry a sentence of one year and one day." (Exhibit B, pp. 76-77.)

The record clearly shows that the BPH abused it discretion and violated Petitioner's rights to be free from double jeopardy or a duel use of the commitment offense. By the doctrines of res judicata and collateral estoppel, the BPH is precluded from reconsidering whether the gravity of Petitioner's nonlife offenses provides a basis for denying him parole. (See, e.g., U.S. v. Schwartz, 785 F.2d 673, 681-682 (9th Cir.).)

The Double Jeopardy Clauses prohibition against prosecution for same offense limits the power of a court, or parole board, to alter sentences. (See, e.g., U.S. v. Arrellano-Rios, 799 F.2d 520, 524-25 (9th Cir. 1986) [defendant who served one-year sentence for aiding and abetting drug crimes could not have sentence increased after related weapons conviction vacated nor could case be remanded to provide government with chance to increase sentence for aiding and abetting drug crime.].)

For the forgoing reasons, the court should find that the BPH violated Petitioner's due process when it denied him parole for four years.

20.

PETITIONER WAS DENIED A FAIR AND IMPARTIAL PAROLE HEARING
WHEN THE PANEL USED OPPOSITION TO PETITIONER'S SUITABILITY FOR
PAROLE FROM THE DISTRICT ATTORNEY'S OFFICE AND VICTIM'S NEXT
OF KIN AS A REASON TO FIND PETITIONER UNSUITABLE FOR PAROLE.
THE VICTIM'S NEXT OF KIN'S FEELINGS, CONCERNS, AND OTHER
STATEMENTS WERE ALREADY CONSIDERED DURING THE SENTENCE STAGE
AND THEIR PRESENCE, ALONG WITH THE DISTRICT ATTORNEY'S OFFICE
PRESENCE, CREATES A CONTAMINATION BY EXTRANEOUS INFLUENCES
IN THE PAROLE PROCEEDINGS.

On October 31, 1988, in the Los Angeles County Superior Court, a jury convicted Petitioner of second-degree, attempted murder, and attempted manslaughter. After considering the statements from the District Attorney's office and victim's next of kin, the court sentenced Petitioner to a determinate term of 14 years and a consecutive, indeterminate term of 17 years-to-life.

On March 15, 1997, after serving his determinate sentence, Petitioner began to serve his 17 years-to-life sentence for the second degree murder. Petitioner's Minimum Eligible Parole Date ("MEPD") is set at March 15, 2007.

On April 19, 2006, pursuant to California Penal Code § 3041(a), Petitioner appeared before the Board of Parole Hearings ("BPH") and was denied parole for four years. In their decision, the BPH stated:

> ... [T]he panel notes opposition to your finding of
> suitability both from the District Attorney's office of Los
> Angeles County as well as the victim's next of kin. ... The
> district Attorney has indicated that five years is the
> appropriate denial time. I will indicate is a separate
> decision the hearing panel finds that the prisoner has been
> convicted of murder as well as attempted homicide and it
> is not reasonable to expect parole would be granted in the
> next four years. ...

(Exhibit A, HT 87.)

Petitioner has a right to a parole hearing by an impartial panel. The Board of Parole Hearings (BPH) has a the responsibility of protecting this right to ensure that the parole applicant receives a fair and impartial hearing.

21.

petitioner contends that he did not receive a fair and impartial hearing because the BPH was unfairly influenced by the District Attorney's office and victim's next of kin. The District Attorney's office and victim's next of kin will always oppose Petitioner's release.

A decision based on a few facts that will always form the basis for denying parole, amounting to a permanent and virtually automatic denial of parole in a contravention of due process, is clearly arbitrary and capricious. "The presence of a large measure of discretion in a parole system ... does not alter the fundamental due process limitation against capricious decision-making. A legislative grant of discretion does not amount to a license for arbitrary behavior. When the Parole Board bases its decision on factors that bear no rational relationship to rehabilitation or deterrence, it transgresses the legitimate bounds of its discretion." In re Fain (1983) 139 Cal.App.3d 295, 307 (quoting Block v. Potter (3rd Cir. 1980) 631 F.2d 233, 236-37).

The BPH systematically denies parole to all life prisoners by unreasonably finding that the release of almost every life prisoner would jeopardize public safety. The Board always gives a multiple year denial of parole when the District Attorney office or victim's next of kin opposes parole at the initial parole hearing. The Board almost never sets a parole date at the prisoner's initial hearing; rather, it repeatedly postpones the setting of a parole date for the overwhelming majority of prisoners, and rarely grants a life prisoner a parole date no matter how many times it considers the prisoner for release or how much time he has served. The BPH currently grants parole to a very small percentage of eligible lifers – and even more rarely to those who are from another country. (See, e.g., In re Rosenkrantz, supra, 29 Cal.4th at p. 685 [Board granted parole to murderers

22.

In sum, the BPH implementation of the parole system in California has turned upside down the legislative contemplation that murderers normally be found suitable for parole at their earliest eligibility and released at a time proportionate to the individual's culpability. Instead of honoring the legislative mandate to normally parole murderers, the executive has arbitrarily established a policy of almost never permitting parole to them, especially if the District Attorney's office or next of kin opposes parole. Consequently Petitioner has not been afforded federal and state constitutional due process guaranties in the course of the executive's refusal to grant parole to those who have opposition for parole. (See Hicks v. Oklahoma (1980) 447 U.S. 343 [arbitrary deprivation of a state statute affecting life or liberty constitutes a violation of federal due process].) The implementation of the parole law by the executive branch in a manner that disregards both the spirit and the letter of the law also arbitrarily violates the separation of powers doctrine contained in California Constitution, article III, section 3. Finally, an executive practice of parole denial that imposes greater punishment on a prisoner ex post facto violates his right to due process of law. (See, e.g., Young v. Weston (9th Cir. 1999) 176 F.3d 1196 [although law may not be ex post facto on its face, it can be ex post facto as applied]; Rogers v. Tennessee (2001) 532 U.S. 451 [149 L.Ed.2d 697, 121 S.Ct. 1693] [retrospective change in law detrimental to criminal defendant effected by other than legislative/regulatory means implicates due process].)

The contemporary and historical recidivism rate for murderers paroled in California historically is about 2%; the recidivism for other felons paroled in California has been as high as 70% - the highest in the nation. Prisoners as old as Petitioner, particularly after service of long prison

23.

prisoners who have been paroled, whether by court order or otherwise, overall
have performed admirably well on parole and demonstrate that the BPH's refusal
to grant parole have needlessly caused excessive imprisonment that not only
retarded the prisoners' continued rehabilitation and imposed gratuitous pain
and suffering on them and their loved ones at a time when the prison system
is in crisis due to over-population, but have done considerable damage to
the public fisc - all without any measurable increase to public safety and
in fact contrary to the interest in public safety.

For the forgoing reasons, Petitioner prays that the Court declare
the rights and duties of the parties; grant equitable relief, which requires
the BPH to conform their practice of holding parole hearings to the dictates
of section 3041 and all statutory, regulatory and constitutional requirements
as set forth in the decision of the courts; and all other relief necessary
to promote the ends of justice.

b. Result: _____  c. Date of decision: _____

d. Case number or citation of opinion, if known: _____

e. Issues raised: (1) _____Ineffective Assistance of counsel; Instruction errors_____

  (2) _____

  (3) _____

f. Were you represented by counsel on appeal? [X] Yes. [ ] No. If yes, state the attorney's name and address, if known:

_____

9. Did you seek review in the California Supreme Court? [X] Yes. [ ] No. If yes, give the following information:

a. Result: _Denied without comment or citation_  b. Date of decision: _November 14, 1990_

c. Case number or citation of opinion, if known: _____

d. Issues raised: (1) _____Same as above_____

  (2) _____

  (3) _____

10. If your petition makes a claim regarding your conviction, sentence, or commitment that you or your attorney did not make on appeal, explain why the claim was not made on appeal:

_____

_____

11. Administrative Review:

a. If your petition concerns conditions of confinement or other claims for which there are administrative remedies, failure to exhaust administrative remedies may result in the denial of your petition, even if it is otherwise meritorious. (See *In re Muszalski* (1975) 52 Cal. App.3d 500 [125 Cal. Rptr. 286].) Explain what administrative review you sought or explain why you did not seek such review:

_____There are no administrative remedies available for denial of parole._____

_____

_____

_____

_____

b. Did you seek the highest level of administrative review available? [ ] Yes. [ ] No.
Attach documents that show you have exhausted your administrative remedies.

MC-275 (Rev. January 1, 1999)    **PETITION FOR WRIT OF HABEAS CORPUS**    Page five of six

13. a. (1)  Name of court: __Los Angeles Superior Court__

    (2)  Nature of proceeding (for example, habeas corpus petition): __Habeas corpus petition__

    (3)  Issues raised:  (a)  __Trail issues__

              (b)  _____

    (4)  Result (Attach order or explain why unavailable): __Denied, order lost in transfer__

    (5)  Date of decision: __August 14, 1992__

  b. (1)  Name of court: __Court of Appeal, 2nd District__

    (2)  Nature of proceeding: __Habeas corpus petition__

    (3)  Issues raised:  (a)  __Trial issues__

              (b)  _____

    (4)  Result (Attach order or explain why unavailable): __Denied, Order lost in transfer with other document__

    (5)  Date of decision: __April 27, 1993__

  c.  For additional prior petitions, applications, or motions, provide the same information on a separate page.

14. If any of the courts listed in number 13 held a hearing, state name of court, date of hearing, nature of hearing, and result:

__California Supreme Court, habeas corpus denied June 23, 1993; United States District Cour__

__Central District of California, Habeas corpus denied August 2003__

15. Explain any delay in the discovery of the claimed grounds for relief and in raising the claims in this petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.)

_____

_____

_____

16. Are you presently represented by counsel? ☐ Yes. ☒ No. If yes, state the attorney's name and address, if known:

_____

_____

17. Do you have any petition, appeal, or other matter pending in any court? ☐ Yes. ☒ No. If yes, explain:

_____

_____

18. If this petition might lawfully have been made to a lower court, state the circumstances justifying an application to this court:

_____

_____

I, the undersigned, say: I am the petitioner in this action. I declare under penalty of perjury under the laws of the State of California that the foregoing allegations and statements are true and correct, except as to matters that are stated on my information and belief, and as to those matters, I believe them to be true.

Date: 5-7-07        ▶ *Alfonso Carvayan*

                                  (SIGNATURE OF PETITIONER)

MC-275 (Rev. January 1, 1999)          PETITION FOR WRIT OF HABEAS CORPUS          Page six of six

E X H I B I T    A

INITIAL PAROLE CONSIDERATION HEARING STATE OF CALIFORNIA BOARD OF PAROLE HEARINGS
SAN QUENTIN STATE PRISON, APRIL 19, 2006

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Life )
Term Parole Consideration )
Hearing of: )     CDC Number E-30803
)
ALFONSO CARRANZA )
)
_____ )

**INMATE COPY**

SAN QUENTIN STATE PRISON

SAN QUENTIN, CALIFORNIA

APRIL 19, 2006

PANEL PRESENT:

Mr. Stephen Lee, Presiding Commissioner
Ms. Joan Thompson, Deputy Commissioner

OTHERS PRESENT:
Mr. Alfonso Carranza, Inmate
Mr. Michael Satris, Attorney for Inmate
Ms. Alexis Delagarza, Deputy District Attorney(vid)
Mr. Robert Butman, Deputy District Attorney(vid)
Mr. Timothy Smith, Deputy District Attorney(vid)
Mr. David Pearson, Deputy District Attorney(vid)
Mr. Marsh Goldstein, Deputy District Attorney(vid)
Mr. Hector Munoz, (indiscernible)
Ms. Cecelia O'Reilly, sister of victim
Mr. Luis Munoz, brother of victim
Mr. Anderson, observer

Correctional Officers Unidentified

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____ No    See Review of Hearing
_____ Yes   Transcript Memorandum

Jennyfer Osecheck, Peters Shorthand Reporting

INDEX

|  | PAGE |
|---|---|
| Proceedings | 1 |
| Case Factors | 15 |
| Pre Conviction Factors | 13 |
| Post Conviction Factors | 28 |
| Parole Plans | 42 |
| Closing Statements | 56 |
| Recess | 80 |
| Decision | 81 |
| Transcriber Certification | 91 |

--oOo--

1                    P R O C E E D I N G S

2          **PRESIDING COMMISSIONER LEE:**  Ms. Delagarza

3    can you hear us?

4          **DEPUTY DISTRICT ATTORNEY DELAGARZA:**  Yes I

5    can, can you hear me?

6          **PRESIDING COMMISSIONER LEE:**  Yes very good

7    thank you very much.  All right, Mr. Satris I

8    believe we are ready to proceed, are you ready?

9          **ATTORNEY SATRIS:**  We are ready to proceed.

10         **PRESIDING COMMISSIONER LEE:**  Very good.  At

11   this time, just hold on one second here.  I will

12   indicate that this is the Initial Parole

13   Consideration Hearing for Alfonso Carranza, C-A-

14   R-R-A-N-Z-A, CDC number E-30803.  We are

15   currently located at San Quentin State Prison.

16   The date of the hearing is April 19, 2006.

17   Inmates life term began on March 15, 1997 out of

18   the county of Los Angeles in case number

19   LA539854.  The offense was murder in the second

20   degree pursuant to Penal Code Section 187.  The

21   term was set at 31 years to life.  Minimum

22   eligibility for parole is March 15, 2007.  At

23   this time we will make our appearances. My name

24   is Stephen Lee, L-E-E, Commissioner presiding.

25   We will go to my right to the Deputy

26   Commissioner.

27         **DEPUTY COMMISSIONER THOMPSON:**  My name is

1    Joan Thompson, T-H-O-M-P-S-O-N, and I am a

2    Deputy Commissioner with the Board of Parole

3    Hearings.

4        PRESIDING COMMISSIONER LEE:  Ms. Delagarza?

5        DEPUTY DISTRICT ATTORNEY DELAGARZA:  Alexis

6    Delagarza, D-E-L-A-G-A-R-Z-A, Deputy District

7    Attorney Los Angeles County and with me in the

8    room are some other Deputy District Attorney's

9    who are observing this particular lifer hearing.

10   I will have them identify themselves.

11       DEPUTY DISTRICT ATTORNEY BUTMAN:  Robert

12   Butman, Deputy District Attorney, B-U-T-M-A-N.

13       DEPUTY DISTRICT ATTORNEY SMITH:  Timothy

14   Smith, S-M-I-T-H, Deputy District Attorney.

15       DEPUTY DISTRICT ATTORNEY PEARSON:  David

16   Pearson, Deputy District Attorney that is P-E-A-

17   R-S-O-N.

18       DEPUTY DISTRICT ATTORNEY GOLDSTEIN:  Marsh

19   Goldstein, G-O-L-D-S-T-E-I-N, Deputy District

20   Attorney.

21       PRESIDING COMMISSIONER LEE:  Thank you.

22   Ms. Delagarza is appearing by video conferencing

23   and for all parties we will treat her as though

24   she is in the hearing room with us.  Sir?

25       INMATE CARRANZA:  My name is Alfonso

26   Carranza my number is E-30803.

27       ATTORNEY SATRIS:  And I am Michael Satris,



1  S-A-T-R-I-S and I am the attorney for Mr.

2  Carranza.

3      MR. MUNOZ:  My name is Hector Munoz and I

4  am (indiscernible).

5      MS. O'REILLY:  I am Cecilia O'Reilly.

6      PRESIDING COMMISSIONER LEE:  And your

7  relationship to the victim?

8      MS. O'REILLY:  I am the sister of Alfonso

9  (indiscernible) Munoz the victim.

10     MR. MUNOZ:  My name is Luis Munoz I am the

11  brother of (indiscernible), my L-U-I-S-M-U-N-O-

12  Z.  And my other brother Pedro Munoz.

13     MR. ANDERSON:  Henry Anderson, from the

14  board of parole hearings, A-N-D-E-R-S-O-N.

15     PRESIDING COMMISSIONER LEE:  Observer?

16     MR. ANDERSON:  Observer.

17     PRESIDING COMMISSIONER LEE:  And we have

18  officers here for security purposes as well.  At

19  this time I will indicate that the inmate has

20  certain rights.  Sir you have what is called ADA

21  rights.  It appears that there is no documented

22  (indiscernible) so I will give you a document.

23  Sir I understand that you speak English, is the

24  correct?

25     INMATE CARRANZA:  Yes I do.

26     PRESIDING COMMISSIONER LEE:  All right do

27  you need any assistance in speaking or

1  understanding the English language?

2      INMATE CARRANZA:  No sir.

3      PRESIDING COMMISSIONER LEE:  All right.

4  At this time I a am going to give you a document

5  (indiscernible) right now an ADA document.  It

6  is a document that basically states the rights

7  you have, thank you sir.  Could you read that

8  out loud to us please?

9      ATTORNEY SATRIS:  Let me just ask there

10  wont be any problems with the microphones

11  picking up the voices, like yourself, with the

12  way the mikes are positioned is it a pretty good

13  setup?  Because a lot of time there is

14  indiscernibles that end up in the reporters

15  transcripts.

16      PRESIDING COMMISSIONER LEE:  Unfortunately

17  the board has been particular issue and I will

18  have to leave that to the Deputy Commissioner

19  Thompson.

20      DEPUTY COMMISSIONER THOMPSON:  They were

21  all tested before we began.  Everything tested

22  as recording and appropriate.  Unfortunately I

23  am not an electronics skilled person but the

24  staff that did set them up is and vouches that

25  the test was positive for proceeding.

26      ATTORNEY SATRIS:  This room does have some

27  more background noise than some of the others.

1       PRESIDING COMMISSIONER LEE:  Correct but at

2  this point and time what I can when we switch

3  the tape over I will ask the Deputy Commissioner

4  to check it, to see how well it picked up.  So

5  at this point and time will you read the ADA

6  statement?

7  INMATE CARRANZA:  Ok, The Americans with

8          Disabilities Act, ADA, is a law to help

9          people with disabilities.  Disabilities

10          are a problem that make it harder for

11          some people to see, hear, read, talk,

12          walk, learn, think, work or take care

13          of themselves than it is for others.

14          Nobody can be kept out of public places

15          or activities because of a disability.

16          If you have a disability, you have a

17          right to ask for help to get ready for

18          your BPT hearing, get to the hearing,

19          talk, read forms and papers, and

20          understand the hearing process.  BPT

21          will look at what you asked for to make

22          sure that you have a disability that is

23          covered by the ADA, and that you have

24          asked for the right kind of help.  If

25          you do not get help or if you don't

26          think you got the kind of help you

27          need, ask for a BPT 1074 Grievance

1       Form.  You can also get help to fill it

2       out.

3           PRESIDING COMMISSIONER LEE:  All right

4   thank you.  Sir did you understand what you just

5   read?

6           INMATE CARRANZA:  Yes I do.

7           PRESIDING COMMISSIONER LEE:  All right, did

8   you have any problems getting here today?

9           INMATE CARRANZA:  No.

10.         PRESIDING COMMISSIONER LEE:  All right do

11  you have any problems with your eyesight?

12          INMATE CARRANZA:  A little bit, I wear

13  glasses.

14          PRESIDING COMMISSIONER LEE:  Ok, that was

15  my second question.  With your glasses do you

16  have any problems?

17          INMATE CARRANZA:  No.

18          PRESIDING COMMISSIONER LEE:  All right do

19  you need them to read or merely to see far?

20          INMATE CARRANZA:  Just to read.

21          PRESIDING COMMISSIONER LEE:  Ok, did you

22  have the glasses when you went over your Central

23  File?

24          INMATE CARRANZA:  Yes I did.

25          PRESIDING COMMISSIONER LEE:  Ok at this

26  point and time have you ever been involved in

27  either the Triple CMS or EOP programs?

1          INMATE CARRANZA:  No.

2          PRESIDING COMMISSIONER LEE:  Did you take

3    any type of psychotropic medication?

4          INMATE CARRANZA:  No sir.

5          PRESIDING COMMISSIONER LEE:  Have you ever

6    been in any special education courses?

7          INMATE CARRANZA:  No.

8          PRESIDING COMMISSIONER LEE:  Do you suffer

9    from any disability to your knowledge that would

10   prevent you from participating in today's

11   hearing?

12         INMATE CARRANZA:  Say it again?

13         PRESIDING COMMISSIONER LEE:  Do you suffer

14   from any disability that would prevent you from

15   participating fully in today's hearing?

16         INMATE CARRANZA:  No sir.

17         PRESIDING COMMISSIONER LEE:  Ok, Mr. Satris

18   do you know of any ADA issues that we need to

19   address?

20         ATTORNEY SATRIS:  No we are prepared to

21   proceed on that basis.

22         PRESIDING COMMISSIONER LEE:  This hearing

23   is this hearing is being conducted, pursuant to

24   Penal Code Sections number 3041 and 3042 as well

25   as the rules and regulations of the Board of

26   Parole Hearings.  Governing parole consideration

27   hearings for life inmates.  The purpose of

1    today's hearing is to consider your suitability

2    for parole.  In doing so we will consider the

3    nature, number of crimes you were committed for,

4    prior criminal and social history, and your

5    behavior and programming since your commitment.

6    We have had an opportunity to review your

7    Central File, and your prior transcript and you

8    will be given an opportunity to correct or to

9    clarify on the record.  We will consider your

10   progress since your commitment, your counselors

11   report, your psychological report, and any

12   changes of parole plans should be brought to our

13   attention.  I will indicate to counsel and I

14   apologize to both counsels that our checklist is

15   inadequate.  The problem being is that there has

16   been some issues in regards to getting documents

17   out.  Does everyone have the latest board report

18   as well as the psychological report?

19        ATTORNEY SATRIS:  I do.

20        PRESIDING COMMISSIONER LEE:  Ms. Delagarza?

21        DEPUTY DISTRICT ATTORNEY DELAGARZA:  I do

22   thank you.

23        PRESIDING COMMISSIONER LEE:  All right very

24   good.  At this point and time I will indicate

25   that we expect at this time to you to be totally

26   honest with us today.  This is your initial

27   hearing.  What that means is that if you are

1    unfortunate enough to not get a date today, this
2    will be the foundation for all of your future
3    hearings.  If you mistake something or tell a
4    lie at this hearing that will be transcribed it
5    will be on the record.  If you do not get a date
6    today I will indicate to you any false statement
7    you make will have an adverse effect on your
8    ability to get a date in the future.  However
9    you are not required to discuss the facts of the
10   case, and that is your right.  Nothing that
11   happens here today will change the findings of
12   the court, we are not here to retry your case.
13   Our purpose is solely to determine your
14   suitability for parole.  This hearing will be
15   conducted in three phases.  I will handle your
16   social history as well as the facts of the
17   crime.  I will then turn it over to the Deputy
18   Commissioner who will then discuss with you your
19   programming while incarcerated as well as your
20   psychological report.  Then we will discuss your
21   future plans including any letters of support as
22   well as letter of opposition.  There are notices
23   that are sent out pursuant to 3042, which are
24   sent out to various organizations and
25   individuals who have special interest in your
26   case.  We do have a response.  We have a
27   response not only by the victim's next of kin

1   but also from the District Attorney's office of
2   Los Angeles County.  District Attorney has an
3   opportunity to ask you questions and make a
4   statement at the end of this hearing.  The
5   commissioners, the Deputy District Attorney and
6   your attorney will be given opportunities to ask
7   you questions, the questions however from the
8   District Attorney will be addressed through the
9   chair and your questions will be directed toward
10  the panel.  Before we recess for deliberations
11  the Deputy District Attorney, your attorney and
12  you will be given an opportunity to make a final
13  statement, your statement will be limited to as
14  to why you feel you are suitable for parole.  We
15  will recess, clear the room and deliberate.
16  Once we have completed our deliberations we will
17  resume the hearing and announce our decision.
18  Pursuant to California code of regulations it
19  states that regardless of time served a life
20  inmate shall be found unsuitable and denied
21  parole if in the judgment of the panel the
22  inmate poses an unreasonable risk to society if
23  released from prison.  You have certain rights.
24  These rights include a timely notice of this
25  hearing, the right to review your Central File,
26  and the right to present relevant documents.  At
27  this time counsel are there any documents you

1  wish to submit?

2      ATTORNEY SATRIS:  No.

3      PRESIDING COMMISSIONER LEE:  And to the

4  best of your knowledge has your client received

5  his notice in regards to this hearing and review

6  of his Central File?

7      ATTORNEY SATRIS:  Yes, except for certain

8  notices.  We did not receive notice that the

9  District Attorney would be appearing or that

10  there would be an appearance by the kin of the

11  victims.  And we did not receive timely notice

12  of the District Attorney's submission.  It was

13  received by my office on April 13, 2006, I had

14  not been in to see Mr. Carranza since then.  He

15  never received a copy of the submission.  I had

16  seen Mr. Carranza ten days before the hearing to

17  make sure that we were fully informed.  So I had

18  briefly had a little time before this hearing to

19  discuss the unnoticed matters.  We are prepared

20  to proceed but I did want to make that part of

21  the record.

22      PRESIDING COMMISSIONER LEE:  I will

23  indicate to counsel that, that is a concern and

24  we have attempted to address that.  Often times

25  the District Attorney sends the items out

26  properly but based upon our lack of staff we

27  don't get it out to you, and take my apologies.

1    **ATTORNEY SATRIS:** I think this time it was

2    sent timely from the dates I see on this paper

3    but it didn't get to me on time. And to this

4    moment it has not gotten to Mr. Carranza.

5    **PRESIDING COMMISSIONER LEE:** However you

6    are ready to proceed?

7    **ATTORNEY SATRIS:** We are.

8    **PRESIDING COMMISSIONER LEE:** All right. I

9    am not exactly sure what that noise was but we

10   will continue on unless they tell us there is a

11   fire. All right you have an additional right

12   sir to be heard by an impartial panel. Do you

13   have any objections to the panel?

14   **INMATE CARRANZA:** No.

15   **PRESIDING COMMISSIONER LEE:** You will

16   receive a copy of our written tentative decision

17   today, that decision becomes effective within

18   120 days. A copy of the decision and a copy of

19   the transcript will be sent to you. You are not

20   required to admit your offense. But the panel

21   does accept as true the findings of the court.

22   We do not have an appellate right be we do

23   however have a grievance procedure pursuant to

24   administrative decisions 0401. As I have

25   indicated to you I do not have an exhibit to

26   submit to counsels. If there becomes an issues

27   in regards to documents please let me know and

1   we will discuss that at that time.  At this time

2   sir would you raise your right hand?  Do you

3   solemnly swear or affirm to tell the truth, the

4   whole truth and nothing but the truth?

5.      **INMATE CARRANZA:**  Yes I do.

6      **PRESIDING COMMISSIONER LEE:**  Is your client

7   going to discuss with us the facts of the case?

8      **ATTORNEY SATRIS:**  He is going to exercise

9   the right you described about not discussing the

10   facts.  But he is prepared to otherwise speak to

11   the board on matters related to parole.

12      **PRESIDING COMMISSIONER LEE:**  Ok, very good.

13      **ATTORNEY SATRIS:**  His position and our

14   position is that we understand the board does

15   accept the court findings and is not here to

16   retry the case and we similarly accept the

17   findings and are not here to retry the case.

18      **PRESIDING COMMISSIONER LEE:**  Very good.  Ok

19   we will begin.  The inmate was born on November

20   18, 1959 in and I am not exactly sure how we

21   pronounce this, Zacatecas Mexico.  To the union

22   of Maria and Jose Carranza.  Carranza's parents

23   have been married for 50 years.  The inmate

24   completed elementary school in Mexico and moved

25   to Palatine Illinois at the age of 15 years old.

26   The inmate did not finish his education in the

27   United States but gained employment doing

1    landscaping and day laborer. On February 11,

2    1977 the inmate married Theresa Silva in

3    Palatine Illinois. The inmate has been married

4    to Theresa for 29 years. From this union then

5    have one child Linda who is age 27. She is

6    currently a registered nurse in Illinois. The

7    inmate also has another child, Eric, who he

8    fathered with Lupe Vargas. Eric is currently

9    working as a Mercedes mechanic in Fremont

10   California. In 1979 the inmate and his family

11   moved from Illinois to California where the

12   inmate obtained employment in a paper

13   manufacturing company making envelopes and

14   writing tablets. The inmate began to use

15   cocaine heavily in California. And began to

16   sell cocaine apparently to support his habit.

17   As far as previous contacts the inmate as far as

18   we know has no juvenile contacts. Adult

19   contacts he had a drunk driving that apparently

20   was reduced, well I take that back. This was in

21   1980. He also has, was arrested I should say

22   for a drunk driving in the following month in

23   April. The inmate was ordered to attend a drug

24   and alcohol program at that time. In 1984 the

25   inmate was in possession of a controlled

26   substance. Sir what were you arrested for in

27   1984, do you remember?

1      INMATE CARRANZA:  Yes I was arrested in

2  possession of a weapon.  A gun and cocaine.

3      PRESIDING COMMISSIONER LEE:  All right,

4  cocaine?

5      INMATE CARRANZA:  Yes.

6      PRESIDING COMMISSIONER LEE:  Ok, why were

7  you carrying a gun and having cocaine in 1984?

8      INMATE CARRANZA:  I was living that

9  lifestyle.  I used to carry a gun.

10      PRESIDING COMMISSIONER LEE:  Why did you

11  carry a gun?  Because of your drugs selling?

12      INMATE CARRANZA:  Yes.

13      PRESIDING COMMISSIONER LEE:  All right.

14  Apparently the inmate also has a federal

15  conviction.  What is your federal conviction

16  for?

17      INMATE CARRANZA:  They arrested me with

18  cocaine.

19      PRESIDING COMMISSIONER LEE:  This was in

20  1987?

21      INMATE CARRANZA:  Yes and they gave me six

22  years in Federal Prison.

23      PRESIDING COMMISSIONER LEE:  All right.

24  And then we have the current matter.  On

25  November 30, 1985 at approximately 1:33 a.m. the

26  victim Raul Munoz and the inmate got into an

27  argument over a quarter that had been placed on

1    a pool table by the inmate who was to play the

2    next game of pool. According to the victim the

3    quarter had fallen off the pool table and he

4    attempted to tell the inmate that the quarter

5    had fallen off.  After trying to tell him two or

6    three times the inmate appeared to be ignoring

7    him, he had nothing to say.  After a few moments

8    the inmate faced the victim and stated in

9    Spanish do you want me to kick your ass.  At

10   this time the victim Raul stood up and stated

11   anytime you want.  After they pushed and shoved

12   one another a couple of times the victim stated

13   if we are going to fight let's do it.  Inmate

14   suddenly backed down and resumed, got back into

15   some type of conversation.  The victim seeing

16   that he was outnumbered left the bar and went

17   and got his brothers, victim Juan and victim

18   Pedro.  When he returned to the bar he asked his

19   two brothers to wait outside while he was

20   inside, to see what the inmate was up to.  Once

21   inside the victim confronted the inmate however

22   things calmed down and there was no actual

23   physical confrontation.  While things were

24   coming down one or calming down I should say,

25   the victim's friends excuse me, the inmates

26   friend attempted to hit victim Raul but he was

27   grabbed by victim Pedro.  And victim Pedro



1  prevented him from doing so.  At this time the
2  owner of the bar told the suspects and the
3  victims he didn't want any fighting inside the
4  bar and asked them to calm down.  After a short
5  conversation the victim and the defendant
6  apparently shook hands and it appeared that
7  there was no more altercation.  Consequently the
8  victim decided to leave the restaurant and go
9  home.  As he was about to step out and leave the
10  bar one of the inmate's friends told him he
11  wanted to talk to him outside.  Feeling there
12  was going to be a possible fight the victim took
13  off his jacket.  Instead of having a physical
14  altercation, strike that.  Apparently there was
15  some discussion and while this was being said
16  the door of the bar opened and the inmate
17  stepped out and pointed a handgun directly at
18  the victim.  The victim was about ten to twelve
19  inches from the inmate when the inmate fired one
20  round striking him in the neck.  After shooting
21  the gun the victim began to run, he was then
22  shot in his leg.  The victim Juan Munoz appeared
23  to be frozen in terror and the inmate merely
24  pointed the gun at him and shot him once.
25  Victim Munoz said that his brother was a
26  distance of approximately five feet away from
27  him when he was shot.  When this happened victim

1    Munoz said he ran towards the sidewalk area to
2    get away from the inmate, in doing so he heard
3    two more shots fired at him.  None of these
4    rounds apparently struck him.  He then saw the
5    inmate and one of his friends enter some type of
6    vehicle and leave the location.  At this point
7    and time the witness indicated he noted his
8    brother Juan lying on the ground in the parking
9    lot.  And later his cousin Sanchez came to help.
10   At the hospital the victim was pronounced dead.
11   At this point and time before we go any further
12   I have stated on the record the inmates social
13   history as well as his priors and the facts of
14   the case.  At this point and time sir this is a
15   opportunity to make any corrections.  Is there
16   anything that I have indicated for which you
17   feel is inaccurate or need explanation?
18        **ATTORNEY SATRIS:**  Well let me speak to that
19   at least in terms of the offense.
20        **PRESIDING COMMISSIONER LEE:**  Let me
21   (indiscernible) the question that I just did,
22   all right.  At first in regards to the social
23   history and the priors is there anything the
24   inmate wishes to clarify or respond to at this
25   time?
26        **INMATE CARRANZA:**  No sir.
27        **ATTORNEY SATRIS:**  Let me just say on that

1  then.  I think if might be useful to elaborate

2  on that a little bit.  On the background in

3  terms of your wife and so forth.  You know you

4  know her from all the way back in Mexico.

5      INMATE CARRANZA:  Yah.

6      ATTORNEY SATRIS:  Could you just tell the

7  board a little bit about that?

8      INMATE CARRANZA:  About my wife?

9      ATTORNEY SATRIS:  Yes meeting her, how you

10  know her and the family and so forth?

11      INMATE CARRANZA:  I knew my wife since we

12  were in Mexico in Zacatecas.  We were little on

13  the ranch.  You know her parents and my parents

14  knew each other.  They kind of grew up together

15  too.  Then we came to Chicago Illinois and I

16  came across her again and we started dating and

17  we got married.  I have been with my wife for 29

18  years.

19      PRESIDING COMMISSIONER LEE:  And apparently

20  she still supports you?

21      INMATE CARRANZA:  Yes.

22      PRESIDING COMMISSIONER LEE:  All right,

23  where is she living, what city?

24      INMATE CARRANZA:  She lives in Round Lake

25  with my daughter.

26      PRESIDING COMMISSIONER LEE:  Anything else

27  counsel?

1       ATTORNEY SATRIS:  Yes just about you are

2   the eldest of eight is that right?

3       INMATE CARRANZA:  Yes.

4       ATTORNEY SATRIS:  Could you just briefly

5   talk about your family?

6       INMATE CARRANZA:  Ok, my father and my

7   mother Jose Carranza and Maria (indiscernible) I

8   am the oldest of eight children.  We grew up on

9   Mexico, then we came to the United States.  And

10  they went to school and they did something with

11  their lives and I didn't, I took the wrong path.

12      PRESIDING COMMISSIONER LEE:  We have quite

13  a few letters and we will go through them

14  shortly.  Is there anything else you would like

15  to tell us about your period of time while you

16  were growing up anything that you would want us

17  to know?

18      INMATE CARRANZA:  Well --

19      PRESIDING COMMISSIONER LEE:  Let me ask you

20  this question straight out.  Why did you get

21  involved in drugs?

22      INMATE CARRANZA:  I don't know.  It is not

23  like I planned to get involved in drugs.  You

24  know I was into going to bars with my uncles and

25  cousins and you know I was introduced to drugs.

26  And I got hooked on drugs.

27      PRESIDING COMMISSIONER LEE:  Primarily



1 cocaine?

2     **INMATE CARRANZA:** Yes (indiscernible).

3     **PRESIDING COMMISSIONER LEE:** And alcohol?

4     **INMATE CARRANZA:** Yes.

5     **PRESIDING COMMISSIONER LEE:** All right, Mr.

6 Satris anything else?

7     **ATTORNEY SATRIS:** No I think it can wait

8 until the letters they will cover it.

9     **PRESIDING COMMISSIONER LEE:** At this point

10 and time I will go to the next aspect and that

11 is that the inmate has elected not to discuss

12 the facts of the case so I will read the

13 prisoners version from the April 2006 board

14 report. On the evening of November 30, 1985 he

15 went to the La Casa Blanca bar. I started to

16 play pool, drink beer, and snort cocaine. When

17 I got into an argument with Raul Munoz instead

18 of trying to calm the situation down I responded

19 at his level. In my macho mentality I thought

20 it was considered week to back down from

21 violence. After the heated argument Mr. Munoz

22 left the bar and I stayed to continue to play

23 pool. Just before the bar closed I went outside

24 and saw Mr. Munoz and two men coming at me. Mr.

25 Munoz was cursing at me and I reached over and I

26 was quick to shoot--

27     **ATTORNEY SATRIS:** And I overreacted.

1    PRESIDING COMMISSIONER LEE: And I

2    overreacted, excuse me. I overreacted and was

3    quick to shoot them. After shooting them I got

4    into my car and drove away. When I sobered up I

5    realized what I had done, and the seriousness of

6    my actions and fearing punishment I did not turn

7    myself in. Back then I never thought about how

8    destructive my lifestyle was, I was living a

9    life that was out of control. I refused to take

10   responsibility for myself and for those I hurt

11   around me. I put my family through much pain

12   and suffering. At this point and time I will

13   stop the rest of the information is not related

14   to the facts of the case. At this point and

15   time sir I can ask you, I am not asking you in

16   regards to the facts of the case, but you have

17   been incarceration for approximately 20 years

18   have you learned anything these last 20 years?

19      INMATE CARRANZA: Yes I learned first of

20   all I learned English as a second language. And

21   I got my GED equivalency. I got training as a

22   peer health educator. And I work with Center

23   force educating people, inmates upon their

24   arrival to the institution. And I talk to them

25   about the risk of HIV, AIDS, hepatitis,

26   especially hepatitis C., and STD, Sexually

27   Transmitted Diseases. And you know I have been

1    working for the last four years for them.

2        **ATTORNEY SATRIS:**  I think maybe if I may

3    to, I think the question is a little bit also

4    directed at what have you learned about yourself

5    and has that effected the attitude towards your

6    criminal actions and the offense?

7        **INMATE CARRANZA:**  Thank you.  Well I came

8    to realize upon my arrest, that they didn't

9    arrest me they rescued me from my life of self-

10   destruction and causing pain and suffering to

11   other people.

12       **ATTORNEY SATRIS:**  And particularly your

13   attitudes about, about the crime that has

14   brought you here to prison life?

15       **INMATE CARRANZA:**  I really apologize for

16   what I did.  I wish I can go back and change

17   things but that is impossible.  I wish this

18   never would have happened.  I am totally sorry

19   and I take full responsibility for the pain and

20   suffering I caused the victims and their

21   families.  And I would like to ask them for

22   their forgiveness.  I am very sorry for what I

23   did to them.

24       **PRESIDING COMMISSIONER LEE:**  Ok, let me ask

25   you have you been involved in any victims or

26   groups here at San Quentin?

27       **INMATE CARRANZA:**  No not yet, I am just

1  involved with AA.

2      PRESIDING COMMISSIONER LEE:  One expects

3  that people change over 20 years, have you

4  changed sir?

5      INMATE CARRANZA:  I feel and I know I am a

6  totally different person.  I am 46 years old and

7  I am a totally different person.

8      PRESIDING COMMISSIONER LEE:  How are you

9  totally different?

10     INMATE CARRANZA:  Because I am not the same

11 person I was back then.  Because I grow up,

12 mature as a person.  I am an older person.  I

13 became to know god in here.

14     ATTORNEY SATRIS:  And have your values

15 changed?

16     INMATE CARRANZA:  (indiscernible).

17     ATTORNEY SATRIS:  Could you explain to the

18 board in those regards?

19     INMATE CARRANZA:  Well back then I didn't

20 care you know the lifestyle I was living.  Now

21 I, I think totally different.  I care for other

22 people I care for my family, my kids.  And I try

23 to do good to people.

24     PRESIDING COMMISSIONER LEE:  All right.  I

25 am not going to discuss with you NA or AA at

26 this time because the Deputy Commissioner will

27 discuss those with you shortly.  However I will

1   in fact indicate--

2       DEPUTY DISTRICT ATTORNEY DELAGARZA:

3   Commissioner I can't hear you.

4       PRESIDING COMMISSIONER LEE:  All right -

5       DEPUTY DISTRICT ATTORNEY DELAGARZA:  I am

6   sorry I can't hear you.

7       PRESIDING COMMISSIONER LEE:  That's all

8   right.  I will speak up.  I just basically

9   indicated that I will not discuss AA and NA with

10  the inmate since the Deputy Commissioner will

11  discuss that with him shortly.  Is that better?

12  Can you hear me?

13      DEPUTY DISTRICT ATTORNEY DELAGARZA:  That

14  is fine thank you.

15      PRESIDING COMMISSIONER LEE:  The phone was

16  in the way.  I will indicate to you sir if you

17  are released at this point and time what will

18  keep you from going back to that lifestyle you

19  indicated earlier?

20      INMATE CARRANZA:  I will seek some kind of

21  support our there.  AA or NA and I have the

22  support of my family and I will never fail them

23  anymore (sic).

24      PRESIDING COMMISSIONER LEE:  You think that

25  would be sufficient?

26      INMATE CARRANZA:  I do.

27      ATTORNEY SATRIS:  And your church is that

1    important also?

2         INMATE CARRANZA:  Yes.

3         PRESIDING COMMISSIONER LEE:  You say your

4    church is there a particular church outside that

5    you are associating with right now?

6         INMATE CARRANZA:  Yes.

7         PRESIDING COMMISSIONER LEE:  Which church

8    is that?

9         INMATE CARRANZA:  Jubilee Christian Center

10   in San Jose.

11        PRESIDING COMMISSIONER LEE:  Ok all right

12   that is a very large church.

13        INMATE CARRANZA:  Yes it is.

14        PRESIDING COMMISSIONER LEE:  All right is

15   there a prison ministry or do you happen to know

16   someone there?

17        INMATE CARRANZA:  Yes my son goes to that

18   church and his pastor visits me from time to

19   time.

20        PRESIDING COMMISSIONER LEE:  Ok, when you

21   say his pastor you are not talking about the

22   senior pastor you are talking about the prison

23   ministry pastor?

24        INMATE CARRANZA:  No I am talking about the

25   Jubilee Christian Center, the pastor for the

26   Spanish ministry.  The Spanish ministry, they

27   have the English ministry (indiscernible).

1    PRESIDING COMMISSIONER LEE:  All right.

2    INMATE CARRANZA:  And we also have

3    volunteers who come over here and talk to us

4    about Jesus and the bible.  And I have support

5    from that to if I get released I have a place to

6    go.

7    PRESIDING COMMISSIONER LEE:  Now sir you

8    indicated that there was a change in your life

9    apparently you now know god better than you did

10   before.  When did this occur?

11   INMATE CARRANZA:  Like in a few months

12   after I got arrested.

13   PRESIDING COMMISSIONER LEE:  Back in 1985?

14   INMATE CARRANZA:  No, I got arrested in

15   1987.

16   PRESIDING COMMISSIONER LEE:  So somewhere

17   around 1988?

18   INMATE CARRANZA:  Yah somewhere around that

19   time.

20   PRESIDING COMMISSIONER LEE:  All right I

21   have no further questions at this time.  I will

22   turn it over to the Deputy Commissioner, the

23   Deputy Commissioner will discuss with you your

24   programming as well as your psychological

25   report.

26   DEPUTY COMMISSIONER THOMPSON:  Ok, thank

27   you.  You arrived in California in the

1   Correctional system in 1989. You had been I
2   believe in Minnesota.
3       INMATE CARRANZA: Midland Michigan.
4       DEPUTY COMMISSIONER THOMPSON: Michigan
5   pardon me. You finished some term there then
6   came, you moved among various institutions for
7   the next, then you were reduced in custody
8   level. You were reduced in classification
9   score. You apparently at this time have a score
10  of zero classification or did they do the
11  minimum for lifers?
12      INMATE CARRANZA: Yah they did a minimum
13  for lifers, they gave us the 19 points.
14      DEPUTY COMMISSIONER THOMPSON: But up till
15  then you had a classification score of zero.
16      INMATE CARRANZA: I had a minus.
17      DEPUTY COMMISSIONER THOMPSON: At this time
18  disciplinary you have only one and that is a
19  counseling chrono that you received in December
20  of 2000 for being out of bounds. Is that
21  correct?
22      INMATE CARRANZA: Yes.
23      DEPUTY COMMISSIONER THOMPSON: And there
24  has been none subsequent to that. Academically
25  you did achieve your GED. When was that? What
26  year?
27      INMATE CARRANZA: It was like in 1994 or

1  1995.

2  DEPUTY COMMISSIONER THOMPSON:  1994 or 1995

3  ok.

4  ATTORNEY SATRIS:  Is it an actual GED?

5  INMATE CARRANZA:  No an equivalent.

6  DEPUTY COMMISSIONER THOMPSON:  It is an

7  equivalence certificate.  But it was achieved in

8  1994 or 1995.

9  INMATE CARRANZA:  It happened in Corcoran,

10  late 1994.

11  DEPUTY COMMISSIONER THOMPSON:  Late 1994.

12  And vocationally I didn't see any particular

13  training.  But you do have some certificates of

14  completion.  One is in I believe contagious

15  disease and another is in general six hours of

16  advanced disease training and then basic

17  infectious disease training.  Is that all you

18  have?

19  INMATE CARRANZA: Yes I have some training

20  too in substance abuse for drugs and alcohol and

21  all of that stuff.

22  DEPUTY COMMISSIONER THOMPSON:  Ok, that is

23  part of that so no vocational issues.  So work

24  wise you have been a peer counselor and a health

25  educator.  You said for the last four years.

26  Was there any other work as such or work postion

27  that you were assigned to?

1          INMATE CARRANZA:  Yes when I first got here

2     in 1995 from Corcoran I came here and I started

3     working in R and R, receiving and release.  We

4     would receive and release inmates.  I worked

5     there for about two and a half years and then

6     they moved me to north block as a porter.  I was

7     a laundry man doing Landry for the incoming

8     inmates from reception center.  I did that

9     until, I worked there for approximately 19,

10    almost 2001 something like that.  Then I went to

11    work at the joint venture where they were paying

12    me minimum wage.  They removed me from that

13    position because I have an active INS hold.

14         DEPUTY COMMISSIONER THOMPSON:  Correct.

15         INMATE CARRANZA:  So then I went to work to

16    Centerforce.  First I went through health

17    training a five-day training.  And then they

18    offered me a job.  I got hired by them and I

19    have been working with them ever since.

20         DEPUTY COMMISSIONER THOMPSON:  And then it

21    seems you have become or perhaps were a master

22    leather craftsman.

23         INMATE CARRANZA:  Yes, I work with leather.

24    I make all kind of items, purses, wallets, and

25    belts.  I do tooling, carved, I make all the

26    officers and staff what they wear their gear.

27    Alarm holders, haircut cases, pepper spray

1   holders, double key holders and all that stuff.

2   I make that, I put them in the gift shop for

3   sale.

4       DEPUTY COMMISSIONER THOMPSON:  And it says

5   you have been successful in that to the extent

6   that you send home money to put your children,

7   help put your children through school and help

8   your wife buy a home.

9       INMATE CARRANZA:  Yes when they were going

10  to school I was able to send, I had the

11  privilege and blessing to send them money for

12  books or whatever.  And that is on the record

13  too I think.

14      DEPUTY COMMISSIONER THOMPSON:  It is?

15      INMATE CARRANZA:  Yah, and I send money to

16  my wife when we bought the house.

17      DEPUTY COMMISSIONER THOMPSON:  And that

18  house is in Round Hills?

19      INMATE CARRANZA:  Round Lake.

20      DEPUTY COMMISSIONER THOMPSON:  Round Lake

21  Illinois.  And she still has that home and still

22  occupies it?

23      INMATE CARRANZA:  Yes, she and my daughter.

24      DEPUTY COMMISSIONER THOMPSON:  Yes your

25  daughter who is a nurse.  Now as to self-help

26  you were on the AA and NA waiting list for two

27  years.  But you began going in this year, is

1  that correct?

2       INMATE CARRANZA:  Yes.

3.      DEPUTY COMMISSIONER THOMPSON:  And you are

4  still attending those on a regular basis?

5       INMATE CARRANZA:  Yes and I will continue

6  attending.

7       DEPUTY COMMISSIONER THOMPSON:  All right on

8  the psychological evaluation report that your

9  counselor did for this hearing in this year of

10  April 2006 it says you have a positive attitude.

11  And you would benefit from remaining

12  disciplinary free and that you it notes that you

13  have family resources and employment resources

14  as well.

15      INMATE CARRANZA:  Yes.

16      DEPUTY COMMISSIONER THOMPSON:  You were

17  aware of that?

18      INMATE CARRANZA:  Yes fully aware.

19      DEPUTY COMMISSIONER THOMPSON:  Ok,

20  anything, I wanted to go back.  You have a

21  certificate of appreciation you have actually

22  four of them.  Two from Center Point, one from

23  the Protestant Chaplain Ministry, and what is

24  VVGSQ?

25      INMATE CARRANZA:  That is the veterans

26  Vietnam, Vietnam veterans group.

27      DEPUTY COMMISSIONER THOMPSON:  Ok, so you

1    have also a certificate of appreciation from

2    that group.

3         INMATE CARRANZA:  From that group, yes.

4         DEPUTY COMMISSIONER THOMPSON:  And then you

5    have laudatory chronos.  One, two, three, four,

6    five, six, seven, eight laudatory chronos

7    between October of 1999 and March 7, 2006.  The

8    last being from the Protestant Chaplain in

9    recognition of your counseling work with the

10   Spanish Christian community.  And I want to make

11   sure that is the extent of them.  You have at

12   least 18 letters of support.  17 were written in

13   the year of 2005.  And you received one in

14   January of this year, January 3, 2006 from the

15   Jubilee Christian Center.  I think that was the

16   church you were discussing earlier.  Did we

17   leave anything out about when you arrived, since

18   you have arrived in CDC?

19        INMATE CARRANZA:  Not that I recall.

20        DEPUTY COMMISSIONER THOMPSON:  Ok, thank

21   you then I would turn to the psychiatric or

22   psychosocial evaluation.  That was prepared on

23   March 6, 2006.  And they review many of the

24   factors that you and Commissioner Lee have

25   already discussed.  And I think we have touched

26   on.  The current diagnostic impression on AXIS I

27   is adult anti social personality behavior

1    acculturation problem by history, alcohol

2    dependence in a controlled environment, I

3    presume they mean to say it is in remission.

4    And cocaine dependence in a controlled

5    environment would be in control.  On AXIS II

6    which is the mental disorder as opposed to

7    disease there is no diagnosis.  And on AXIS III

8    which relates to physical symptoms or

9    contributory causes they listed degenerative

10   disc disease.  On AXIS IV which is your overall

11   approach they see your stressors as the life

12   sentence itself.  And you have a Global

13   assessment of functioning of 85, which is a very

14   good score.  You were aware of this?

15        **INMATE CARRANZA:**  Yes thank you.

16        **DEPUTY COMMISSIONER THOMPSON:**  All right

17   then they went to your contention that you shot

18   the victim in self-defense and that he saw at

19   least one man had a weapon.  Is that your

20   recollection of the event?  Or did you not want

21   to talk about that.  I don't want to go into the

22   facts of the case.

23        **ATTORNEY SATRIS:**  I don't think it is, I

24   don't know how to say this.  I think he would

25   stand by his offense where he did say he did

26   shoot to irrationally and I think to much.  And

27   that is what the verdicts reflect, the attempted

1    manslaughter and then the murder.  But the

2    evidence did show that there was a knife that

3    was found at the scene where one of the victims

4    had fallen.

5        DEPUTY COMMISSIONER THOMPSON:  Ok we can

6    move on.  Next point within this, it is a very

7    extensive report and reiterates a lot of the

8    factors that have already been discussed.  But

9    we turned to the section of assessment of

10   dangerousness.  In a controlled environment the

11   risk of violence is felt to be considered low.

12   As would seem quite reasonable.  If the risk

13   assessment upon release to the community you

14   don't have any of the dynamic factors related to

15   violence in the opinion of the author.  However

16   there is a notation that should you relapse into

17   drugs or alcohol then that risk factor would

18   increase and that it would be a consideration.

19   And it was recommended you build yourself as it

20   were a safety net with AA and NA and any other

21   support groups religious or whatever nature that

22   you could find yourself connected with.  And it

23   seems that you said at one point your involvment

24   in drugs as a seller resulted in your own use of

25   drugs.  And that you had at some point to get

26   into that life to support your habit.

27       INMATE CARRANZA:  Yes.

1    DEPUTY COMMISSIONER THOMPSON:  And that you

2  contend that you do not have a problem of

3  substance abuse since you haven't used since you

4  were incarcerated.  And I would say that is a

5  reasonable observation but hopefully there

6  wasn't any that you could have used in the

7  incarcerated situation.  Though it is kind of

8  one of those questions like we stop beating your

9  wife no matter how you answer it, it is not

10  going to be a good answer.  He feels strongly

11  that he has put this problem behind him and

12  hopefully he has.

13    INMATE CARRANZA:  I feel strongly that I

14  have put that problem behind me.  I mean there

15  is drugs in prison and but you know alcohol and

16  all that stuff but you know thank god I feel

17  like I overcome that addiction.  And I know

18  those addictions you know caused me to do a lot

19  of harm to people.  And I consider that

20  addiction my enemy.  I consider that it is like

21  kissing a cobra.  I feel that way.  But I still

22  feel like I will benefit out there and here and

23  out there from self-help groups, support groups.

24    DEPUTY COMMISSIONER THOMPSON:  What I would

25  say in the least is it couldn't hurt and

26  hopefully they would help.

27    INMATE CARRANZA:  Oh yes.

1    DEPUTY COMMISSIONER THOMPSON:  And it

2  concludes essentially and the report is by a

3  Michael Lynn Ynava PhD.  That or is it Michelle.

4    ATTORNEY SATRIS:  Michelle?

5    DEPUTY COMMISSIONER THOMPSON:  It is

6  Michelle Lynn Ynava PhD., which again was done

7  on March 6, 2006.  That you would benefit from

8  further discussion of the facts surrounding your

9  offense and would hope that this could begin in

10  the near future.  As his parole plans seem

11  likely to proceed.  And she would hope for or

12  believe that if the same factors of drugs and

13  alcohol did not recur in your life, violence

14  would hopefully not be likely to reoccur.  But

15  should they recur problems would likely suffice.

16  And basically that concludes what I have gleamed

17  from this report. At this time do you have any

18  thing you want to add or point out that I didn't

19  cover or address?

20    INMATE CARRANZA:  Like I said before I

21  would like to get into a program you know like

22  empathy for victims and --

23    DEPUTY COMMISSIONER THOMPSON:  I am sure

24  whatever self-help programs are offered at San

25  Quentin if you can have the time and the

26  opportunity would all be beneficial to you.  And

27  you should address entering them if you can.  I

1    think those would all be positive influences.

2    But if you have no particular question I would

3    reiterate there is an active US INS hold and a

4    strong liability that is you would be deported

5    upon any release to parole.  And you do have

6    some plans in Mexico and I do have something to

7    address in the parole planning issue.  Or the

8    parole goals if you will.  And when we get to

9    that section I will take those on accordingly.

10   Is there anything you have a question about as I

11   say that I have touched on at this point?

12       **ATTORNEY SATRIS:**  Let me just say back to

13   the psychiatric report just to elaborate on the

14   notion that he does not have any dynamic factors

15   related to violence.  Dynamic meaning anything

16   that can change.  So all of the changes have

17   been away from violence.  And what the doctor

18   goes on to say there is no recent history of

19   loss of control or impulsive behavior.  He does

20   not appear to be at all an angry person.  He is

21   grateful to his wife and family for their

22   generous support of him over the years.  And he

23   has demonstrated a capacity for empathy and

24   compassion, although that can be further

25   developed.  And then it goes on to talk a little

26   bit at some length in ways that Mr. Carranza I

27   think has already spoken about recognizing the

1   harm of his actions and the negative effect they

2   have on everybody.  It is a motivator for doing

3   well in the future so --

4        DEPUTY COMMISSIONER THOMPSON:  I think we

5   agree.  It touches on the matters we have

6   discussed, expands them to some degree but the

7   general tone I think is positive but at the end

8   the prognosis is still to be hopeful.  And I

9   think it capsulate it all.

10        ATTORNEY SATRIS:  Ok.

11        DEPUTY COMMISSIONER THOMPSON:  And if there

12   is no question at this point on the institution

13   or post conviction factors I would move to the

14   parole section.

15        PRESIDING COMMISSIONER LEE:  I have a

16   question we have disciplinary 128 December 1,

17   2000, is that correct?

18        DEPUTY COMMISSIONER THOMPSON:  That is

19   correct.

20        PRESIDING COMMISSIONER LEE:  Would the

21   inmate like to tell us why he received the 128

22   in December of 2000?

23        ATTORNEY SATRIS:  I think we will rest on

24   the record there, it is a 128 it is not even a

25   disciplinary rules violation report.  I don't

26   think there is to much more to add there.

27        PRESIDING COMMISSIONER LEE:  All right, Mr.

# EXHIBIT B
# Part 2 of 2

1    Satris do you want to say something?

2        ATTORNEY SATRIS:   I was just going to say

3    if we are talking about chronos we didn't, we

4    mentioned one, two, three, four, five, six,

5    seven and eight laudatory chronos and but I

6    would just say they address a range of behavior

7    by Mr. Carranza relating to job performances is

8    outstanding.   The various donations he has made

9    to victims and survivors for example on

10   September 11 the children toys and candy around

11   Christmas has also completed over a 100 hours of

12   hatha yoga that is good for stress reduction and

13   basic self knowledge and then has done the

14   counseling work in the Spanish Christian

15   community.

16       PRESIDING COMMISSIONER LEE:   Very good

17   however you are instructing your client at this

18   time not to discuss with me what occurred on

19   December 2000?

20       ATTORNEY SATRIS:   One problem is, I don't,

21   that chrono was not in the material that I

22   received.

23       PRESIDING COMMISSIONER LEE:   Are you

24   indicating it is not in the Central File?

25       ATTORNEY SATRIS:   No I am indicating it is

26   not in the lifer packet.   If you will give me a

27   moment, let me see what I have, I thought that

1   the chrono laudatory and negative are typically

2   included in the packet but they weren't.

3       PRESIDING COMMISSIONER LEE:  No that is

4   just a summary.

5       ATTORNEY SATRIS:  Out of bounds, do you

6   want to speak about the out of bounds Mr.

7   Carranza?

8       INMATE CARRANZA:  I think I was just out of

9   bounds.  They had some lines in the lower yard

10  you know some lines and I work close to R and R

11  and there are some lines that the inmates are

12  not supposed to cross.  And I work there, I work

13  there and the officer gave me a verbal

14  counseling and I explained to him that I was a

15  worker but he never asked me for my work card.

16      PRESIDING COMMISSIONER LEE:  Ok, Deputy

17  Commissioner how are we doing on the tape.

18      DEPUTY COMMISSIONER THOMPSON: I believe, it

19  looks like we have a reasonable amount left.  It

20  looks like there is maybe an eighth of a tape

21  left at this point.

22      PRESIDING COMMISSIONER LEE:  All right we

23  will continue on.

24      DEPUTY COMMISSIONER THOMPSON:  Sufficient

25  to go through the parole I am sure and then

26  maybe we ought to turn it to be on the safe

27  side.

1          PRESIDING COMMISSIONER LEE:  All right.

2          DEPUTY COMMISSIONER THOMPSON:  I think my

3    technical consultant would agree and I

4    appreciate that.  Mr. Montgomery is in here in

5    the room with us.  I will indicate the following

6    future parole plans for the inmate.  The inmate

7    if paroled to California would like to stay with

8    his son Eric in Fremont California.  The inmate

9    has indicated if he is deported to Mexico he

10   wishes to stay on the family estate.  And we

11   have a letter of support dated November 16, 2005

12   this was translated apparently.  I will read

13   that into the record.  I will indicate we have

14   numerous letters on behalf of the inmate from

15   various family members.  And I am not going to

16   read each one into the record.  I will state

17   that this letter is from the inmate's father and

18   his mother.  We are aware that our son Alfonso

19   Carranza is in prison for murder and involuntary

20   homicide.  We understand that those are vary

21   serious offenses of the law.  We understand that

22   murder happened when he was young and immature.

23   But now he is mature, we are appealing to you

24   the authorities for your support and humanity.

25   We are prepared to help the inmate economically

26   since we have properties, which consist of a

27   farm with land and cattle, which we are ready to

1   give him so he may live without any problems.

2   Assets we have in Mexico specifically located in

3   the municipality of Escobeto Mexico can be

4   verified.  And that letter I believe was dated

5   in 2005.  The inmate does have an INS hold.  If

6   however he is released to Calfornia he has a job

7   offer and that is with Fremont Foreign Auto

8   located in Fremont California.  So as far as the

9   letters as I have indicated I will not go

10  through all the letters.  I will indicate

11  letters from Elia Mario, and Silvia Sergio Real,

12  Carlos Carranza, Jose and Maria Carranza,

13  Ricardo Carranza, Marisa Silva, Celeste Vargis,

14  Linda Carranza, Theresa Carranza, Eduarda Porta,

15  Geronemo Pueteres, Maribel Munoz Alonzo, Jessica

16  Rio, Silvano Bueno, Javier Carranza, Jubilee

17  Christioan Center, and there are letters of

18  appreciation from VVGSQ, Center force

19  incorporated, and Protestant Chapel ministries.

20  Counsel in light of the fact I am not going to

21  go through each one of the letters is there

22  anything you wish to highlight at this time?

23      **ATTORNEY SATRIS:**  The only thing I would

24  like to highlight is the letter from his wife.

25  It talks about their longstanding relationship

26  and she basically has what I think Mr. Carranza,

27  it may be in the paperwork, what he described to

1   me as an unconditional love for him.  So that

2   she is prepared to assist him in the transition

3   back to Mexico which is where she is from.  And

4   she is prepared to go back.

5        PRESIDING COMMISSIONER LEE:  It is my

6   understanding that she is not in the state of

7   California, is that correct?

8        INMATE CARRANZA:  She is in Illinois.

9        PRESIDING COMMISSIONER LEE:  She came up

10  for your anniversary?

11       INMATE CARRANZA:  Yes she comes two or

12  three tiems a year.  Also my daughter came like

13  a month ago.

14       ATTORNEY SATRIS:  And that the letters do

15  reflect a large family he is from and the

16  support that everybody is prepared to provide

17  him or has provided him during his incarceration

18  and continue to provide him if he is released.

19       PRESIDING COMMISSIONER LEE:  It is very

20  clear he has substantial family support at this

21  time.  All right at this point and time I will

22  turn it over to questioning.  Deputy

23  Commissioner do you have any questions in

24  regards to the matter?

25       DEPUTY COMMISSIONER THOMPSON:  No thank you

26  Commissioner I do not.

27       PRESIDING COMMISSIONER LEE:  All right, I

1    will turn it over to Ms. Delagarza.  Ms.

2    Delagarza do you have any questions of the

3    inmate?

4        DEPUTY DISTRICT ATTORNEY DELAGARZA:  I do

5    have some questions.  The first question is

6    could the panel ask the inmate I read in one of

7    the reports after the killing of Mr. Munoz the

8    inmate was involved in another bar killing in

9    Kansas, is that correct?

10        ATTORNEY SATRIS:  Again we will rest on the

11    record there.  There was an acquittal.  There

12    were charges presented, he was involved in it

13    Mr. Carranza do you want to speak to whether you

14    see any kind of connection or relation between

15    those charges and the offense you are in here

16    for now?

17        INMATE CARRANZA:  Yah it was related

18    because I was living a life of destruction.  A

19    life out of control.  I was involved with drugs

20    and all of that stuff.

21        PRESIDING COMMISSIONER LEE:  So you are

22    indicating that there was another bar fight?

23    Subsequent to this one?

24        INMATE CARRANZA:  Yes.

25        PRESIDING COMMISSIONER LEE:  And you were

26    actually tried in another state but were

27    acquitted, is that right?

1          INMATE CARRANZA:  Yes.

2          PRESIDING COMMISSIONER LEE:  Ms. Delagarza?

3          DEPUTY DISTRICT ATTORNEY DELAGARZA:  But he

4     did actually shoot and kill another individual

5     is that correct?

6          ATTORNEY SATRIS:  I think we will rest on

7     the record.  I mean it is an acquittal.

8          DEPUTY DISTRICT ATTORNEY DELAGARZA:  Well

9     if he --

10         PRESIDING COMMISSIONER LEE:  Ms. Delagarza

11    hold on.  Hold on.  Let me pose the question.

12    At this point and time is your client going to,

13    will the client answer the question from the

14    District Attorney?

15         ATTORNEY SATRIS:  We are prepared.  It was

16    a self-defense, a finding of an acquittal on

17    self-defense.  Yes that is what he is talking

18    about.

19         DEPUTY DISTRICT ATTORNEY DELAGARZA:  I am

20    going to ask that the inmate be allowed to

21    answer my questions not the attorney.

22         PRESIDING COMMISSIONER LEE:  Ok, Ms.

23    Delagarza I will conduct the hearing.  I know

24    exactly what you are saying.  Let me handle

25    this.  Mr. Satris is your client deciding to not

26    discuss what occurred in regards to the incident

27    after this hearing, I mean after this incident.

1       ATTORNEY SATRIS:  He can answer that

2  question, I already have but he can answer that

3  question yes or no.

4       PRESIDING COMMISSIONER LEE:  Go ahead sir.

5  The question was did you shoot someone in

6  another bar incident?

7       INMATE CARRANZA:  Yes.

8       PRESIDING COMMISSIONER LEE:  All right next

9  question.

10       DEPUTY DISTRICT ATTORNEY DELAGARZA:  And

11  the next question is on the date he was arrested

12  in Colorado at that time besides the drugs was

13  he also in possession of weapons?

14       PRESIDING COMMISSIONER LEE:  You may

15  answer?

16       ATTORNEY SATRIS:  I would direct him not to

17  answer that.

18       PRESIDING COMMISSIONER LEE:  All right,

19  next question.

20       DEPUTY DISTRICT ATTORNEY DELAGARZA:

21  Besides himself, according to the report there

22  was another individual by the name of Linda who

23  was arrested with the inmate. Who was Linda?

24       ATTORNEY SATRIS:  What are we talking about

25  now?

26       DEPUTY DISTRICT ATTORNEY DELAGARZA:  The

27  Colorado arrest.

1     PRESIDING COMMISSIONER LEE:  All right lets

2  clarify now.  You were arrested in Colorado was

3  there another individual by the name of Lind

4  with you and who is Linda?

5     ATTORNEY SATRIS:  Yah I would direct him

6  not to go into the details of a case on which he

7  was acquitted.

8     PRESIDING COMMISSIONER LEE:  All right next

9  question.

10     DEPUTY DISTRICT ATTORNEY DELAGARZA:  Let me

11  object, he was not acquitted of that one.  We

12  are talking about Colorado where he was arrested

13  for drug sales.  There were two people actually

14  arrested one of them was an individual by the

15  name of Linda. This was a conviction not an

16  acquittal.

17     PRESIDING COMMISSIONER LEE:  Ms. Delagarza

18  the inmate does not have to respond, I will

19  allow him to respond.  You can certainly argue

20  this in your final statement.  However at this

21  point and time do you wish to respond in regards

22  not the acquittal the shooting, but your arrest

23  in Colorado?

24     ATTORNEY SATRIS:  We rest on the record on

25  that.  That is in the material so I will direct

26  him not to answer those questions that go beyond

27  the record in this case before the board.

1    PRESIDING COMMISSIONER LEE:  He has the

2  right not to respond.  I have no sanction

3  authority here, obviously the District Attorney

4  can make whatever statement she thinks is

5  appropriate when it is her opportunity.  Ms.

6  Delagarza next question.

7    ATTORNEY SATRIS:  Let me can I just the

8  whatever argument given at the end has to based

9  on the record before the board correct?

10    PRESIDING COMMISSIONER LEE:  Correct.

11    ATTORNEY SATRIS:  All right.

12    PRESIDING COMMISSIONER LEE:  Go ahead.

13    DEPUTY DISTRICT ATTORNEY DELAGARZA:  My

14  next question is was the person Linda his

15  daughter Linda Carranza or some other Linda?

16    ATTORNEY SATRIS:  We have already made

17  clear our position on going into any details

18  beyond the record that is already before the

19  board and that we are prepared for.

20    PRESIDING COMMISSIONER LEE:  Next please.

21    DEPUTY DISTRICT ATTORNEY DELAGARZA:  My

22  next question is with respect to the

23  psychological report in the psychological report

24  and I am referring to page number six in that

25  report.  It says in the second full paragraph

26  Mr. Carranza contends that he does not himself

27  have a problem with substance abuse since he has

1    not used while incarcerated. He feels strongly

2    he has put this problem behind him. And that he

3    would be able to refuse any offer of drugs. Mr.

4    Carranza does not participate in NA or AA

5    programming, as he does not feel he has a

6    substance abuse problem. When did the inmate

7    start in AA, since according to the March of

8    2006 it indicated he was not involved?

9         **PRESIDING COMMISSIONER LEE:** Do you

10   understand the question sir? It appears you are

11   not involved in NA or AA you may have been--

12        **INMATE CARRANZA:** That is correct.

13        **PRESIDING COMMISSIONER LEE:** There may have

14   been references in the past that you were

15   involved, when were you involved

16   (indiscernible)?

17        **INMATE CARRANZA:** I was on the waiting list

18   for two years. And I was involved, I started

19   attending sometime in March.

20        **DEPUTY DISTRICT ATTORNEY DELAGARZA:** I am

21   sorry I couldn't hear what he said.

22        **PRESIDING COMMISSIONER LEE:** Could you

23   speak up please?

24        **INMATE CARRANZA:** I was on the waiting list

25   for two years. And I started to attend AA

26   sometime in March.

27        **ATTORNEY SATRIS:** After your meeting with

1  the Doctor here, correct?

2      INMATE CARRANZA:  Yes.

3      PRESIDING COMMISSIONER LEE:  All right, so

4  that was the first time?

5      INMATE CARRANZA:  Yes.

6      PRESIDING COMMISSIONER LEE:  Ms. Delagarza?

7      DEPUTY DISTRICT ATTORNEY DELAGARZA:  I have

8  no other questions.

9      PRESIDING COMMISSIONER LEE:  At this time

10  Mr. Satris do you have any questions of your

11  client?

12      ATTORNEY SATRIS:  Yes let me pick up where

13  we were leaving off there about addictions and

14  so forth.  Because it was mentioned earlier that

15  you have a degenerative disc disease, that

16  causes you some pain does it?

17      INMATE CARRANZA:  In my back?

18      ATTORNEY SATRIS:  Yes.

19      INMATE CARRANZA:  Yes I had an MRI done.

20      ATTORNEY SATRIS:  And you have been offered

21  medication for that?

22      INMATE CARRANZA:  Yes.

23      ATTORNEY SATRIS:  And what is your position

24  on that?

25      INMATE CARRANZA:  I didn't want to take any

26  medication that would get me addicted to a

27  prescribed medication.

1    ATTORNEY SATRIS:  So have you basically

2    ignored the pain rather than take that

3    medication?

4    INMATE CARRANZA:  Yes.

5    ATTORNEY SATRIS:  Now you talked a bit

6    about your work for the past number of years for

7    Center Force and the counseling of other inmates

8    in connection with that.

9    INMATE CARRANZA:  With drugs?

10    ATTORNEY SATRIS:  With drugs and just

11    generally HIV and so forth.  Do you find meaning

12    in your work?

13    INMATE CARRANZA:  Oh, yes I do.  I feel

14    like I give back something to socieity because

15    my counseling this guys about the risk of

16    getting infected with HIV or other diseases.  I

17    have numerous occasions when this guys come back

18    with results that they have HIV or they have

19    hepatitis or some other kind of disease and they

20    come talk to me.  And I counsel them and I refer

21    them to the doctor.  Because a lot of these guys

22    are Hispanics who don't understand English.

23    ATTORNEY SATRIS:  Now is this work, do you

24    have any interest or plans to pursue it if you

25    are released?

26    INMATE CARRANZA:  Yes I would like to

27    continue that here, learning more and more.  And

1   when I get out there in California or go back to

2   Mexico.  I would love to.

3        **ATTORNEY SATRIS:**  Now you do have plans. we

4   have gone over in the event that you are not

5   deported to Mexico.  You do have plans in

6   California?

7        **INMATE CARRANZA:**  Yes.

8        **ATTORNEY SATRIS:**  As have been gone over.

9        **INMATE CARRANZA:**  Yes.

10       **ATTORNEY SATRIS:**  It has been it was

11  described here by the Deputy Commissioner that

12  there was a quote on quote strong probability

13  that you would be deported.

14       **INMATE CARRANZA:**  Yes.

15       **ATTORNEY SATRIS:**  Do you understand that

16  the actual reality is that you will be deported?

17       **INMATE CARRANZA:**  Yes I know that.  I have

18  been seeing hundreds of inmates over here in San

19  Quentin they have INS holds and upon there

20  release all of them have been deported.  So --

21       **ATTORNEY SATRIS:**  And in terms of

22  continuing the counseling work you have done for

23  Center force by going back to Mexico do you see

24  a need for you to do that work?  Or a need that

25  could be served by you doing that work?

26       **INMATE CARRANZA:**  Yes we actually the

27  agency contacted somebody in Zacatecas an

1    agency.    It is called Zacatecas (indiscernible)

2    that means the state of Zacatecas against AIDS.

3    And you know --

4         ATTORNEY SATRIS:   So there is an

5    organization already in your local and you have

6    taken steps to connect up with them.

7         INMATE CARRANZA:   Yes.

8         ATTORNEY SATRIS:   And you were telling me

9    at one point I think I have this straight about

10   an incident regarding a cell move.    Where you

11   got into or there was some conflict with another

12   inmate do you remember that?    Could you just run

13   that down to the board and explain your kind of

14   reaction and how you handled it and felt about

15   that.

16        INMATE CARRANZA:   That was this cell move

17   and this inmate got to move out of his cell.    He

18   got mad at me because he thought that I had

19   something to do with the cell move.    And he came

20   to my house, I was doing some leatherwork

21   because I have an in cell hobby, I work with

22   leather.    So anyway he came and he was real

23   angry.    And to make a long story short he

24   attacked me.    He hit me a few times over here--

25        ATTORNEY SATRIS:   Just because we are on

26   the record over here is along the shoulder--

27        INMATE CARRANZA:   Along the shoulder and

1    over here.  And yah and I was totally amazed and
2    full of joy that I didn't respond.  I did not
3    even raise my hand.  And I told him to god bless
4    you when I say that he took off and I was just
5    amazed and grateful and the same time because I
6    wasn't planning on having that kind of
7    experience.  But in the same time I was grateful
8    that I passed, that I passed the test without
9    being prepared for it.  And especially here in
10   prison.  And in this place there is some other
11   nationals I get along with everybody.  So I
12   didn't told nothing to nobody this happened at
13   night.  And somehow they find out about it and
14   they came to me and they wanted to hurt this guy
15   because what he did, to them it was wrong.  But
16   I told them to leave him alone.  That I you know
17   that I forgave him and they still wanted to hurt
18   him and again told them it was my decision and I
19   said they should leave him alone.  And he was,
20   he has only one arm.  And they went to talk to
21   him and anyway they didn't hurt him so he came
22   back and apologized to me.  We hug each other
23   and we pray and that was it.  And I will you
24   know I will I would have liked, if I would have
25   handled the situation the same way you know for
26   what I did in 1985 to the victims.  And again I
27   say to the victim's family I am really sorry for

1    what I did.  I pray to god one day they will

2    find it in their hearts to forgive me.  Because

3    I have family and I would get hurt if somebody

4    do something to them.  So I pray for them and I

5    understand they might hate me and they have all

6    the reason, the right to do that.  But I pray

7    for them I hope they will forgive me one day.

8    You know what I did was wrong and I am

9    responsible.  And I am guilty.

10          PRESIDING COMMISSIONER LEE:  Any further

11   questions?

12          ATTORNEY SATRIS:  No further questions

13   thank you.

14          PRESIDING COMMISSIONER LEE:  All right it

15   is time we are going to go to statements.

16          DEPUTY COMMISSIONER THOMPSON:  It might be

17   better to change the tape.

18          PRESIDING COMMISSIONER LEE:  We are going

19   to take a brief recess while we change tapes.

20          DEPUTY COMMISSIONER THOMPSON:  We are back

21   on the record this will be side two tape one of

22   the Carranza hearing.  And if you wish to

23   proceed with statements you now have tape.

24          PRESIDING COMMISSIONER LEE:  Thank you all

25   right at this point and time, we are waiting for

26   one officer and we can begin.  At this time we

27   are ready to begin with statements Ms. Delagarza

1   you may be heard.

2       **Los Angeles County** opposes granting of a

3   parole date for this inmate beginning with the

4   inmate's criminality.  He had an escalating

5   pattern of criminality he had convictions for

6   both drugs, alcohol, and in addition to that

7   possession of guns.  So we have this escalating

8   pattern with respect to this inmate.  All of

9   them as I have indicated involving drugs,

10  alcohol and guns.  In respect to the life crime

11  the inmate has failed to accept full

12  responsibility when you look at the

13  psychological report his claim is now a very

14  self serving one, one of self defense.  However

15  if you read all the police reports including

16  statements from victims including statements

17  from witnesses who were in the bar it is clear

18  that this was not an act of self-defense by the

19  inmate.  But it was actually a very cold

20  calculated attempt on the part of this inmate to

21  kill three individuals and he was successful as

22  to one of them.  He was involved initially in an

23  argument with Raoul Munoz, Mr. Munoz left the

24  bar, he came back to the bar and they again got

25  into a verbal altercation.  By everyone's

26  statement it is clear that at some point it

27  appeared that they shook hands and Mr. Munoz

1   left the bar along with his two brothers.  As

2   they were outside the inmate comes out and

3   shoots all three of the individuals.  There was

4   no self-defense people were leaving the bar they

5   were on their way home.  According to the inmate

6   he claims what he told the psychologist and what

7   he told the counselors that he goes outside and

8   he is accosted by the individuals.  That was not

9   what happened.  There was no self-defense.  And

10   he has failed to both accept responsibility for

11   the crime and he has no insight into his

12   criminality.  If that is not bad enough after

13   leaving, having committed this murder and having

14   committed these assaults on two other

15   individuals attempted murder as to both of them.

16   The inmate goes into another state and he is

17   again responsible for the death of another

18   individual.  What is important about that is

19   that he is again in possession of a weapon and

20   he is again responsible for the shooting death

21   of another human being.  A little bit over a

22   year later the inmate is arrested in Colorado.

23   And again as to that particular offense looking

24   at the police reports it is clear that not only

25   is he trafficking drugs at that point but again

26   when he is arrested he is again in possession of

27   weapons.  So we have somebody who is very much

1   entrenched in violence and who is responsible
2   for the death and also the wounding of several
3   individuals before he is finally arrested and
4   incarcerated.  Since the inmate has been in
5   prison with respect to some aspects of his
6   prison time it has been positive.  He has got no
7   115's and only the one 128a.  However that is
8   the only thing positive you can say about him.
9   He has gotten no vocations in the entire time he
10  has been in prison.  Yes he has been involved in
11  some programs but even if you look at the
12  programs with respect to the Center Force it has
13  been since March of 2005 and with respect to the
14  AA it has only been since March of 2006 so we
15  have somebody who has very minimal self-help, no
16  vocations, and we have somebody who has
17  marginally and has only started doing positive
18  programming in prison.  It is very nice that he
19  did the toy drive and he helped by selling
20  things on ebay to victims.  But with respect to
21  his own programming the fact that he has done
22  the little self-help and again with the AA and
23  NA somebody that has been involved in drugs and
24  alcohol as long as the inmate has. Somebody
25  who's crimes according to his own statements
26  were as a result of this involvment in drugs and
27  alcohol this individual before we can be sure he

1   is safe to go into socieity we have to make sure
2   that he is involved in programs that will make
3   sure he will maintain his sobriety during the
4   time he is released.  As far as his parole plans
5   are concerned while it is true he does have at
6   least on paper parole plans for both United
7   States and Mexico one of the troubling aspects
8   of this inmate is that we know for sure he came
9   into this country illegally, he had an arrest in
10  San Diego for coming into the country illegally
11  and what is very troubling is all of his family
12  lives in the United States his wife, his
13  daughter by his wife, his son by another
14  individual, his parents, his brothers, his
15  sisters all of them live in the United States.
16  And with respect to the parole plans we would
17  need to be sure that this inmate would not be
18  coming back into the United States, should he be
19  deported.  And as everyone has said it is very
20  clear that he will be deported.  So I think that
21  we have to make sure that whatever parole plans
22  he has in Mexico are going to insure that he is
23  not going to return to this country.  Until he
24  has a history of involvment in AA and NA until
25  we know he has many years of involvement in
26  self-help and until he accepts full
27  responsibility for this crime we cannot be sure

1  he will not go out and continue in his

2  criminality.  We have an individual who has many

3  victims.  He is responsible for the death of two

4  people, he is responsible for the wounding of

5  two other individuals.  Until we can be sure he

6  would not continue to present a risk, he will

7  continue to be a threat to society.  We are

8  asking for a five-year denial to make sure he

9  has enough time to get the self-help he needs.

10  And to also have sufficient years of involvment

11  in AA and NA before he is released.  Thank you.

12      **PRESIDING COMMISSIONER LEE:**  Thank you Ms.

13  Delagarza for your comments.  Next we will go to

14  Mr. Satris.

15      **ATTORNEY SATRIS:**  Thank you.  Before I

16  close making the points I would like to make.

17  Favoring the parole of Mr. Carranza let me

18  correct a couple of miss statements in the

19  closing by the Deputy District Attorney.  Again

20  we accept the findings of the court and are not

21  here to relitigate.  Mr. Carranza over and over

22  has expresses in that exact sentiment in his

23  acceptance of responsibility for the crimes that

24  he was convicted of.  That includes murder.  As

25  he has said he shot to soon and he shot for to

26  long.  We don't have two counts of attempted

27  murder in this case, as the District Attorney

1    characterized it.  We have a finding of

2    attempted voluntary manslaughter and that is

3    critical because that shows that this isn't the

4    kind of cold calculated attempt to kill three

5    people that the District Attorney is now trying

6    to promote in a retrial of the case.  The

7    manslaughter finding or attempted manslaughter

8    does indicate apparent acceptance either a

9    provocation or unreasonable or honest or

10    unreasonable belief in the need for self-

11    defense.  And there is substantial evidence of

12    course in the record that would support this.

13    So the kind of one-sided distortion of the

14    factual scenario in this case is not persuasive.

15    And we are not going to respond in kind by not

16    pointing out the evidence that is different than

17    the evidence reflecting the jury's verdict.

18    There is no question that there was, and I would

19    accept or use the language of the District

20    Attorney of an entrenchment in that kind of

21    violent world of drugs and guns.  And we know

22    what happens when you have drugs and guns,

23    violence results.  That is why Mr. Carranza I

24    think has characterized his arrest in this case

25    as a kind of rescue.  This is actually a

26    situation where the criminal justice system

27    worked as it is designed to and as we always

1    hope it will.  It stops the person in their
2    tracks and sits them down and gives them time
3    and plenty of time to reflect upon their actions
4    and what they have done and hopefully work out a
5    change from that, that I will go on to later.
6    But while I am on the subject on the correct
7    statements from the record and I will just speak
8    to the notions of the vocations now.  In terms
9    of Mr. Carranza has a job, resources waiting for
10   him in Mexico.  He will go to work immediately.
11   There is not a vocation available in the CDC
12   system that is going to facilitate or help him
13   in that regard.  The interesting thing is the
14   job he has is probably the best kind of
15   vocational training that he could receive.  He
16   actually does have a job offer in this country
17   as a result to that work available to him.  And
18   as he stated this is an activity of beneficial
19   use.  He can put to for the betterment of
20   sociaty when he is released in Mexico, whether
21   that would lead to an actual paying job or not
22   is really beside the point from his point of
23   view.  He has got the means for work and he has
24   got a very constructive positive activity to do.
25   And that work with Center Force has not been
26   just since March of 2005.  That has been for
27   four years.  And as he stated he is going to

1   continue in that work.  All right so I would ask
2   the board to do what it indicated in the vary
3   outset of this hearing of what it was going to
4   do.  Which is to consider Mr. Carranza for
5   parole in accordance with Penal Code Section
6   3041 and its own rules and regulations.  That
7   Penal Code Section provides that the board
8   should normally grant a prisoner or set a parole
9   date for a prisoner at his first parole hearing.
10  This is Mr. Carranza's first parole hearing.  It
11  is even more appropriate in his case to do so
12  than perhaps some other cases because of the
13  length of time he has served to this point.  So
14  you can see the long post conviction record that
15  he has.  He was committed in 1989 and served
16  time for the consecutive sentences for the
17  multiple offenses that were involved in this
18  case.  The attempted voluntary manslaughter and
19  the attempted murder before serving the time
20  required to serve to become eligible for his
21  life offense.  And he has built up a remarkable
22  record in that time.  So I am going to now speak
23  in terms of the board rules implementing the
24  Penal Code Section to see if this is the kind of
25  case for pursuant to the board's rules it should
26  set a parole date for Mr. Carranza.  We have the
27  commitment offense certainly that weights the

1  other way.   Under the boards rules in terms of
2  multiple victims to start with that is a factor
3  that leans towards a finding of unsuitability
4  for parole.   But what is important is that is
5  only if that offense shows he presents a
6  continuing danger at this point.   Because we are
7  talking about present dangerousness when we are
8  talking about suitability for parole.   The
9  record makes it very plain in this case that
10  kind of entrenched criminality at that time was
11  a the product of a kind of destructive lifestyle
12  he was living involving drugs and weapons.
13  Those factors that underlie that behavior have
14  been addressed and dealt with and he has adopted
15  a set of values and a way of living that is
16  totally contrary to that.   And I think is best
17  exemplified by that incident with the cell move.
18  Where he gets attacked and does not respond
19  impulsively, angrily or in any negative way.
20  And that is the way I think the board is
21  reasonably assured that Mr. Carranza is going to
22  live out the rest of his life.   So addressing
23  the suitability factors you do see that they all
24  apply here.   Starting with the signs of remorse.
25  Mr. Carranza has expressed it directly to the
26  board today but you will also see in both the
27  counselors report and the psychiatric report

1  that he has expressed his sorrow and remorse for
2  his criminal acts that resulted in such a loss.
3  As he said though you know those are words.  And
4  the way he has demonstrated his remorse is by
5  changing his actions and doing whatever he can
6  at this point to make up for that crime by
7  positive constructive activity including
8  changing his own life and helping others in ways
9  that better society rather than to detract from
10 it.  In terms of pre offense factors.  You have
11 no juvenile record, the next factor in the
12 suitability factors.  You have really a life
13 that Mr. Carranza led that was a conforming
14 prosocial life until he did come to California,
15 he did involve himself in drugs that vary
16 clearly led to his criminal conduct.  In that
17 regard the next factor is lack of criminal
18 history.  He lacks any significant history of
19 violent crime.  And what you have is no violent
20 criminality outside of this offense.  This is
21 his single act of criminal violence.  Then you
22 go to the next factor, which is a stable social
23 history.  Has the prisoner experienced
24 reasonably stable relationships with others.
25 And yes you can see he has.  He has had a very
26 stable upbringing and social background.  There
27 is no childhood maladjustment according to the

1   psychiatric report.  You see the large prosocial

2   intact family out of which Mr. Carranza comes

3   from.  His parents are literally still living on

4   the same property in Mexico where they come

5   from.  There is no family history of mental

6   illness, criminality or alcohol abuse.  He knew

7   his wife from childhood.  He has been married

8   since she was age 16 and he was age 17.  He has

9   maintained that relationship throughout.  He has

10  maintained relationships with his children, he

11  has maintained relationships with all of his

12  family.  That is a factor that supports a

13  finding of suitability here.  You have then the

14  next factor you look at.  Institutional behavior

15  has institution activities indicated an enhanced

16  ability to function within the law upon release.

17  And you see that first of all with the behavior

18  of the remarkable record he has of being

19  disciplinary free.  No CDC 115's rule

20  violations.  You have him obtaining his

21  education getting his equivalency high school

22  degree as well as the English as a second

23  language.  And you can see actually great

24  progress in the TABE results there.  And they

25  you have the therapy and self-help programming.

26  And I think you can see his work, let me just

27  say work in addition to the education he has

1   been getting exceptional work reports from the
2   beginning.  You see in his most recent work it
3   is an aspect of self-help programming too.  He's
4   acting as a counselor on behalf of other
5   prisoners concerning HIV and concerning related
6   dangerous activities including drug use, you
7   have his religious activities that he has been
8   laudated for again.  And being an active in the
9   ministry and counseling there.  You have
10  positive extra curricular activities.  Lets say
11  in terms of the leather craftsman you have a
12  showing that he has been able to address on his
13  own through his Christian principles and embrace
14  a positive lifestyle.  Putting away use of
15  drugs, it is unfortunate that he had to wait for
16  two years to begin the AA and NA program.  It is
17  understandable.  I think the District Attorney
18  does make a point that's this board should
19  consider in terms of ensuring that, that becomes
20  kind of an entrenched process of its own that AA
21  treatment continue.  Mr. Carranza says he is
22  going to continue it.  You can set a parole date
23  for him, it is going to be in the future that is
24  the idea, give prisoners a predictable time when
25  they will be released.  That is the design of
26  Penal Code Section 3041.  Make a condition of
27  that parole grant that he continue in his AA

1   treatment, that is a basis for parole recision
2   then if he does not.  That is the best way to
3   handle that issue of insuring that he continues
4   with that programming, not by withholding a date
5   from him so that you would never know when you
6   were going to be released.  Ok so then we go to
7   the next and last factor and we see it applies
8   as well.  So that there is a unanimous showing
9   of applicability of the suitability factors.
10  And that is understanding and plans for the
11  future.  Has he developed realistic plans or
12  skills that can be put to use upon release.  You
13  see he has done both in that case.  He has his
14  plans for what is most realistic, really the
15  only realistic plan for the future is he is
16  going to be deported to Mexico.  And he is fully
17  prepared for that.  He has his wife ready to
18  move as need be back there.  I think that does
19  address the concern somewhat expressed by the
20  District Attorney that he is going to go down
21  there an illegally cross the border.  Again he
22  is going to have his parents that are down there
23  as well as his wife.
24  **DEPUTY DISTRICT ATTORNEY DELAGARZA:**  Excuse
25  me according to the parent's letter they live in
26  the United States.
27  **PRESIDING COMMISSIONER LEE:**  The letter I

1    read from Mexico indicates that their property

2    is in Mexico and that is where they have a place

3    for him to stay.

4        ATTORNEY SATRIS:  Well let me clarify--

5        DEPUTY DISTRICT ATTORNEY DELAGARZA:  It

6    says we are living permanently in the United

7    States, page two first line.

8        PRESIDING COMMISSIONER LEE:  I understand

9    counsel but the question is where will he stay

10   and what will he do in Mexico.  I don't care,

11   there is no indication that he has to live with

12   parents.  The letter clearly indicates that he

13   would be living in Mexico and that is where he

14   would be working.  Am I correct Mr. Satris?

15       ATTORNEY SATRIS:  Say that again I was

16   conferring with my client.

17       PRESIDING COMMISSIONER LEE:  The letter

18   that I read that was translated is that the

19   inmate, this is the letter dated November 16,

20   2005, the inmate will live in Mexico on their

21   property is that correct?

22       ATTORNEY SATRIS:  Right.

23       PRESIDING COMMISSIONER LEE:  Ok.

24       ATTORNEY SATRIS:  And they have substantial

25   ties there.  They are there right now.  Whether

26   there--

27       PRESIDING COMMISSIONER LEE:  Whether they

1   go back and forth is irrelevant to me.

2       **ATTORNEY SATRIS:**  Ok.

3       **PRESIDING COMMISSIONER LEE:**  Ok.

4       **ATTORNEY SATRIS:**  So let me move on then.

5   Let me talk for a minute about the Mexico plans

6   and the likelihood of deportation.  What is

7   called the strong probability. What it is, is as

8   certain a likelihood as can be and that is based

9   on the law.  Which provides that not only

10  because Mr. Carranza was an undocumented alien

11  at the time, which makes him deportable.  He is

12  deportable now as well because of the crime,

13  which is part of the new legislation that was

14  passed a few years back.  And that is a very

15  strict law that makes him first of all removable

16  and requires mandatory detention during the

17  course of the removal proceedings and that is

18  under Eight USC Section 1226c.  So there is no

19  discretion by California not to offer Mr.

20  Carranza to authorities.  There is no discretion

21  of federal authorities not to come and pick him

22  up.  And while immigration law provides for

23  various acceptation's in certain circumstances

24  depending on the status of the wife and so

25  forth, none of those exceptions apply under the

26  provision where their inmate has committed, I

27  forget how they call it exactly, but an

1   aggravated violent felony under 110143a.   That
2   makes him ineligible for cancellation of removal
3   for voluntary departure or for political asylum.
4   His only possible remedy under the law to avoid
5   deportation is if it would involve torture if he
6   went back there.   He makes no claim, there is no
7   claim of that.   It is as guaranteed as can be
8   that he is going to be deported.   Now that is
9   important not only for parole plans but for you
10   to assess under the statute and regulations
11   whether in fact the setting of a parole date for
12   Mr. Carranza would unreasonably threaten public
13   safety.   And it would not.   The very, very, very
14   simple reason that he is never going to be
15   setting foot in California again.   He goes
16   straight from confinement here to confinement
17   under federal authorities, no bail, into
18   removal.   And the law further provides that once
19   he is released or deported to Mexico there is no
20   way for him to legally come back to the United
21   States, he is permanently excluded.   And if he
22   came back illegally as the concern was expressed
23   he would be subject to felony criminal
24   prosecution and exposed to a federal prison
25   sentence of up to 20 years.   He is not going to
26   risk that. I think you can be reasonably
27   satisfied on that point.   So there is no basis

1   to find that he would present and unreasonable
2   risk rather, now I know the victims kin here
3   will be speaking after me. I know that is
4   pursuant to the board's rules that you were
5   explaining off the record to them before and I
6   would lodge an objection just in terms of due
7   process because of notice but I know that is
8   futile. The board is going to follow its rules
9   in that regard but let me just say in closing as
10  Mr. Carranza said he has totally changed and
11  reformed himself. As we exactly hope that
12  arrest and incarceration will do. And I for one
13  was impressed with the remarks that were made at
14  the time of sentencing by the victim's kin at
15  that time. And in fact it was by one that was
16  here now with the sister Cecelia who said she
17  appreciated that justice has been done, I am
18  paraphrasing a little bit there. I hope in the
19  years to come he, Mr. Carranza, will reconsider
20  his acts. And that hope expressed with great
21  restraint by the victims kin has been fulfilled
22  in this case. The board should recognize change
23  and rehabilitation when it sees it. When it is
24  across the table from it. And hold up that as a
25  example of what we want prisoners to do in terms
26  of reform and reformation. And set a parole
27  date on that basis so that the law if followed.

1    Thank you.

2        **PRESIDING COMMISSIONER LEE:**  Thank you Mr.

3    Satris.  At this time I am going to turn to the

4    victims next of kin.  And would you please

5    indicate before the statement, your name again

6    spell your last name and your relationship.  And

7    I will ask you to limit your self in regards to

8    how the incident has impacted your lives and

9    those in your family.  And the reason being is

10    that sometimes information comes out from

11    another source, I heard about this and I heard

12    about that and it becomes problematic because we

13    don't have any foundation for that.  So

14    nonetheless feel free to say whatever you need

15    to say and I will do what I need to do in

16    regards to giving it weight.  So go ahead.

17        **MR. MUNOZ:**  My name is Louis Munoz I am the

18    brother of the victim and I am a victim myself

19    too.  Louis, L-O-U-I-S, Munoz, M-U-N-O-Z.  On

20    behalf of the Munoz family we would like to ask

21    the parole board that the inmate Alfonso

22    Carranza complete his sentence in full.  The

23    pain and damage he caused the family Munoz, he

24    literally killed my brother (indiscernible).  He

25    attempted to kill my two other brothers Raoul

26    Munoz and Pedro Munoz.  We don't think that he

27    is ready for society or he has been

75

1   rehabilitated to be in society either in Mexico
2   or in the US.  We think that he is a threat to
3   society.  He is not ready to be a productive man
4   in socieity.  When people are in jail they
5   always want to get out and they will say
6   whatever.  A person who is used to doing crime
7   all of his life (indiscernible) what is the
8   chances he will not commit crime again.  What
9   are the chances he will not kill another human
10  being again.  When they do it once they can do
11  it again.  And the other (indiscernible) he not
12  only killed my brother he destroyed part of my
13  family.  He destroyed part of the Munoz family.
14  Since my brother (indiscernible) died we never
15  been the same.  After the murder of my brother I
16  was only 15 years old when he was murdered.  I
17  was in deep depression for a long time because
18  my brother was my best friend.  We grew up
19  together.  That night when he left that Friday
20  night we were supposed to go to Knotts Berry
21  Farm the next day, I never seen my brother
22  again.  My brother died.  It has been a long
23  time, it might seem like a long time but it
24  takes sometimes longer for a person to
25  rehabilitate and get back to socieity.  Like I
26  mentioned earlier he did not only take my
27  brothers life but he did it with no remorse

1   whatsoever.  When we were in trial pro bono
2   every time we go into the courthouse he will
3   come out and he will laugh at us.  I was there,
4   I remember.  I don't think he stopped and
5   thinked (sic) he was taking a young kids life.
6   My brother was only 18 when he died.  He was
7   only 18 years old and I would like the parole
8   board to keep that in mind my brother would have
9   been 38 years old right now.  37 or 38 years old
10  so we believe he should stay in prison for the
11  time until he finishes his sentence.  To pay to
12  society for what he had done, to be sure that
13  when he gets out of this prison he is not a
14  threat to another person.  Not only worrying
15  about my family, what has happened to my family
16  was already done.  I am worrying about another
17  human being, being in danger again by a person
18  that had already killed.  And that god knows
19  what he feels.  I know what I feel.  The pain of
20  my brother still feels like it happened
21  yesterday.  Every time I get up in the morning I
22  think of my brother.  And all I am asking for is
23  for him to pay for the crime that he committed
24  to society.  Thank you very much.
25          PRESIDING COMMISSIONER LEE:  Thank you sir.
26  Ma'am.
27          MS. O'REILLY:  Ladies and gentlemen I am

1  Cecelia O'Reilly, I am the sister of Juan, Jose,

2  Raoul, and Pedro Munoz.  My brothers that were

3  victims of the crime at the hands of Mr. Alfonso

4  Carranza.  Years has passed by that is true but

5  we have never forgotten his reaction.  He tried

6  to take three lives away in the matter of

7  seconds.  And he did, he killed my younger

8  brother when he was in the prime of his life.

9  When he was only 18 years old.  Without knowing

10 him, without having a word with him before that

11 night.  He wounded my older two brothers.  He

12 left my other brothers hurt, one dead and the

13 other one bleeding.  On top of that not only

14 happy with that he chased my older brother, he

15 had a bullet in his neck, and he run after him

16 because he tried to finish his work.  He tried

17 to take his life away.  He killed the youngest

18 and he gived (sic) scars to my family forever.

19 Because we have never been the same since then.

20 We always have that empty spot when the family

21 get together his seat is always empty.  My

22 brother he could have been right now 37 years

23 old. He could have had a family, he could have

24 been married but no he is not there anymore.

25 Mr. Carranza showed to my family the Munoz

26 family, the pain and suffering of loosing

27 someone in death.  He showed to my family what a

1  person can be what a human being can be capable
2  to do to hurt others.  He really give us a lot
3  of thought.  We don't hate him.  We hate his
4  actions what he did to us.  And he did it once,
5  he did it twice he can do it again.  The only
6  thing I am asking is for him to finish, to do
7  his time for some reason the state given him 25
8  years let him finish his time until the last
9  day.  Why because he has to learn his lesson.
10  He has to learn that before he grab a gun again
11  he has to think twice.  You cannot take peoples
12  lives away like drinking a soda or changing
13  shoes.  You cant. No one has the right to take
14  no ones life.  And I believe Mr. Carranza has to
15  learn.  Because could you imagine if someone
16  would have taken one of your kids lives away.
17  Would you let them go or let them leave before
18  the time?  I don't think so.  Anyone in this
19  room wouldn't do that.  You would agree with me
20  and you would ask the same thing.  I am opposed
21  to his parole.  That is why I took my time.
22  That is why I am here.  I just want to make sure
23  you guys make the right decision.  It is not
24  easy to believe someone with such a history of
25  violence and crime and let them go outside.
26  Because if he does it again before the time it
27  is going to be on your conscious and it is a big

1    responsibility on your shoulders.  Before you
2    make any decision I please ask you to make sure
3    you are doing the right thing.  Because if
4    happened to my family it could happen to you
5    too.  So please of course I am glad he is doing
6    changes and I didn't mention it to him but I
7    remember.  17 years ago when I talked to him.  I
8    was happy that justice was done.  They give him
9    25 years that is justice, let him finish the 25
10   years (indiscernible) before the time.  And I am
11   glad that he wants to make changes.  But
12   everybody wants to make points when they want to
13   leave before.  My brother is not alive.  He
14   feels the son everyday on his face.  My brother
15   is not here anymore.  We don't hate him we just
16   want him to pay for what he did.  And after the
17   25 years if it is ok if he wants to go on with
18   his life, I mean everybody has a right to change
19   but not before the time.  I really thank you for
20   all this but I don't think Mr. Carranza is ready
21   to reintegrate to society.  I don't think he, I
22   think he needs to really try hard and I want him
23   to finish to the last day of the sentence.
24        PRESIDING COMMISSIONER LEE:  Thank you for
25   your comments.  At this time we are going to
26   recess and deliberate and we will call everyone
27   back once we have made our decision, thank you

1    very much.

2                        R E C E S S

3                        --oOo--

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

1            CALIFORNIA BOARD OF PAROLE HEARINGS

2                     D E C I S I O N

3        DEPUTY COMMISSIONER THOMPSON:  We are back

4  on record.

5        PRESIDING COMMISSIONER LEE:  Ms. Delagarza

6  we are about to begin.  Apparently you have been

7  abandoned Ms. Delagarza.

8        DEPUTY DISTRICT ATTORNEY DELAGARZA:  In

9  what way?

10       PRESIDING COMMISSIONER LEE:  Oh I see empty

11 chairs now.

12       DEPUTY DISTRICT ATTORNEY DELAGARZA:  Oh

13 they are standing right here.

14       PRESIDING COMMISSIONER LEE:  Oh ok we are

15 waiting for the victims next of kin, they are in

16 the restroom.

17       ATTORNEY SATRIS:  We are off the record now

18 or are we on?

19       DEPUTY COMMISSIONER THOMPSON:  If you want

20 to be you can be.

21       ATTORNEY SATRIS:  No I don't want to be.

22       PRESIDING COMMISSIONER LEE:  Can we go off

23 the record Deputy Commissioner?

24       DEPUTY COMMISSIONER THOMPSON:  We are back

25 on the record.

26       PRESIDING COMMISSIONER LEE:  All right I

27 ALFONSO CARRANZA E-30803 DECISION PAGE 1 4/19/2006

```
 1    think everybody has returned at this point and
 2    time.  Ms. Delagarza is there.  The panel has
 3    reviewed all information received from the
 4    public and relied on the following circumstances
 5    in concluding the prisoner is not suitable for
 6    parole and would pose an unreasonable risk to
 7    society or a threat to public safety if released
 8    from prison.  Multiple victims were attacked,
 9    injured and one killed during the offense.  The
10    offense was carried out in a dispassionate and
11    calculated manner.  The offense was carried out
12    in a manner, which demonstrates an exceptional
13    callous disregard for human suffering.  The
14    motive of the crime was inexplicable or very
15    trivial in relationship to the offense.  The sad
16    part of my position is that I truly do not know
17    what occurred out on the street nor does the
18    Deputy Commissioner.  We are only privy to what
19    is submitted before us.  The inmate's version is
20    totally at odds with the information we have
21    received in our packets.  The information
22    apparently in the packets seem to indicate at
23    trial the witnesses did indicate there was an
24    ongoing dispute that had apparently on at least
25    two occasions an attempt to solve this
26    particular dispute in fact it seems to indicate
27    ALFONSO CARRANZA E-30803 DECISION PAGE 2 4/19/2006
```

1    there was a point and time where both sides

2    shook hands.  But that is where we come to or I

3    must take as the facts in this case.  And

4    apparently the inmate began shooting for no

5    apparent reason.  There is no indication that

6    the individuals were aggressors.  The

7    information seems to indicate that one

8    individual was struck in the neck, two other

9    individuals were shot at, and one died.  The

10    offense itself is of sufficient severity for the

11    denial. And for that reason the inmate is being

12    denied.  The inmate is also being denied because

13    he has an escalating pattern of criminal

14    conduct.  It clearly indicates that not only

15    being a user the inmate went into drug selling

16    and unfortunately even after the offense

17    continued on in a lifestyle that he has

18    indicated himself that was leading him to

19    destruction.  One suspects this is a continued

20    lifestyle not only in drugs and alcohol but also

21    in violence.  There was information in regards

22    to activities after this offense prior to his

23    arrest.  The inmate has failed at previous

24    grants of probation and cannot be counted upon

25    to avoid criminality.  Sir it is unfortunate

26    that in both instances where people have lost

27    ALFONSO CARRANZA E-30803 DECISION PAGE 3 4/19/2006

1   their lives.  One which you were acquitted they

2   were apparently in bars.  Which leads to, I mean

3   which can infer there was alcohol use but also

4   your admitted usage in regards to cocaine.  You

5   had an opportunity under driving under the

6   influence in 1980 or excuse me in 1980 as well

7   as in 1984 to get off both drugs and alcohol for

8   whatever reasons you were unable to do so.  And

9   the reasons I am bringing that up is because of

10   your lack of AA and NA participation which I

11   will get to in just a minute.  The inmate has

12   failed to profit from societies previous

13   attempts to correct his criminality such

14   attempts include adult probation as well as your

15   drug rehab.  The prisoner has failed to

16   sufficiently participate in self-help and

17   therapy programming.  Sir it is amazing to me in

18   light of the situation you got yourself into

19   that you have not looked into AA and NA.  The

20   concerns expressed by the victims as well as the

21   District Attorney are the same concerns of the

22   panel.  If a person chooses to stop taking

23   alcohol or drugs that is obviously a good

24   choice.  No one is doubting that.  But that also

25   leads to the next step that you can readily

26   chose to take drugs and alcohol again.  One of

27   ALFONSO CARRANZA E-30803 DECISION PAGE 4 4/19/2006

1   the things about AA and NA is the basic precept

2   that you need help from other people.  That they

3   would assist you outside.  And I am hoping that

4   you understand that at some point and time and

5   receive that type of assistance.  Now if you

6   find another plan that you like better that is

7   fine too.  But we believe you need substance

8   abuse programming.  In regards to the inmate's

9   parole plans I think they are sufficient.

10  Obviously if you ever receive a date all parole

11  plans go through what we call legal review.

12  That means that an investigator will actually go

13  and determine whether or not your plans are

14  valid.  And that is not because we don't believe

15  you but we have had individuals lie to us in the

16  past.  So the concerns are unwarranted at this

17  stage.  I believe if you are foolish enough to

18  lie to us that, that would be found out.  But at

19  this point and time you have a place to stay

20  both in Mexico and the United States as well as

21  job offers.  However the panel notes opposition

22  to your finding of suitability both from the

23  District Attorney's office of Los Angeles County

24  as well as the victim's next of kin.  The panel

25  makes the following findings.  The prisoner

26  needs therapy, programming and self-help in

27  ALFONSO CARRANZA E-30803 DECISION PAGE 5 4/19/2006

1   order to face, discuss, understand, and cope

2   with stress in a non destructive manner as well

3   as to get further insight into the crime.  Until

4   progress is made the prisoner continues to be

5   unpredictable and a threat to others.

6   Nonetheless the prisoner should be commended for

7   the following.

8       **DEPUTY COMMISSIONER THOMPSON:**  Well he did

9   remain disciplinary free and he has been

10  involved in counseling his peers and the Spanish

11  speaking inmates as well as concerning both

12  health issues and as well as adjustment issues.

13  And he was noted and commended for that by the

14  church group, I believe it is Jubilee Christian

15  church.  And he has a number of letters thanking

16  him for his help and his cooperation in various

17  events.  I think they all show a willingness to

18  be socialized and try to have empathy for other

19  people.  Which is to be commended and hopefully

20  built on as a good foundation for future life or

21  future contacts.  And I think all in all he has

22  made some educational efforts, he did get an

23  equivalency degree.  And he has taken English as

24  a second language which makes him a good role

25  model for Spanish speaking inmates who are

26  trying to interface and interrelate to an

27  ALFONSO CARRANZA E-30803 DECISION PAGE 6 4/19/2006

1   English speaking, American English admittedly,

2   but an English speaking community.  And I think

3   that is all commendable.

4        PRESIDING COMMISSIONER LEE:  However these

5   positive aspects of his behavior do not outweigh

6   the factors of unsuitability.  This is the

7   inmate initial hearing.  The District Attorney

8   has indicated that five years is the appropriate

9   denial time.  I will indicate in a separate

10  decision the hearing panel finds that the

11  prisoner has been convicted of murder as well as

12  attempted homicide and it is not reasonable to

13  expect parole would be granted in the next four

14  years.  Sir I will tell you we had discussions

15  about this particular area.  But Mr. Satris does

16  indicate the obvious.  You were not given the

17  sentence of life without possibility of parole,

18  you are attempting at this point and time to

19  better yourself.  I don't believe five years is

20  appropriate.  I think four years is the

21  appropriate amount to get together the things

22  that you do need to get together.  Including AA,

23  right now you have no track record at all.  Some

24  individuals as you know have been going to AA

25  for 10 or 15 years.  So that the concern that

26  has been expressed by various individuals will

27  ALFONSO CARRANZA E-30803 DECISION PAGE 7 4/19/2006

1   be alleviated.  That you will go back and end up

2   doing the same things you did before and

3   ultimately hurting others once again.  I cannot

4   emphasize or over emphasize to you the concern

5   that the panel has but not even just the panel.

6   The governor has a very similar concern and I

7   suggest strongly that you reassess your position

8   in regards to AA and NA.  The reason for the

9   multiple year denial is that multiple victims

10  were attacked.  It is very obvious that whatever

11  occurred out there for what ever reasons you had

12  no intentions of stopping.  That you intended to

13  deal with the three individuals out on the

14  street.  The offense was carried out in a

15  manner, which demonstrates an exceptional

16  callous disregard for human suffering.  One of

17  the individuals apparently was wounded and you

18  continued on afterwards.  The motive for the

19  crime was very inexplicable very trivial in

20  relation to the offense.  In your own statement

21  you overreacted and based upon what you

22  indicated you observed.  The prisoner apparently

23  did not learn from his previous contacts with

24  the criminal justice system.  The prisoner has

25  not completed necessary programming, which is

26  essential to his adjustment and need additional

27  ALFONSO CARRANZA E-30803 DECISION PAGE 8 4/19/2006

1   time to gain such programming.  Specifically the

2   inmate needs to participate in AA as well as NA

3   or the equivalent.   Therefore a longer period of

4   observation and evaluation of the prisoner is

5   required before the board should find that the

6   prisoner is suitable for parole.  The panel

7   recommends the inmate remain disciplinary free,

8   and if available participate in self-help and

9   therapy programming.  Deputy Commissioner?

10      DEPUTY COMMISSIONER THOMPSON:  I wouldn't

11  add anything to that except to wish you well.

12  And that is it from my side.

13      PRESIDING COMMISSIONER LEE:  Good luck sir.

14      INMATE CARRANZA:  You do the same.

15      ATTORNEY SATRIS:  Is there an automatic

16  policy that he will see the psychologist four

17  years down the road or do you need to make a

18  special request for that.

19      PRESIDING COMMISSIONER LEE:  You know what

20  as you know we kind of bounce back and forth.

21  But based upon your request I am assuming you

22  wish for me to readmit an evaluation to the

23  inmate and I will do that.

24      ATTORNEY SATRIS:  Ok thank you.

25      PRESIDING COMMISSIONER LEE:  All right at

26  this time we are in recess.

27  ALFONSO CARRANZA E-30803 DECISION PAGE 9 4/19/2006

--oOo--

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23     PAROLE DENIED FOR FOUR YEARS          AUG 1 6 2006

24     THIS DECISION WILL BE FINAL ON:_____

25     YOU WILL BE PROMPLTY NOTIFIED IF, PRIOR TO THAT

26     DATE, THE DECISION IS MODIFIED

27     ALFONSO CARRANZA E-30803 DECISION PAGE 10 4/19/2006

# CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, JENNYFER OSECHECK, a duly designated transcriber, PETERS SHORTHAND REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1 -90, and which recording was duly recorded at SAN QUENTIN STATE PRISON, SAN QUENTIN, CALIFORNIA, in the matter of the INITIAL PAROLE CONSIDERATION HEARING OF ALFONSO CARRANZA, CDC NO. E-30803, ON APRIL 19, 2006, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape to the best of my ability.

I hereby certify that I am a disinterested party in the above-mentioned matter and have no interest in the outcome of the hearing.

Dated   May 29, 2006 at Sacramento, California.

_____
JENNYFER OSECHECK
TRANSCRIBER
**PETERS SHORTHAND REPORTING**

E X H I B I T   B

CALIFORNIA CODE OF REGULATIONS TITLE 15, SECTION 2400-2411, PAGES 73-81

### § 2373. Nonlife 1168 and ISL Prisoners: Parole Consideration Hearing Rights.

(a) Multijurisdiction Prisoners Located in California. At all hearings at which a prisoner is being considered for parole, all multijurisdiction prisoners located in California shall have the rights specified in Sections 2245–2255.

(b) Multijurisdiction Prisoners Located Outside California. At all hearings at which a prisoner is being considered for parole all multijurisdiction prisoners located outside California shall have the rights specified in Section 2367. The hearing shall be a telephone hearing.

(c) Record. The record of any parole consideration hearing shall be a tape recording. Until July 1, 1978, for all multijurisdiction ISL prisoners, the record shall be a written summary of the hearing prepared at the hearing by department staff. After July 1, 1978, the record shall be a tape recording.

#### HISTORY

1. Repealer of former Section 2373 and renumbering of Section 2374 to Section 2373 filed 6–11–79; effective thirtieth day thereafter (Register 79, No. 24). For history of former section, see Register 77, No. 44.

## Article 11. Parole Consideration Criteria and Guidelines for Murders Committed on or After November 8, 1978, and Specified Attempted First Degree Murders Committed on or After January 1, 1987

### § 2400. Scope of Article.

The criteria and guidelines in this article apply to prisoners sentenced to prison for first and second degree murders committed on or after November 8, 1978 and attempted first degree murders where the perpetrator is sentenced for life under the provisions of Penal Code Section 664, effective January 1, 1987. The guidelines in this article are based on the public's expressed intent in amending Penal Code Sections 190 and 664 that a person convicted of first or second degree murder or attempted first degree murder, as specified should be incarcerated for an extended period of time.

The prisoner's minimum eligible parole date is established by statute. The amount of good conduct credit that a prisoner sentenced for first or second degree murder may earn to reduce the minimum eligible parole date is established by statute. (Penal Code Sections 2930–2933.) Life prisoners convicted of attempted first degree murder do not earn these credits; their minimum eligible parole date will be established pursuant to Penal Code Section 3046. The Department of Corrections will determine the minimum eligible parole date. The length of time a prisoner must serve prior to actual release on parole is determined by the board. The amount of postconviction credit a prisoner may earn to reduce the length of time prior to release on parole is determined by the board. This article implements Penal Code Section 3041 and concerns only the board's exercise of discretion in determining whether a prisoner is suitable for parole and, if so, when the prisoner should be released on parole.

The standards for the Department's action in reducing the minimum eligible parole date and the standards for the board's decision whether to reduce the period of confinement are different. The Department's decisions under Penal Code Sections 2930–2933 do not affect the board's decision concerning postconviction credit under these rules.

A prisoner committed for first or second degree murder or attempted first degree murder shall have his or her initial parole consideration hearing as provided in Section 2268. The prisoner will have documentation hearings as provided in Section 2269.1, but no specific amount of postconviction credit will be granted until the board has established a period of confinement.

Although many of the sections in this article are the same as the sections in Article 10, there are differences in procedures to avoid confusion between the rules applicable to prisoners who committed murders on or before November 7, 1978 and these rules which apply to prisoners who committed murders on or after November 8, 1978, and those who committed attempted murder on or after January 1, 1987. The suitability criteria are the same for both groups. The guidelines for establishing the periods of confinement are different because of the change in the minimum term for first degree murder and the change from a determinate to an indeterminate term for second degree murder and attempted first degree murder. The provisions for adjusting the terms for other offenses are also different because of the change in Penal Code Section 669 which permits courts to impose sentences consecutive to life terms (Stats. 1978, Ch. 579, eff. 1/1/79).

As used in this article, "life prisoner(s)" refers only to persons committed to prison for first or second degree murders committed on or after November 8, 1978, or to persons committed to prison for life for attempted murders committed on or after January 1, 1987.

NOTE: Authority cited: Section 5076.2, Penal Code. Reference: Sections 190, 664, 2930–2933, 3040, 3041, 3046 and 5076.1, Penal Code.

#### HISTORY

1. New Article 11 (Sections 2400–2411) filed 9–8–81; effective thirtieth day thereafter (Register 81, No. 37).
2. Amendment filed 6–14–84; effective thirtieth day thereafter (Register 84, No. 24).
3. Amendment filed 11–13–85; effective thirtieth day thereafter (Register 85, No. 46).
4. Amendment filed 1–20–88; operative 2–19–88 (Register 88, No. 5).

### § 2401. General.

A life prisoner shall be considered for parole for the first time at the initial parole consideration hearing scheduled as provided in Section 2268. A parole date shall be denied if the prisoner is found unsuitable for parole under Section 2402(c). A parole date shall be set if the prisoner is found suitable for parole under Section 2402(d). A parole date set under this article shall be set in a manner that provides uniform terms for offenses of similar gravity and magnitude with respect to the threat to the public.

In setting the parole date the panel shall consider the Sentencing Rules for the Superior Courts. The panel shall also consider the criteria and guidelines set forth in this article for determining the suitability for parole and the setting of parole dates, considering the number of victims of the crime for which the prisoner was sentenced and any other circumstances in mitigation or aggravation.

The terms in this article are guidelines only. The suggested terms serve as the starting point for the board's consideration of each case on an individual basis. The board may establish a term above or below the guidelines when warranted and reasons are stated on the record. A prisoner shall not be released before the minimum eligible parole date.

NOTE: Authority cited: Section 5076.2, Penal Code. Reference: Sections 3040 and 3041, Penal Code.

#### HISTORY

1. Amendment filed 8–12–82; effective thirtieth day thereafter (Register 82, No. 33).
2. Amendment filed 11–13–85; effective thirtieth day thereafter (Register 85, No. 46).

### § 2402. Determination of Suitability.

(a) General. The panel shall first determine whether the life prisoner is suitable for release on parole. Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison.

(b) Information Considered. All relevant, reliable information available to the panel shall be considered in determining suitability for parole. Such information shall include the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, dur-

and after the crime; past and present attitude toward the crime; conditions of treatment or control, including the use of special conditions or which the prisoner may safely be released to the community; and other information which bears on the prisoner's suitability for re-. Circumstances which taken alone may not firmly establish unsuitly for parole may contribute to a pattern which results in a finding insuitability.

) Circumstances Tending to Show Unsuitability. The following circumstances each tend to indicate unsuitability for release. These circumstances are set forth as general guidelines; the importance attached to any circumstance or combination of circumstances in a particular case is left the judgment of the panel. Circumstances tending to indicate unsuity include:

) Commitment Offense. The prisoner committed the offense in an especially heinous, atrocious or cruel manner. The factors to be considered include:

) Multiple victims were attacked, injured or killed in the same or separate incidents.

) The victim was carried out in a dispassionate and calculated manner such as an execution–style murder.

) The victim was abused, defiled or mutilated during or after the of-

) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.

) The motive for the crime is inexplicable or very trivial in relation offense.

Previous Record of Violence. The prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if prisoner demonstrated serious assaultive behavior at an early age.

Unstable Social History. The prisoner has a history of unstable or tumultuous relationships with others.

Sadistic Sexual Offenses. The prisoner has previously sexually assaulted another in a manner calculated to inflict unusual pain or fear upon victim.

Psychological Factors. The prisoner has a lengthy history of severe problems related to the offense.

Institutional Behavior. The prisoner has engaged in serious misconduct in prison or jail.

Circumstances Tending to Show Suitability. The following circumstances each tend to show that the prisoner is suitable for release. The circumstances are set forth as general guidelines; the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the panel. Circumstances tending to indicate suitability include:

) Juvenile Record. The prisoner does not have a record of assaults as a juvenile or committing crimes with a potential of personal victims.

(2) Stable Social History. The prisoner has experienced reasonably stable relationships with others.

(3) Signs of Remorse. The prisoner performed acts which tend to indicate the presence of remorse, such as attempting to repair the damage, seeking help for or relieving suffering of the victim, or indicating that he understands the nature and magnitude of the offense.

(4) Motivation for Crime. The prisoner committed his crime as the result of significant stress in his life, especially if the stress has built over a long period of time.

(5) Lack of Criminal History. The prisoner lacks any significant history of violent crime.

(6) Age. The prisoner's present age reduces the probability of recidivism.

(7) Understanding and Plans for Future. The prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release.

(8) Institutional Behavior. Institutional activities indicate an enhanced ability to function within the law upon release.

NOTE: Authority cited: Section 5076.2, Penal Code. Reference: Section 3041, Penal Code.

## § 2403.  Base Term.

(a) General. The panel shall set a base term for each life prisoner who is found suitable for parole. The base term shall be established solely on the gravity of the base crime, taking into account all of the circumstances of that crime. If the prisoner has been received in prison for more than one murder committed on or after November 8, 1978 the base crime is the most serious of the murders considering the facts and circumstances of the crime. If the prisoner has been sentenced to prison for murders committed before November 8, 1978 and for murders committed on or after November 8, 1978 the base offense shall be the most serious of the murders committed on or after November 8, 1978.

The base term shall be established by utilizing the appropriate matrix of base terms provided in this section. The panel shall determine the category most closely related to the circumstances of the crime. The panel shall impose the middle base term reflected in the matrix unless the panel finds circumstances in aggravation or mitigation.

Provided, however in cases of attempted murder, after determining the category as specified, the panel shall impose one–half the middle base term, unless the panel finds circumstances in aggravation or mitigation.

If the panel finds circumstances in aggravation or in mitigation as provided in Sections 2404 or 2405, the panel may impose the upper or lower base term provided in the matrix by stating the specific reason for imposing such a term. A base term other than the upper, middle or lower base term provided in the matrix may be imposed by the panel if justified by the particular facts of the individual case and if the facts supporting the term imposed are stated.

(4–1–90)

CIRCUMSTANCES

| FIRST DEGREE MURDER<br>Penal Code § 189 in years and does not include post conviction credit as provided in § 2290) | A. Indirect<br>Victim died of causes related to the act of the prisoner but was not directly assaulted by prisoner with deadly force; e.g., shock producing heart attack; a crime partner actually did the killing. | B. Direct or Victim Contribution<br>Death was almost immediate or resulted at least partially from contributing factors from the victim; e.g., victim initiated struggle or had goaded the prisoner. This does not include victims acting in defense of self or property. | C. Severe Trauma<br>Death resulted from severe trauma inflicted with deadly intensity; e.g., beating, clubbing, stabbing, strangulation, suffocation, burning, multiple wounds inflicted with a weapon not resulting in immediate death or actions calculated to induce terror in the victim | D. Torture<br>Victim was subjected to the prolonged infliction of physical pain through the use of tendency, force prior to act resulting in death |
|---|---|---|---|---|
| I. Participating Victim<br>Victim was accomplice or otherwise implicated in a criminal act with the prisoner during which or as a result of which the death occurred, e.g. crime partner, drug dealer, etc. | 25—26—27 | 26—27—28 | 27—28—29 | 28—29—30 |
| II. Prior Relationship<br>Victim was involved in a personal relationship with prisoner (spouse, family member, friend, etc.) which contributed to the motivation for the act resulting in death. If victim had a personal relationship but prisoner hired and/or paid a person to commit the offense, see Category IV. | 26—27—28 | 27—28—29 | 28—29—30 | 29—30—31 |
| III. No Prior Relationship<br>Victim had little or no personal relationship with prisoner, or motivation for act resulting in death was related to the accomplishment of another crime, e.g. death of victim during robbery, rape, or other felony. | 27—28—29 | 28—29—30 | 29—30—31 | 30—31—32 |
| IV. Threat to Public Order or Murder for Hire<br>The act resulting in the victim's death constituted a threat to the public order include the murder of a police officer, prison guard, public official, fellow patient or prisoner, any killing within an institution, or any killing where the prisoner hired and/or paid another person to commit the offense | 28—29—30 | 29—30—31 | 30—31—32 | 31—32—33 |

SUGGESTED BASE TERM

(c) Matrix of Base Terms for Second Degree Murder on or after November 8, 1978.

CIRCUMSTANCES

| SECOND DEGREE MURDER<br>Penal Code § 189 in years and does not include post conviction credit as provided in § 2290) | A. Indirect<br>Victim died of causes related to the act of the prisoner but was not directly assaulted by prisoner with deadly force; e.g. shock producing heart attack; a crime partner actually did the killing. | B. Direct or Victim Contribution<br>Death was almost immediate or resulted at least partially from contributing factors from the victim; e.g., victim initiated struggle or had goaded the prisoner. This does not include victims acting in defense of self or property. | C. Severe Trauma<br>Death resulted from severe trauma inflicted with deadly intensity; e.g. beating, clubbing, stabbing, strangulation, suffocation, burning, multiple wounds inflicted death or actions calculated to induce terror in the victim. |
|---|---|---|---|
| I. Participating Victim<br>Victim was accomplice or otherwise implicated in a criminal act with the prisoner during which or as a result of which the death occurred, e.g. crime partner, drug dealer, etc. | 15—16—17 | 16—17—18 | 17—18—19 |
| II. Prior Relationship<br>Victim was involved in a personal relationship with prisoner (spouse, family member, friend, etc.) which contributed to the motivation for the act resulting in death. If victim had a personal relationship but prisoner hired and/or paid a person to commit the offense, see Category IV. | 16—17—18 | 17—18—19 | 18—19—20 |
| III. No Prior Relationship<br>Victim had little or no personal relationship with prisoner; or motivation for act resulting in death was related to the accomplishment of another crime, e.g. death of victim during robbery, rape, or other felony. | 17—18—19 | 18—19—20 | 19—20—21 |

SUGGESTED BASE TERM

NOTE: Authority cited: Section 5076.2, Penal Code. Reference: Sections 3040 and 3041, Penal Code.

HISTORY

1. Editorial correction filed 10-8-81; effective thirtieth day thereafter (Register 81, No. 41).

2. Amendment of subsection (a) filed 1-20-88; operative 2-19-88 (Register 88, No. 5).

§ 2404.  Circumstances in Aggravation of the Base Term.
(a) General. The panel may impose the upper base term or another term longer than the middle base term upon a finding of aggravating circumstances. Circumstances in aggravation of the base term include:

(1) The crime involved some factors described in the appropriate matrix in a category higher on either axis than the categories chosen as most closely related to the crime;
(2) The victim was particularly vulnerable;
(3) The prisoner had a special relationship of confidence and trust with the victim, such as that of employee-employer;
(4) The murder was committed to preclude testimony of potential or actual witnesses during a trial or criminal investigation;
(5) The victim was intentionally killed because of his race, color, religion, nationality or country or origin;
(6) During the commission of the crime the prisoner had a clear opportunity to cease but instead continued;

(4–3–90)

) The manner in which the crime was committed created a potential ...erious injury to persons other than the victim of the crime;

) The murder was wanton and apparently senseless in that it was ...nitted after another crime occurred and served no purpose in com-...ng that crime;

) The corpse was abused, mutilated or defiled;

0) The prisoner went to great lengths to hide the body or to avoid de-...n;

1) The murder was committed to prevent discovery of another ...;

2) The murder was committed by a destructive device or explosives;

3) There were multiple victims for which the term is not being en-...ed under Section 2407;

4) The prisoner intentionally killed the victim by the administration ...ison;

5) The prisoner intentionally killed the victim by lying in wait;

6) The prisoner occupied a position of leadership or dominance over ...participants in the commission of the crime, or the prisoner induced ...s to participate in the commission of the crime;

7) The prisoner has a history of criminal behavior for which the term ...being enhanced under Section 2407;

8) The prisoner has engaged in other reliably documented criminal ...ct which was an integral part of the crime for which the prisoner ...rently committed to prison;

9) The prisoner was on probation or parole or was in custody or had ...ed from custody at the time the crime was committed;

10) Any other circumstances in aggravation including those listed in ...entencing Rules for the Superior Courts.

: Authority cited: Section 5076.2, Penal Code. Reference: Sections 3040 and Penal Code.

## 5. Circumstances in Mitigation of the Base Term.

General. The panel shall impose the lower base term or another shorter than the middle base term upon a finding of mitigating cir-...tances. Circumstances in mitigation of the base term include:

The crime involved some factors described in the appropriate ma-...a category lower on either axis than the categories chosen as most y related to the crime;

The prisoner participated in the crime under partially excusable cir-...ances which do not amount to a legal defense;

The prisoner had no apparent predisposition to commit the crime as induced by others to participate in its commission;

The prisoner tried to help the victim or sought aid after the commis-...f the crime or tried to dissuade a crime partner from committing offenses;

The prisoner was a passive participant or played a minor role in the ...ission of the crime;

The crime was committed during or due to an unusual situation un-...to reoccur;

The crime was committed during a brief period of extreme mental otional trauma;

The prisoner has a minimal or no history of criminal behavior;

Any specific factors in mitigation, including those listed in the Sen-...g Rules for Superior Courts.

Authority cited: Section 5076.2 Penal Code. Reference: Sections 3040 and Penal Code.

## 6. Adjustment for Weapons, Great Loss and Prior Prison Terms.

General. Effective January 1, 1979, Penal Code Section 669 was ...led to permit the court to impose enhancements under Penal Code ...ns 12022, 12022.5, 12022.6 and 667.5 consecutive to a life sen-...(Stats. 1978, Ch. 579). Since the court has discretion whether to im-...or strike the punishment upon a finding that the prisoner used a ...r or dangerous weapon, was armed with a firearm, used a firearm, ...l great loss or served prior prison terms, the board shall consider

the court's action in determining the adjustment under this section.

(b) Punishment Imposed by the Court. If the court imposed the consec-utive punishment for the enhancement, the board shall not add an addi-tional adjustment for using a deadly or dangerous weapon, being armed with a firearm, using a firearm, causing great loss in committing the mur-der, or having served a prior prison term.

(c) Punishment Stricken by Court. If the court struck the punishment upon a finding of circumstances in mitigation, the board shall consider any circumstances in mitigation. The board may add an adjustment for using a deadly or dangerous weapon, being armed with a firearm, using a firearm, causing great loss or having served a prior prison term. The suggested adjustment is one-half the punishment that was stricken by the court.

(d) No Allegation or Finding. If the board finds that the prisoner used a deadly or dangerous weapon, was armed with a firearm, used a firearm, caused great loss or served a prior prison term although that fact was not found to be true at the time of the prisoner's conviction, the board may add an adjustment based on that finding. The adjustment should be less than the adjustment suggested in subdivision (c) of this section.

In adding adjustments for prior prison terms under this subsection, the panel should consider the length of time between the prisoner's release from custody and commission of a new offense.

NOTE: Authority cited: Section 5076.2, Penal Code. Reference: Sections 669, 3040, 3041, 12022, 12022.5, 12022.6 and 12022.7, Penal Code.

## § 2407. Adjustments for Other Offenses.

(a) General. Effective January 1, 1979 Penal Code Section 669 was amended to permit the court to impose sentences for other crimes to be served consecutively to a life sentence (Stats. 1978, Ch. 579). Since the court has discretion to order that the sentences for more than one crime be served consecutively, the board shall consider the court's action in de-termining the adjustment pursuant to this section.

(b) Multiple Convictions.

(1) General. The board shall not add adjustments for convictions for which the prisoner has been pardoned or which have been reversed by an appellate court.

(2) Consecutive Life Sentences Imposed by the Court. If the court im-posed consecutive life sentences the board shall determine the base crime and base term as provided in Section 2403(a). The board shall add adjust-ments for the remaining life crimes. The adjustment for each remaining life crime shall be a period of time commensurate with the nature of the crime but no less than the period of parole ineligibility for the crime. In no case will the parole date for consecutive sentences be earlier than the parole date for concurrent sentences.

(3) Concurrent Life Sentences Imposed by the Court. If the court im-posed concurrent life sentences, the board may add an adjustment be-cause the prisoner has been convicted of more than one crime. The sug-gested adjustment is the greater of:

(A) Time served on the nonbase life crime prior to reception on the base offense; or

(B) The following adjustment:

1. First degree murder: 13 years for a first degree murder committed on or after November 8, 1978.

2. Second degree murder: 8 years for a second degree murder com-mitted on or after November 8, 1978.

3. One-half the period of parole ineligibility for other life crimes.

(4) Consecutive Nonlife Sentences Imposed by the Court. If the court imposed consecutive nonlife sentences the Board shall not add additional adjustment for the nonlife crime.

(5) Concurrent Nonlife Sentences Imposed by the Court. If the court imposed concurrent nonlife sentences, the board may add an adjustment because the prisoner has been convicted of more than one crime. The sug-gested adjustment is the greater of:

(A) Time served for the nonlife crime prior to reception on the life of-fense; or

(B) One-half the determinate term imposed by the court; or

for crimes which carry a sentence of 9 years and that day. NOTE: Authority cited: Section 5076.2, Penal Code. Reference: Sections 669, 1170, 3040 and 3041, Penal Code.

1. Amendment of subsection (b)(3)(B) filed 11-13-85; effective thirtieth day thereafter (Register 85, No. 46).

### § 2408. Circumstances in Aggravation of the Adjustment for Other Crimes.

Circumstances which may justify imposition of an adjustment for another crime higher than that suggested in Section 2407 include:

(a) Pattern of Violence. A victim was seriously injured or killed in the course of the other crime, or there was a substantial likelihood of serious injury or death resulting from the acts of the prisoner.

(b) Numerous Crimes. The other crime was one of a series of crimes which occurred during a single period of time, showing a pattern of similar conduct resulting in convictions, but not resulting in adjustments under Section 2407.

(c) Crimes of Increasing Seriousness. The prisoner has committed multiple crimes which indicate a significant pattern of increasingly serious criminal conduct.

(d) Independent Criminal Activity. The other crime and its objective were independent of the base crime or the other crime was committed at a different time and place, indicating a significant pattern of criminal behavior rather than a single period of aberrant behavior.

(e) Status. The prisoner was on probation or parole or was in custody or had escaped from custody when the crime was committed.

(f) Vulnerability. The victim was particularly vulnerable.

(g) Other. The other crime included any other circumstances in aggravation including those listed in the Sentencing Rules for the Superior Courts.

NOTE: Authority cited: Section 5076.2, Penal Code. Reference: Sections 669, 1170, 3040 and 3041, Penal Code: Sentencing Rules for the Superior Courts.

### § 2409. Circumstances in Mitigation of the Adjustment for Other Crimes.

Circumstances which may justify imposition of an adjustment for another crime lower than that suggested in Section 2407, or which may justify no adjustment, include:

(a) Successful Completion of Probation or Parole. The prisoner's performance on probation or parole for the other crime was good, and the prisoner was free of criminal convictions for a reasonable period of time following completion of probation or parole.

(b) Insignificant Prior Record. The other crime indicates an insignificant pattern of prior criminal behavior. For example, the other crime is unrelated to the principal offense in time, in the kind of criminal conduct involved, or in the apparent motivation or cause of the criminal conduct.

(c) Probation. The prisoner was granted probation after conviction of the other crime.

(d) Other. The other crime included any other circumstances in mitigation including those listed in the Sentencing Rules for the Superior Courts.

NOTE: Authority cited: Section 5076.2, Penal Code. Reference: Sections 669, 1170, 3040 and 3041, Penal Code: Sentencing Rules for the Superior Courts.

### § 2410. Postconviction Credit.

(a) General. Life prisoners may earn postconviction credit for each year spent in state prison from the date the life term starts. Prior to the initial parole consideration hearing life prisoners shall have documentation hearings as provided in Section 2269.1. At the documentation hearings, the board shall document the prisoner's performance, participation, behavior and other conduct as specified in subsection (c) of this section. Credit shall not be granted or denied at these hearings. The documentation shall be used by the panel which establishes a parole date to determine how much, if any, credit should be granted for the years served prior to the establishment of the parole date. Once a parole date is established, postconviction credit for time served since the last hearing shall be considered at the progress hearings scheduled as provided in Section 2269.

---

The board shall consider each case individually in determining the amount of credit, if any, it provides guidelines for granting credit but a panel may grant more or less credit as appropriate.

(b) Amount of Credit. Postconviction credit shall be granted to life prisoners in a manner which allows similar amounts of time to prisoners in similar circumstances. The suggested amount of postconviction credit is zero to 4 months for each year served since the date the life term started excluding any time during which service of the life term is tolled.

The board may grant more or less than 4 months annual postconviction credit when the prisoner's performance, participation or behavior warrants such adjustment of credit. Less than 4 months credit may be granted if the prisoner fails to meet the general expectations set forth in Section 2410(c). More than 4 months credit may be granted if the prisoner demonstrates exceptional performance in a work assignment, exceptional participation in self-help or rehabilitative programs, or other exemplary conduct. If the panel grants more than 4 months of postconviction credit for any year, the case shall be reviewed as provided in Sections 2041–2043.

Provided, however, postconviction credits which would advance the parole release date to less than 180 days from the date of the hearing shall not be granted unless or until the parole review authority of the Governor is exercised pursuant to Penal Code section 3041.1.

(c) Criteria. In determining the amount of postconviction credit to be granted, the panel shall consider the following:

(1) Performance in Institutional Work Assignments. All life prisoners are presumed to work and to perform satisfactorily in work assignments (see CDC Rules 3040 and 3041). Lack of a work assignment shall not necessarily prevent the granting of postconviction credit. The panel shall consider the nature and availability of work assignments at the institution, the prisoner's custody status, and any other impediments to the prisoner's receiving work assignment.

(2) Participation in Self-Help and Rehabilitative Programs. All life prisoners are presumed to participate in programs for self development (refer to CDC Rules 3040 and 3041). Lack of program participation shall not necessarily prevent the granting of postconviction credit. The panel shall consider the nature and availability of programs at the institution, the prisoner's custody status, and any other impediments to the prisoner's participation in programs.

(3) Behavior in the Institutional Setting. All life prisoners are presumed to behave in a disciplinary-free manner, in accordance with state law and departmental regulations (refer to CDC Rules 3000–3021). However, a minor disciplinary offense shall not necessarily prevent the granting of postconviction credit.

(d) Credit Not Granted. No annual postconviction credit shall be granted in the case of any prisoner who commits serious (as defined in 15 CCR Section 3315) or numerous (more than three) infractions of departmental regulations, violates any state law, or engages in other conduct which could result in rescission of a parole date (see Section 2451) unless the panel finds evidence in mitigation and supports such finding with a statement of its reasoning.

Consistent unsatisfactory performance in work assignments, consistent failure to engage in program participation, or consistent overall negative behavior demonstrated by numerous minor disciplinary reports may, individually or cumulatively, justify the withholding of annual postconviction credit which otherwise could have been granted.

(e) Change in Parole Date. Once postconviction credit is granted for particular year of imprisonment, the credit shall be applied to any new term established after rescission or reconviction after a reversal.

NOTE: Authority cited: Sections 3052 and 5076.2, Penal Code. Reference: Sections 3040 and 3041, Penal Code. In re Stanley, 54 Cal.App.3d 1030 (1976).

1. Amendment of subsection (d) and NOTE filed 8-15-91; operative 9-16-91 (Register 91, No. 51).
2. Amendment of subsections (b) and (c)(2) filed 12-20-93; operative 1-19-94 (Register 93, No. 52).

### § 2411. Fixing a Parole Date.

(a) Total Period of Confinement. The terms established for the base crime and any adjustments shall be added together resulting in a total pe-

Case 2:90-cv-00520... Document 8... Filed 09/03/2008 Page...

confinement. The to... confinement shall be reduced
tconviction credit granted under Section 2410. This results in the
d period of confinement.

eriod of Prison Confinement. Any preprison credit shall be de-
from the total period of confinement as provided in Sections
345. This results in the total period of prison confinement. The to-
od of prison confinement shall be reduced by any postconviction
ranted under Section 2410. This results in the adjusted period of
confinement.

elease Date. The adjusted period of prison confinement and any
large shall be added to the date the life term starts. This results in
le date. For purposes of determining the parole date, the life terms
n:

onsecutive Life Sentences. The date the prisoner was received
enal Code Section 2900 or 1203.2a for the earliest life sentence
isoner is sentenced to prison with consecutive life sentences.

oncurrent Life Sentences. The date the prisoner was received un-
al Code Section 2900 or 1203.2a for the earliest life sentence used
lating the parole date if the prisoner is sentenced to prison with
ent life sentences.

onsecutive Nonlife Sentences for Crimes or Enhancements. The
prisoner completed serving the nonlife sentence or the sentence
consecutive enhancement under Penal Code Section 669 if the
is sentenced to prison with nonlife sentences which are consecu-
ife sentence or with court imposed consecutive enhancements.

oncurrent Nonlife Sentences. The date the prisoner was received
fe crime under Penal Code Section 2900 or 1203.2a, if the prison-
itenced to prison with nonlife sentences which are concurrent to
sentences. If the panel added any adjustments for the nonlife
and the prisoner was received for those crimes prior to the date
eceived for the life crime, the time served for those nonlife crimes
the date the life term starts shall be deducted from the adjustment
ionlife crime.

uthority cited: Section 5076.2, Penal Code. Reference: Sections 669,
and 2900, Penal Code.

HISTORY
dment of subsection (b) filed 11-13-85; effective thirtieth day thereafter
ter 85, No. 46)

## icle 12. Parole Consideration Criteria nd Guidelines for Habitual Offenders enced to Life Terms Under Penal Code Section 667.7

### Scope of Article.

riteria and guidelines in this article shall apply to prisoners sen-
a term of 20 years to life as habitual offenders under Penal Code
667.7 for crimes committed on or after January 1, 1982. The
es in this article shall be construed to be based on the public's ex-
intent in adding Section 667.7 to the Penal Code that a person
d of a felony in which the person inflicts great bodily injury or
sonally uses force likely to produce great bodily injury, and who
ed two or more prior prison terms for specified crimes should be
ated for an extended period of time.

eneral statement in Section 2400 regarding the differences be-
le minimum eligible parole date and the parole release date shall
lied with as if incorporated herein.

soner committed as a habitual offender shall have his initial pa-
sideration hearing in the thirteenth month prior to the minimum
parole date. The prisoner shall have documentation hearings as
d in Section 2269.1, but no specific amount of postconviction
all be granted until the board has established a period of confine-

uthority cited: Section 5076.2, Penal Code. Reference: Sections 667.7,
33, 3040 and 3041, Penal Code.

1. New Article 12 (Sections 2420-2429.1) filed 6-14-84; effective thirtieth day
thereafter (Register 84, No. 24).

### § 2421. General.

A habitual offender shall be considered for parole for the first time at
the initial parole consideration hearing. A parole date shall be denied if
the prisoner is found unsuitable for parole under Section 2422(c). A pa-
role date shall be set if the prisoner is found suitable for parole under Sec-
tion 2422(d). A parole date set under this article shall be set in a manner
that provides uniform terms for offenses of similar gravity and magnitude
with respect to the threat to the public.

In setting the parole date the panel shall consider the Sentencing Rules
for the Superior Courts. The panel shall also consider the criteria and
guidelines set forth in this article for determining suitability for parole
and the setting of parole dates, the circumstances of the crimes for which
the prisoner was sentenced, and any circumstances in aggravation or mit-
igation.

In setting the base period of confinement, the panel shall consider the
circumstances of the current and prior offenses resulting in the conviction
as a habitual offender, including the number of prior prison terms for spe-
cified crimes and the extent of injury to the victim of the current offense.
The panel may then make adjustments to the base period of confinement
for other factors.

The circumstances tending to show suitability and unsuitability, and
the circumstances in aggravation and mitigation contained in this article
shall be construed as guidelines only. The panel may make findings out-
side the guidelines when warranted in the individual case and reasons are
stated on the record.

NOTE: Authority cited: Section 5076.2, Penal Code; Reference: Sections 667.7,
3040 and 3041, Penal Code.

### § 2422. Determination of Suitability.

(a) General. The panel shall first determine whether the prisoner is
suitable for release on parole. Regardless of the length of time served, a
prisoner shall be found unsuitable for and denied parole if in the judgment
of the panel the prisoner will pose an unreasonable risk of danger to soci-
ety if released from prison.

(b) Information Considered. At all parole consideration hearings for
habitual offenders the panel shall consider the information described in
Section 2281(b).

(c) Circumstances Tending to Show Unsuitability. The panel shall
consider those circumstances listed in Section 2281(c) which the panel
finds are appropriate to the case of a habitual offender. The panel may
make other findings when warranted by the circumstances of an individu-
al case and reasons are stated in the record.

(d) Circumstances Tending to Show Suitability. The panel shall con-
sider those circumstances listed in Section 2281(d) which the panel finds
are appropriate to the case of a habitual offender. The panel may make
other findings when warranted by the circumstances of an individual case
and reasons are stated in the record.

NOTE: Authority cited: Section 5076.2, Penal Code. Reference: Sections 667.7
and 3041, Penal Code.

### § 2423. Base Term.

(a) General. The panel shall set a base term for each habitual offender
who is found suitable for parole. The base term shall be established based
on the circumstances of the series of prior and current offenses which re-
sulted in conviction as a habitual offender, considered as a whole.

The base term shall be established by utilizing the appropriate matrix
of base terms provided in this section. The panel shall determine the cate-
gory most closely related to the circumstances of the most serious of the
series of prior and current offenses which resulted in commitment as an
habitual offender. The panel shall impose the middle base term reflected
in the matrix unless the panel finds circumstances in aggravation or miti-
gation.

If the panel finds circumstances in aggravation or in mitigation as pro-
vided in Sections 2424 or 2425, the panel may impose the upper or lower
base term provided in the matrix by stating the specific reason for impos-
ing such a term. A base term other than the upper, middle, or lower base

the particular facts of the individual case and if... facts supporting them are... term imposed are stated.

(b) Matrix of base terms for prisoners sentenced to terms of 20 years to life... Penal Code Section 667.7 for crimes committed on or after January 1, 1982.

## CIRCUMSTANCES

| HABITUAL OFFENDERS Penal Code § 667.7 (in years and does not include postconviction credit as provided for in § 2410) | A. Crime included a single victim who did not require extensive medical treatment or prisoner was a passive participant or played a minor role in the crime. | B. Crime involved multiple victims or there were multiple injuries inflicted on the same or different victims. | C. Victim was tortured or suffered loss of bodily member or organ, or duration of offense was lengthy and prisoner had an opportunity to cease but instead continued. | D. Crime involved intricate planning or there exists facts which indicate the crime was committed in a manner which demonstrates an exceptionally callous disregard for human suffering. |
|---|---|---|---|---|
| I. Contributing Victim While not an accomplice, victim was involved in criminal activity which contributed to the motivation for the crime, i.e., drug dealer, sex offender, etc. | 20–22–24 | 21–23–25 | 22–24–26 | 23–25–27 |
| II. Prior relationship Victim was involved in a prior relationship with prisoner (spouse, family member, friend, etc.) which contributed to the motivation for the crime. | 21–23–25 | 22–24–26 | 23–25–27 | 24–26–28 |
| III. Vulnerable victim Victim was particularly vulnerable due to age or physical or mental condition. | 22–24–26 | 23–25–27 | 24–26–28 | 25–27–29 |
| IV. Injury to victim Victim suffered fatal injury, required extensive medical treatment, or was permanently disabled as result of the crime. | 23–25–27 | 24–26–28 | 25–27–29 | 26–28–30 |

## SUGGESTED BASE TERMS

NOTE: Authority cited: Sections 3052 and 5076.2, Penal Code. Reference: Sections 667.7 and 3041, Penal Code.

HISTORY
1. Amendment of section and NOTE filed 3–15–93; operative 4–14–93 (Register 93, No. 12).
2. Editorial correction adding subsection (b) and matrix (Register 93, No. 17).

§ 2424.   Circumstances in Aggravation of the Base Term.
Circumstances in aggravation of the base term include but are not limited to:

(a) Criminal History.

(1) The current offense or offenses and the offenses underlying the prior prison terms are violent offenses as defined in Penal Code Section 667.5(c).

(2) The current offense or offenses and the offenses underlying the prior prison terms were committed within a relatively short time after release on parole.

(3) The prisoner has been convicted of other offenses during the periods between the commission of the current offense and the offenses underlying the prior prison terms.

(4) The prisoner has served more than two prior prison terms for offenses listed in Penal Code Section 667.7.

(b) Circumstances of Offenses.

(1) The current offense or offenses resulted in greater injury to one or more victims than is required for a finding under Penal Code Section 12022.7.

(2) The current offense or offenses or the offenses underlying the prior prison terms resulted in death to one or more victims.

(3) The circumstances of the current offense or offenses and the offenses underlying the prior prison terms indicate the prisoner preys on victims who are particularly vulnerable, or who occupy a position of trust in relation to the prisoner.

Register 98, No. 42; 10-16-98

The circumstances of the current offense or offenses and the offenses underlying the prior prison terms indicate a pattern of the commission of similar violent crimes; i.e., conviction for three or more sexual offenses or three or more offenses involving use of a firearm.

The Circumstances in Aggravation enumerated in Sections 2283, subdivision (a)(1), and 2404, as appropriate to the case of a habitual under.

Any other circumstances in aggravation including those listed in ntencing Rules for the Superior Courts.

Authority cited: Section 5076.2, Penal Code. Reference: Sections 667.7, d.3041, Penal Code..

**i. Circumstances in Mitigation of Base Term.**

umstances in mitigation include but are not limited to:

Criminal History.

The current offense or offenses and the offenses underlying the rison terms are non-violent offenses not listed in Penal Code Sec-7.5(c).

There is a relatively long period of crime-free conduct, including sful completion of parole, between commission of the offenses re- in commitment as a habitual offender.

The prisoner has no other convictions for violent crimes as defined l Code Section 667.5(c) other than those resulting in commitment bitual offender.

Circumstances of Offenses.

The great bodily injury to the victim in the current offense was no than that required for a finding under Penal Code Section 7, and the prisoner did not personally inflict injury on any other of any offense of which he has previously been convicted.

The current offense or offenses did not involve use of a firearm, and enses underlying the prior prison terms did not involve use of a i, or arming or use of a deadly or dangerous weapon.

The Circumstances in Mitigation enumerated in Sections 2284, ex-bdivision (a)(1), and 2405, as appropriate to the case of a habitual er.

Any other circumstances in mitigation including those listed in the cing Rules for the Superior Courts.

Authority cited: 5076.2, Penal Code. Reference. Sections 667.7, 3040 and enal Code.

**i. Adjustment for Weapons, Great Loss, Great Bodily Injury and Prior Prison Terms.**

The panel shall consider the addition of adjustments for weapons, oss, and prior prison terms as provided in Section 2406.

The panel shall consider the addition of an adjustment for great injury using the guidelines as provided in Section 2406 for the ad-of adjustments for weapons, great loss, and prior prison terms.

The panel shall not add adjustments for prior prison terms or find-great bodily injury which resulted in the commitment as a habitual er.

Authority cited: Section 5076.2, Penal Code. Reference: Sections 667.5, 040, 3041, 12022, 12022.5, 12022.6 and 12022.7, Penal Code.

**'. Adjustments for Other Offenses.**

eneral. Effective January 1, 1979, Penal Code Section 669 was ed to permit the court to impose sentences for other crimes to be consecutively to a life sentence (Stats. 1978, Ch. 579). Since the as discretion to order that the sentences for more than one crime ed consecutively, the board shall consider the court's action in de-ng the adjustment pursuant to this section.

Multiple Convictions.

eneral. The board shall not add adjustments for convictions for he prisoner has been pardoned or which have been reversed by an ie court.

Consecutive Life Sentences Imposed by the Court. If the court im-onsecutive life sentences the board shall determine the base crime se term. The board shall add adjustments for the remaining life The adjustment for each remaining life crime shall be a period

the current offense and the sentence commensurate with the nature of the crime, or no less than the period of parole ineligibility for the crime. In no case will the parole date for consecutive sentences be earlier than the parole date for concurrent sentences.

(3) Concurrent Life Sentences Imposed by the Court. If the court imposed concurrent life sentences, the board may add an adjustment because the prisoner has been convicted of more than one crime. The suggested adjustment is the greater of:

(A) Time served on the nonbase life crime prior to reception on the base offense; or

(B) The following adjustment:

1. First degree murder: 13 years for a first degree murder committed on or after November 8, 1978.

2. Second degree murder: 8 years for a second degree murder committed on or after November 8, 1978.

3. One-half the period of parole ineligibility for other life crimes.

(4) Consecutive Nonlife Sentences Imposed by the Court. If the court imposed consecutive nonlife sentences the board shall not add additional adjustments for the nonlife crimes.

(5) Concurrent Nonlife Sentences Imposed by the Court. If the court imposed concurrent nonlife sentences, the board may add an adjustment because the prisoner has been convicted of more than one crime. The suggested adjustment is the greater of:

(A) Time served for the nonlife crime prior to reception on the life offense; or

(B) One-half the determinate term imposed by the court; or

(C) One-half the term that would be established under Section 2271 for crimes which carry a sentence of a year and a day.

NOTE: Authority cited: Section 5076.2, Penal Code. Reference: Sections 667.7, 669, 1170, 3040 and 3041, Penal Code.

**§ 2428. Circumstances in Aggravation and Mitigation of the Adjustment for Other Crimes.**

(a) Circumstances in Aggravation. Circumstances which may justify imposition of an adjustment for another crime higher than that suggested in Section 2427 include:

(1) Pattern of Violence. A victim was seriously injured or killed in the course of the other crime, or there was a substantial likelihood of serious injury or death resulting from the acts of the prisoner.

(2) Numerous Crimes. The other crime was one of a series of crimes which occurred during a single period of time, showing a pattern of similar conduct resulting in convictions but not resulting in adjustments under Section 2427.

(3) The prisoner has committed multiple crimes which indicate a significant pattern of increasingly serious criminal conduct.

(4) Independent Criminal Activity. The other crime and its objective were independent of the base crime or the other crime was committed at a different time and place.

(5) Status. The prisoner was on probation or parole or had escaped from custody when the other crime was committed.

(6) Vulnerability. The victim was particularly vulnerable.

(7) Other. The other crime included any other circumstances in aggravation including those listed in the Sentencing Rules for the Superior Courts.

(b) Circumstances in Mitigation. Circumstances which may justify imposition of an adjustment for another crime lower than that suggested in Section 2427, or which may justify no adjustment, include:

(1) Successful Completion of Probation or Parole. The prisoner's performance on probation or parole for the other crime was good, and the prisoner was free of criminal convictions for a reasonable period of time following completion of probation or parole.

(2) Probation. The prisoner was granted probation after conviction of the other crime.

(3) Other. The other crime included any other circumstances in mitigation including those listed in the Sentencing Rules for the Superior Courts.

§ 2429.   Postconviction Credit.

The application of postconviction credit shall be considered as provided in Section 2410.

NOTE: Authority cited: Section 5076.2, Penal Code. Reference: Sections 667.7, 3040 and 3041, Penal Code; *In re Stanley*, 54 Cal.App.3d 1030 (1976).

§ 2429.1.   Fixing a Parole Date.

The parole date shall be determined as provided in Section 2411.

NOTE: Authority cited: Section 5076.2, Penal Code. Reference: Sections 667.7, 669, 1203.2a and 2900, Penal Code.

## Article 13.   Parole Consideration Criteria and Guidelines for Sex Offenders Sentenced to Life Terms Under Penal Code Section 667.51

§ 2430.   Scope of Article.

The criteria and guidelines in this article shall apply to prisoners sentenced to a term of 15 years to life under Penal Code Section 667.51. The guidelines in this article shall be construed as based on the public's expressed intent in adding Section 667.51 to the Penal Code that a person convicted of lewd or lascivious acts committed against a child under the age of 14, and who has served two or more prior prison terms for specified sex crimes should be incarcerated for an extended period of time.

The general statement in Section 2400 regarding the differences between the minimum eligible parole date and the parole release date shall be construed as if incorporated herein.

A person committed under Penal Code Section 667.51 shall have his initial parole consideration hearing in the thirteenth month prior to the minimum eligible parole date. The prisoner shall have documentation hearings as provided in Section 2269.1, but no specific amount of postconviction credit shall be granted until the board has established a period of confinement.

NOTE: Authority cited: Section 5076.2, Penal Code. Reference: Sections 667.51, 667.7, 2930–2933, 3040 and 3041, Penal Code.

HISTORY

1. New Article 13 (Sections 2430–2439.1) filed 6–14–84; effective thirtieth day thereafter (Register 84, No. 24).

§ 2431.   General.

A sex offender shall be considered for parole for the first time at the initial parole consideration hearing. A parole date shall be denied if the prisoner is found unsuitable for parole under Section 2432(c). A parole date shall be set if the prisoner is found suitable for parole under Section 2432(d). A parole date set under this article shall be set in a manner that provides uniform terms for offenses of similar gravity and magnitude with respect to the threat to the public.

In setting a parole date the panel shall consider the Sentencing Rules for the Superior Courts. The panel shall also consider the criteria and guidelines set forth in this article for determining suitability for parole and the setting of parole dates, the circumstances of the crimes for which the prisoner was sentenced and any circumstances in aggravation or mitigation.

In setting a base period of confinement, the panel shall consider the circumstances of the current and prior offenses resulting in conviction under Penal Code Section 667.51.

The circumstances tending to show suitability and unsuitability, and the circumstances in aggravation and mitigation contained in this article shall be construed as guidelines only. The panel may make findings outside the guidelines when warranted in the individual case and reasons are stated on the record.

NOTE: Authority cited: Section 5076.2, Penal Code. Reference: Sections 667.51, 3040 and 3041, Penal Code.

(a) General. The panel shall determine whether the prisoner shall be released on parole. Regardless of the length of time served, a prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison.

(b) Information Considered. At all parole consideration hearings sex offenders the panel shall consider the information described in Section 2281(b).

(c) Circumstances Tending to Show Unsuitability. The panel shall consider those circumstances listed in Section 2281(c) which the panel finds are appropriate to the case of a sex offender. The panel may make other findings when warranted by the circumstances of an individual case and reasons are stated in the record.

(d) Circumstances Tending to Show Suitability. The panel shall consider those circumstances listed in Section 2281(d) which the panel finds are appropriate to the case of a sex offender. The panel may make other findings when warranted by the circumstances of an individual case and reasons are stated in the record.

NOTE: Authority cited: Section 5076.2, Penal Code. Reference: Sections 667.51 and 3041, Penal Code.

§ 2433.   Base Term.

(a) General. The panel shall set a base term for each sex offender who is found suitable for parole. The base term shall be established based on the circumstances of the series of prior and current offenses which resulted in conviction as a sex offender, considered as a whole. The panel shall set a base term which it finds to be appropriate in an individual case after consideration of the Circumstances in Aggravation listed in Section 2434 and the Circumstances in Mitigation listed in Section 2435, and any other circumstances which appear to be important in the judgment of the panel.

NOTE: Authority cited: Section 5076.2, Penal Code. Reference: Sections 667.51 and 3041, Penal Code.

§ 2434.   Circumstances in Aggravation of the Base Term.

Circumstances in aggravation of the base term include:

(a) Criminal History.

(1) The current offense or offenses and the offenses underlying the prior prison terms are violent offenses as defined in Penal Code Section 667.5(c).

(2) The current offense or offenses and the offenses underlying the prior prison terms were committed within a relatively short time of each other.

(3) The prisoner has been convicted of other offenses, misdemeanors or felonies, involving sexually aberrant behavior other than those resulting in the life sentence under Penal Code Section 667.51.

(4) The prisoner has served more than two prior prison terms for offenses listed in Penal Code Section 667.51.

(5) The current or prior commitments to state prison resulted from multiple convictions for sex and sex–related offenses.

(b) Circumstances of Offenses.

(1) The current offense or offenses or the offenses underlying the prior prison terms resulted in physical or psychological injury to the victim beyond that occasioned by the sex act.

(2) The current offense or offenses or the offenses underlying the prior prison terms involved arming or use of a firearm or deadly or dangerous weapon.

(3) The current offense or offenses and the offenses underlying the prior prison terms establish a pattern of sexual crimes against children.

(4) The circumstances of the current offense or offenses and the offenses underlying the prior prison terms indicate the prisoner preys on victims who are particularly vulnerable resulting from factors other than the age or sex of the victim, and/or who occupy a position of trust in relation to the prisoner.

he Circumstances in ... listed in Sections 2283, except ... sion (a)(1), and 2404, as appropriate in the case of a habitual ... r.

ny other circumstances in aggravation including those listed in ntencing Rules for the Superior Courts.

Authority cited: Section 5076.2, Penal Code. Reference: Sections 667.51, d 3041, Penal Code.

## 5. Circumstances in Mitigation of the Base Term.

cumstances in mitigation of the base term include:
Criminal History.
The offenses underlying the prior prison terms were for non-viol-
fenses not listed in Penal Code Section 667.5(c).
The prisoner has no other convictions for sex or sex-related of-
s other than those resulting in commitment under Penal Code Sec-
567.51.
The current and previous commitments resulted from a single sex
se committed against a single victim.
) Circumstances of Offense.
) The current offense or offenses and the offenses underlying the
prison terms resulted in no physical or psychological injury to any
m beyond that directly resulting from the sex act.
!) The current offense or offenses and the offenses underlying the
r prison terms did not involve arming or use of a firearm or deadly
angerous weapon.
3) The commission of the offenses resulting in commitment under Pe-
Code Section 667.51 appear to have resulted from a psychological
dition for which the prisoner has voluntarily and continuously sought
atment.
c) The Circumstances in Mitigation listed in Sections 2284, except
(1), and 2405, as appropriate to the case of a habitual sex offender.
(d) Any other circumstances in mitigation including those listed in
ntencing Rules for the Superior Courts.

TE: Authority cited: Section 5076.2, Penal Code. Reference: Sections 667.51,
40 and 3041, Penal Code.

## 2436. Adjustment for Weapons, Great Loss, Great Bodily Injury and Prior Prison Terms.

(a) The panel shall consider the addition of adjustments for weapons,
eat loss, and prior prison terms as provided in Section 2406.
(b) The panel shall consider the addition of an adjustment for great
odily injury using the guidelines as provided in Section 2406 for the ad-
ition of adjustments for weapons, great loss and prior prison terms.
(c) The panel shall not consider adjustments for prior prison terms
vhich resulted in the commitment as a sex offender.

NOTE: Authority cited: Section 5076.2, Penal Code. Reference: Sections 667.5,
567.51, 3040, 3041, 12022, 12022.5, 12022.6 and 12022.7, Penal Code.

## § 2437. Adjustments for Other Offenses.

(a) General. Effective January 1, 1979, Penal Code Section 669 was
amended to permit the court to impose sentences for other crimes to be
served consecutively to a life sentence (Stats. 1978, Ch. 579). Since the
court has discretion to order that the sentence for more than one crime
be served consecutively, the board shall consider the court's action in de-
termining the adjustment pursuant to this section.

(b) Multiple Convictions.
(1) General. The board shall not add adjustments for convictions for
which the prisoner has been pardoned or which have been reversed by an
appellate court.
(2) Consecutive Life Sentences Imposed by the Court. If the court im-
posed consecutive life sentences the board shall determine the base crime
and base term. The board shall add adjustments for the remaining life
es. The adjustment for each remaining life crime shall be a period of
nsurate with the nature of the crime but no less than the peri-
ibility for the crime. In no case will the parole date for
nces be earlier than the parole date for concurrent sen-

(3) Concurrent Life Sentences Imposed by ...
cause the prisoner has been convicted of more than one crime ... sug-
gested adjustment is the greater of:
(A) Time served on the nonbase life crime prior to reception on the
base offense; or
(B) The following adjustment:
1. First degree murder: 13 years for a first degree murder committed
on or after November 8, 1978.
2. Second degree murder: 8 years for a second degree murder com-
mitted on or after November 8, 1978.
3. One-half the period of parole ineligibility for other life crimes.
(4) Consecutive Nonlife Sentences Imposed by the Court. If the court
imposed consecutive nonlife sentences the board shall not add additional
adjustments for the nonlife crimes.
(5) Concurrent Nonlife Sentences Imposed by the Court. If the court
imposed concurrent nonlife sentences, the board may add an adjustment
because the prisoner has been convicted of more than one crime. The sug-
gested adjustment is the greater of:
(A) Time served for the nonlife crime prior to reception on the life of-
fense; or
(B) One-half the determinate term imposed by the court; or
(C) One-half the term that would be established under Section 2271
for crimes which carry a sentence of a year and a day.

NOTE: Authority cited: Section 5076.2, Penal Code. Reference: Sections 667.51,
669, 1170, 3040 and 3041, Penal Code.

## § 2438. Circumstances in Aggravation and Mitigation of the Adjustment for Other Crimes.

(a) Circumstances in Aggravation. Circumstances which may justify
imposition of an adjustment for another crime higher than that suggested
in Section 2437 include:
(1) Pattern of Violence. A victim was seriously injured or killed in the
course of the other crime, or there was a substantial likelihood of serious
injury or death resulting from the acts of the prisoner.
(2) Numerous Crimes. The other crime was one of a series of crimes
which occurred during a single period of time, showing a pattern of simi-
lar conduct resulting in convictions but not resulting in adjustments un-
der Section 2437.
(3) The prisoner has committed multiple crimes which indicate a sig-
nificant pattern of increasingly serious criminal conduct.
(4) Independent Criminal Activity. The other crime and its objective
were independent of the base crime or the other crime was committed at
a different time and place.
(5) Status. The prisoner was on probation or parole, or had escaped
from custody when the other crime was committed.
(6) Other. The other crime included any other circumstances in aggra-
vation including those listed in the Sentencing Rules for the Superior
Courts.
(b) Circumstances in Mitigation. Circumstances which may justify
imposition of an adjustment for another crime lower than that suggested
in Section 2437, or which may justify no adjustment, include:
(1) Successful Completion of Probation or Parole. The prisoner's per-
formance on probation or parole for the other crime was good, and the
prisoner was free of criminal convictions for a reasonable period of time
following completion of probation or parole.
(2) Probation. The prisoner was granted probation after conviction of
the other crime.
(3) Other. The other crime included any other circumstances in mitiga-
tion including those listed in the Sentencing Rules for the Superior
Courts.

NOTE: Authority cited: Section 5076.2, Penal Code. Reference: Sections 667.51,
669, 1170, 3040 and 3041, Penal Code; and Sentencing Rules for the Superior
Courts.

## § 2439. Postconviction Credit.

The application of postconviction credit shall be considered as pro-
vided in Section 2410.

**EXHIBIT C**
**Part 1 of 2**

Address _SAN QUENTIN STATE PRISON_

_SAN QUENTIN, CA 94974_

CDC or ID Number _E-30803_

B151232 (T) W|D

B074755 (T) W|D    CALIFORNIA COURT OF APPEAL

SEP 28 2007    B038914 (T) A|D    SECOND APPELLATE DISTRICT

_(Court)_

| | |
|---|---|
| ALFONSO CARRANZA, | PETITION FOR WRIT OF HABEAS CORPUS |
| Petitioner | |
| vs. | **B202483** |
| ROBERT AYERS JR., Warden, | No. _____ |
| Respondent | _(To be supplied by the Clerk of the Court)_ |

## INSTRUCTIONS - READ CAREFULLY

- If you are challenging an order of commitment or a criminal conviction and are filing this petition in the Superior Court, you should file it in the county that made the order.

- If you are challenging the conditions of your confinement and are filing this petition in the Superior Court, you should file it in the county in which you are confined.

- Read the entire form *before* answering any questions.

- This petition must be clearly handwritten in ink or typed. You should exercise care to make sure all answers are true and correct. Because the petition includes a verification, the making of a statement that you know is false may result in a conviction for perjury.

- Answer all applicable questions in the proper spaces. If you need additional space, add an extra page and indicate that your answer is "continued on additional page."

- If you are filing this petition in the Superior Court, you need file only the original unless local rules require additional copies. courts require more copies.

- If you are filing this petition in the Court of Appeal, file the original and four copies.

- If you are filing this petition in the California Supreme Court, file the original and thirteen copies.

- Notify the Clerk of the Court in writing if you change your address after filing your petition.

- In most cases, the law requires service of a copy of the petition on the district attorney, city attorney, or city prosecutor. See Penal Code section 1475 and Government Code section 72193. You may serve the copy by mail.

Approved by the Judicial Council of California for use under Rules 56.5 and 201(h)(1) of the California Rules of Court [as amended effective January 1, 1999]. Subsequent amendments to Rule 44(b) may change the number of copies to be furnished the Supreme Court and Court of Appeal.

Page one of six

Form Approved by the
Judicial Council of California
MC-275 [Rev. January 1, 1999]
PETITION FOR WRIT OF HABEAS CORPUS
Penal Code, § 1473 et seq. ;
Cal. Rules of Court, rules 56.5, 201(h)

Assigned to DIVISION SEVEN

☐ A conviction                    ☐ Parole

☐ A sentence                      ☐ Credits

☐ Jail or prison conditions       ☐ Prison discipline

☐ Other (specify): _____

1. Your name: Alfonso Carranza

2. Where are you incarcerated? San Quentin State Prison, San Quentin, CA 94974

3. Why are you in custody? ☐ Criminal Conviction  ☐ Civil Commitment

   *Answer subdivisions a. through i. to the best of your ability.*

   a. State reasons for civil commitment or, if criminal conviction, state nature of offense and enhancements (for example, "robbery with use of a deadly weapon").

      Second degree murder, attempted murder, and attempted manslaughter with use of gun.

   b. Penal or other code sections: Penal Code § 187

   c. Name and location of sentencing or committing court: California Superior Court, in and for the county of Los Angeles

   d. Case number: VA539854

   e. Date convicted or committed: October 31, 1988

   f. Date sentenced: November 1988

   g. Length of sentence: 14 years and a consecutive 17 years-to-life.

   h. When do you expect to be released? Minimum Eligible Parole Date: March 15, 2007

   i. Were you represented by counsel in the trial court? ☒ Yes. ☐ No.   If yes, state the attorney's name and address:

      _____

      _____

      _____

4. What was the LAST plea you entered? (check one)

   ☒ Not guilty  ☐ Guilty  ☐ Nolo Contendere  ☐ Other: _____

5. If you pleaded not guilty, what kind of trial did you have?

   ☒ Jury  ☐ Judge without a jury  ☐ Submitted on transcript  ☐ Awaiting trial

SEE "INSERT A" attached pages 1, through 12

_____

_____

_____

a. Supporting facts:

Tell your story briefly without citing cases or law. If you are challenging the legality of your conviction, describe the facts upon which your conviction is based. If necessary, attach additional pages. CAUTION: You must state facts, not conclusions. For example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or failed to do and how that affected your trial. Failure to allege sufficient facts will result in the denial of your petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.) A rule of thumb to follow is: who did exactly *what* to violate your rights at what time *(when)* or place *(where)*. *(If available, attach declarations, relevant records, transcripts, or other documents supporting your claim.)*

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

b. Supporting cases, rules, or other authority (optional):

*(Briefly discuss, or list by name and citation, the cases or other authorities that you think are relevant to your claim. If necessary, attach an extra page.)*

_____

_____

_____

_____

BECAUSE NO EVIDENCE SUPPORTS THE BOARD'S FINDING AND DECISION
THAT PETITIONER IS UNSUITABLE FOR PAROLE AND POSES A CURRENT
UNREASONABLE THREAT TO PUBLIC SAFETY

On April 19, 2006, Alfonso Carranza ("Petitioner"), appeared before the Board of Parole Hearings ("BPH") for his initial "Life Term Parole Consideration Hearing." The BPH found petitioner unsuitable for parole and that he would pose an unreasonable risk to society or a threat to public safety if released from prison. The BPH stated that "Nothing that happens here today will change the findings of the court, we are not here to retry your case. Our purpose is solely to determine your suitability for parole." (Exhibit A, Hearing Transcripts ("HT"), p. 9.) However, the record indicates that the BPH did relitagate the case, mischaracterized it as a first degree murder, being calculated, and based its decision on unchanging factors, while ignoring factors that support a finding of rehabilitation and suitability for parole. The BPH based its decision to deny parole on the following:

1. The offense itself is of sufficient severity for the denial. And for that reason the inmate is being denied.

2. The inmate is also being denied because he has an escalating pattern of criminal conduct.

3. The inmate has failed at previous grants of probation and cannot be counted upon to avoid criminality.

4. The inmate has failed to profit from societies previous attempts to correct his criminality such attempts include adult probation as well as your drug rehab.

5. The prisoner has failed to sufficiently participate in self-help and therapy programming.

6. [T]he panel notes opposition to your finding of suitability both from the District Attorney's office of Los Angeles County as well as the victim's next of kin.

7. The prisoner needs therapy, programming and self-help in order to face, discuss, understand, and cope with stress in a non destructive manner as well as to get further insight

1.

(Exhibit A, HT at p. 83-86.)

After denying Petitioner parole, Deputy Commissioner Thompson commended

Petitioner for the following:

> [H]e did remain disciplinary free and he has been involved
> in counseling his peers and the Spanish speaking inmates
> as well as adjustment issues. And he was noted and commended
> for that by the church group, I believe it is Jubilee
> Christian church. And he has a number of letters thanking
> him for his help and his cooperation in various events. I
> think they all show a willingness to be socialized and try
> to have empathy for other people. Which is to be commended
> and hopefully built on as a good foundation for future life
> or future contacts. And I think all in all he has made some
> educational efforts, he did get an equivalency degree. And
> he has taken English as a second language which makes him
> a good role model for Spanish speaking inmates who are trying
> to interface and interrelate to an English speaking, American
> English admittedly, but an English speaking community. And
> I think that is all commendable.

(Exhibit A, HT at 86-87.)

The BPH's reason to deny parole must be supported by "some evidence"

pertinent to the "relevant standards" promulgated by the BPH to comply with

constitutional due process. (In re Rosenkrantz, supra, 29 Cal.4th at pp.

657-658 & 675-677; see also In re Dannenberg, supra, 34 Cal.4th at pp. 1071,

1084, 1095, fn. 16.) This requires a BPH panel's decision to deny parole

to "have some rational basis in fact." (Scott II, 133 Cal.App.4th at p. 590,

fn. 6.) As the administrative record of the BPH's review and consideration

of the pleadings make clear, there simply is no such rational basis supporting

the BPH's decision to deny Petitioner parole.

This is another case which demonstrates the BPH's boiler-plate denial

of using the gravity of the offense as the basis to deny parole regardless

of a prisoner's efforts and showing of rehabilitation. Putting aside the

pre-commitment factors and, commitment offense, "all other factors indicate

2.

Cal.App.4th at 594.) The California First Appellate District Court cautioned

the Governor about a reversing a grant of parole based solely on the

commitment offense or other pre-commitment factors:

> Reliance on such an immutable factor "without regard to or consideration of subsequent circumstances" may be unfair [citation] and "runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation." [Citation.] The commitment offense can negate suitability only if circumstances of the crime reliably established by evidence in the record rationally indicate that the offender will present an unreasonable public safety risk if released from prison. Yet, the predictive value of the commitment offense may be very questionable after a long period of time. [Citation.] Thus, denial of release solely on the basis of the gravity of the commitment offense warrants especially close scrutiny.

(Id. at pp. 594-595.) Where such scrutiny reveals that the [BPH] "did not

fulfill" the requirement "to consider all other relevant factors," the

decision cannot stand. (Id. at p. 595.) Such is the case here.

1. The Facts of the Commitment Offense Do Not Provide a Reasonable Basis to Deny Parole.

The BPH's mischaracterization of Petitioner's commitment offense does

not make it "some evidence" to support a finding of unsuitability for parole.

In relying on the commitment offense to deny parole, the BPH stated:

> Multiple victims were attacked, injured and one was killed during the offense. The offense was carried out in a dispassionate and calculated manner, which demonstrates an exceptional callous disregard for human suffering. The motive for the crime was inexplicable. The sad part of my position [Commissioner Lee] is that I truly do not know what occurred out on the street nor does the Deputy Commissioner. We are only privy to what is submitted before us. The inmate's version is totally at odds with the information we have received in our packets.

(Exhibit A, HT p. 82.)

The BPH cannot base their decision on uncertainty and then used that

uncertainty to recharacterize the second degree murder, commitment offense,

3.

Michael Satris

> We don't have two counts of attempted murder in this case, as the District Attorney characterized it. We have a finding of attempted voluntary manslaughter and that is critical because that shows that this isn't the kind of cold calculated attempt to kill three people that the District Attorney is now trying to promote in a retrial of the case. The manslaughter finding or attempted manslaughter does indicate apparent acceptance either a provocation or unreasonable belief in the need for self-defense. And there is substantial evidence of course in the record that would support this. (HT 61-62). ... All right so I would ask the board to do what it indicated in the very outset of this hearing of what it was going to do. Which is to consider Mr. Carranza [Petitioner] for parole in accordance with Penal Code Section 3041 and its own rules and regulations. That Penal Code Section provides that the board should normally grant a prisoner or set a parole date for a prisoner at his first parole hearing (HT 64). ... Under the boards rules in terms of multiple victims to start with that is a factor that leans toward a finding of unsuitability for parole. But what is important is that is only if that offense shows he presents a continuing danger at this point. Because we are talking about present dangerousness when we are talking about suitability for parole. The record makes it very plain in this case that kind of entrenched criminality at that time was a the product of a kind of destructive lifestyle he was living involving drugs and weapons (HT 65). ... In terms of pre offense factors. You have no juvenile record, ... lacks any significant history of violent crime. And what you have is no violent criminality outside of this offense. This is his single act of criminal violence (HT 66). ... Institutional behavior has institution activities indicated an enhanced ability to function within the law upon release. And you see that first of all with the behavior of the remarkable record he has of being disciplinary free (HT 67). ... He has his plans for what is most realistic, really the only realistic plan for the future is he is going to be deported to Mexico. And he is fully prepared for that. He has his wife ready to move as need to be back there (HT 69.)

(Exhibit A, HT 61-69.)

"[T]he [BPH] is required to consider whether the prisoner committed

the crime as the result of significant stress in his or her life." (Scott

II, supra, 133 Cal.App.4th at 596, quoting with emphasis In re Rosenkrantz,

supra, 29 Cal.4th at p. 679.) a failure to do so "is arbitrary and capricious

-4-

they failed to consider the evidence of the considerable stress that

Petitioner was experiencing at the time, which includes being addicted to

drugs and alcohol, while being confronted by the victims in a altercation.

As petitioner explained in his written version of the offense, Petitioner

was not the instigator and was under influence:

> On the evening of November 30, 1985 I went to the La Casa
> Blanca bar. I started to play pool, drink beer, and snort
> cocaine. When I got into an argument with Raul Munoz [victim]
> instead of trying to calm the situation down I responded
> at his [the victim's] level. In my macho mentality I thought
> it was considered we[a]k to back down from violence. After
> the heated argument Mr. Munoz left the bar and I stayed to
> continue to play pool. Just before the bar closed I went
> outside and saw Mr. Munoz and two men coming at me. Mr. Munoz
> was cursing at me and I reached over and I was quick to shoot
> -- And I overreacted, []. ... I was living a life that was
> out of control. ...

(Exhibit A, HT 21-22.)

Though the BPH did mention that "[t]he information apparently in the

packets seem to indicate at trial the witnesses did indicate there was an

ongoing dispute that apparently on at least two occasions an attempt to solve

this particular dispute in fact it seems to indicate there was a point and

time where both sides shook hands[]" (HT 82-83), and that "the victim left

the bar and went and got his brothers," (HT 16), the BPH ignored the fact

that the jury rejected the prosecutor's version of the crime when it found

Petitioner guilty of a less capable offense than charged and argued by the

District Attorney's office. Furthermore, the BPH recognized that Petitioner's

"usage in regards to cocaine[]" (HT 84), at the time of the offense, the

BPH decision studiously avoided notice of the evidence of stress that the

record spread before them. The BPH not only ignored the evidence that

Petitioner was experiencing a significant amount of stress at the time of

the offense, but that the stress had built up over a long period of time.

5.

Regs., tit. 15, §2402, subd. (d)(4) ["the prisoner's 'motivation' for the offense tends to show suitability when it was the result of significant stress in his life, especially if the stress has built over a long period of time'"].)

The fact that the BPH describes the commitment offense as "dispassionate and calculated" (HT 82), does not change the analysis. As the on Court has stated: "'All second degree murders by definition involve some callousness - i.e., lack of emotion or sympathy, emotional insensitivity, indifference to the feelings and suffering of others. [Citation.] As noted, however, parole is the rule, rather than the exception, and a conviction of second degree murder does not automatically render one unsuitable.'" (Scott II, supra, 119 Cal.App.4th at p. 891.)

As brutal as Petitioner's homicidal conduct may have been, it did not go beyond what caused that conduct to constitute second degree murder, he did nothing beyond what accomplished the killing to "cruelly or callously exacerbate[] the victim's suffering." Parole authorities may use the factors in Petitioner's case, shooting the victim, to aggravate his term, but that manner of death does not disqualify a prisoner from parole. As the California Court of Appeals, First Appellate District, noted, the BPH's observation that "[t]he offense itself is of sufficient severity for the denial" (HT 83), "could be repeated annually until [Petitioner] dies or is rendered helpless by the infirmities of sickness or age." (Scott II, supra, 133 Cal.App.4th at p. 595.) The manner in which Petitioner shot at the victim is not atypical for a murder case, and hardly acts to "distinguish this crime from other ... murders as exceptionally callous." (In re Smith, supra, 114 Cal.App.4th at p. 367.) As the California Supreme Court has noted on more

6.

v. Hinton (2006) 37 Cal.4th 839, 896.) The legal definition of such

murders is contrary to the statute.

The BPH failed to conduct an individualized assessment of all required factors. Clearly, the facts at hand do not meet the requirements set forth by the regulations and the courts to justify the BPH's finding of unsuitability for parole. As the record shows, Petitioner's crime merely satisfies the bare minimum requirements for finding of a second degree murder. He did not torture Mr. Munoz, or lie in wait for him; he did not prolong his suffering, or kill him in order to rob him or incite a race war. His crime, while terrible, does not rise to the level of callousness present in Dannenberg, where after a long period of marital disharmony, the defendant bludgeoned his wife repeatedly with a pipe wrench and then drowned her or allowed her to drown in the bathtub; or Rosenkrantz, where defendant purchased an Uzi and, one week after provocation, shot the victim numerous times at close range and then remained a fugitive for 24 days; or Van Houten, where defendant assisted with multiple stabbings of the victim with a knife and bayonet, after the victim witnessed her husband receiving the same fate, all an effort to incite a race war. See Van Houten, 116 Cal.App.4th at 365. Not only does Petitioner's crime fail on its own to constitute "some evidence" that he is a continuing threat to public safety, but the BPH erred by failing to consider all of factors required by the regulations. Post-commitment facts are essential to determining suitability of parole. The BPH failed to consider Petitioner's perfect post-commitment record, positive psychological and forensic evaluations, exemplary in-prison work record, extensive self-help and therapy, and post release offer of housing and employment in Mexico, and therefore cannot justify his denial of parole.

7.

Cal. May 17, 2006), Judge Patel held that (1) sole reliance on the circumstances of petitioner's offense and conduct prior to the offense in denying parole constituted a due process violation, and (2) denial or parole under California's then-existing no-parole policy for murderers denied the inmate his due process right to be heard by an impartial decision-maker. Judge Patel further found that California inmates have a federally-protected due process liberty interest in parole.

2. The Facts of Petitioner's Escalating Pattern of Criminal
3. Conduct; His Failure at Previous Grants of Probation; and
& His Failure to Profit from Societies Previous Attempts to
4. Correct His Criminality, Do Not Provide Some Evidence That Petitioner is a Current Unreasonable Risk to Public Safety.

The BPH also points to Petitioner's pre-commitment offense behavior. "The inmate began to use cocaine heavily in California. And began to sell cocaine apparently to support his habit. As far as previous contacts the inmate as far as we know has no juvenile contacts. ... 1980. He also has, was arrested I should say for drunk driving in the following month in April. The inmate was ordered to attend a drug and alcohol program at that time. In 1984 the inmate was in possession of a controlled sustains. ..." (HT 14.) In 1984 Petitioner was arrested for possession of gun and cocaine. In 1987 Petitioner was arrested for possession of cocaine and received six years in Federal Prison. (HT 15.) These charges do not rise to the level anticipated in the Regulations which define "Previous Record of Violence" as "previous occasions [prisoner] inflicted or attempted to inflict serious injury on a victim." 15 CCR § 2402(b)(2); see also Van Houten, 116 Cal. App.4th at 353. Possession of cocaine is not assault and Petitioner's arrest for possession of weapon was not an attempt to inflict injury, of any severity,

Record of Violence."(15 CCR § 2402(b)).

Courts have also made clear that the evidence cited by the Executive must be relevant and probative to the factors that such evidence is being used to support. For instance, in <u>Smith</u>, the Governor had pointed to evidence indicating that "the crime was not an isolated incident, but rather the culmination of 'a continuing pattern' of personal drug use, social instability, and violence against Garner." <u>Smith</u>, 114 Cal.App.4th at 367. The court held that though there was some evidence of drug use, such evidence was not relevant to a determination of the key inquiry -- whether the inmate would pose a current, unreasonable threat to public safety.

> [T]he observation is more historical backdrop than a
> reflection of the circumstances surrounding commission of
> the offense: its manner, scope, and motivation. Indeed, there
> is no evidence that Smith shot Garner while he was under
> the influence, and no evidence that he abused her immediately
> before the shooting or even during the days and weeks before
> it. Thus, the Governor's observation does not tend to
> distinguish Smith's offense as especially grave.

(<u>Id.</u> at 368.)

5. There No Evidence That Petitioner Has Failed to Sufficiently
   Participate in Self-Help and Therapy Programming to Support
   a Finding of Unsuitability for Parole.

In another recent parole case, the court held that the Board's observation that the inmate had not gained an ability to speak English and that he had failed to upgrade his vocational training was not relevant to support a conclusion that "'he would pose an unreasonable risk of danger to society or threat to public safety if released from prison.' Nothing in the record indicates that defendant's criminality or ability to support himself was affected by any limitation of his vocational or language skills." <u>In re Deluna</u> (2005) 126 Cal.App.4th 585, 598; Cf. <u>Van Houten</u>, 116 Cal.App.4th

injury or attempted serious injury to a victim).

6. The Fact That The District Attorney's Office and Victim's Next of Kin Opposes Parole Does Not Constitute "Some Evidence" That Petitioner Currently Poses An Unreasonable Risk to Public Safety.

The BPH cited the District Attorney' Office and Victim's next of kin opposition to a finding of suitability to deny Petitioner parole. (HT 86.) Public outcry cannot be used to determine whether an inmate is suitable for parole. (In re Powell (1988) 248 Cal.Rptr. 431; In re Fain (1983) 139 Cal.App.3d 295.) Furthermore, because Petitioner had no notice that this factor would be used against him, this factor is unconstitutionally vague. (United States v. Doremus, 888 F.2d 630, 634 (9th Cir. 1989) [A statute (or regulation) is void for vagueness : if it fails to give adequate notice to people of ordinary intelligence concerning the conduct it proscribes, or if it invites arbitrary and discriminatory enforcement.].)

7. There is No Evidence to Support the BPH's Finding that Petitioner Needs Programming and Self-Help in Order to Face, Discuss, Understand, and Cope With Stress in a Non Violent Manner.

Finally, the BPH panel found that Petitioner "needs therapy, programming, and self-help in order to face, discuss, understand and cope with stress in a non destructive manner as well as to get further insight into the crime. Until progress is made the prisoner continues to be unpredictable and a threat to others." (HT 86.)

Petitioner has been disciplinary free his entire time in prison. He has shown that he can cope with stress in a non-destructive manner. In In re Smith, Cal.App.4th at page 371, the court held that evidence that a prisoner used intoxicating substance 20 years prior is not some evidence

10.

[W]e conclude that Smith's past desire for drug use was
not by itself reasonably established current unsuitability
because there is no additional evidence to complete a chain
of reasoning between his past drug use and a finding that
because of it he currently poses an unreasonable risk of
danger if released. In other words, in the absence of some
evidence to support a reasonable belief that Smith might
start using drugs again, the fact that he used drugs
extensively more than 20 years ago does not by itself
represent some evidence that he is currently dangerous.

Same holds true in the instant case. There is no reasonable basis to believe

that Petitioner might start using alcohol and drugs if released. The BPH

is asserting authority that it does not possess, denying parole because a

prisoner continues to be unpredictable. "According to a Task Force of the

American Psychiatric Association, '[n]either psychiatrist nor anyone else

have demonstrated an ability to predict the future violence or dangerousness.

[Citation] As our Supreme Court has also noted, 'the same studies which proved

the inaccuracy of psychiatric prediction [of dangerousness] have demonstrated

beyond dispute the no less disturbing manner in which such prophecies

consistently err: they predict acts of violence which will not in fact take

place ('false positive'), thus branding as 'dangerous' many persons who are

in reality totally harmless. [Citation]" (People v. Burnick (1975) 14 Cal.3d

306, 327.)

Under the clearly established framework of Allen and Greenholtz,

"California's parole scheme gives rise to a cognizable liberty interest in

release on parole." McQuillion v. Duncan, 306 F.3d 895, 902 (9th Cir. 2002).

The scheme creates a presumption that parole release will be granted unless

the statutorily defined determinations are made. (Id.; Biggs v. Terhune,

334 F.3d 910, 915-916 (9th Cir. 2003) (finding initial refusal to set a parole

date for prisoner with 25-to-life sentence implicated prisoner's liberty

interest.) In sum, the structure of California's parole scheme, with its

process by which inmates recognizes the alternative as a federal right to due process in parole proceedings.

For the foregoing reasons, the Court should reverse the BPH's findings and order the BPH to set Petitioner's term within the Matrix guidelines for second degree murder. (See Exhibit B, CCR-15 § 2403(c).)

Grounds 3 through Grounds 5   pages 13 through 27

a.  Supporting facts:

b.  Supporting cases, rules, or other authority:

THE GUIDELINES ON THE SAME FACTORS THAT WENT INTO
FORMULATING THE GUIDELINES IN THE FIRST PLACE.

On April 19, 2006, Alfonso Carranza ("Petitioner"), appeared before
the Board of Parole Hearings ("BPH") for his initial "Life Term Parole
Consideration Hearing." In its decision to deny Petitioner parole for four-
years, the BPH stated:

> The panel has reviewed all information received from the
> public and relied on the following circumstances in
> concluding the prisoner is not suitable for parole and
> would pose an unreasonable risk to society or a threat
> to public safety if released from prison. Multiple victims
> were attacked, injured and one killed during the offense.
> The offense was carried out in a dispassionate and
> calculated manner. The offense was carried out in a manner,
> which demonstrates an exceptional callous disregard
> for human suffering. The motive for the crime was inexplicable
> or very trivial in relationship to the offense. The sad
> part of my position is that I truly do not know what
> occurred out on the street nor does the Deputy Commissioner.
> We are only privy to what is submitted before us. The
> inmate's version is totally at odds with the information
> we have received in our packets. ... The inmate is also
> denied because he has an escalating pattern of criminal
> conduct. ... The inmate failed at previous grants of
> probation and cannot be counted upon to avoid criminality.
> ... The prisoner has failed to sufficiently participate
> in self-help and therapy programming. ... In regards to
> inmate's parole plans I think they are sufficient. ...
> However the panel notes opposition to your finding of
> suitability both from the District Attorney's office of
> Los Angeles County as well as the victim's next of kin.
> ...

(Exhibit A, Hearing Transcripts, pp. 82-85.)

This case presents interesting issues concerning the procedures and
guidelines used by the BPH in reaching and explaining its decisions
concerning parole. The issues arise because the BPH has designed procedures
(Pursuant to Cal. Penal Code §3041 (a)) that are suppose promote rationality
in its decision-making process and to enhance understanding of the that
process by all concerned, especially prisoners. The key ingredients of

13.

in deciding the appropriate length or time a prisoner should serve without good-time credit, and then calculating the good-time credit toward that term; and (b) a requirement that a prisoner denied parole receive in writing the reasons for the decision. These aspects of the BPH's guidelines and procedures are detailed in In re Rosenkrantz (2002) 29 Cal.4th 616, 653-654; Cal. Codes of Regs. tit. 15 ("CCR-15") § 2400-2411. (Exhibit B.)

The guideline table sets forth suggested length of time to be served prior to parole for various combinations of two variables: 1) the severity of the offense, and 2) the characteristics of the offender in relation with the victim. The precise issues raised by this case are (a) whether, in determining suitability for parole, the BPH must use the offense for which the prisoner was convicted, or can use the offense the BPH concludes he or she has committed based on the BPH's understanding of facts that allegedly occurred, and (b) whether the BPH can use factors that went into formulating the guidelines for setting terms (in mitigation or aggravation) as the stated reason for denying parole.

As brutal as Petitioner's homicidal conduct may have been, by the BPH's own guidelines, petitioner's term "shall normally" be set at his initial parole hearing, which was held in April 19, 2006. Petitioner Minimum Eligible Parole Date (MEPD) is set at March 15, 2007. As will be shown below, Petitioner should have been found suitable for parole and his term should have been set somewhere in the range of 15 to 19 years, which can be reduced with good conduct credit. (Exhibit B, CCR-15 § 2410.)

The BPH's own guidelines requires the BPH to determine the category most closely related to the circumstances of the crime, and impose the middle base term reflected in the matrix unless the panel finds

14.

set forth in § 2403(c), (d), and § 2403(b) describes three circumstances and victim situations to be used in determining the category most closely related to the crime being reviewed for setting terms:

CIRCUMSTANCES

A. Indirect

Victim died of causes related to the act of the prisoner but was not directly assaulted by prisoner with deadly force; e.g., shock producing heart attack; a crime partner actually did the killing.

B. Direct or Victim Contribution

Death was almost immediate or resulted at least partial from contributing factors from the victim; e.g., victim initiated struggle or had goaded the prisoner. This does not include victim acting in defense of self or property.

C. Severe Trauma

Death resulted from severe trauma inflicted with deadly intensity; e.g., beating, clubbing, stabbing, strangulation, suffocation, burning, multiple wounds inflicted with a weapon not resulting in immediate death or actions calculated to induce terror in the victim.

OFFENDER'S AND VICTIM'S RELATIONSHIP

I. Participating Victim

Victim was accomplished or otherwise implicated in a criminal act with the prisoner during which or as a result of which the death occurred, e.g., crime partner, drug dealer, etc.

II. Prior Relationship

Victim was involved in a personal relationship with prisoner (spouse, family member, friend, etc.) which contributed to the motivation for the act resulting in death. If the victim had a personal relationship but prisoner hired and/or paid to commit the offense, see Category IV.

III. No prior relationship

Victim had little or no relationship with prisoner, or motivation for act resulting in death was related to the accomplishment of another crime, e.g., death of victim during robbery, rape, or other felony.

15.

CCR-15 § 2407 provides Adjustments for Other Offenses:

(a) General. Effective January 1, 1979, Penal Code Section 669 was amended to permit the court to impose sentences for other crimes to be served consecutively to a life sentence (Stats. 1978, Ch. 579). Since the court has discretion to order that the sentences for more than one crime be served consecutively, the board shall consider the court's action in determining the adjustment pursuant to this section.

(b) Multiple Convictions.

(1) General. The board shall not add adjustments for convictions for which the prisoner has been pardoned or which have been reversed by an appellate court.

(2) Consecutive Life Sentences Imposed by the Court. If the court imposed consecutive life sentences the board shall determine the base crime and base term as provided in Section 2403(a). The board shall add adjustments for remaining life crimes. The adjustment for each remaining life crime shall be a period of time commensurate with the nature of the crime but no less than the period of parole ineligibility for the crime. In no case will the parole date for consecutive sentences be earlier than the parole date for the concurrent sentences.

(3) Concurrent Life Sentences Imposed by the Court. If the court imposed concurrent life sentences, the board may add an adjustment because prisoner has been convicted of more than one crime. The suggested adjustment is greater of:

(A) Time served on the nonbase life crime prior to reception on the base offense; or

(B) The following adjustment:

1. First degree murder: 13 years for a first degree murder committed on or after November 8, 1978.

2. Second degree murder: 8 years for second degree murder committed on or after November 8, 1978.

3. One-half the period of parole ineligibility for other life crimes.

(4) Consecutive Nonlife Sentences Imposed by the Court. If the court imposed consecutive nonlife sentences the Board shall not add additional adjustment for nonlife crime.

(5) Concurrent Nonlife Sentences Imposed by the Court. If the court imposed concurrent nonlife sentences, the board may add an adjustment because the prisoner has been convicted of more than one crime. The suggested adjustment is the greater of:

(A) Time served for nonlife crime prior to reception on the life offense; or

(B) One-half the determinate term imposed by the court; or

(C) One-half the term that would be established under Section 227 (e) for crimes which carry a sentence of one year and one day.

16.

and Matrix. Instead, the BPH based its decision to deny parole on the
same factors that went into formulating the guidelines.

The BPH's guidelines recognize that there will be adjustment to
be made for elements that go beyond what is necessary to convict for second
degree murder. These factors do not preclude a finding of suitability.
(See CCR-15 § 2411, Fixing a Parole Date.) (Exhibit B, p. 77-78.)

In Little v. Hadden, 504 F.supp. 558, 561, a federal court addressed
the same type of abuse that occurred in this case:

> [I]t is unreasonable and impermissible for the Commission
> to base a decision to continue beyond the guidelines on
> the same factors that went into formulating the guidelines
> in the first place. No one disputes that this was a serious
> crime, but the factors of seriousness indicated by this
> record are included in the guidelines themselves. ... It
> is clear to the Court from the record in this case that
> the Commission has attempted to continue Little in custody
> beyond the guidelines because of its ad hoc decision
> regarding the seriousness of the offense, but the factors
> relied upon are either unsupported by the record or were
> already considered in formulating the guidelines. ... In
> short, the Commission's decision is arbitrary and capricious
> because it is not based on anything in the record before
> it. Moreover, it reflects an abuse of discretion because
> it attempts to continue Little's confinement beyond the
> guidelines without the statutory required good cause.

(See also, Lupo v. Norton, 371 F.Supp. 156 (1974).)

Petitioner's right to a presumption parole release date, Legislative
intent, includes "behavioral" credits for participation with "good conduct"
under California Penal Code § 2900.5 and CCR-15 § 2900. The BPH's failure
to set petitioner's parole release date abrogates this whole Legislative
mandate for prisoners with term-to-life sentences. Failure to set a term
at the earliest possible time, initial hearing, also precludes Petitioner
from participating in self-help programs located at the minimum security

17.

legal status of one's family, including family relationships, to keep family ties strong and to assist the prisoner reentry into the family and community.

In sum, the executive's implementation of the parole system in California has turned upside down the legislative contemplation that murderers normally be found suitable for parole at their earliest parole suitability hearing, which is to be held 13 months before the prisoner becomes eligible for parole (Cal. Penal Code § 3041(a)), and released at a time proportionate to the individual's culpability. Instead of honoring the legislative mandate to normally parole murderers, the BPH had arbitrarily established a policy of almost never permitting parole to them. Consequently, Petitioner has not been afforded federal and state constitutional due process guaranties in the course of the executive's refusal to follow their own guidelines. (See Hicks v. Oklahoma (1980) 447 U.S. 343 [arbitrary deprivation of a state statute affecting life and liberty constitutes a violation of federal due process].)

"The measure of atrociousness is not general notions of common decency or social norms, for by that yardstick all murders are atrocious. ... 'All second degree murders by definition involve some callousness – i.e. lack of emotion or sympathy, emotional insensitivity, indifference to the feelings and suffering of others.' Rather, the inquiry is whether among murders the one committed by [the inmate] was particularly heinous, atrocious or cruel." In re Gray, 151 Cal.App.4th 379, 404 (2007), citing In re Lee, 146 Cal.App.4th 1400 (2006) (italics omitted).

California courts, interpreting the California parole suitability guidelines, have found decisions to deny parole unsupported by some evidence in cases where the petitioner perpetrated the killing on facts much worse

18.

than this case or others reasons that were more trivial than this case.

For example, In re Cooper, supra, petitioner killed his wife with a sledgehammer by hitting her in the neck five or six times. She suffered for 20 to 30 minutes before she died. Cooper then hid the body and covered up his crime. Nonetheless, the Court of Appeal found that "some evidence" consistent with the California parole scheme did not support the decision denying suitability.

In In re Barker, 151 Cal.App.4th 346, 353-354, 372-375 (2007), Barker helped his friend kill his father and grandfather: the friend shot the father, who was watching television, in the head three times and shot the mother two times. The petitioner struck the grandfather on the head three or four times with a chisel and then shot him in the head with a rifle. Nonetheless, this was insufficient to support a finding of unsuitability. "Some evidence" did not support denial.

In In re Lawrence, 150 Cal.App.4th 1511, 1518-1519 (2007), the petitioner was convicted of first degree murder for killing her lover's wife by wounding her in the hand, arm, leg, and neck, and then stabbing her to death with a potato peeler. "Some evidence" did not support the decision denying suitability.

In In re Elkins, 144 Cal.App.4th 475, 480-481, 496-499 (2006), the petitioner beat a friend with a bat until he was dead. He did this while his friend was asleep. He dumped the body down the side of hill. "Some evidence" did not support the decision denying suitability.

In In re Weider, 145 Cal.App.4th 570, 575-576 (2006), the petitioner killed his victim in the course of a suicidal rage in the middle of a bar and also shot two other patrons, one twice. Weider had gone out to his

19.

truck and returned with a gun. Id. at 589-590 ("his untimely

going out to his car to retrieve the murder weapon does not reflect the

type of heinous, atrocious, or cruel behavior .... rationally indicat[ing]

he will present an unreasonable public safety risk if released from

prison."). "Some evidence" did not support the decision denying suitability.

In In re Lee, 143 Cal.App.4th at 140, the petitioner went to a

restaurant to collect a payment and decided he would kill the debtor if

he did not pay. When the debtor indicated he would not pay, petitioner

fired five times, hitting the debtor twice, but also killed the debtor's

wife by shooting her in the head. "Some evidence" did not support the

decision denying suitability.

In each of these cases, California appellate courts have interpreted

California law to require more evidence that a crime is especially heinous,

atrocious or cruel, or exceptionally callous, when the commitment offense

itself is the basis for a finding of unsuitability. "[W]here there is no

convincing evidence that the state Supreme Court would decide differently,

a federal court is obligated to follow the decisions of the state's

intermediate appellate courts." Nelson v. City of Irvine, 143 F.3d 1196,

1206-1207 (9th Cir. 1998). Accord, Assurance Co. of America v. Wall &

Associates LLC of Olympia, 379 F.3d 557, 560 (9th Cir. 2004). The California

courts' authoritative interpretation of the parole standard governing

petitioner's liberty interest refutes the Board's finding in this case.

The BPH may not replace the legal standards for parole with its own

personal and political ones. (See, e.g., United States v. Lee (1882) 106

U.S. 196, 220.)

For the forgoing reasons, the Court should find that the BPH violated

Petitioner's state and federal due process when it failed to follow its

20.

own guidelines and instead based its decision on the same factors that went into formulating the guidelines in the first place, deeming the guidelines as unconstitutionally vague as applied. The court should order the BPH to a hold a new hearing within 30 days, follow its own guidelines, and set Petitioner's term within the guidelines set forth for second degree murder. (See Exhibit B, § 2403(c).)

AND PETITIONER'S DUE PROCESS BECAUSE PETITIONER HAS ALREADY
RECEIVED AND SERVED SEPARATED TERMS FOR THE MULTIPLE-COUNTS.
BY THE DOCTRINES OF RES JUDICATA AND COLLATERAL ESTOPPEL,
THE BOARD IS PROHIBITED FROM USING MULTIPLE VICTIMS AS A
REASON TO DENY PAROLE FOR MULTIPLE-YEARS.

On October 31, 1988, in the Los Angeles County Superior Court, a jury convicted Petitioner of second-degree, attempted murder, and attempted manslaughter. Petitioner was sentenced to a determinate term of 14 years and a consecutive, indeterminate term of 17 years-to-life.

On March 15, 1997, after serving his determinate sentence, Petitioner began to serve his 17 years-to-life sentence for the second degree murder. Petitioner's Minimum Eligible Parole Date ("MEPD") is set at March 15, 2007.

On April 19, 2006, pursuant to California Penal Code § 3041(a), Petitioner appeared before the Board of Parole Hearings ("BPH") and was denied parole for four years. In their decision, the BPH stated:

> This is the inmate initial hearing. The District Attorney
> has indicated that five years is the appropriate denial time.
> I will indicate in a separate decision the hearing panel
> finds that the prisoner has been convicted of murder as well
> as attempted homicide and it is not reasonable to expect
> parole would be granted in the next four years. Sir I will
> tell you we had discussions about this particular area. But
> Mr. Satris does indicate the obvious. You were not given
> the sentence of life without possibility of parole, you are
> attempting at this point and time to better yourself. I don't
> believe five years is appropriate. I think four years is
> the appropriate amount to get together the things that you
> need to get together.

(Exhibit A, HT 87.)

The California Code of Regulation Title 15 ("CCR-15") § 2407(b)(4) mandates that "If the court imposed consecutive nonlife sentences the Board shall not add an additional adjustment for the nonlife crime." CCR-15 § 2407(b)(5) states, "If the court imposes concurrent nonlife sentences, the board may add an adjustment because the prisoner has been convicted of more

22.

for the nonlife crime prior to reception on the life offense; or (B) One-half the determinate term imposed by the court; or (C) One-half the term that would be established under Section 2271(e) for crimes which carry a sentence of one year and one day." (Exhibit B, pp. 76-77.)

The record clearly shows that the BPH abused it discretion and violated Petitioner's rights to be free from double jeopardy or a duel use of the commitment offense. By the doctrines of res judicata and collateral estoppel, the BPH is precluded from reconsidering whether the gravity of Petitioner's nonlife offenses provides a basis for denying him parole. (See, e.g., U.S. v. Schwartz, 785 F.2d 673, 681-682 (9th Cir.).)

The Double Jeopardy Clauses prohibition against prosecution for same offense limits the power of a court, or parole board, to alter sentences. (See, e.g., U.S. v. Arrellano-Rios, 799 F.2d 520, 524-25 (9th Cir. 1986) [defendant who served one-year sentence for aiding and abetting drug crimes could not have sentence increased after related weapons conviction vacated nor could case be remanded to provide government with chance to increase sentence for aiding and abetting drug crime.].)

For the forgoing reasons, the court should find that the BPH violated Petitioner's due process when it denied him parole for four years.

23.

WHEN THE BOARD OF PAROLE HEARINGS RELIED ON OPPOSITION FOR
PAROLE FROM THE DISTRICT ATTORNEY'S OFFICE AND THE VICTIM'S NEXT
OF KIN AS A REASON TO FIND PETITIONER UNSUITABLE FOR PAROLE.
THE VICTIM'S NEXT OF KIN'S FEELINGS, CONCERNS, AND OTHER
STATEMENTS WERE ALREADY CONSIDERED DURING THE SENTENCE STAGE
AND THEIR PRESENCE, ALONG WITH THE DISTRICT ATTORNEY'S OFFICE
PRESENCE, CREATES A CONTAMINATION BY EXTRANEOUS INFLUENCES
IN THE PAROLE PROCEEDINGS.

On October 31, 1988, in the Los Angeles County Superior Court, a jury
convicted Petitioner of second-degree, attempted murder, and attempted
manslaughter. After considering the statements from the District Attorney's
office and victim's next of kin, the court sentenced Petitioner to a
determinate term of 14 years and a consecutive, indeterminate term of 17
years-to-life.

On March 15, 1997, after serving his determinate sentence, Petitioner
began to serve his 17 years-to-life sentence for the second degree murder.
Petitioner's Minimum Eligible Parole Date ("MEPD") is set at March 15, 2007.

On April 19, 2006, pursuant to California Penal Code § 3041(a),
Petitioner appeared before the Board of Parole Hearings ("BPH") and was denied
parole for four years. In their decision, the BPH stated:

> ... [T]he panel notes opposition to your finding of
> suitability both from the District Attorney's office of Los
> Angeles County as well as the victim's next of kin. ... The
> district Attorney has indicated that five years is the
> appropriate denial time. I will indicate is a separate
> decision the hearing panel finds that the prisoner has been
> convicted of murder as well as attempted homicide and it
> is not reasonable to expect parole would be granted in the
> next four years. ...

(Exhibit A, HT 87.)

Petitioner has a right to a parole hearing by an impartial panel.
The Board of Parole Hearings (BPH) has a the responsibility of protecting
this right to ensure that the parole applicant receives a fair and impartial
hearing.

24.

heavily and repeatedly influenced by the District Attorney's office and victim's next of kin. The District Attorney's office and victim's next of kin will always oppose Petitioner's release.

A decision based on a few facts that will always form the basis for denying parole, amounting to a permanent and virtually automatic denial of parole in a contravention of due process, is clearly arbitrary and capricious. "The presence of a large measure of discretion in a parole system ... does not alter the fundamental due process limitation against capricious decision-making. A legislative grant of discretion does not amount to a license for arbitrary behavior. When the Parole Board bases its decision on factors that bear no rational relationship to rehabilitation or deterrence, it transgresses the legitimate bounds of its discretion." In re Fain (1983) 139 Cal.App.3d 295, 307 (quoting Block v. Potter (3rd Cir. 1980) 631 F.2d 233, 236-37).

The BPH systematically denies parole to all life prisoners by unreasonably finding that the release of almost every life prisoner would jeopardize public safety. The Board always gives a multiple year denial of parole when the District Attorney office or victim's next of kin opposes parole at the initial parole hearing. The Board almost never sets a parole date at the prisoner's initial hearing; rather, it repeatedly postpones the setting of a parole date for the overwhelming majority of prisoners, and rarely grants a life prisoner a parole date no matter how many times it considers the prisoner for release or how much time he has served. The BPH currently grants parole to a very small percentage of eligible lifers – and even more rarely to those who are from another country. (See, e.g., In re Rosenkrantz, supra, 29 Cal.4th at p. 685 [Board granted parole to murderers

25.

In sum, the arm implementation of the parole system in California has turned upside down the legislative contemplation that murderers normally be found suitable for parole at their earliest eligibility and released at a time proportionate to the individual's culpability. Instead of honoring the legislative mandate to normally parole murderers, the executive has arbitrarily established a policy of almost never permitting parole to them, especially if the District Attorney's office or next of kin opposes parole. Consequently Petitioner has not been afforded federal and state constitutional due process guaranties in the course of the executive's refusal to grant parole to those who have opposition for parole. (See Hicks v. Oklahoma (1980) 447 U.S. 343 [arbitrary deprivation of a state statute affecting life or liberty constitutes a violation of federal due process].) The implementation of the parole law by the executive branch in a manner that disregards both the spirit and the letter of the law also arbitrarily violates the separation of powers doctrine contained in California Constitution, article III, section 3. Finally, an executive practice of parole denial that imposes greater punishment on a prisoner ex post facto violates his right to due process of law. (See, e.g., Young v. Weston (9th Cir. 1999) 176 F.3d 1196 [although law may not be ex post facto on its face, it can be ex post facto as applied]; Rogers v. Tennessee (2001) 532 U.S. 451 [149 L.Ed.2d 697, 121 S.Ct. 1693] [retrospective change in law detrimental to criminal defendant effected by other than legislative/regulatory means implicates due process].)

The contemporary and historical recidivism rate for murderers paroled in California historically is about 2%; the recidivism for other felons paroled in California has been as high as 70% - the highest in the nation. Prisoners as old as Petitioner, particularly after service of long prison

26.

prisoners who have been paroled, whether by court order or otherwise, overall have performed admirably well on parole and demonstrate that the BPH's refusal to grant parole have needlessly caused excessive imprisonment that not only retarded the prisoners' continued rehabilitation and imposed gratuitous pain and suffering on them and their loved ones at a time when the prison system is in crisis due to over-population, but have done considerable damage to the public fisc - all without any measurable increase to public safety and in fact contrary to the interest in public safety.

For the forgoing reasons, Petitioner prays that the Court declare the rights and duties of the parties; grant equitable relief, which requires the BPH to conform their practice of holding parole hearings to the dictates of section 3041 and all statutory, regulatory and constitutional requirements as set forth in the decision of the courts; and all other relief necessary to promote the ends of justice.

Affirmed the conviction

b. Result:

c. Date of decision: August 24, 1990

d. Case number or citation of opinion, if known: _____

e. Issues raised: (1) _____ Ineffective Assistance of counsel; Instruction errors _____

    (2) _____

    (3) _____

f. Were you represented by counsel on appeal? [X] Yes. [ ] No. If yes, state the attorney's name and address, if known: _____

9. Did you seek review in the California Supreme Court? [X] Yes. [ ] No. If yes, give the following information:

  a. Result: __Denied without comment or citation__ b. Date of decision: __November 14, 1990__

  c. Case number or citation of opinion, if known: _____
                               Same as above.

  d. Issues raised: (1) _____

    (2) _____

    (3) _____

10. If your petition makes a claim regarding your conviction, sentence, or commitment that you or your attorney did not make on appeal, explain why the claim was not made on appeal:

_____

_____

11. Administrative Review:

  a. If your petition concerns conditions of confinement or other claims for which there are administrative remedies, failure to exhaust administrative remedies may result in the denial of your petition, even if it is otherwise meritorious. (See *In re Muszalski* (1975) 52 Cal. App.3d 500 [125 Cal. Rptr. 286].) Explain what administrative review you sought or explain why you did not seek such review:
      There are no administrative remedies available for denial of parole.

_____

_____

_____

_____

_____

_____

  b. Did you seek the highest level of administrative review available? [ ] Yes. [ ] No.
    *Attach documents that show you have exhausted your administrative remedies.*

(2) Nature of proceedings:    Habeas corpus petition

(3) Issues raised: (a)    SAME AS IN INSTANT PETITION

         (b) _____

(4) Result (Attach order or explain why unavailable):    DENIED, ATTACHED

(5) Date of decision:    AUGUST 7, 2007

b. (1) Name of court: _____

   (2) Nature of proceeding: _____

   (3) Issues raised: (a) _____

           (b) _____

   (4) Result (Attach order or explain why unavailable): _____

   (5) Date of decision: _____

c. For additional prior petitions, applications, or motions, provide the same information on a separate page.

14. If any of the courts listed in number 13 held a hearing, state name of court, date of hearing, nature of hearing, and result:

_____

15. Explain any delay in the discovery of the claimed grounds for relief and in raising the claims in this petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.)

_____

16. Are you presently represented by counsel? ☐ Yes. ☒ No. If yes, state the attorney's name and address, if known:

_____

17. Do you have any petition, appeal, or other matter pending in any court? ☐ Yes. ☒ No. If yes, explain:

_____

18. If this petition might lawfully have been made to a lower court, state the circumstances justifying an application to this c

_____

I, the undersigned, say: I am the petitioner in this action. I declare under penalty of perjury under the laws of the State of C the foregoing allegations and statements are true and correct, except as to matters that are stated on my information and t to those matters, I believe them to be true.

Date: 9-22-07

▶ *Alfonse Carranza*
(SIGNATURE OF PETITIONER)

E X H I B I T    A

INITIAL PAROLE CONSIDERATION HEARING STATE OF CALIFORNIA BOARD OF PAROLE HEARINGS
SAN QUENTIN STATE PRISON, APRIL 19, 2006

In the matter of the Life )
Term Parole Consideration )
Hearing of: )
                          )          CDC Number E-30803
                          )
ALFONSO CARRANZA          )          INMATE
                          )
                          )          COPY
_____)

SAN QUENTIN STATE PRISON

SAN QUENTIN, CALIFORNIA

APRIL 19, 2006

PANEL PRESENT:

Mr. Stephen Lee, Presiding Commissioner
Ms. Joan Thompson, Deputy Commissioner


OTHERS PRESENT:
Mr. Alfonso Carranza, Inmate
Mr. Michael Satris, Attorney for Inmate
Ms. Alexis Delagarza, Deputy District Attorney(vid)
Mr. Robert Butman, Deputy District Attorney(vid)
Mr. Timothy Smith, Deputy District Attorney(vid)
Mr. David Pearson, Deputy District Attorney(vid)
Mr. Marsh Goldstein, Deputy District Attorney(vid)
Mr. Hector Munoz, (indiscernible)
Ms. Cecelia O'Reilly, sister of victim
Mr. Luis Munoz, brother of victim
Mr. Anderson, observer

Correctional Officers Unidentified



CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____  No    See Review of Hearing
_____  Yes   Transcript Memorandum



Jennyfer Osecheck, Peters Shorthand Reporting

## INDEX

| | PAGE |
|---|---|
| Proceedings | 1 |
| Case Factors | 15 |
| Pre Conviction Factors | 13 |
| Post Conviction Factors | 28 |
| Parole Plans | 42 |
| Closing Statements | 56 |
| Recess | 80 |
| Decision | 81 |
| Transcriber Certification | 91 |

--oOo--

2       PRESIDING COMMISSIONER LEE:  Ms. Delagarza

3   can you hear us?

4       DEPUTY DISTRICT ATTORNEY DELAGARZA:  Yes I

5   can, can you hear me?

6       PRESIDING COMMISSIONER LEE:  Yes very good

7   thank you very much.  All right, Mr. Satris I

8   believe we are ready to proceed, are you ready?

9       ATTORNEY SATRIS:  We are ready to proceed.

10      PRESIDING COMMISSIONER LEE:  Very good.  At

11  this time, just hold on one second here.  I will

12  indicate that this is the Initial Parole

13  Consideration Hearing for Alfonso Carranza, C-A-

14  R-R-A-N-Z-A, CDC number E-30803.  We are

15  currently located at San Quentin State Prison.

16  The date of the hearing is April 19, 2006.

17  Inmates life term began on March 15, 1997 out of

18  the county of Los Angeles in case number

19  LA539854.  The offense was murder in the second

20  degree pursuant to Penal Code Section 187.  The

21  term was set at 31 years to life.  Minimum

22  eligibility for parole is March 15, 2007.  At

23  this time we will make our appearances.  My name

24  is Stephen Lee, L-E-E, Commissioner presiding.

25  We will go to my right to the Deputy

26  Commissioner.

27      DEPUTY COMMISSIONER THOMPSON:  My name is

2    Deputy Commissioner with the Board of Parole

3    Hearings.

4         PRESIDING COMMISSIONER LEE:  Ms. Delagarza?

5         DEPUTY DISTRICT ATTORNEY DELAGARZA:  Alexis

6    Delagarza, D-E-L-A-G-A-R-Z-A, Deputy District

7    Attorney Los Angeles County and with me in the

8    room are some other Deputy District Attorney's

9    who are observing this particular lifer hearing.

10   I will have them identify themselves.

11        DEPUTY DISTRICT ATTORNEY BUTMAN:  Robert

12   Butman, Deputy District Attorney, B-U-T-M-A-N.

13        DEPUTY DISTRICT ATTORNEY SMITH:  Timothy

14   Smith, S-M-I-T-H, Deputy District Attorney.

15        DEPUTY DISTRICT ATTORNEY PEARSON:  David

16   Pearson, Deputy District Attorney that is P-E-A-

17   R-S-O-N.

18        DEPUTY DISTRICT ATTORNEY GOLDSTEIN:  Marsh

19   Goldstein, G-O-L-D-S-T-E-I-N, Deputy District

20   Attorney.

21        PRESIDING COMMISSIONER LEE:  Thank you.

22   Ms. Delagarza is appearing by video conferencing

23   and for all parties we will treat her as though

24   she is in the hearing room with us.  Sir?

25        INMATE CARRANZA:  My name is Alfonso

26   Carranza my number is E-30803.

27        ATTORNEY SATRIS:  And I am Michael Satris,

2  Carranza.

3      MR. MUNOZ: My name is Hector Munoz and I

4  am (indiscernible).

5      MS. O'REILLY: I am Cecilia O'Reilly.

6      PRESIDING COMMISSIONER LEE: And your

7  relationship to the victim?

8      MS. O'REILLY: I am the sister of Alfonso

9  (indiscernible) Munoz the victim.

10      MR. MUNOZ: My name is Luis Munoz I am the

11  brother of (indiscernible), my L-U-I-S-M-U-N-O-

12  Z. And my other brother Pedro Munoz.

13      MR. ANDERSON: Henry Anderson, from the

14  board of parole hearings, A-N-D-E-R-S-O-N.

15      PRESIDING COMMISSIONER LEE: Observer?

16      MR. ANDERSON: Observer.

17      PRESIDING COMMISSIONER LEE: And we have

18  officers here for security purposes as well. At

19  this time I will indicate that the inmate has

20  certain rights. Sir you have what is called ADA

21  rights. It appears that there is no documented

22  (indiscernible) so I will give you a document.

23  Sir I understand that you speak English, is the

24  correct?

25      INMATE CARRANZA: Yes I do.

26      PRESIDING COMMISSIONER LEE: All right do

27  you need any assistance in speaking or

1   understanding the English language?

2      INMATE CARRANZA:  No sir.

3      PRESIDING COMMISSIONER LEE:  All right.

4   At this time I a am going to give you a document

5   (indiscernible) right now an ADA document.  It

6   is a document that basically states the rights

7   you have, thank you sir.  Could you read that

8   out loud to us please?

9      ATTORNEY SATRIS:  Let me just ask there

10  wont be any problems with the microphones

11  picking up the voices, like yourself, with the

12  way the mikes are positioned is it a pretty good

13  setup?  Because a lot of time there is

14  indiscernibles that end up in the reporters

15  transcripts.

16     PRESIDING COMMISSIONER LEE:  Unfortunately

17  the board has been particular issue and I will

18  have to leave that to the Deputy Commissioner

19  Thompson.

20     DEPUTY COMMISSIONER THOMPSON:  They were

21  all tested before we began.  Everything tested

22  as recording and appropriate.  Unfortunately I

23  am not an electronics skilled person but the

24  staff that did set them up is and vouches that

25  the test was positive for proceeding.

26     ATTORNEY SATRIS:  This room does have some

27  more background noise than some of the others.

1   PRESIDING COMMISSIONER BEN: Correct but at
2   this point and time what I can when we switch
3   the tape over I will ask the Deputy Commissioner
4   to check it, to see how well it picked up.  So
5   at this point and time will you read the ADA
6   statement?

7   INMATE CARRANZA:  Ok, The Americans with
8       Disabilities Act, ADA, is a law to help
9       people with disabilities.  Disabilities
10      are a problem that make it harder for
11      some people to see, hear, read, talk,
12      walk, learn, think, work or take care
13      of themselves than it is for others.
14      Nobody can be kept out of public places
15      or activities because of a disability.
16      If you have a disability, you have a
17      right to ask for help to get ready for
18      your BPT hearing, get to the hearing,
19      talk, read forms and papers, and
20      understand the hearing process.  BPT
21      will look at what you asked for to make
22      sure that you have a disability that is
23      covered by the ADA, and that you have
24      asked for the right kind of help.  If
25      you do not get help or if you don't
26      think you got the kind of help you
27      need, ask for a BPT 1074 Grievance

2          out.

3          PRESIDING COMMISSIONER LEE:  All right

4     thank you.  Sir did you understand what you just

5     read?

6          INMATE CARRANZA:  Yes I do.

7          PRESIDING COMMISSIONER LEE:  All right, did

8     you have any problems getting here today?

9          INMATE CARRANZA:  No.

10         PRESIDING COMMISSIONER LEE:  All right do

11    you have any problems with your eyesight?

12         INMATE CARRANZA:  A little bit, I wear

13    glasses.

14         PRESIDING COMMISSIONER LEE:  Ok, that was

15    my second question.  With your glasses do you

16    have any problems?

17         INMATE CARRANZA:  No.

18         PRESIDING COMMISSIONER LEE:  All right do

19    you need them to read or merely to see far?

20         INMATE CARRANZA:  Just to read.

21         PRESIDING COMMISSIONER LEE:  Ok, did you

22    have the glasses when you went over your Central

23    File?

24         INMATE CARRANZA:  Yes I did.

25         PRESIDING COMMISSIONER LEE:  Ok at this

26    point and time have you ever been involved in

27    either the Triple CMS or EOP programs?

2      PRESIDING COMMISSIONER LEE:  Did you take

3  any type of psychotropic medication?

4      INMATE CARRANZA:  No sir.

5      PRESIDING COMMISSIONER LEE:  Have you ever

6  been in any special education courses?

7      INMATE CARRANZA:  No.

8      PRESIDING COMMISSIONER LEE:  Do you suffer

9  from any disability to your knowledge that would

10  prevent you from participating in today's

11  hearing?

12      INMATE CARRANZA:  Say it again?

13      PRESIDING COMMISSIONER LEE:  Do you suffer

14  from any disability that would prevent you from

15  participating fully in today's hearing?

16      INMATE CARRANZA:  No sir.

17      PRESIDING COMMISSIONER LEE:  Ok, Mr. Satris

18  do you know of any ADA issues that we need to

19  address?

20      ATTORNEY SATRIS:  No we are prepared to

21  proceed on that basis.

22      PRESIDING COMMISSIONER LEE:  This hearing

23  is this hearing is being conducted, pursuant to

24  Penal Code Sections number 3041 and 3042 as well

25  as the rules and regulations of the Board of

26  Parole Hearings.  Governing parole consideration

27  hearings for life inmates.  The purpose of

1   today's hearing is to consider your suitability

2   for parole.  In doing so we will consider the

3   nature, number of crimes you were committed for,

4   prior criminal and social history, and your

5   behavior and programming since your commitment.

6   We have had an opportunity to review your

7   Central File, and your prior transcript and you

8   will be given an opportunity to correct or to

9   clarify on the record.  We will consider your

10  progress since your commitment, your counselors

11  report, your psychological report, and any

12  changes of parole plans should be brought to our

13  attention.  I will indicate to counsel and I

14  apologize to both counsels that our checklist is

15  inadequate.  The problem being is that there has

16  been some issues in regards to getting documents

17  out.  Does everyone have the latest board report

18  as well as the psychological report?

19       ATTORNEY SATRIS:  I do.

20       PRESIDING COMMISSIONER LEE:  Ms. Delagarza?

21       DEPUTY DISTRICT ATTORNEY DELAGARZA:  I do

22  thank you.

23       PRESIDING COMMISSIONER LEE:  All right very

24  good.  At this point and time I will indicate

25  that we expect at this time to you to be totally

26  honest with us today.  This is your initial

27  hearing.  What that means is that if you are

1   unfortunate enough to not give a second to I
2   will be the foundation for all of your future
3   hearings.  If you mistake something or tell a
4   lie at this hearing that will be transcribed it
5   will be on the record.  If you do not get a date
6   today I will indicate to you any false statement
7   you make will have an adverse effect on your
8   ability to get a date in the future.  However
9   you are not required to discuss the facts of the
10  case, and that is your right.  Nothing that
11  happens here today will change the findings of
12  the court, we are not here to retry your case.
13  Our purpose is solely to determine your
14  suitability for parole.  This hearing will be
15  conducted in three phases.  I will handle your
16  social history as well as the facts of the
17  crime.  I will then turn it over to the Deputy
18  Commissioner who will then discuss with you your
19  programming while incarcerated as well as your
20  psychological report.  Then we will discuss your
21  future plans including any letters of support as
22  well as letter of opposition.  There are notices
23  that are sent out pursuant to 3042, which are
24  sent out to various organizations and
25  individuals who have special interest in your
26  case.  We do have a response.  We have a
27  response not only by the victim's next of kin

1  but also from the District Attorney's office in

2  Los Angeles County.  District Attorney has an

3  opportunity to ask you questions and make a

4  statement at the end of this hearing.  The

5  commissioners, the Deputy District Attorney and

6  your attorney will be given opportunities to ask

7  you questions, the questions however from the

8  District Attorney will be addressed through the

9  chair and your questions will be directed toward

10  the panel.  Before we recess for deliberations

11  the Deputy District Attorney, your attorney and

12  you will be given an opportunity to make a final

13  statement, your statement will be limited to as

14  to why you feel you are suitable for parole.  We

15  will recess, clear the room and deliberate.

16  Once we have completed our deliberations we will

17  resume the hearing and announce our decision.

18  Pursuant to California code of regulations it

19  states that regardless of time served a life

20  inmate shall be found unsuitable and denied

21  parole if in the judgment of the panel the

22  inmate poses an unreasonable risk to society if

23  released from prison.  You have certain rights.

24  These rights include a timely notice of this

25  hearing, the right to review your Central File,

26  and the right to present relevant documents.  At

27  this time counsel are there any documents you

1    wish to submit.

2            ATTORNEY SATRIS:  No.

3            PRESIDING COMMISSIONER LEE:  And to the

4    best of your knowledge has your client received

5    his notice in regards to this hearing and review

6    of his Central File?

7            ATTORNEY SATRIS:  Yes, except for certain

8    notices.  We did not receive notice that the

9    District Attorney would be appearing or that

10   there would be an appearance by the kin of the

11   victims.  And we did not receive timely notice

12   of the District Attorney's submission.  It was

13   received by my office on April 13, 2006, I had

14   not been in to see Mr. Carranza since then.  He

15   never received a copy of the submission.  I had

16   seen Mr. Carranza ten days before the hearing to

17   make sure that we were fully informed.  So I had

18   briefly had a little time before this hearing to

19   discuss the unnoticed matters.  We are prepared

20   to proceed but I did want to make that part of

21   the record.

22           PRESIDING COMMISSIONER LEE:  I will

23   indicate to counsel that, that is a concern and

24   we have attempted to address that.  Often times

25   the District Attorney sends the items out

26   properly but based upon our lack of staff we

27   don't get it out to you, and take my apologies.

1    ATTORNEY SATRIS: I think this time it was

2 sent timely from the dates I see on this paper

3 but it didn't get to me on time. And to this

4 moment it has not gotten to Mr. Carranza.

5    PRESIDING COMMISSIONER LEE: However you

6 are ready to proceed?

7    ATTORNEY SATRIS: We are.

8    PRESIDING COMMISSIONER LEE: All right. I

9 am not exactly sure what that noise was but we

10 will continue on unless they tell us there is a

11 fire. All right you have an additional right

12 sir to be heard by an impartial panel. Do you

13 have any objections to the panel?

14    INMATE CARRANZA: No.

15    PRESIDING COMMISSIONER LEE: You will

16 receive a copy of our written tentative decision

17 today, that decision becomes effective within

18 120 days. A copy of the decision and a copy of

19 the transcript will be sent to you. You are not

20 required to admit your offense. But the panel

21 does accept as true the findings of the court.

22 We do not have an appellate right be we do

23 however have a grievance procedure pursuant to

24 administrative decisions 0401. As I have

25 indicated to you I do not have an exhibit to

26 submit to counsels. If there becomes an issues

27 in regards to documents please let me know and

2    sir would you raise your right hand?  Do you

3    solemnly swear or affirm to tell the truth, the

4    whole truth and nothing but the truth?

5.       INMATE CARRANZA:  Yes I do.

6        PRESIDING COMMISSIONER LEE:  Is your client

7    going to discuss with us the facts of the case?

8        ATTORNEY SATRIS:  He is going to exercise

9    the right you described about not discussing the

10   facts.  But he is prepared to otherwise speak to

11   the board on matters related to parole.

12       PRESIDING COMMISSIONER LEE:  Ok, very good.

13       ATTORNEY SATRIS:  His position and our

14   position is that we understand the board does

15   accept the court findings and is not here to

16   retry the case and we similarly accept the

17   findings and are not here to retry the case.

18       PRESIDING COMMISSIONER LEE:  Very good.  Ok

19   we will begin.  The inmate was born on November

20   18, 1959 in and I am not exactly sure how we

21   pronounce this, Zacatecas Mexico.  To the union

22   of Maria and Jose Carranza.  Carranza's parents

23   have been married for 50 years.  The inmate

24   completed elementary school in Mexico and moved

25   to Palatine Illinois at the age of 15 years old.

26   The inmate did not finish his education in the

27   United States but gained employment doing

1    landscaping and day laborer. On February 11,

2    1977 the inmate married Theresa Silva in

3    Palatine Illinois.  The inmate has been married

4    to Theresa for 29 years.  From this union then

5    have one child Linda who is age 27.  She is

6    currently a registered nurse in Illinois.  The

7    inmate also has another child, Eric, who he

8    fathered with Lupe Vargas.  Eric is currently

9    working as a Mercedes mechanic in Fremont

10   California.  In 1979 the inmate and his family

11   moved from Illinois to California where the

12   inmate obtained employment in a paper

13   manufacturing company making envelopes and

14   writing tablets.  The inmate began to use

15   cocaine heavily in California.  And began to

16   sell cocaine apparently to support his habit.

17   As far as previous contacts the inmate as far as

18   we know has no juvenile contacts.  Adult

19   contacts he had a drunk driving that apparently

20   was reduced, well I take that back. This was in

21   1980.  He also has, was arrested I should say

22   for a drunk driving in the following month in

23   April.  The inmate was ordered to attend a drug

24   and alcohol program at that time.  In 1984 the

25   inmate was in possession of a controlled

26   substance.  Sir what were you arrested for in

27   1984, do you remember?

1   INMATE CARRANZA:  Yes I was arrested in

2   possession of a weapon.  A gun and cocaine.

3         PRESIDING COMMISSIONER LEE:  All right,

4   cocaine?

5         INMATE CARRANZA:  Yes.

6         PRESIDING COMMISSIONER LEE:  Ok, why were

7   you carrying a gun and having cocaine in 1984?

8         INMATE CARRANZA:  I was living that

9   lifestyle.  I used to carry a gun.

10         PRESIDING COMMISSIONER LEE:  Why did you

11   carry a gun?  Because of your drugs selling?

12         INMATE CARRANZA:  Yes.

13         PRESIDING COMMISSIONER LEE:  All right.

14   Apparently the inmate also has a federal

15   conviction.  What is your federal conviction

16   for?

17         INMATE CARRANZA:  They arrested me with

18   cocaine.

19         PRESIDING COMMISSIONER LEE:  This was in

20   1987?

21         INMATE CARRANZA:  Yes and they gave me six

22   years in Federal Prison.

23         PRESIDING COMMISSIONER LEE:  All right.

24   And then we have the current matter.  On

25   November 30, 1985 at approximately 1:33 a.m. the

26   victim Raul Munoz and the inmate got into an

27   argument over a quarter that had been placed on

1    a pool table by the inmate who was to play the

2    next game of pool. According to the victim the

3    quarter had fallen off the pool table and he

4    attempted to tell the inmate that the quarter

5    had fallen off.  After trying to tell him two or

6    three times the inmate appeared to be ignoring

7    him, he had nothing to say.  After a few moments

8    the inmate faced the victim and stated in

9    Spanish do you want me to kick your ass.  At

10   this time the victim Raul stood up and stated

11   anytime you want.  After they pushed and shoved

12   one another a couple of times the victim stated

13   if we are going to fight let's do it.  Inmate

14   suddenly backed down and resumed, got back into

15   some type of conversation.  The victim seeing

16   that he was outnumbered left the bar and went

17   and got his brothers, victim Juan and victim

18   Pedro.  When he returned to the bar he asked his

19   two brothers to wait outside while he was

20   inside, to see what the inmate was up to.  Once

21   inside the victim confronted the inmate however

22   things calmed down and there was no actual

23   physical confrontation.  While things were

24   coming down one or calming down I should say,

25   the victim's friends excuse me, the inmates

26   friend attempted to hit victim Raul but he was

27   grabbed by victim Pedro.  And victim Pedro

1   prevented him from doing so.  At this time the

2   owner of the bar told the suspects and the

3   victims he didn't want any fighting inside the

4   bar and asked them to calm down.  After a short

5   conversation the victim and the defendant

6   apparently shook hands and it appeared that

7   there was no more altercation.  Consequently the

8   victim decided to leave the restaurant and go

9   home.  As he was about to step out and leave the

10  bar one of the inmate's friends told him he

11  wanted to talk to him outside.  Feeling there

12  was going to be a possible fight the victim took

13  off his jacket.  Instead of having a physical

14  altercation, strike that.  Apparently there was

15  some discussion and while this was being said

16  the door of the bar opened and the inmate

17  stepped out and pointed a handgun directly at

18  the victim.  The victim was about ten to twelve

19  inches from the inmate when the inmate fired one

20  round striking him in the neck.  After shooting

21  the gun the victim began to run, he was then

22  shot in his leg.  The victim Juan Munoz appeared

23  to be frozen in terror and the inmate merely

24  pointed the gun at him and shot him once.

25  Victim Munoz said that his brother was a

26  distance of approximately five feet away from

27  him when he was shot.  When this happened victim

1   Munoz said he ran towards the sidewalk area to
2   get away from the inmate, in doing so he heard
3   two more shots fired at him.  None of these
4   rounds apparently struck him.  He then saw the
5   inmate and one of his friends enter some type of
6   vehicle and leave the location.  At this point
7   and time the witness indicated he noted his
8   brother Juan lying on the ground in the parking
9   lot.  And later his cousin Sanchez came to help.
10  At the hospital the victim was pronounced dead.
11  At this point and time before we go any further
12  I have stated on the record the inmates social
13  history as well as his priors and the facts of
14  the case.  At this point and time sir this is a
15  opportunity to make any corrections.  Is there
16  anything that I have indicated for which you
17  feel is inaccurate or need explanation?
18      ATTORNEY SATRIS:  Well let me speak to that
19  at least in terms of the offense.
20      PRESIDING COMMISSIONER LEE:  Let me
21  (indiscernible) the question that I just did,
22  all right.  At first in regards to the social
23  history and the priors is there anything the
24  inmate wishes to clarify or respond to at this
25  time?
26      INMATE CARRANZA:  No sir.
27      ATTORNEY SATRIS:  Let me just say on that

1  then.  I think if might be useful to elaborate

2  on that a little bit.  On the background in

3  terms of your wife and so forth.  You know you

4  know her from all the way back in Mexico.

5      INMATE CARRANZA:  Yah.

6      ATTORNEY SATRIS:  Could you just tell the

7  board a little bit about that?

8      INMATE CARRANZA:  About my wife?

9      ATTORNEY SATRIS:  Yes meeting her, how you

10  know her and the family and so forth?

11      INMATE CARRANZA:  I knew my wife since we

12  were in Mexico in Zacatecas.  We were little on

13  the ranch.  You know her parents and my parents

14  knew each other.  They kind of grew up together

15  too.  Then we came to Chicago Illinois and I

16  came across her again and we started dating and

17  we got married.  I have been with my wife for 29

18  years.

19      PRESIDING COMMISSIONER LEE:  And apparently

20  she still supports you?

21      INMATE CARRANZA:  Yes.

22      PRESIDING COMMISSIONER LEE:  All right,

23  where is she living, what city?

24      INMATE CARRANZA:  She lives in Round Lake

25  with my daughter.

26      PRESIDING COMMISSIONER LEE:  Anything else

27  counsel?

1    ATTORNEY SATRIS:

2    the eldest of eight is that right?

3        INMATE CARRANZA:  Yes.

4        ATTORNEY SATRIS:  Could you just briefly

5    talk about your family?

6        INMATE CARRANZA:  Ok, my father and my

7    mother Jose Carranza and Maria (indiscernible) I

8    am the oldest of eight children.  We grew up on

9    Mexico, then we came to the United States.  And

10   they went to school and they did something with

11   their lives and I didn't, I took the wrong path.

12       PRESIDING COMMISSIONER LEE:  We have quite

13   a few letters and we will go through them

14   shortly.  Is there anything else you would like

15   to tell us about your period of time while you

16   were growing up anything that you would want us

17   to know?

18       INMATE CARRANZA:  Well --

19       PRESIDING COMMISSIONER LEE:  Let me ask you

20   this question straight out.  Why did you get

21   involved in drugs?

22       INMATE CARRANZA:  I don't know.  It is not

23   like I planned to get involved in drugs.  You

24   know I was into going to bars with my uncles and

25   cousins and you know I was introduced to drugs.

26   And I got hooked on drugs.

27       PRESIDING COMMISSIONER LEE:  Primarily

2         INMATE CARRANZA:  Yes (indiscernible).

3         PRESIDING COMMISSIONER LEE:  And alcohol?

4         INMATE CARRANZA:  Yes.

5         PRESIDING COMMISSIONER LEE:  All right, Mr.

6  Satris anything else?

7       ATTORNEY SATRIS:  No I think it can wait

8  until the letters they will cover it.

9       PRESIDING COMMISSIONER LEE:  At this point

10  and time I will go to the next aspect and that

11  is that the inmate has elected not to discuss

12  the facts of the case so I will read the

13  prisoners version from the April 2006 board

14  report.  On the evening of November 30, 1985 he

15  went to the La Casa Blanca bar.  I started to

16  play pool, drink beer, and snort cocaine.  When

17  I got into an argument with Raul Munoz instead

18  of trying to calm the situation down I responded

19  at his level.  In my macho mentality I thought

20  it was considered week to back down from

21  violence.  After the heated argument Mr. Munoz

22  left the bar and I stayed to continue to play

23  pool.  Just before the bar closed I went outside

24  and saw Mr. Munoz and two men coming at me.  Mr.

25  Munoz was cursing at me and I reached over and I

26  was quick to shoot--

27       ATTORNEY SATRIS:  And I overreacted.

1    PRESIDING COMMISSIONER LEE:   And I

2   overreacted, excuse me.  I overreacted and was

3   quick to shoot them.  After shooting them I got

4   into my car and drove away.  When I sobered up I

5   realized what I had done, and the seriousness of

6   my actions and fearing punishment I did not turn

7   myself in.  Back then I never thought about how

8   destructive my lifestyle was, I was living a

9   life that was out of control.  I refused to take

10   responsibility for myself and for those I hurt

11   around me.  I put my family through much pain

12   and suffering.  At this point and time I will

13   stop the rest of the information is not related

14   to the facts of the case.  At this point and

15   time sir I can ask you, I am not asking you in

16   regards to the facts of the case, but you have

17   been incarceration for approximately 20 years

18   have you learned anything these last 20 years?

19    INMATE CARRANZA:  Yes I learned first of

20   all I learned English as a second language.  And

21   I got my GED equivalency.  I got training as a

22   peer health educator.  And I work with Center

23   force educating people, inmates upon their

24   arrival to the institution.  And I talk to them

25   about the risk of HIV, AIDS, hepatitis,

26   especially hepatitis C., and STD, Sexually

27   Transmitted Diseases.  And you know I have been

1   working for the last four years for them.

2       ATTORNEY SATRIS:  I think maybe if I may

3   to, I think the question is a little bit also

4   directed at what have you learned about yourself

5   and has that effected the attitude towards your

6   criminal actions and the offense?

7       INMATE CARRANZA:  Thank you.  Well I came

8   to realize upon my arrest, that they didn't

9   arrest me they rescued me from my life of self-

10  destruction and causing pain and suffering to

11  other people.

12      ATTORNEY SATRIS:  And particularly your

13  attitudes about, about the crime that has

14  brought you here to prison life?

15      INMATE CARRANZA:  I really apologize for

16  what I did.  I wish I can go back and change

17  things but that is impossible.  I wish this

18  never would have happened.  I am totally sorry

19  and I take full responsibility for the pain and

20  suffering I caused the victims and their

21  families.  And I would like to ask them for

22  their forgiveness.  I am very sorry for what I

23  did to them.

24      PRESIDING COMMISSIONER LEE:  Ok, let me ask

25  you have you been involved in any victims or

26  groups here at San Quentin?

27      INMATE CARRANZA:  No not yet, I am just

1  involved with AA.

2       PRESIDING COMMISSIONER LEE:  One expects
3  that people change over 20 years, have you
4  changed sir?

5       INMATE CARRANZA:  I feel and I know I am a
6  totally different person.  I am 46 years old and
7  I am a totally different person.

8       PRESIDING COMMISSIONER LEE:  How are you
9  totally different?

10      INMATE CARRANZA:  Because I am not the same
11 person I was back then.  Because I grow up,
12 mature as a person.  I am an older person.  I
13 became to know god in here.

14      ATTORNEY SATRIS:  And have your values
15 changed?

16      INMATE CARRANZA:  (indiscernible).

17      ATTORNEY SATRIS: Could you explain to the
18 board in those regards?

19      INMATE CARRANZA:  Well back then I didn't
20 care you know the lifestyle I was living.  Now
21 I, I think totally different.  I care for other
22 people I care for my family, my kids.  And I try
23 to do good to people.

24      PRESIDING COMMISSIONER LEE:  All right.  I
25 am not going to discuss with you NA or AA at
26 this time because the Deputy Commissioner will
27 discuss those with you shortly.  However I will

1  in fact indicate--

2      DEPUTY DISTRICT ATTORNEY DELAGARZA:

3  Commissioner I can't hear you.

4      PRESIDING COMMISSIONER LEE:  All right -

5      DEPUTY DISTRICT ATTORNEY DELAGARZA:  I am

6  sorry I can't hear you.

7      PRESIDING COMMISSIONER LEE:  That's all

8  right.  I will speak up.  I just basically

9  indicated that I will not discuss AA and NA with

10  the inmate since the Deputy Commissioner will

11  discuss that with him shortly.  Is that better?

12  Can you hear me?

13      DEPUTY DISTRICT ATTORNEY DELAGARZA:  That

14  is fine thank you.

15      PRESIDING COMMISSIONER LEE:  The phone was

16  in the way.  I will indicate to you sir if you

17  are released at this point and time what will

18  keep you from going back to that lifestyle you

19  indicated earlier?

20      INMATE CARRANZA:  I will seek some kind of

21  support our there.  AA or NA and I have the

22  support of my family and I will never fail them

23  anymore (sic).

24      PRESIDING COMMISSIONER LEE:  You think that

25  would be sufficient?

26      INMATE CARRANZA:  I do.

27      ATTORNEY SATRIS:  And your church is that

1    important also?

2          INMATE CARRANZA:  Yes.

3          PRESIDING COMMISSIONER LEE:  You say your
4    church is there a particular church outside that
5    you are associating with right now?

6          INMATE CARRANZA:  Yes.

7          PRESIDING COMMISSIONER LEE:  Which church
8    is that?

9          INMATE CARRANZA:  Jubilee Christian Center
10   in San Jose.

11         PRESIDING COMMISSIONER LEE:  Ok all right
12   that is a very large church.

13         INMATE CARRANZA:  Yes it is.

14         PRESIDING COMMISSIONER LEE:  All right is
15   there a prison ministry or do you happen to know
16   someone there?

17         INMATE CARRANZA:  Yes my son goes to that
18   church and his pastor visits me from time to
19   time.

20         PRESIDING COMMISSIONER LEE:  Ok, when you
21   say his pastor you are not talking about the
22   senior pastor you are talking about the prison
23   ministry pastor?

24         INMATE CARRANZA:  No I am talking about the
25   Jubilee Christian Center, the pastor for the
26   Spanish ministry.  The Spanish ministry, they
27   have the English ministry (indiscernible).

27

1      PRESIDING COMMISSIONER LEE:  All right.

2      INMATE CARRANZA:  And we also have

3  volunteers who come over here and talk to us

4  about Jesus and the bible.  And I have support

5  from that to if I get released I have a place to

6  go.

7      PRESIDING COMMISSIONER LEE:  Now sir you

8  indicated that there was a change in your life

9  apparently you now know god better than you did

10  before.  When did this occur?

11      INMATE CARRANZA:  Like in a few months

12  after I got arrested.

13      PRESIDING COMMISSIONER LEE:  Back in 1985?

14      INMATE CARRANZA:  No, I got arrested in

15  1987.

16      PRESIDING COMMISSIONER LEE:  So somewhere

17  around 1988?

18      INMATE CARRANZA:  Yah somewhere around that

19  time.

20      PRESIDING COMMISSIONER LEE:  All right I

21  have no further questions at this time.  I will

22  turn it over to the Deputy Commissioner, the

23  Deputy Commissioner will discuss with you your

24  programming as well as your psychological

25  report.

26      DEPUTY COMMISSIONER THOMPSON:  Ok, thank

27  you.  You arrived in California in the

1    Correctional system in 1989. You had been I

2    believe in Minnesota.

3        INMATE CARRANZA: Midland Michigan.

4        DEPUTY COMMISSIONER THOMPSON: Michigan

5    pardon me. You finished some term there then

6    came, you moved among various institutions for

7    the next, then you were reduced in custody

8    level. You were reduced in classification

9    score. You apparently at this time have a score

10   of zero classification or did they do the

11   minimum for lifers?

12       INMATE CARRANZA: Yah they did a minimum

13   for lifers, they gave us the 19 points.

14       DEPUTY COMMISSIONER THOMPSON: But up till

15   then you had a classification score of zero.

16       INMATE CARRANZA: I had a minus.

17.      DEPUTY COMMISSIONER THOMPSON: At this time

18   disciplinary you have only one and that is a

19   counseling chrono that you received in December

20   of 2000 for being out of bounds. Is that

21   correct?

22       INMATE CARRANZA: Yes.

23       DEPUTY COMMISSIONER THOMPSON: And there

24   has been none subsequent to that. Academically

25   you did achieve your GED. When was that? What

26   year?

27       INMATE CARRANZA: It was like in 1994 or

1    INMATE CARRANZA:  Yes when I first got here
2    in 1995 from Corcoran I came here and I started
3    working in R and R, receiving and release.  We
4    would receive and release inmates.  I worked
5    there for about two and a half years and then
6    they moved me to north block as a porter.  I was
7    a laundry man doing Landry for the incoming
8    inmates from reception center.  I did that
9    until, I worked there for approximately 19,
10   almost 2001 something like that.  Then I went to
11   work at the joint venture where they were paying
12   me minimum wage.  They removed me from that
13   position because I have an active INS hold.
14       DEPUTY COMMISSIONER THOMPSON:  Correct.
15       INMATE CARRANZA:  So then I went to work to
16   Centerforce.  First I went through health
17   training a five-day training.  And then they
18   offered me a job.  I got hired by them and I
19   have been working with them ever since.
20       DEPUTY COMMISSIONER THOMPSON:  And then it
21   seems you have become or perhaps were a master
22   leather craftsman.
23       INMATE CARRANZA:  Yes, I work with leather.
24   I make all kind of items, purses, wallets, and
25   belts.  I do tooling, carved, I make all the
26   officers and staff what they wear their gear.
27   Alarm holders, haircut cases, pepper spray

1  holders, double key holders and all that stuff.

2  I make that, I put them in the gift shop for

3  sale.

4        DEPUTY COMMISSIONER THOMPSON:  And it says

5  you have been successful in that to the extent

6  that you send home money to put your children,

7  help put your children through school and help

8  your wife buy a home.

9        INMATE CARRANZA:  Yes when they were going

10 to school I was able to send, I had the

11 privilege and blessing to send them money for

12 books or whatever.  And that is on the record

13 too I think.

14       DEPUTY COMMISSIONER THOMPSON:  It is?

15       INMATE CARRANZA:  Yah, and I send money to

16 my wife when we bought the house.

17       DEPUTY COMMISSIONER THOMPSON:  And that

18 house is in Round Hills?

19       INMATE CARRANZA:  Round Lake.

20       DEPUTY COMMISSIONER THOMPSON:  Round Lake

21 Illinois.  And she still has that home and still

22 occupies it?

23       INMATE CARRANZA:  Yes, she and my daughter.

24       DEPUTY COMMISSIONER THOMPSON:  Yes your

25 daughter who is a nurse.  Now as to self-help

26 you were on the AA and NA waiting list for two

27 years.  But you began going in this year.

1    that correct?

2          INMATE CARRANZA:  Yes.

3          DEPUTY COMMISSIONER THOMPSON:  And you are

4    still attending those on a regular basis?

5          INMATE CARRANZA:  Yes and I will continue

6    attending.

7          DEPUTY COMMISSIONER THOMPSON:  All right on

8    the psychological evaluation report that your

9    counselor did for this hearing in this year of

10   April 2006 it says you have a positive attitude.

11   And you would benefit from remaining

12   disciplinary free and that you it notes that you

13   have family resources and employment resources

14   as well.

15         INMATE CARRANZA:  Yes.

16         DEPUTY COMMISSIONER THOMPSON:  You were

17   aware of that?

18         INMATE CARRANZA:  Yes fully aware.

19         DEPUTY COMMISSIONER THOMPSON:  Ok,

20   anything, I wanted to go back.  You have a

21   certificate of appreciation you have actually

22   four of them.  Two from Center Point, one from

23   the Protestant Chaplain Ministry, and what is

24   VVGSQ?

25         INMATE CARRANZA:  That is the veterans

26   Vietnam, Vietnam veterans group.

27         DEPUTY COMMISSIONER THOMPSON.

1   have also a certificate of appreciation from
2   that group.
3
4        INMATE CARRANZA:   From that group, yes.
5        DEPUTY COMMISSIONER THOMPSON:   And then you
6   have laudatory chronos.  One, two, three, four,
7   five, six, seven, eight laudatory chronos
8   between October of 1999 and March 7, 2006.  The
9   last being from the Protestant Chaplain in
10  recognition of your counseling work with the
11  Spanish Christian community.  And I want to make
12  sure that is the extent of them.  You have at
13  least 18 letters of support.  17 were written in
14  the year of 2005.  And you received one in
15  January of this year, January 3, 2006 from the
16  Jubilee Christian Center.  I think that was the
17  church you were discussing earlier.  Did we
18  leave anything out about when you arrived, since
19  you have arrived in CDC?
20       INMATE CARRANZA:   Not that I recall.
21       DEPUTY COMMISSIONER THOMPSON:   Ok, thank
22  you then I would turn to the psychiatric or
23  psychosocial evaluation.  That was prepared on
24  March 6, 2006.  And they review many of the
25  factors that you and Commissioner Lee have
26  already discussed.  And I think we have touched
27  on.  The current diagnostic impression on AXIS I
    is adult anti social personal.

1  acculturation problem by history, alcohol
2  dependence in a controlled environment, I
3  presume they mean to say it is in remission.
4  And cocaine dependence in a controlled
5  environment would be in control.  On AXIS II
6  which is the mental disorder as opposed to
7  disease there is no diagnosis.  And on AXIS III
8  which relates to physical symptoms or
9  contributory causes they listed degenerative
10 disc disease.  On AXIS IV which is your overall
11 approach they see your stressors as the life
12 sentence itself.  And you have a Global
13 assessment of functioning of 85, which is a very
14 good score.  You were aware of this?
15     INMATE CARRANZA:  Yes thank you.
16     DEPUTY COMMISSIONER THOMPSON:  All right
17 then they went to your contention that you shot
18 the victim in self-defense and that he saw at
19 least one man had a weapon.  Is that your
20 recollection of the event?  Or did you not want
21 to talk about that.  I don't want to go into the
22 facts of the case.
23     ATTORNEY SATRIS:  I don't think it is, I
24 don't know how to say this.  I think he would
25 stand by his offense where he did say he did
26 shoot to irrationally and I think to much.  And
27 that is what the verdicts reflect

1    manslaughter and then the murder. But the

2    evidence did show that there was a knife that

3    was found at the scene where one of the victims

4    had fallen.

5    DEPUTY COMMISSIONER THOMPSON: Ok we can

6    move on. Next point within this, it is a very

7    extensive report and reiterates a lot of the

8    factors that have already been discussed. But

9    we turned to the section of assessment of

10   dangerousness. In a controlled environment the

11   risk of violence is felt to be considered low.

12   As would seem quite reasonable. If the risk

13   assessment upon release to the community you

14   don't have any of the dynamic factors related to

15   violence in the opinion of the author. However

16   there is a notation that should you relapse into

17   drugs or alcohol then that risk factor would

18   increase and that it would be a consideration.

19   And it was recommended you build yourself as it

20   were a safety net with AA and NA and any other

21   support groups religious or whatever nature that

22   you could find yourself connected with. And it

23   seems that you said at one point your involvment

24   in drugs as a seller resulted in your own use of

25   drugs. And that you had at some point to get

26   into that life to support your habit.

27   INMATE CARRANZA: Yes.

1       DEPUTY COMMISSIONER THOMPSON:  And that you

2   contend that you do not have a problem of

3   substance abuse since you haven't used since you

4   were incarcerated.  And I would say that is a

5   reasonable observation but hopefully there

6   wasn't any that you could have used in the

7   incarcerated situation.  Though it is kind of

8   one of those questions like we stop beating your

9   wife no matter how you answer it, it is not

10  going to be a good answer.  He feels strongly

11  that he has put this problem behind him and

12  hopefully he has.

13      INMATE CARRANZA:  I feel strongly that I

14  have put that problem behind me.  I mean there

15  is drugs in prison and but you know alcohol and

16  all that stuff but you know thank god I feel

17  like I overcome that addiction.  And I know

18  those addictions you know caused me to do a lot

19  of harm to people.  And I consider that

20  addiction my enemy.  I consider that it is like

21  kissing a cobra.  I feel that way.  But I still

22  feel like I will benefit out there and here and

23  out there from self-help groups, support groups.

24      DEPUTY COMMISSIONER THOMPSON:  What I would

25  say in the least is it couldn't hurt and

26  hopefully they would help.

27      INMATE CARRANZA:  Oh yes.

1    DEPUTY COMMISSIONER THOMPSON:  And it

2    concludes essentially and the report is by a

3    Michael Lynn Ynava PhD.  That or is it Michelle.

4        ATTORNEY SATRIS:  Michelle?

5        DEPUTY COMMISSIONER THOMPSON:  It is

6    Michelle Lynn Ynava PhD., which again was done

7    on March 6, 2006.  That you would benefit from

8    further discussion of the facts surrounding your

9    offense and would hope that this could begin in

10   the near future.  As his parole plans seem

11   likely to proceed.  And she would hope for or

12   believe that if the same factors of drugs and

13   alcohol did not recur in your life, violence

14   would hopefully not be likely to reoccur.  But

15   should they recur problems would likely suffice.

16   And basically that concludes what I have gleamed

17   from this report.  At this time do you have any

18   thing you want to add or point out that I didn't

19   cover or address?

20       INMATE CARRANZA:  Like I said before I

21   would like to get into a program you know like

22   empathy for victims and --

23       DEPUTY COMMISSIONER THOMPSON:  I am sure

24   whatever self-help programs are offered at San

25   Quentin if you can have the time and the

26   opportunity would all be beneficial to you.  And

27   you should address entering them if you can.  I

1  think those would all be positive influences.

2  But if you have no particular question I would

3  reiterate there is an active US INS hold and a

4  strong liability that is you would be deported

5  upon any release to parole.  And you do have

6  some plans in Mexico and I do have something to

7  address in the parole planning issue.  Or the

8  parole goals if you will.  And when we get to

9  that section I will take those on accordingly.

10  Is there anything you have a question about as I

11  say that I have touched on at this point?

12  ATTORNEY SATRIS:  Let me just say back to

13  the psychiatric report just to elaborate on the

14  notion that he does not have any dynamic factors

15  related to violence.  Dynamic meaning anything

16  that can change.  So all of the changes have

17  been away from violence.  And what the doctor

18  goes on to say there is no recent history of

19  loss of control or impulsive behavior.  He does

20  not appear to be at all an angry person.  He is

21  grateful to his wife and family for their

22  generous support of him over the years.  And he

23  has demonstrated a capacity for empathy and

24  compassion, although that can be further

25  developed.  And then it goes on to talk a little

26  bit at some length in ways that Mr. Carranza I

27  think has already spoken about recognizing the

1  harm of his actions and the negative effect they

2  have on everybody.  It is a motivator for doing

3  well in the future so --

4      DEPUTY COMMISSIONER THOMPSON:  I think we

5  agree.  It touches on the matters we have

6  discussed, expands them to some degree but the

7  general tone I think is positive but at the end

8  the prognosis is still to be hopeful.  And I

9  think it capsulate it all.

10     ATTORNEY SATRIS:  Ok.

11     DEPUTY COMMISSIONER THOMPSON:  And if there

12 is no question at this point on the institution

13 or post conviction factors I would move to the

14 parole section.

15     PRESIDING COMMISSIONER LEE:  I have a

16 question we have disciplinary 128 December 1,

17 2000, is that correct?

18     DEPUTY COMMISSIONER THOMPSON:  That is

19 correct.

20     PRESIDING COMMISSIONER LEE:  Would the

21 inmate like to tell us why he received the 128

22 in December of 2000?

23     ATTORNEY SATRIS:  I think we will rest on

24 the record there, it is a 128 it is not even a

25 disciplinary rules violation report.  I don't

26 think there is to much more to add there.

27     PRESIDING COMMISSIONER LEE:  All right, Mr.

1  Satris do you want to say something?

2  ATTORNEY SATRIS:  I was just going to say

3  if we are talking about chronos we didn't, we

4  mentioned one, two, three, four, five, six,

5  seven and eight laudatory chronos and but I

6  would just say they address a range of behavior

7  by Mr. Carranza relating to job performances is

8  outstanding.  The various donations he has made

9  to victims and survivors for example on

10  September 11 the children toys and candy around

11  Christmas has also completed over a 100 hours of

12  hatha yoga that is good for stress reduction and

13  basic self knowledge and then has done the

14  counseling work in the Spanish Christian

15  community.

16  PRESIDING COMMISSIONER LEE:  Very good

17  however you are instructing your client at this

18  time not to discuss with me what occurred on

19  December 2000?

20  ATTORNEY SATRIS:  One problem is, I don't,

21  that chrono was not in the material that I

22  received.

23  PRESIDING COMMISSIONER LEE:  Are you

24  indicating it is not in the Central File?

25  ATTORNEY SATRIS:  No I am indicating it is

26  not in the lifer packet.  If you will give me a

27  moment, let me see what I have, I thought that

# EXHIBIT C
# Part 2 of 2

1  the chrono laudatory and negative are typically

2  included in the packet but they weren't.

3      PRESIDING COMMISSIONER LEE:  No that is

4  just a summary.

5      ATTORNEY SATRIS:  Out of bounds, do you

6  want to speak about the out of bounds Mr.

7  Carranza?

8      INMATE CARRANZA:  I think I was just out of

9  bounds.  They had some lines in the lower yard

10  you know some lines and I work close to R and R

11  and there are some lines that the inmates are

12  not supposed to cross.  And I work there, I work

13  there and the officer gave me a verbal

14  counseling and I explained to him that I was a

15  worker but he never asked me for my work card.

16      PRESIDING COMMISSIONER LEE:  Ok, Deputy

17  Commissioner how are we doing on the tape.

18      DEPUTY COMMISSIONER THOMPSON: I believe, it

19  looks like we have a reasonable amount left.  It

20  looks like there is maybe an eighth of a tape

21  left at this point.

22      PRESIDING COMMISSIONER LEE:  All right we

23  will continue on.

24      DEPUTY COMMISSIONER THOMPSON:  Sufficient

25  to go through the parole I am sure and then

26  maybe we ought to turn it to be on the safe

27  side.

1    PRESIDING COMMISSIONER LEE:  All right.

2    DEPUTY COMMISSIONER THOMPSON:  I think my

3  technical consultant would agree and I

4  appreciate that.  Mr. Montgomery is in here in

5  the room with us.  I will indicate the following

6  future parole plans for the inmate.  The inmate

7  if paroled to California would like to stay with

8  his son Eric in Fremont California.  The inmate

9  has indicated if he is deported to Mexico he

10  wishes to stay on the family estate.  And we

11  have a letter of support dated November 16, 2005

12  this was translated apparently.  I will read

13  that into the record.  I will indicate we have

14  numerous letters on behalf of the inmate from

15  various family members.  And I am not going to

16  read each one into the record.  I will state

17  that this letter is from the inmate's father and

18  his mother.  We are aware that our son Alfonso

19  Carranza is in prison for murder and involuntary

20  homicide.  We understand that those are vary

21  serious offenses of the law.  We understand that

22  murder happened when he was young and immature.

23  But now he is mature, we are appealing to you

24  the authorities for your support and humanity.

25  We are prepared to help the inmate economically

26  since we have properties, which consist of a

27  farm with land and cattle, which we are ready to

1   give him so he may live without any problems.
2   Assets we have in Mexico specifically located in
3   the municipality of Escobeto Mexico can be
4   verified. And that letter I believe was dated
5   in 2005. The inmate does have an INS hold. If
6   however he is released to Calfornia he has a job
7   offer and that is with Fremont Foreign Auto
8   located in Fremont California. So as far as the
9   letters as I have indicated I will not go
10  through all the letters. I will indicate
11  letters from Elia Mario, and Silvia Sergio Real,
12  Carlos Carranza, Jose and Maria Carranza,
13  Ricardo Carranza, Marisa Silva, Celeste Vargis,
14  Linda Carranza, Theresa Carranza, Eduarda Porta,
15  Geronemo Pueteres, Maribel Munoz Alonzo, Jessica
16  Rio, Silvano Bueno, Javier Carranza, Jubilee
17  Christioan Center, and there are letters of
18  appreciation from VVGSQ, Center force
19  incorporated, and Protestant Chapel ministries.
20  Counsel in light of the fact I am not going to
21  go through each one of the letters is there
22  anything you wish to highlight at this time?
23       ATTORNEY SATRIS: The only thing I would
24  like to highlight is the letter from his wife.
25  It talks about their longstanding relationship
26  and she basically has what I think Mr. Carranza,
27  it may be in the paperwork, what he described to

1   me as an unconditional love for him.   So that

2   she is prepared to assist him in the transition

3   back to Mexico which is where she is from.   And

4   she is prepared to go back.

5       PRESIDING COMMISSIONER LEE:   It is my

6   understanding that she is not in the state of

7   California, is that correct?

8       INMATE CARRANZA:   She is in Illinois.

9       PRESIDING COMMISSIONER LEE:   She came up

10  for your anniversary?

11      INMATE CARRANZA:   Yes she comes two or

12  three tiems a year.   Also my daughter came like

13  a month ago.

14      ATTORNEY SATRIS:   And that the letters do

15  reflect a large family he is from and the

16  support that everybody is prepared to provide

17  him or has provided him during his incarceration

18  and continue to provide him if he is released.

19      PRESIDING COMMISSIONER LEE:   It is very

20  clear he has substantial family support at this

21  time.   All right at this point and time I will

22  turn it over to questioning.   Deputy

23  Commissioner do you have any questions in

24  regards to the matter?

25      DEPUTY COMMISSIONER THOMPSON:   No thank you

26  Commissioner I do not.

27      PRESIDING COMMISSIONER LEE:   All right, I

1   will turn it over to Ms. Delagarza. Ms.

2   Delagarza do you have any questions of the

3   inmate?

4        DEPUTY DISTRICT ATTORNEY DELAGARZA:   I do

5   have some questions.   The first question is

6   could the panel ask the inmate I read in one of

7   the reports after the killing of Mr. Munoz the

8   inmate was involved in another bar killing in

9   Kansas, is that correct?

10       ATTORNEY SATRIS:   Again we will rest on the

11  record there.   There was an acquittal.   There

12  were charges presented, he was involved in it

13  Mr. Carranza do you want to speak to whether you

14  see any kind of connection or relation between

15  those charges and the offense you are in here

16  for now?

17       INMATE CARRANZA:   Yah it was related

18  because I was living a life of destruction.   A

19  life out of control.   I was involved with drugs

20  and all of that stuff.

21       PRESIDING COMMISSIONER LEE:   So you are

22  indicating that there was another bar fight?

23  Subsequent to this one?

24       INMATE CARRANZA:   Yes.

25       PRESIDING COMMISSIONER LEE:   And you were

26  actually tried in another state but were

27  acquitted, is that right?

1      INMATE CARRANZA:  Yes.

2          PRESIDING COMMISSIONER LEE:  Ms. Delagarza?

3          DEPUTY DISTRICT ATTORNEY DELAGARZA:  But he

4   did actually shoot and kill another individual

5   is that correct?

6          ATTORNEY SATRIS:  I think we will rest on

7   the record.  I mean it is an acquittal.

8          DEPUTY DISTRICT ATTORNEY DELAGARZA:  Well

9   if he --

10         PRESIDING COMMISSIONER LEE:  Ms. Delagarza

11   hold on.  Hold on.  Let me pose the question.

12   At this point and time is your client going to,

13   will the client answer the question from the

14   District Attorney?

15         ATTORNEY SATRIS:  We are prepared.  It was

16   a self-defense, a finding of an acquittal on

17   self-defense.  Yes that is what he is talking

18   about.

19         DEPUTY DISTRICT ATTORNEY DELAGARZA:  I am

20   going to ask that the inmate be allowed to

21   answer my questions not the attorney.

22         PRESIDING COMMISSIONER LEE:  Ok, Ms.

23   Delagarza I will conduct the hearing.  I know

24   exactly what you are saying.  Let me handle

25   this.  Mr. Satris is your client deciding to not

26   discuss what occurred in regards to the incident

27   after this hearing, I mean after this incident.

1    ATTORNEY SATRIS: He can answer that

2    question, I already have but he can answer that

3    question yes or no.

4    PRESIDING COMMISSIONER LEE: Go ahead sir.

5    The question was did you shoot someone in

6    another bar incident?

7    INMATE CARRANZA: Yes.

8    PRESIDING COMMISSIONER LEE: All right next

9    question.

10    DEPUTY DISTRICT ATTORNEY DELAGARZA: And

11    the next question is on the date he was arrested

12    in Colorado at that time besides the drugs was

13    he also in possession of weapons?

14    PRESIDING COMMISSIONER LEE: You may

15    answer?

16    ATTORNEY SATRIS: I would direct him not to

17    answer that.

18    PRESIDING COMMISSIONER LEE: All right,

19    next question.

20    DEPUTY DISTRICT ATTORNEY DELAGARZA:

21    Besides himself, according to the report there

22    was another individual by the name of Linda who

23    was arrested with the inmate. Who was Linda?

24    ATTORNEY SATRIS: What are we talking about

25    now?

26    DEPUTY DISTRICT ATTORNEY DELAGARZA: The

27    Colorado arrest.

2 clarify now. You were arrested in Colorado was

3 there another individual by the name of Lind

4 with you and who is Linda?

5 ATTORNEY SATRIS: Yah I would direct him

6 not to go into the details of a case on which he

7 was acquitted.

8 PRESIDING COMMISSIONER LEE: All right next

9 question.

10 DEPUTY DISTRICT ATTORNEY DELAGARZA: Let me

11 object, he was not acquitted of that one. We

12 are talking about Colorado where he was arrested

13 for drug sales. There were two people actually

14 arrested one of them was an individual by the

15 name of Linda. This was a conviction not an

16 acquittal.

17 PRESIDING COMMISSIONER LEE: Ms. Delagarza

18 the inmate does not have to respond, I will

19 allow him to respond. You can certainly argue

20 this in your final statement. However at this

21 point and time do you wish to respond in regards

22 not the acquittal the shooting, but your arrest

23 in Colorado?

24 ATTORNEY SATRIS: We rest on the record on

25 that. That is in the material so I will direct

26 him not to answer those questions that go beyond

27 the record in this case before the board.

1    PRESIDING COMMISSIONER LEE:  He has the
2  right not to respond.  I have no sanction
3  authority here, obviously the District Attorney
4  can make whatever statement she thinks is
5  appropriate when it is her opportunity.  Ms.
6  Delagarza next question.

7    ATTORNEY SATRIS:  Let me can I just the
8  whatever argument given at the end has to based
9  on the record before the board correct?

10    PRESIDING COMMISSIONER LEE:  Correct.

11    ATTORNEY SATRIS:  All right.

12    PRESIDING COMMISSIONER LEE:  Go ahead.

13    DEPUTY DISTRICT ATTORNEY DELAGARZA:  My
14  next question is was the person Linda his
15  daughter Linda Carranza or some other Linda?

16    ATTORNEY SATRIS:  We have already made
17  clear our position on going into any details
18  beyond the record that is already before the
19  board and that we are prepared for.

20    PRESIDING COMMISSIONER LEE:  Next please.

21    DEPUTY DISTRICT ATTORNEY DELAGARZA:  My
22  next question is with respect to the
23  psychological report in the psychological report
24  and I am referring to page number six in that
25  report.  It says in the second full paragraph
26  Mr. Carranza contends that he does not himself
27  have a problem with substance abuse since he has

1    not used while incarcerated.  He feels strongly

2    he has put this problem behind him.  And that he

3    would be able to refuse any offer of drugs.  Mr.

4    Carranza does not participate in NA or AA

5    programming, as he does not feel he has a

6    substance abuse problem.  When did the inmate

7    start in AA, since according to the March of

8    2006 it indicated he was not involved?

9         PRESIDING COMMISSIONER LEE:  Do you

10   understand the question sir?  It appears you are

11   not involved in NA or AA you may have been--

12        INMATE CARRANZA:  That is correct.

13        PRESIDING COMMISSIONER LEE:  There may have

14   been references in the past that you were

15   involved, when were you involved

16   (indiscernible)?

17        INMATE CARRANZA:  I was on the waiting list

18   for two years.  And I was involved, I started

19   attending sometime in March.

20        DEPUTY DISTRICT ATTORNEY DELAGARZA:  I am

21   sorry I couldn't hear what he said.

22        PRESIDING COMMISSIONER LEE:  Could you

23   speak up please?

24        INMATE CARRANZA:  I was on the waiting list

25   for two years.  And I started to attend AA

26   sometime in March.

27        ATTORNEY SATRIS:  After your meeting with

1    the Doctor here, correct?

2        INMATE CARRANZA:  Yes.

3        PRESIDING COMMISSIONER LEE:  All right, so

4    that was the first time?

5        INMATE CARRANZA:  Yes.

6        PRESIDING COMMISSIONER LEE:  Ms. Delagarza?

7        DEPUTY DISTRICT ATTORNEY DELAGARZA:  I have

8    no other questions.

9        PRESIDING COMMISSIONER LEE:  At this time

10   Mr. Satris do you have any questions of your

11   client?

12       ATTORNEY SATRIS:  Yes let me pick up where

13   we were leaving off there about addictions and

14   so forth.  Because it was mentioned earlier that

15   you have a degenerative disc disease, that

16   causes you some pain does it?

17       INMATE CARRANZA:  In my back?

18       ATTORNEY SATRIS:  Yes.

19       INMATE CARRANZA:  Yes I had an MRI done.

20       ATTORNEY SATRIS:  And you have been offered

21   medication for that?

22       INMATE CARRANZA:  Yes.

23       ATTORNEY SATRIS:  And what is your position

24   on that?

25       INMATE CARRANZA: I didn't want to take any

26   medication that would get me addicted to a

27   prescribed medication.

1     ATTORNEY SATRIS:  So have you basically

2  ignored the pain rather than take that

3  medication?

4     INMATE CARRANZA:  Yes.

5     ATTORNEY SATRIS:  Now you talked a bit

6  about your work for the past number of years for

7  Center Force and the counseling of other inmates

8  in connection with that.

9     INMATE CARRANZA:  With drugs?

10     ATTORNEY SATRIS:  With drugs and just

11  generally HIV and so forth.  Do you find meaning

12  in your work?

13     INMATE CARRANZA:  Oh, yes I do.  I feel

14  like I give back something to socieity because

15  my counseling this guys about the risk of

16  getting infected with HIV or other diseases.  I

17  have numerous occasions when this guys come back

18  with results that they have HIV or they have

19  hepatitis or some other kind of disease and they

20  come talk to me.  And I counsel them and I refer

21  them to the doctor.  Because a lot of these guys

22  are Hispanics who don't understand English.

23     ATTORNEY SATRIS:  Now is this work, do you

24  have any interest or plans to pursue it if you

25  are released?

26     INMATE CARRANZA:  Yes I would like to

27  continue that here, learning more and more.  And

1  when I get out there in California or go back to

2  Mexico.  I would love to.

3       ATTORNEY SATRIS:  Now you do have plans we

4  have gone over in the event that you are not

5  deported to Mexico.  You do have plans in

6  California?

7       INMATE CARRANZA:  Yes.

8       ATTORNEY SATRIS:  As have been gone over.

9       INMATE CARRANZA:  Yes.

10      ATTORNEY SATRIS:  It has been it was

11 described here by the Deputy Commissioner that

12 there was a quote on quote strong probability

13 that you would be deported.

14      INMATE CARRANZA:  Yes.

15      ATTORNEY SATRIS:  Do you understand that

16 the actual reality is that you will be deported?

17      INMATE CARRANZA:  Yes I know that.  I have

18 been seeing hundreds of inmates over here in San

19 Quentin they have INS holds and upon there

20 release all of them have been deported.  So --

21      ATTORNEY SATRIS:  And in terms of

22 continuing the counseling work you have done for

23 Center force by going back to Mexico do you see

24 a need for you to do that work?  Or a need that

25 could be served by you doing that work?

26      INMATE CARRANZA:  Yes we actually the

27 agency contacted somebody in Zacatecas an

1  agency.   It is called Zacatecas (indiscernible)

2  that means the state of Zacatecas against AIDS.

3  And you know --

4      ATTORNEY SATRIS:   So there is an

5  organization already in your local and you have

6  taken steps to connect up with them.

7      INMATE CARRANZA:   Yes.

8      ATTORNEY SATRIS:   And you were telling me

9  at one point I think I have this straight about

10  an incident regarding a cell move.   Where you

11  got into or there was some conflict with another

12  inmate do you remember that?   Could you just run

13  that down to the board and explain your kind of

14  reaction and how you handled it and felt about

15  that.

16      INMATE CARRANZA:   That was this cell move

17  and this inmate got to move out of his cell.   He

18  got mad at me because he thought that I had

19  something to do with the cell move.   And he came

20  to my house, I was doing some leatherwork

21  because I have an in cell hobby, I work with

22  leather.   So anyway he came and he was real

23  angry.   And to make a long story short he

24  attacked me.   He hit me a few times over here--

25      ATTORNEY SATRIS:   Just because we are on

26  the record over here is along the shoulder--

27      INMATE CARRANZA:   Along the shoulder and

1  over here. And yah and I was totally amazed and
2  full of joy that I didn't respond. I did not
3  even raise my hand. And I told him to god bless
4  you when I say that he took off and I was just
5  amazed and grateful and the same time because I
6  wasn't planning on having that kind of
7  experience. But in the same time I was grateful
8  that I passed, that I passed the test without
9  being prepared for it. And especially here in
10 prison. And in this place there is some other
11 nationals I get along with everybody. So I
12 didn't told nothing to nobody this happened at
13 night. And somehow they find out about it and
14 they came to me and they wanted to hurt this guy
15 because what he did, to them it was wrong. But
16 I told them to leave him alone. That I you know
17 that I forgave him and they still wanted to hurt
18 him and again told them it was my decision and I
19 said they should leave him alone. And he was,
20 he has only one arm. And they went to talk to
21 him and anyway they didn't hurt him so he came
22 back and apologized to me. We hug each other
23 and we pray and that was it. And I will you
24 know I will I would have liked, if I would have
25 handled the situation the same way you know for
26 what I did in 1985 to the victims. And again I
27 say to the victim's family I am really sorry for

EXHIBIT   B

CALIFORNIA CODE OF REGULATIONS TITLE 15, SECTION 2400-2411, PAGES 73-81

1   what I did.  I pray to god one day they will

2   find it in their hearts to forgive me.  Because

3   I have family and I would get hurt if somebody

4   do something to them.  So I pray for them and I

5   understand they might hate me and they have all

6   the reason, the right to do that.  But I pray

7   for them I hope they will forgive me one day.

8   You know what I did was wrong and I am

9   responsible.  And I am guilty.

10          PRESIDING COMMISSIONER LEE:  Any further

11   questions?

12          ATTORNEY SATRIS:  No further questions

13   thank you.

14          PRESIDING COMMISSIONER LEE:  All right it

15   is time we are going to go to statements.

16          DEPUTY COMMISSIONER THOMPSON:  It might be

17   better to change the tape.

18          PRESIDING COMMISSIONER LEE:  We are going

19   to take a brief recess while we change tapes.

20          DEPUTY COMMISSIONER THOMPSON:  We are back

21   on the record this will be side two tape one of

22   the Carranza hearing.  And if you wish to

23   proceed with statements you now have tape.

24          PRESIDING COMMISSIONER LEE:  Thank you all

25   right at this point and time, we are waiting for

26   one officer and we can begin.  At this time we

27   are ready to begin with statements Ms. Delagarza

1    you may be heard.

2        Los Angeles County opposes granting of a

3    parole date for this inmate beginning with the

4    inmate's criminality.  He had an escalating

5    pattern of criminality he had convictions for

6    both drugs, alcohol, and in addition to that

7    possession of guns.  So we have this escalating

8    pattern with respect to this inmate.  All of

9    them as I have indicated involving drugs,

10   alcohol and guns.  In respect to the life crime

11   the inmate has failed to accept full

12   responsibility when you look at the

13   psychological report his claim is now a very

14   self serving one, one of self defense.  However

15   if you read all the police reports including

16   statements from victims including statements

17   from witnesses who were in the bar it is clear

18   that this was not an act of self-defense by the

19   inmate.  But it was actually a very cold

20   calculated attempt on the part of this inmate to

21   kill three individuals and he was successful as

22   to one of them.  He was involved initially in an

23   argument with Raoul Munoz, Mr. Munoz left the

24   bar, he came back to the bar and they again got

25   into a verbal altercation.  By everyone's

26   statement it is clear that at some point it

27   appeared that they shook hands and Mr. Munoz

1   left the bar along with his two brothers. As
2   they were outside the inmate comes out and
3   shoots all three of the individuals. There was
4   no self-defense people were leaving the bar they
5   were on their way home. According to the inmate
6   he claims what he told the psychologist and what
7   he told the counselors that he goes outside and
8   he is accosted by the individuals. That was not
9   what happened. There was no self-defense. And
10   he has failed to both accept responsibility for
11   the crime and he has no insight into his
12   criminality. If that is not bad enough after
13   leaving, having committed this murder and having
14   committed these assaults on two other
15   individuals attempted murder as to both of them.
16   The inmate goes into another state and he is
17   again responsible for the death of another
18   individual. What is important about that is
19   that he is again in possession of a weapon and
20   he is again responsible for the shooting death
21   of another human being. A little bit over a
22   year later the inmate is arrested in Colorado.
23   And again as to that particular offense looking
24   at the police reports it is clear that not only
25   is he trafficking drugs at that point but again
26   when he is arrested he is again in possession of
27   weapons. So we have somebody who is very much

1  entrenched in violence and who is responsible
2  for the death and also the wounding of several
3  individuals before he is finally arrested and
4  incarcerated.  Since the inmate has been in
5  prison with respect to some aspects of his
6  prison time it has been positive.  He has got no
7  115's and only the one 128a.  However that is
8  the only thing positive you can say about him.
9  He has gotten no vocations in the entire time he
10  has been in prison.  Yes he has been involved in
11  some programs but even if you look at the
12  programs with respect to the Center Force it has
13  been since March of 2005 and with respect to the
14  AA it has only been since March of 2006 so we
15  have somebody who has very minimal self-help, no
16  vocations, and we have somebody who has
17  marginally and has only started doing positive
18  programming in prison.  It is very nice that he
19  did the toy drive and he helped by selling
20  things on ebay to victims.  But with respect to
21  his own programming the fact that he has done
22  the little self-help and again with the AA and
23  NA somebody that has been involved in drugs and
24  alcohol as long as the inmate has. Somebody
25  who's crimes according to his own statements
26  were as a result of this involvment in drugs and
27  alcohol this individual before we can be sure he

1  is safe to go into society we have to make sure
2  that he is involved in programs that will make
3  sure he will maintain his sobriety during the
4  time he is released.  As far as his parole plans
5  are concerned while it is true he does have at
6  least on paper parole plans for both United
7  States and Mexico one of the troubling aspects
8  of this inmate is that we know for sure he came
9  into this country illegally, he had an arrest in
10 San Diego for coming into the country illegally
11 and what is very troubling is all of his family
12 lives in the United States his wife, his
13 daughter by his wife, his son by another
14 individual, his parents, his brothers, his
15 sisters all of them live in the United States.
16 And with respect to the parole plans we would
17 need to be sure that this inmate would not be
18 coming back into the United States, should he be
19 deported.  And as everyone has said it is very
20 clear that he will be deported.  So I think that
21 we have to make sure that whatever parole plans
22 he has in Mexico are going to insure that he is
23 not going to return to this country.  Until he
24 has a history of involvment in AA and NA until
25 we know he has many years of involvement in
26 self-help and until he accepts full
27 responsibility for this crime we cannot be sure

1  he will not go out and continue in his
2  criminality.  We have an individual who has many
3  victims.  He is responsible for the death of two
4  people, he is responsible for the wounding of
5  two other individuals.  Until we can be sure he
6  would not continue to present a risk, he will
7  continue to be a threat to society.  We are
8  asking for a five-year denial to make sure he
9  has enough time to get the self-help he needs.
10 And to also have sufficient years of involvment
11 in AA and NA before he is released.  Thank you.
12      PRESIDING COMMISSIONER LEE:  Thank you Ms.
13 Delagarza for your comments.  Next we will go to
14 Mr. Satris.
15      ATTORNEY SATRIS:  Thank you.  Before I
16 close making the points I would like to make.
17 Favoring the parole of Mr. Carranza let me
18 correct a couple of miss statements in the
19 closing by the Deputy District Attorney.  Again
20 we accept the findings of the court and are not
21 here to relitigate.  Mr. Carranza over and over
22 has expresses in that exact sentiment in his
23 acceptance of responsibility for the crimes that
24 he was convicted of.  That includes murder.  As
25 he has said he shot to soon and he shot for to
26 long.  We don't have two counts of attempted
27 murder in this case, as the District Attorney

1  characterized it. We have a finding of
2  attempted voluntary manslaughter and that is
3  critical because that shows that this isn't the
4  kind of cold calculated attempt to kill three
5  people that the District Attorney is now trying
6  to promote in a retrial of the case. The
7  manslaughter finding or attempted manslaughter
8  does indicate apparent acceptance either a
9  provocation or unreasonable or honest or
10 unreasonable belief in the need for self-
11 defense. And there is substantial evidence of
12 course in the record that would support this.
13 So the kind of one-sided distortion of the
14 factual scenario in this case is not persuasive.
15 And we are not going to respond in kind by not
16 pointing out the evidence that is different than
17 the evidence reflecting the jury's verdict.
18 There is no question that there was, and I would
19 accept or use the language of the District
20 Attorney of an entrenchment in that kind of
21 violent world of drugs and guns. And we know
22 what happens when you have drugs and guns,
23 violence results. That is why Mr. Carranza I
24 think has characterized his arrest in this case
25 as a kind of rescue. This is actually a
26 situation where the criminal justice system
27 worked as it is designed to and as we always

63

1    hope it will.  It stops the person in their
2    tracks and sits them down and gives them time
3    and plenty of time to reflect upon their actions
4    and what they have done and hopefully work out a
5    change from that, that I will go on to later.
6    But while I am on the subject on the correct
7    statements from the record and I will just speak
8    to the notions of the vocations now.  In terms
9    of Mr. Carranza has a job, resources waiting for
10   him in Mexico.  He will go to work immediately.
11   There is not a vocation available in the CDC
12   system that is going to facilitate or help him
13   in that regard.  The interesting thing is the
14   job he has is probably the best kind of
15   vocational training that he could receive. He
16   actually does have a job offer in this country
17   as a result to that work available to him.  And
18   as he stated this is an activity of beneficial
19   use.  He can put to for the betterment of
20   society when he is released in Mexico, whether
21   that would lead to an actual paying job or not
22   is really beside the point from his point of
23   view.  He has got the means for work and he has
24   got a very constructive positive activity to do.
25   And that work with Center Force has not been
26   just since March of 2005.  That has been for
27   four years.  And as he stated he is going t

1 continue in that work. All right so I would ask
2 the board to do what it indicated in the vary
3 outset of this hearing of what it was going to
4 do. Which is to consider Mr. Carranza for
5 parole in accordance with Penal Code Section
6 3041 and its own rules and regulations. That
7 Penal Code Section provides that the board
8 should normally grant a prisoner or set a parole
9 date for a prisoner at his first parole hearing.
10 This is Mr. Carranza's first parole hearing. It
11 is even more appropriate in his case to do so
12 than perhaps some other cases because of the
13 length of time he has served to this point. So
14 you can see the long post conviction record that
15 he has. He was committed in 1989 and served
16 time for the consecutive sentences for the
17 multiple offenses that were involved in this
18 case. The attempted voluntary manslaughter and
19 the attempted murder before serving the time
20 required to serve to become eligible for his
21 life offense. And he has built up a remarkable
22 record in that time. So I am going to now speak
23 in terms of the board rules implementing the
24 Penal Code Section to see if this is the kind of
25 case for pursuant to the board's rules it should
26 set a parole date for Mr. Carranza. We have the
27 commitment offense certainly that weights the

1   other way.  Under the boards rules in terms of

2   multiple victims to start with that is a factor

3   that leans towards a finding of unsuitability

4   for parole.  But what is important is that is

5   only if that offense shows he presents a

6   continuing danger at this point.  Because we are

7   talking about present dangerousness when we are

8   talking about suitability for parole.  The

9   record makes it very plain in this case that

10  kind of entrenched criminality at that time was

11  a the product of a kind of destructive lifestyle

12  he was living involving drugs and weapons.

13  Those factors that underlie that behavior have

14  been addressed and dealt with and he has adopted

15  a set of values and a way of living that is

16  totally contrary to that.  And I think is best

17  exemplified by that incident with the cell move.

18  Where he gets attacked and does not respond

19  impulsively, angrily or in any negative way.

20  And that is the way I think the board is

21  reasonably assured that Mr. Carranza is going to

22  live out the rest of his life.  So addressing

23  the suitability factors you do see that they all

24  apply here.  Starting with the signs of remorse.

25  Mr. Carranza has expressed it directly to the

26  board today but you will also see in both the

27  counselors report and the psychiatric report

1  that he has expressed his sorrow and remorse for
2  his criminal acts that resulted in such a loss.
3  As he said though you know those are words.  And
4  the way he has demonstrated his remorse is by
5  changing his actions and doing whatever he can
6  at this point to make up for that crime by
7  positive constructive activity including
8  changing his own life and helping others in ways
9  that better society rather than to detract from
10  it.  In terms of pre offense factors.  You have
11  no juvenile record, the next factor in the
12  suitability factors.  You have really a life
13  that Mr. Carranza led that was a conforming
14  prosocial life until he did come to California,
15  he did involve himself in drugs that vary
16  clearly led to his criminal conduct.  In that
17  regard the next factor is lack of criminal
18  history.  He lacks any significant history of
19  violent crime.  And what you have is no violent
20  criminality outside of this offense.  This is
21  his single act of criminal violence.  Then you
22  go to the next factor, which is a stable social
23  history.  Has the prisoner experienced
24  reasonably stable relationships with others.
25  And yes you can see he has.  He has had a very
26  stable upbringing and social background.  There
27  is no childhood maladjustment accord-

1  psychiatric report.  You see the large prosocial
2  intact family out of which Mr. Carranza comes
3  from.  His parents are literally still living on
4  the same property in Mexico where they come
5  from.  There is no family history of mental
6  illness, criminality or alcohol abuse.  He knew
7  his wife from childhood.  He has been married
8  since she was age 16 and he was age 17.  He has
9  maintained that relationship throughout.  He has
10  maintained relationships with his children, he
11  has maintained relationships with all of his
12  family.  That is a factor that supports a
13  finding of suitability here.  You have then the
14  next factor you look at.  Institutional behavior
15  has institution activities indicated an enhanced
16  ability to function within the law upon release.
17  And you see that first of all with the behavior
18  of the remarkable record he has of being
19  disciplinary free.  No CDC 115's rule
20  violations.  You have him obtaining his
21  education getting his equivalency high school
22  degree as well as the English as a second
23  language.  And you can see actually great
24  progress in the TABE results there.  And they
25  you have the therapy and self-help programming.
26  And I think you can see his work, let me just
27  say work in addition to the education he has

1   been getting exceptional work reports from the
2   beginning.  You see in his most recent work it
3   is an aspect of self-help programming too.  He's
4   acting as a counselor on behalf of other
5   prisoners concerning HIV and concerning related
6   dangerous activities including drug use, you
7   have his religious activities that he has been
8   laudated for again.  And being an active in the
9   ministry and counseling there.  You have
10  positive extra curricular activities.  Lets say
11  in terms of the leather craftsman you have a
12  showing that he has been able to address on his
13  own through his Christian principles and embrace
14  a positive lifestyle.  Putting away use of
15  drugs, it is unfortunate that he had to wait for
16  two years to begin the AA and NA program.  It is
17  understandable.  I think the District Attorney
18  does make a point that's this board should
19  consider in terms of ensuring that, that becomes
20  kind of an entrenched process of its own that AA
21  treatment continue.  Mr. Carranza says he is
22  going to continue it.  You can set a parole date
23  for him, it is going to be in the future that is
24  the idea, give prisoners a predictable time when
25  they will be released.  That is the design of
26  Penal Code Section 3041.  Make a condition of
27  that parole grant that he continue in his AA

1  treatment, that is a basis for parole recision
2  then if he does not.  That is the best way to
3  handle that issue of insuring that he continues
4  with that programming, not by withholding a date
5  from him so that you would never know when you
6  were going to be released.  Ok so then we go to
7  the next and last factor and we see it applies
8  as well.  So that there is a unanimous showing
9  of applicability of the suitability factors.
10  And that is understanding and plans for the
11  future.  Has he developed realistic plans or
12  skills that can be put to use upon release.  You
13  see he has done both in that case.  He has his
14  plans for what is most realistic, really the
15  only realistic plan for the future is he is
16  going to be deported to Mexico.  And he is fully
17  prepared for that.  He has his wife ready to
18  move as need be back there.  I think that does
19  address the concern somewhat expressed by the
20  District Attorney that he is going to go down
21  there an illegally cross the border.  Again he
22  is going to have his parents that are down there
23  as well as his wife.
24      DEPUTY DISTRICT ATTORNEY DELAGARZA:  Excuse
25  me according to the parent's letter they live in
26  the United States.
27      PRESIDING COMMISSIONER LEE:  Th--

1  read from Mexico indicates that their property

2  is in Mexico and that is where they have a place

3  for him to stay.

4       ATTORNEY SATRIS:  Well let me clarify--

5       DEPUTY DISTRICT ATTORNEY DELAGARZA:  It

6  says we are living permanently in the United

7  States, page two first line.

8       PRESIDING COMMISSIONER LEE:  I understand

9  counsel but the question is where will he stay

10  and what will he do in Mexico.  I don't care,

11  there is no indication that he has to live with

12  parents.  The letter clearly indicates that he

13  would be living in Mexico and that is where he

14  would be working.  Am I correct Mr. Satris?

15       ATTORNEY SATRIS:  Say that again I was

16  conferring with my client.

17       PRESIDING COMMISSIONER LEE:  The letter

18  that I read that was translated is that the

19  inmate, this is the letter dated November 16,

20  2005, the inmate will live in Mexico on their

21  property is that correct?

22       ATTORNEY SATRIS:  Right.

23       PRESIDING COMMISSIONER LEE:  Ok.

24       ATTORNEY SATRIS:  And they have substantial

25  ties there.  They are there right now.  Whether

26  there--

27       PRESIDING COMMISSIONER LEE:  Whether they

1    go back and forth is irrelevant to me.

2          ATTORNEY SATRIS:  Ok.

3          PRESIDING COMMISSIONER LEE:  Ok.

4          ATTORNEY SATRIS:  So let me move on then.

5    Let me talk for a minute about the Mexico plans

6    and the likelihood of deportation.  What is

7    called the strong probability.  What it is, is as

8    certain a likelihood as can be and that is based

9    on the law.  Which provides that not only

10   because Mr. Carranza was an undocumented alien

11   at the time, which makes him deportable.  He is

12   deportable now as well because of the crime,

13   which is part of the new legislation that was

14   passed a few years back.  And that is a very

15   strict law that makes him first of all removable

16   and requires mandatory detention during the

17   course of the removal proceedings and that is

18   under Eight USC Section 1226c.  So there is no

19   discretion by California not to offer Mr.

20   Carranza to authorities.  There is no discretion

21   of federal authorities not to come and pick him

22   up.  And while immigration law provides for

23   various acceptation's in certain circumstances

24   depending on the status of the wife and so

25   forth, none of those exceptions apply under the

26   provision where their inmate has committed, I

27   forget how they call it exactly.

1    aggravated violent felony under 110143a.  That
2    makes him ineligible for cancellation of removal
3    for voluntary departure or for political asylum.
4    His only possible remedy under the law to avoid
5    deportation is if it would involve torture if he
6    went back there.  He makes no claim, there is no
7    claim of that.  It is as guaranteed as can be
8    that he is going to be deported.  Now that is
9    important not only for parole plans but for you
10   to assess under the statute and regulations
11   whether in fact the setting of a parole date for
12   Mr. Carranza would unreasonably threaten public
13   safety.  And it would not.  The very, very, very
14   simple reason that he is never going to be
15   setting foot in California again.  He goes
16   straight from confinement here to confinement
17   under federal authorities, no bail, into
18   removal.  And the law further provides that once
19   he is released or deported to Mexico there is no
20   way for him to legally come back to the United
21   States, he is permanently excluded.  And if he
22   came back illegally as the concern was expressed
23   he would be subject to felony criminal
24   prosecution and exposed to a federal prison
25   sentence of up to 20 years.  He is not going to
26   risk that.  I think you can be reasonably
27   satisfied on that point.

1   to find that he would present and unreasonable

2   risk rather, now I know the victims kin here

3   will be speaking after me. I know that is

4   pursuant to the board's rules that you were

5   explaining off the record to them before and I

6   would lodge an objection just in terms of due

7   process because of notice but I know that is

8   futile. The board is going to follow its rules

9   in that regard but let me just say in closing as

10  Mr. Carranza said he has totally changed and

11  reformed himself. As we exactly hope that

12  arrest and incarceration will do. And I for one

13  was impressed with the remarks that were made at

14  the time of sentencing by the victim's kin at

15  that time. And in fact it was by one that was

16  here now with the sister Cecelia who said she

17  appreciated that justice has been done, I am

18  paraphrasing a little bit there. I hope in the

19  years to come he, Mr. Carranza, will reconsider

20  his acts. And that hope expressed with great

21  restraint by the victims kin has been fulfilled

22  in this case. The board should recognize change

23  and rehabilitation when it sees it. When it is

24  across the table from it. And hold up that as a

25  example of what we want prisoners to do in terms

26  of reform and reformation. And set a parole

27  date on that basis so that the law if followed.

1    Thank you.

2        PRESIDING COMMISSIONER LEE:  Thank you Mr.

3    Satris.  At this time I am going to turn to the

4    victims next of kin.  And would you please

5    indicate before the statement, your name again

6    spell your last name and your relationship.  And

7    I will ask you to limit your self in regards to

8    how the incident has impacted your lives and

9    those in your family.  And the reason being is

10   that sometimes information comes out from

11   another source, I heard about this and I heard

12   about that and it becomes problematic because we

13   don't have any foundation for that.  So

14   nonetheless feel free to say whatever you need

15   to say and I will do what I need to do in

16   regards to giving it weight.  So go ahead.

17       MR. MUNOZ:  My name is Louis Munoz I am the

18   brother of the victim and I am a victim myself

19   too.  Louis, L-O-U-I-S, Munoz, M-U-N-O-Z.  On

20   behalf of the Munoz family we would like to ask

21   the parole board that the inmate Alfonso

22   Carranza complete his sentence in full.  The

23   pain and damage he caused the family Munoz, he

24   literally killed my brother (indiscernible).  He

25   attempted to kill my two other brothers Raoul

26   Munoz and Pedro Munoz.  We don't think that he

27   is ready for society or he has been


1  rehabilitated to be in society either in Mexico

2  or in the US.  We think that he is a threat to

3  society.  He is not ready to be a productive man

4  in society.  When people are in jail they

5  always want to get out and they will say

6  whatever.  A person who is used to doing crime

7  all of his life (indiscernible) what is the

8  chances he will not commit crime again.  What

9  are the chances he will not kill another human

10  being again.  When they do it once they can do

11  it again.  And the other (indiscernible) he not

12  only killed my brother he destroyed part of my

13  family.  He destroyed part of the Munoz family.

14  Since my brother (indiscernible) died we never

15  been the same.  After the murder of my brother I

16  was only 15 years old when he was murdered.  I

17  was in deep depression for a long time because

18  my brother was my best friend.  We grew up

19  together.  That night when he left that Friday

20  night we were supposed to go to Knotts Berry

21  Farm the next day, I never seen my brother

22  again.  My brother died.  It has been a long

23  time, it might seem like a long time but it

24  takes sometimes longer for a person to

25  rehabilitate and get back to society.  Like I

26  mentioned earlier he did not only take my

27  brothers life but he did it with no remorse

1   whatsoever. When we were in trial pro bono
2   every time we go into the courthouse he will
3   come out and he will laugh at us. I was there,
4   I remember. I don't think he stopped and
5   thinked (sic) he was taking a young kids life.
6   My brother was only 18 when he died. He was
7   only 18 years old and I would like the parole
8   board to keep that in mind my brother would have
9   been 38 years old right now. 37 or 38 years old
10  so we believe he should stay in prison for the
11  time until he finishes his sentence. To pay to
12  society for what he had done, to be sure that
13  when he gets out of this prison he is not a
14  threat to another person. Not only worrying
15  about my family, what has happened to my family
16  was already done. I am worrying about another
17  human being, being in danger again by a person
18  that had already killed. And that god knows
19  what he feels. I know what I feel. The pain of
20  my brother still feels like it happened
21  yesterday. Every time I get up in the morning I
22  think of my brother. And all I am asking for is
23  for him to pay for the crime that he committed
24  to society. Thank you very much.
25       PRESIDING COMMISSIONER LEE: Thank you sir.
26  Ma'am.
27       MS. O'REILLY: Ladies and gentlemen I am



1   Cecelia O'Reilly, I am the sister of Juan, Jose,
2   Raoul, and Pedro Munoz. My brothers that were
3   victims of the crime at the hands of Mr. Alfonso
4   Carranza. Years has passed by that is true but
5   we have never forgotten his reaction. He tried
6   to take three lives away in the matter of
7   seconds. And he did, he killed my younger
8   brother when he was in the prime of his life.
9   When he was only 18 years old. Without knowing
10  him, without having a word with him before that
11  night. He wounded my older two brothers. He
12  left my other brothers hurt, one dead and the
13  other one bleeding. On top of that not only
14  happy with that he chased my older brother, he
15  had a bullet in his neck, and he run after him
16  because he tried to finish his work. He tried
17  to take his life away. He killed the youngest
18  and he gived (sic) scars to my family forever.
19  Because we have never been the same since then.
20  We always have that empty spot when the family
21  get together his seat is always empty. My
22  brother he could have been right now 37 years
23  old. He could have had a family, he could have
24  been married but no he is not there anymore.
25  Mr. Carranza showed to my family the Munoz
26  family, the pain and suffering of loosing
27  someone in death. He showed to my family what a

1  person can be what a human being can be capable
2  to do to hurt others.  He really give us a lot
3  of thought.  We don't hate him.  We hate his
4  actions what he did to us.  And he did it once,
5  he did it twice he can do it again.  The only
6  thing I am asking is for him to finish, to do
7  his time for some reason the state given him 25
8  years let him finish his time until the last
9  day.  Why because he has to learn his lesson.
10 He has to learn that before he grab a gun again
11 he has to think twice.  You cannot take peoples
12 lives away like drinking a soda or changing
13 shoes.  You cant.  No one has the right to take
14 no ones life.  And I believe Mr. Carranza has to
15 learn.  Because could you imagine if someone
16 would have taken one of your kids lives away.
17 Would you let them go or let them leave before
18 the time?  I don't think so.  Anyone in this
19 room wouldn't do that.  You would agree with me
20 and you would ask the same thing.  I am opposed
21 to his parole.  That is why I took my time.
22 That is why I am here.  I just want to make sure
23 you guys make the right decision.  It is not
24 easy to believe someone with such a history of
25 violence and crime and let them go outside.
26 Because if he does it again before the time it
27 is going to be on your conscious and it is a big

1  responsibility on your shoulders.  Before you

2  make any decision I please ask you to make sure

3  you are doing the right thing.  Because if

4  happened to my family it could happen to you

5  too.  So please of course I am glad he is doing

6  changes and I didn't mention it to him but I

7  remember.  17 years ago when I talked to him.  I

8  was happy that justice was done.  They give him

9  25 years that is justice, let him finish the 25

10  years (indiscernible) before the time.  And I am

11  glad that he wants to make changes.  But

12  everybody wants to make points when they want to

13  leave before.  My brother is not alive.  He

14  feels the son everyday on his face.  My brother

15  is not here anymore.  We don't hate him we just

16  want him to pay for what he did.  And after the

17  25 years if it is ok if he wants to go on with

18  his life, I mean everybody has a right to change

19  but not before the time.  I really thank you for

20  all this but I don't think Mr. Carranza is ready

21  to reintegrate to socieity.  I don't think he, I

22  think he needs to really try hard and I want him

23  to finish to the last day of the sentence.

24      PRESIDING COMMISSIONER LEE:  Thank you for

25  your comments.  At this time we are going to

26  recess and deliberate and we will call everyone

27  back once we have made our decision, thank you

1    very much.

2                    R E C E S S

3                    --oOo--

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

1          CALIFORNIA BOARD OF PAROLE HEARINGS

2                    D E C I S I O N

3          DEPUTY COMMISSIONER THOMPSON:  We are back

4     on record.

5          PRESIDING COMMISSIONER LEE:  Ms. Delagarza

6     we are about to begin.  Apparently you have been

7     abandoned Ms. Delagarza.

8          DEPUTY DISTRICT ATTORNEY DELAGARZA:   In

9     what way?

10         PRESIDING COMMISSIONER LEE:  Oh I see empty

11    chairs now.

12         DEPUTY DISTRICT ATTORNEY DELAGARZA:   Oh

13    they are standing right here.

14         PRESIDING COMMISSIONER LEE:  Oh ok we are

15    waiting for the victims next of kin, they are in

16    the restroom.

17         ATTORNEY SATRIS:  We are off the record now

18    or are we on?

19         DEPUTY COMMISSIONER THOMPSON:  If you want

20    to be you can be.

21         ATTORNEY SATRIS:  No I don't want to be.

22         PRESIDING COMMISSIONER LEE:  Can we go off

23    the record Deputy Commissioner?

24         DEPUTY COMMISSIONER THOMPSON:  We are back

25    on the record.

26         PRESIDING COMMISSIONER LEE:  All right I

27    ALFONSO CARRANZA E-30803 DECISION PAGE 1 4/19/2006



1    think everybody has returned at this point and
2    time. Ms. Delagarza is there. The panel has
3    reviewed all information received from the
4    public and relied on the following circumstances
5    in concluding the prisoner is not suitable for
6    parole and would pose an unreasonable risk to
7    society or a threat to public safety if released
8    from prison. Multiple victims were attacked,
9    injured and one killed during the offense. The
10   offense was carried out in a dispassionate and
11   calculated manner. The offense was carried out
12   in a manner, which demonstrates an exceptional
13   callous disregard for human suffering. The
14   motive of the crime was inexplicable or very
15   trivial in relationship to the offense. The sad
16   part of my position is that I truly do not know
17   what occurred out on the street nor does the
18   Deputy Commissioner. We are only privy to what
19   is submitted before us. The inmate's version is
20   totally at odds with the information we have
21   received in our packets. The information
22   apparently in the packets seem to indicate at
23   trial the witnesses did indicate there was an
24   ongoing dispute that had apparently on at least
25   two occasions an attempt to solve this
26   particular dispute in fact it seems to indicate
27   ALFONSO CARRANZA E-30803 DECISION PAGE 2 4/19/2006

1  there was a point and time where both sides
2  shook hands. But that is where we come to or I
3  must take as the facts in this case. And
4  apparently the inmate began shooting for no
5  apparent reason. There is no indication that
6  the individuals were aggressors. The
7  information seems to indicate that one
8  individual was struck in the neck, two other
9  individuals were shot at, and one died. The
10 offense itself is of sufficient severity for the
11 denial. And for that reason the inmate is being
12 denied. The inmate is also being denied because
13 he has an escalating pattern of criminal
14 conduct. It clearly indicates that not only
15 being a user the inmate went into drug selling
16 and unfortunately even after the offense
17 continued on in a lifestyle that he has
18 indicated himself that was leading him to
19 destruction. One suspects this is a continued
20 lifestyle not only in drugs and alcohol but also
21 in violence. There was information in regards
22 to activities after this offense prior to his
23 arrest. The inmate has failed at previous
24 grants of probation and cannot be counted upon
25 to avoid criminality. Sir it is unfortunate
26 that in both instances where people have lost
27 ALFONSO CARRANZA E-30803 DECISION PAGE 3 4/19/2006

1    their lives.  One which you were acquitted they
2    were apparently in bars.  Which leads to, I mean
3    which can infer there was alcohol use but also
4    your admitted usage in regards to cocaine.  You
5    had an opportunity under driving under the
6    influence in 1980 or excuse me in 1980 as well
7    as in 1984 to get off both drugs and alcohol for
8    whatever reasons you were unable to do so.  And
9    the reasons I am bringing that up is because of
10   your lack of AA and NA participation which I
11   will get to in just a minute.  The inmate has
12   failed to profit from societies previous
13   attempts to correct his criminality such
14   attempts include adult probation as well as your
15   drug rehab.  The prisoner has failed to
16   sufficiently participate in self-help and
17   therapy programming.  Sir it is amazing to me in
18   light of the situation you got yourself into
19   that you have not looked into AA and NA.  The
20   concerns expressed by the victims as well as the
21   District Attorney are the same concerns of the
22   panel.  If a person chooses to stop taking
23   alcohol or drugs that is obviously a good
24   choice.  No one is doubting that.  But that also
25   leads to the next step that you can readily
26   chose to take drugs and alcohol again.  One of
27   ALFONSO CARRANZA E-30803 DECISION PAGE 4 4/19/2006

1  the things about AA and NA is the basic precept

2  that you need help from other people. That they

3  would assist you outside. And I am hoping that

4  you understand that at some point and time and

5  receive that type of assistance. Now if you

6  find another plan that you like better that is

7  fine too. But we believe you need substance

8  abuse programming. In regards to the inmate's

9  parole plans I think they are sufficient.

10 Obviously if you ever receive a date all parole

11 plans go through what we call legal review.

12 That means that an investigator will actually go

13 and determine whether or not your plans are

14 valid. And that is not because we don't believe

15 you but we have had individuals lie to us in the

16 past. So the concerns are unwarranted at this

17 stage. I believe if you are foolish enough to

18 lie to us that, that would be found out. But at

19 this point and time you have a place to stay

20 both in Mexico and the United States as well as

21 job offers. However the panel notes opposition

22 to your finding of suitability both from the

23 District Attorney's office of Los Angeles County

24 as well as the victim's next of kin. The panel

25 makes the following findings. The prisoner

26 needs therapy, programming and self-help in

27 ALFONSO CARRANZA E-30803 DECISION PAGE 5 4/19/2006

1  order to face, discuss, understand, and cope

2  with stress in a non destructive manner as well

3  as to get further insight into the crime.    Until

4  progress is made the prisoner continues to be

5  unpredictable and a threat to others.

6  Nonetheless the prisoner should be commended for

7  the following.

8      DEPUTY COMMISSIONER THOMPSON:  Well he did

9  remain disciplinary free and he has been

10  involved in counseling his peers and the Spanish

11  speaking inmates as well as concerning both

12  health issues and as well as adjustment issues.

13  And he was noted and commended for that by the

14  church group, I believe it is Jubilee Christian

15  church.  And he has a number of letters thanking

16  him for his help and his cooperation in various

17  events.  I think they all show a willingness to

18  be socialized and try to have empathy for other

19  people.  Which is to be commended and hopefully

20  built on as a good foundation for future life or

21  future contacts.  And I think all in all he has

22  made some educational efforts, he did get an

23  equivalency degree.  And he has taken English as

24  a second language which makes him a good role

25  model for Spanish speaking inmates who are

26  trying to interface and interrelate to an

27  ALFONSO CARRANZA E-30803 DECISION PAGE 6 4/19/2006

1    English speaking, American English admittedly,

2    but an English speaking community.  And I think

3    that is all commendable.

4        PRESIDING COMMISSIONER LEE:  However these

5    positive aspects of his behavior do not outweigh

6    the factors of unsuitability.  This is the

7    inmate initial hearing.  The District Attorney

8    has indicated that five years is the appropriate

9    denial time.  I will indicate in a separate

10   decision the hearing panel finds that the

11   prisoner has been convicted of murder as well as

12   attempted homicide and it is not reasonable to

13   expect parole would be granted in the next four

14   years.  Sir I will tell you we had discussions

15   about this particular area.  But Mr. Satris does

16   indicate the obvious.  You were not given the

17   sentence of life without possibility of parole,

18   you are attempting at this point and time to

19   better yourself.  I don't believe five years is

20   appropriate.  I think four years is the

21   appropriate amount to get together the things

22   that you do need to get together.  Including AA,

23   right now you have no track record at all.  Some

24   individuals as you know have been going to AA

25   for 10 or 15 years.  So that the concern that

26   has been expressed by various individuals will

27   ALFONSO CARRANZA E-30803 DECISION PAGE 7 4/19/2006

1    be alleviated.  That you will go back and end up

2    doing the same things you did before and

3    ultimately hurting others once again.  I cannot

4    emphasize or over emphasize to you the concern

5    that the panel has but not even just the panel.

6    The governor has a very similar concern and I

7    suggest strongly that you reassess your position

8    in regards to AA and NA.  The reason for the

9    multiple year denial is that multiple victims

10   were attacked.  It is very obvious that whatever

11   occurred out there for what ever reasons you had

12   no intentions of stopping.  That you intended to

13   deal with the three individuals out on the

14   street.  The offense was carried out in a

15   manner, which demonstrates an exceptional

16   callous disregard for human suffering.  One of

17   the individuals apparently was wounded and you

18   continued on afterwards.  The motive for the

19   crime was very inexplicable very trivial in

20   relation to the offense.  In your own statement

21   you overreacted and based upon what you

22   indicated you observed.  The prisoner apparently

23   did not learn from his previous contacts with

24   the criminal justice system.  The prisoner has

25   not completed necessary programming, which is

26   essential to his adjustment and need additional

27   ALFONSO CARRANZA E-30803 DECISION PAGE 8 4/19/2006

1  time to gain such programming.  Specifically the

2  inmate needs to participate in AA as well as NA

3  or the equivalent.  Therefore a longer period of

4  observation and evaluation of the prisoner is

5  required before the board should find that the

6  prisoner is suitable for parole.  The panel

7  recommends the inmate remain disciplinary free,

8  and if available participate in self-help and

9  therapy programming.  Deputy Commissioner?

10     DEPUTY COMMISSIONER THOMPSON:  I wouldn't

11  add anything to that except to wish you well.

12  And that is it from my side.

13     PRESIDING COMMISSIONER LEE:  Good luck sir.

14     INMATE CARRANZA:  You do the same.

15     ATTORNEY SATRIS:  Is there an automatic

16  policy that he will see the psychologist four

17  years down the road or do you need to make a

18  special request for that.

19     PRESIDING COMMISSIONER LEE:  You know what

20  as you know we kind of bounce back and forth.

21  But based upon your request I am assuming you

22  wish for me to readmit an evaluation to the

23  inmate and I will do that.

24     ATTORNEY SATRIS:  Ok thank you.

25     PRESIDING COMMISSIONER LEE:  All right at

26  this time we are in recess.

27  ALFONSO CARRANZA E-30803 DECISION PAGE 9 4/19/2006

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23    PAROLE DENIED FOR FOUR YEARS                    AUG 1 6 2006

24    THIS DECISION WILL BE FINAL ON: _____

25    YOU WILL BE PROMPLTY NOTIFIED IF, PRIOR TO THAT

26    DATE, THE DECISION IS MODIFIED

27    ALFONSO CARRANZA E-30803 DECISION PAGE 10 4/19/2006

CERTIFICATE AND

DECLARATION OF TRANSCRIBER


I, JENNYFER OSECHECK, a duly designated

transcriber, PETERS SHORTHAND REPORTING, do hereby

declare and certify under penalty of perjury that I

have transcribed tape(s) which total one in number and

cover a total of pages numbered 1 -90, and which

recording was duly recorded at SAN QUENTIN STATE

PRISON, SAN QUENTIN, CALIFORNIA, in the matter of the

INITIAL PAROLE CONSIDERATION HEARING OF ALFONSO

CARRANZA, CDC NO. E-30803, ON APRIL 19, 2006, and that

the foregoing pages constitute a true, complete, and

accurate transcription of the aforementioned tape to

the best of my ability.

I hereby certify that I am a disinterested

party in the above-mentioned matter and have no

interest in the outcome of the hearing.

Dated  May 29, 2006 at Sacramento, California.

JENNYFER OSECHECK
TRANSCRIBER
PETERS SHORTHAND REPORTING

EXHIBIT   B

CALIFORNIA CODE OF REGULATIONS TITLE 15, SECTION 2400-2411, PAGES 73-81

(a) Multijurisdiction Prisoners Located in California. At all hearings at which a prisoner is being considered for parole, all multijurisdiction prisoners located in California shall have the rights specified in Sections 2245-2255.

(b) Multijurisdiction Prisoners Located Outside California. At all hearings at which a prisoner is being considered for parole all multijurisdiction prisoners located outside California shall have the rights specified in Section 2367. The hearing shall be a telephone hearing.

(c) Record. The record of any parole consideration hearing shall be a tape recording. Until July 1, 1978, for all multijurisdiction ISL prisoners, the record shall be a written summary of the hearing prepared at the hearing by department staff. After July 1, 1978, the record shall be a tape recording.

### HISTORY

1. Repealer of former Section 2373 and renumbering of Section 2374 to Section 2373 filed 6–11–79; effective thirtieth day thereafter (Register 79, No. 24). For history of former section, see Register 77, No. 44.

## Article 11. Parole Consideration Criteria and Guidelines for Murders Committed on or After November 8, 1978, and Specified Attempted First Degree Murders Committed on or After January 1, 1987

### § 2400. Scope of Article.

The criteria and guidelines in this article apply to prisoners sentenced to prison for first and second degree murders committed on or after November 8, 1978 and attempted first degree murders where the perpetrator is sentenced for life under the provisions of Penal Code Section 664; effective January 1, 1987. The guidelines in this article are based on the public's expressed intent in amending Penal Code Sections 190 and 664 that a person convicted of first or second degree murder or attempted first degree murder, as specified should be incarcerated for an extended period of time.

The prisoner's minimum eligible parole date is established by statute. The amount of good conduct credit that a prisoner sentenced for first or second degree murder may earn to reduce the minimum eligible parole date is established by statute. (Penal Code Sections 2930–2933.) Life prisoners convicted of attempted first degree murder do not earn these credits; their minimum eligible parole date will be established pursuant to Penal Code Section 3046. The Department of Corrections will determine the minimum eligible parole date. The length of time a prisoner must serve prior to actual release on parole is determined by the board. The amount of postconviction credit a prisoner may earn to reduce the length of time prior to release on parole is determined by the board. This article implements Penal Code Section 3041 and concerns only the board's exercise of discretion in determining whether a prisoner is suitable for parole and, if so, when the prisoner should be released on parole.

The standards for the Department's action in reducing the minimum eligible parole date and the standards for the board's decision whether to reduce the period of confinement are different. The Department's decisions under Penal Code Sections 2930–2933 do not affect the board's decision concerning postconviction credit under these rules.

A prisoner committed for first or second degree murder or attempted first degree murder shall have his or her initial parole consideration hearing as provided in Section 2268. The prisoner will have documentation hearings as provided in Section 2269.1, but no specific amount of postconviction credit will be granted until the board has established a period of confinement.

fore November 7, 1978, and those who committed murders on or before November 7, 1978, and those who committed murders on or after November 8, 1978, and those who committed attempted murder on or after January 1, 1987. The suitability criteria are the same for both groups. The guidelines for establishing the periods of confinement are different because of the change in the minimum term for first degree murder and the change from a determinate to an indeterminate term for second degree murder and attempted first degree murder. The provisions for adjusting the terms for other offenses are also different because of the change in Penal Code Section 669 which permits courts to impose sentences consecutive to life terms (Stats. 1978, Ch. 579, eff. 1/1/79).

As used in this article, "life prisoner(s)" refers only to persons committed to prison for first or second degree murders committed on or after November 8, 1978, or to persons committed to prison for life for attempted murders committed on or after January 1, 1987.

NOTE: Authority cited: Section 5076.2, Penal Code. Reference: Sections 190, 664, 2930–2933, 3040, 3041, 3046 and 5076.1, Penal Code.

### HISTORY

1. New Article 11 (Sections 2400–2411) filed 9–8–81; effective thirtieth day thereafter (Register 81, No. 37).

2. Amendment filed 6–14–84; effective thirtieth day thereafter (Register 84, No. 24).

3. Amendment filed 11–13–85; effective thirtieth day thereafter (Register 85, No. 46).

4. Amendment filed 1–20–88; operative 2–19–88 (Register 88, No. 5).

### § 2401. General.

A life prisoner shall be considered for parole for the first time at the initial parole consideration hearing scheduled as provided in Section 2268. A parole date shall be denied if the prisoner is found unsuitable for parole under Section 2402(c). A parole date shall be set if the prisoner is found suitable for parole under Section 2402(d). A parole date set under this article shall be set in a manner that provides uniform terms for offenses of similar gravity and magnitude with respect to the threat to the public.

In setting the parole date the panel shall consider the Sentencing Rules for the Superior Courts. The panel shall also consider the criteria and guidelines set forth in this article for determining the suitability for parole and the setting of parole dates, considering the number of victims of the crime for which the prisoner was sentenced and any other circumstances in mitigation or aggravation.

The terms in this article are guidelines only. The suggested terms serve as the starting point for the board's consideration of each case on an individual basis. The board may establish a term above or below the guidelines when warranted and reasons are stated on the record. A prisoner shall not be released before the minimum eligible parole date.

NOTE: Authority cited: Section 5076.2, Penal Code. Reference: Sections 3040 and 3041, Penal Code.

### HISTORY

1. Amendment filed 8–12–82; effective thirtieth day thereafter (Register 82, No. 33).

2. Amendment filed 11–13–85; effective thirtieth day thereafter (Register 85, No. 46).

### § 2402. Determination of Suitability.

(a) General. The panel shall first determine whether the life prisoner is suitable for release on parole. Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison.

(b) Information Considered. All relevant, reliable information available to the panel shall be considered in determining suitability for parole. Such information shall include the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, dur-

(4–1–90)

## CIRCUMSTANCES

| FIRST DEGREE MURDER | A. Indirect Victim died of causes related to the set of the prisoner but was not directly assaulted by prisoner with deadly force, e.g. shock producing heart attack, a crime partner actually did the killing | B. Direct or Victim Contribution Death was almost immediate or resulted at least partially from contributing factors from the victim, e.g. victim initiated struggle or had goaded the prisoner. This does not include victims acting in defense of self or property. | C. Severe Trauma Death resulted from severe trauma inflicted with deadly intensity, e.g. beating, clubbing, stabbing, strangulation, suffocation, burning, multiple wounds inflicted with a weapon not resulting in immediate death or actions calculated to induce terror in the victim | [fourth column] Victim was subjected to the prolonged infliction of physical pain through the use of mutilation, torture or agony prior to act resulting in death |
|---|---|---|---|---|
| **I. Participating Victim** Victim was accomplice or otherwise implicated in a criminal act with the prisoner during which as a result of which the death occurred, e.g. crime partner, drug dealer, etc. | 25–26–27 | 26–27–28 | 27–28–29 | 28–29–30 |
| **II. Prior Relationship** Victim was involved in a personal relationship with prisoner spouse, family member, friend, etc.) which contributed to the motivation for the act resulting in death. If victim had a personal relationship but prisoner hired and/or paid a person to commit the offense, see Category IV. | 26–27–28 | 27–28–29 | 28–29–30 | 29–30–31 |
| **III. No Prior Relationship** Victim had little or no personal relationship with prisoner; or motivation for act resulting in death was related to the accomplishment of another crime, e.g. death of victim during robbery, rape, or other felony | 27–28–29 | 28–29–30 | 29–30–31 | 30–31–32 |
| **IV. Threat to Public Order or Murder for Hire** The act resulting in the victim's death constituted a threat to the public order include the murder of a police officer, prison guard, public official, felon, patient or prisoner; any killing within an institution, or any killing where the prisoner hired and/or paid another person to commit the offense | 28–29–30 | 29–30–31 | 30–31–32 | 31–32–33 |

### SUGGESTED BASE TERM

(c) Matrix of Base Terms for Second Degree Murder on or after November 8, 1978.

## CIRCUMSTANCES

| SECOND DEGREE MURDER Penal Code § 189 in years and does not include post conviction credit as provided in § 2290) | A. Indirect Victim died of causes related to the set of the prisoner but was not directly assaulted by prisoner with deadly force, e.g. shock producing heart attack, a crime partner actually did the killing | B. Direct or Victim Contribution Death was almost immediate or resulted at least partially from contributing factors from the victim, e.g. victim initiated struggle or had goaded the prisoner. This does not include victims acting in defense of self or property. | C. Severe Trauma Death resulted from severe trauma inflicted with deadly intensity, e.g. beating, clubbing, stabbing, strangulation, suffocation, burning, multiple wounds inflicted with a weapon not resulting in immediate death or actions calculated to induce terror in the victim. |
|---|---|---|---|
| **I. Participating Victim** Victim was accomplice or otherwise implicated in a criminal act with the prisoner during which as a result of which the death occurred, e.g. crime partner, drug dealer, etc. | 15–16–17 | 16–17–18 | 17–18–19 |
| **II. Prior Relationship** Victim was involved in a personal relationship with prisoner spouse, family member, friend, etc.) which contributed to the motivation for the act resulting in death. If victim had a personal relationship but prisoner hired and/or paid a person to commit the offense, see Category IV. | 16–17–18 | 17–18–19 | 18–19–20 |
| **III. No Prior Relationship** Victim had little or no personal relationship with prisoner; or motivation for act resulting in death was related to the accomplishment of another crime, e.g. death of victim during robbery, rape, or other felony | 17–18–19 | 18–19–20 | 19–20–21 |

### SUGGESTED BASE TERM

NOTE: Authority cited: Section 5076.2, Penal Code. Reference: Sections 3040 and 3041, Penal Code.

### HISTORY

1. Editorial correction filed 10-8-81; effective thirtieth day thereafter (Register 81, No. 41).

2. Amendment of subsection (a) filed 1-20-88; operative 2-19-88 (Register 88, No. 5).

**§ 2404. Circumstances in Aggravation of the Base Term.**

(a) General. The panel may impose the upper base term or another term longer than the middle base term upon a finding of aggravating circumstances. Circumstances in aggravation of the base term include:

(1) The crime involved some factors described in the appropriate matrix in a category higher on either axis than the categories chosen as most closely related to the crime;

(2) The victim was particularly vulnerable;

(3) The prisoner had a special relationship of confidence and trust with the victim, such as that of employee-employer;

(4) The murder was committed to preclude testimony of potential or actual witnesses during a trial or criminal investigation;

(5) The victim was intentionally killed because of his race, color, religion, nationality or country or origin;

(6) During the commission of the crime the prisoner had a clear opportunity to cease but instead continued;

(6-1-90)

HISTORY

1. Amendment of subsection (b)(3)(B) filed 11-18-85; effective thirtieth day thereafter (Register 85, No. 46).

## § 2408. Circumstances in Aggravation of the Adjustment for Other Crimes.

Circumstances which may justify imposition of an adjustment for another crime higher than that suggested in Section 2407 include:

(a) Pattern of Violence. A victim was seriously injured or killed in the course of the other crime, or there was a substantial likelihood of serious injury or death resulting from the acts of the prisoner.

(b) Numerous Crimes. The other crime was one of a series of crimes which occurred during a single period of time, showing a pattern of similar conduct resulting in convictions, but not resulting in adjustments under Section 2407.

(c) Crimes of Increasing Seriousness. The prisoner has committed multiple crimes which indicate a significant pattern of increasingly serious criminal conduct.

(d) Independent Criminal Activity. The other crime and its objective were independent of the base crime or the other crime was committed at a different time and place, indicating a significant pattern of criminal behavior rather than a single period of aberrant behavior.

(e) Status. The prisoner was on probation or parole or was in custody or had escaped from custody when the crime was committed.

(f) Vulnerability. The victim was particularly vulnerable.

(g) Other. The other crime included any other circumstances in aggravation including those listed in the Sentencing Rules for the Superior Courts.

NOTE: Authority cited: Section 5076.2, Penal Code. Reference: Sections 669, 1170, 3040 and 3041, Penal Code; Sentencing Rules for the Superior Courts.

## § 2409. Circumstances in Mitigation of the Adjustment for Other Crimes.

Circumstances which may justify imposition of an adjustment for another crime lower than that suggested in Section 2407, or which may justify no adjustment, include:

(a) Successful Completion of Probation or Parole. The prisoner's performance on probation or parole for the other crime was good, and the prisoner was free of criminal convictions for a reasonable period of time following completion of probation or parole.

(b) Insignificant Prior Record. The other crime indicates an insignificant pattern of prior criminal behavior. For example, the other crime is unrelated to the principal offense in time, in the kind of criminal conduct involved, or in the apparent motivation or cause of the criminal conduct.

(c) Probation. The prisoner was granted probation after conviction of the other crime.

(d) Other. The other crime included any other circumstances in mitigation including those listed in the Sentencing Rules for the Superior Courts.

NOTE: Authority cited: Section 5076.2, Penal Code. Reference: Sections 669, 1170, 3040 and 3041, Penal Code; Sentencing Rules for the Superior Courts.

## § 2410. Postconviction Credit.

(a) General. Life prisoners may earn postconviction credit for each year spent in state prison from the date the life term starts. Prior to the initial parole consideration hearing life prisoners shall have documentation hearings as provided in Section 2269.1. At the documentation hearings, the board shall document the prisoner's performance, participation, behavior and other conduct as specified in subsection (c) of this section. Credit shall not be granted or denied at these hearings. The documentation shall be used by the panel which establishes a parole date to determine how much, if any, credit should be granted for the years served prior to the establishment of the parole date. Once a parole date is established, postconviction credit for time served since the last hearing shall be considered at the progress hearings scheduled as provided in Section 2269.

(b) Amount of Credit. Postconviction credit shall be granted to life prisoners in a manner which allows similar amounts of time to prisoners in similar circumstances. The suggested amount of postconviction credit is zero to 4 months for each year served since the date the life term started excluding any time during which service of the life term is tolled.

The board may grant more or less than 4 months annual postconviction credit when the prisoner's performance, participation or behavior warrants such adjustment of credit. Less than 4 months credit may be granted if the prisoner fails to meet the general expectations set forth in Section 2410(c). More than 4 months credit may be granted if the prisoner demonstrates exceptional performance in a work assignment, exceptional participation in self-help or rehabilitative programs, or other exemplary conduct. If the panel grants more than 4 months of postconviction credit for any year, the case shall be reviewed as provided in Sections 2041-2043.

Provided, however, postconviction credits which would advance the parole release date to less than 180 days from the date of the hearing shall not be granted unless or *until the parole review authority of the Governor is exercised pursuant to Penal Code section 3041.1.*

(c) Criteria. In determining the amount of postconviction credit to be granted, the panel shall consider the following:

(1) Performance in Institutional Work Assignments. All life prisoners are presumed to work and to perform satisfactorily in work assignments (see CDC Rules 3040 and 3041). Lack of a work assignment shall not necessarily prevent the granting of postconviction credit. The panel shall consider the nature and availability of work assignments at the institution, the prisoner's custody status, and any other impediments to the prisoner's receiving work assignment.

(2) Participation in Self-Help and Rehabilitative Programs. All life prisoners are presumed to participate in programs for self development (refer to CDC Rules 3040 and 3041). Lack of program participation shall not necessarily prevent the granting of postconviction credit. The panel shall consider the nature and availability of programs at the institution, the prisoner's custody status, and any other impediments to the prisoner's participation in programs.

(3) Behavior in the Institutional Setting. All life prisoners are presumed to behave in a disciplinary-free manner, in accordance with state law and departmental regulations (refer to CDC Rules 3000-3021). However, a minor disciplinary offense shall not necessarily prevent the granting of postconviction credit.

(d) Credit Not Granted. No annual postconviction credit shall be granted in the case of any prisoner who commits serious (as defined in 15 CCR Section 3315) or numerous (more than three) infractions of departmental regulations, violates any state law, or engages in other conduct which could result in rescission of a parole date (see Section 2451) unless the panel finds evidence in mitigation and supports such finding with a statement of its reasoning.

Consistent unsatisfactory performance in work assignments, consistent failure to engage in program participation, or consistent overall negative behavior demonstrated by numerous minor disciplinary reports may, individually or cumulatively, justify the withholding of annual postconviction credit which otherwise could have been granted.

(e) Change in Parole Date. Once postconviction credit is granted for particular year of imprisonment, the credit shall be applied to any new term established after rescission or reconviction after a reversal.

NOTE: Authority cited: Sections 3052 and 5076.2, Penal Code. Reference: Sections 3040 and 3041, Penal Code. *In re Stanley*, 54 Cal.App.3d 1030 (1976).

HISTORY

1. Amendment of subsection (d) and NOTE filed 8-15-91; operative 9-16-91 (Register 91, No. 51).
2. Amendment of subsections (b) and (c)(2) filed 12-20-93, operative 1-19-94 (Register 93, No. 52).

## § 2411. Fixing a Parole Date.

(a) Total Period of Confinement. The terms established for the base crime and any adjustments shall be added together resulting in a total pe-

| HABITUAL OFFENDERS Penal Code § 667.7 (in years and does not include postconviction credit as provided for in § 2410) | A. Crime included a single victim who did not require extensive medical treatment or prisoner was a passive participant or played a minor role in the crime. | B. Crime involved multiple victims or there were multiple injuries inflicted on the same or different victims. | C. Victim was tortured or suffered loss of bodily member or organ, or duration of offense was lengthy and prisoner had an opportunity to cease but instead continued. | D. Crime involved intricate planning or there exists facts which indicate the crime was committed in a manner which demonstrates an exceptionally callous disregard for human suffering. |
|---|---|---|---|---|
| I. Contributing Victim While not an accomplice, victim was involved in criminal activity which contributed to the motivation for the crime, i.e., drug dealer, sex offender, etc. | 20–22–24 | 21–23–25 | 22–24–26 | 23–25–27 |
| II. Prior relationship Victim was involved in a prior relationship with prisoner (spouse, family member, friend, etc.) which contributed to the motivation for the crime. | 21–23–25 | 22–24–26 | 23–25–27 | 24–26–28 |
| III. Vulnerable victim Victim was particularly vulnerable due to age or physical or mental condition. | 22–24–26 | 23–25–27 | 24–26–28 | 25–27–29 |
| IV. Injury to victim Victim suffered fatal injury, required extensive medical treatment, or was permanently disabled as result of the crime. | 23–25–27 | 24–26–28 | 25–27–29 | 26–28–30 |

## SUGGESTED BASE TERMS

NOTE: Authority cited: Sections 3052 and 5076.2, Penal Code; Reference: Sections 667.7 and 3041, Penal Code.

HISTORY
1. Amendment of section and NOTE filed 3–15–93; operative 4–14–93 (Register 93, No. 12).
2. Editorial correction adding subsection (b) and matrix (Register 93, No. 17).

§ 2424.  Circumstances in Aggravation of the Base Term.

Circumstances in aggravation of the base term include but are not limited to:

(a) Criminal History.

(1) The current offense or offenses and the offenses underlying the prior prison terms are violent offenses as defined in Penal Code Section 667.5(c).

(2) The current offense or offenses and the offenses underlying the prior prison terms were committed within a relatively short time after release on parole.

(3) The prisoner has been convicted of other offenses during the periods between the commission of the current offense and the offenses underlying the prior prison terms.

(4) The prisoner has served more than two prior prison terms for offenses listed in Penal Code Section 667.7.

(b) Circumstances of Offenses.

(1) The current offense or offenses resulted in greater injury to one or more victims than is required for a finding under Penal Code Section 12022.7.

(2) The current offense or offenses or the offenses underlying the prior prison terms resulted in death to one or more victims.

(3) The circumstances of the current offense or offenses and the offenses underlying the prior prison terms indicate the prisoner preys on victims who are particularly vulnerable, or who occupy a position of trust in relation to the prisoner.

Register 93, No. 42; 10–16–93

NOTE: Authority cited: Section 5076.2, Penal Code. Reference: Sections 667.7, 3040 and 3041, Penal Code; *In re Stanley*, 54 Cal.App.3d 1030 (1976).

### § 2429.1.  Fixing a Parole Date.

The parole date shall be determined as provided in Section 2411.

NOTE: Authority cited: Section 5076.2, Penal Code. Reference: Sections 667.7, 669, 1203.2a and 2900, Penal Code.

## Article 13.  Parole Consideration Criteria and Guidelines for Sex Offenders Sentenced to Life Terms Under Penal Code Section 667.51

### § 2430.  Scope of Article.

The criteria and guidelines in this article shall apply to prisoners sentenced to a term of 15 years to life under Penal Code Section 667.51. The guidelines in this article shall be construed as based on the public's expressed intent in adding Section 667.51 to the Penal Code that a person convicted of lewd or lascivious acts committed against a child under the age of 14, and who has served two or more prior prison terms for specified sex crimes should be incarcerated for an extended period of time.

The general statement in Section 2400 regarding the differences between the minimum eligible parole date and the parole release date shall be construed as if incorporated herein.

A person committed under Penal Code Section 667.51 shall have his initial parole consideration hearing in the thirteenth month prior to the minimum eligible parole date. The prisoner shall have documentation hearings as provided in Section 2269.1, but no specific amount of postconviction credit shall be granted until the board has established a period of confinement.

NOTE: Authority cited: Section 5076.2, Penal Code. Reference: Sections 667.51, 667.7, 2930–2933, 3040 and 3041, Penal Code.

HISTORY

1. New Article 13 (Sections 2430–2439.1) filed 6–14–84; effective thirtieth day thereafter (Register 84, No. 24).

### § 2431.  General.



A sex offender shall be considered for parole for the first time at the initial parole consideration hearing. A parole date shall be denied if the prisoner is found unsuitable for parole under Section 2432(c). A parole date shall be set if the prisoner is found suitable for parole under Section 2432(d). A parole date set under this article shall be set in a manner that provides uniform terms for offenses of similar gravity and magnitude with respect to the threat to the public.

In setting a parole date the panel shall consider the Sentencing Rules for the Superior Courts. The panel shall also consider the criteria and the setting of parole dates, the circumstances of the crimes for which the prisoner was sentenced and any circumstances in aggravation or mitigation.

In setting a base period of confinement, the panel shall consider the circumstances of the current and prior offenses resulting in conviction under Penal Code Section 667.51.

The circumstances tending to show suitability and unsuitability, and the circumstances in aggravation and mitigation contained in this article shall be construed as guidelines only. The panel may make findings outside the guidelines when warranted in the individual case and reasons are stated on the record.

NOTE: Authority cited: Section 5076.2, Penal Code. Reference: Sections 667.51, 3040 and 3041, Penal Code.

found unsuitable for and denied parole if in the judgment ... to society if released from prison.

(b) Information Considered. At all parole consideration hearing sex offenders the panel shall consider the information described in tion 2281(b).

(c) Circumstances Tending to Show Unsuitability. The panel s consider those circumstances listed in Section 2281(c) which the p finds are appropriate to the case of a sex offender. The panel may m other findings when warranted by the circumstances of an individual and reasons are stated in the record.

(d) Circumstances Tending to Show Suitability. The panel shall c sider those circumstances listed in Section 2281(d) which the panel fi are appropriate to the case of a sex offender. The panel may make oth findings when warranted by the circumstances of an individual case a reasons are stated in the record.

NOTE: Authority cited: Section 5076.2, Penal Code. Reference: Sections 667. and 3041, Penal Code.

### § 2433.  Base Term.

(a) General. The panel shall set a base term for each sex offender wh is found suitable for parole. The base term shall be established based o the circumstances of the series of prior and current offenses as a sulted in conviction as a sex offender, considered as a whole. The pane shall set a base term which it finds to be appropriate in an individual case after consideration of the Circumstances in Aggravation listed in Section 2434 and the Circumstances in Mitigation listed in Section 2435, and any other circumstances which appear to be important in the judgment of the panel.

NOTE: Authority cited: Section 5076.2, Penal Code. Reference: Sections 667.51 and 3041, Penal Code.

### § 2434.  Circumstances in Aggravation of the Base Term.

Circumstances in aggravation of the base term include:

(a) Criminal History.

(1) The current offense or offenses and the offenses underlying the prior prison terms are violent offenses as defined in Penal Code Section 667.5(c).

(2) The current offense or offenses and the offenses underlying the prior prison terms were committed within a relatively short time of each other.

(3) The prisoner has been convicted of offenses, misdemeanors or felonies, involving sexually aberrant behavior other than those resulting in the life sentence under Penal Code Section 667.51.

(4) The prisoner has served more than two prior prison terms for offenses listed in Penal Code Section 667.51.

(5) The current or prior commitments to state prison resulted from multiple convictions for sex and sex–related offenses.

(b) Circumstances of Offenses.

(1) The current offense or offenses or the offenses underlying the prior prison terms resulted in physical or psychological injury to the victim beyond that occasioned by the sex act.

(2) The current offense or offenses or the offenses underlying the prior prison terms involved arming or use of a firearm or deadly or dangerous weapon.

(3) The current offense or offenses and the offenses underlying the prior prison terms establish a pattern of sexual crimes against children.

(4) The circumstances of the current offense or offenses and the offenses underlying the prior prison terms indicate the offender preys on victims who are particularly vulnerable resulting from factors other than the age or sex of the victim, and/or who occupy a position of trust in relation to the prisoner.

ATTACHED COURT ORDER

| Date: AUGUST 7, 2007 | | | |
|---|---|---|---|
| Honorable: PETER ESPINOZA | Judge | JOSEPH M. PULIDO | Deputy Clerk |
| NONE | Bailiff | NONE | Reporter |

| | (Parties and Counsel checked if present) |
|---|---|
| BH004213<br>In re,<br>ALFONSO CARRANZA,<br> Petitioner,<br>On Habeas Corpus | Counsel for Petitioner:<br><br>Counsel for Respondent: |

Nature of Proceedings: ORDER RE: WRIT OF HABEAS CORPUS

    The Court has read and considered the Petition for Writ of Habeas Corpus filed on August 18, 2006 by Petitioner. Having independently reviewed the record, giving deference to the broad discretion of the Board of Parole Hearings ("Board") in parole matters, the Court concludes that the record contains "some evidence" to support the Board's finding that Petitioner is unsuitable for parole. See Cal. Code Reg. Tit. 15, §2402; *In re Rosenkrantz* (2002) 29 Cal.4th 616, 667.

    Petitioner was received in the Department of Corrections in 1989 after convictions for murder in the second-degree, attempted murder, and attempted manslaughter with the use of a firearm. He was sentenced to 17 years to life, plus a consecutive 14 years. His minimum parole eligibility date was March 15, 2007. The record reflects that on November 30, 1985, Petitioner argued with Raul Munoz at a bar over who had the next game of pool. Petitioner threatened Raul and the two engaged in a shoving match. Raul then left the bar and picked up his brothers, Juan and Pedro. The three brothers returned to the bar to confront Petitioner. Petitioner's friend attempted to hit Raul, but was stopped by Pedro. The owner of the bar threatened to kick the entire group out if they did not stop fighting, so they separated and the Munoz brothers began to leave. As they were leaving, Petitioner's friend told Raul that he wanted to speak to him outside. When they reached the door, Petitioner pointed a gun at Raul and shot him in the neck from approximately 12 inches away. Raul began to run away and Petitioner shot him again in the leg. Petitioner then turned the gun on Juan, who was standing nearby in the parking lot and shot him once, killing him. Finally, Petitioner shot two times at Pedro as he ran away. Pedro was not hit by either shot. Petitioner and his friend then fled the scene and Petitioner later moved out of California. He began serving his sentence for this offense in 1989, after serving another sentence in another state.

    The Board found Petitioner unsuitable for parole after a parole consideration hearing held on April 19, 2006. Petitioner was denied parole for four years. The Board concluded that Petitioner was unsuitable for parole and would pose an unreasonable risk of danger to society and a threat to public safety. The Board based its decision primarily upon the commitment offense.

    The Court finds that there is some evidence to support the Board's finding that Petitioner's offense demonstrated an exceptionally callous disregard for human suffering. Cal. Code Regs., tit. 15, §2402, subd. (c)(1)(D). Petitioner shot Raul in the neck at close range and then continued shooting at him as he fled, hitting

<div align="center">1</div>

| Minutes Entered |
|---|
| 08-07-07 |
| County Clerk |

| Date: AUGUST 7, 2007 | | |
|---|---|---|
| Honorable: PETER ESPINOZA | Judge | JOSEPH M. PULIDO | Deputy Clerk |
| NONE | Bailiff | NONE | Reporter |

<table>
<tr><td></td><td colspan="2">(Parties and Counsel checked if present)</td></tr>
<tr><td>BH004213<br>In re,<br>ALFONSO CARRANZA,<br>      Petitioner,<br><br>On Habeas Corpus</td><td>Counsel for Petitioner:<br><br><br>Counsel for Respondent:</td></tr>
</table>

him again in the leg. Petitioner also fatally shot Juan, although Juan was merely standing nearby. Petitioner then fled the scene, leaving each of his victims to die. These actions demonstrated an exceptionally callous disregard for human suffering.

The Court also finds that there is some evidence to support the Board's finding that Petitioner's motive was very trivial in relation to the offense. Cal. Code Regs., tit. 15, §2402, subd. (c)(1)(E). The entire altercation began with an argument over who was next in line to play pool at a bar. Although the victims did provoke Petitioner by confronting him after the initial argument, they were leaving the bar at the time he began shooting them and were no longer posing a threat. The minor confrontation was a very trivial motive for shooting at three men, killing one and severely injuring another. Because of these facts, the Court also finds that there is some evidence to support the Board's finding that there were multiple victims. Cal. Code Regs., tit. 15, §2402, subd. (c)(1)(D).

The Board also considered Petitioner's prior offenses and substance abuse problems, his limited programming; his failure, until recently, to participate in a substance abuse-related self-help program; his parole plans; and the opposition from the District Attorney and the victims' family members. While these are not factors tending to show unsuitability under Cal. Code Regs., tit. 15, §2402, subd. (c) and, therefore, may not justify a finding of unsuitability on their own, the Board may properly consider them.

Finally, the Court finds that the Board did not err in denying Petitioner parole for a period of four years. The Board must articulate reasons that justify a postponement of two to five years in a separate finding, but those reasons need not be completely different from those justifying the denial of parole. See In re Jackson (1985) 39 Cal.3d 464, 479. The Board indicated that Petitioner was denied parole for four years because his commitment offense involved multiple crimes against multiple victims, demonstrated an exceptionally callous disregard for human suffering, and had a trivial motive and because until recently, Petitioner has failed to participate in substance abuse-related self-help programs or vocational programs. These reasons were sufficient to justify a four-year denial.

Accordingly, the petition is denied.

The court order is signed and filed this date. The clerk is directed to give notice.

Minutes Entered
08-07-07
County Clerk

| Date: | AUGUST 7, 2007 | | | | Deputy Clerk |
|---|---|---|---|---|---|
| Honorable: | PETER ESPINOZA | Judge | JOSEPH M. PULIDO | | |
| | NONE | Bailiff | NONE | | Reporter |

(Parties and Counsel checked if present)

BH004213
In re,
ALFONSO CARRANZA,
                    Petitioner,

On Habeas Corpus

Counsel for Petitioner:

Counsel for Respondent:

A true copy of this minute order is sent via U.S. Mail to the following parties:

Alfonso Carranza
E-30803
San Quentin State Prison
San Quentin, California 94974

Department of Justice- State of California
Office of the Attorney General
110 West A Street, Suite 1100
San Diego, California 92101
Attn: Ms. Cynthia Lumely

3

Minutes Entered
08-07-07
County Clerk

| SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF LOS ANGELES | Reserved for Clerk's File Stamp |
|---|---|
| COURTHOUSE ADDRESS:<br>Clara Shortridge Foltz Criminal Justice Center<br>210 West Temple Street<br>Los Angeles, CA 90012 | CONFORMED COPY<br><br>AUG 1 0 2007<br><br>LOS ANGELES<br>SUPERIOR COURT<br><br>Joseph M. Pulido |
| PLAINTIFF/PETITIONER:<br><br>ALFONSO CARRANZA | |
| **CLERK'S CERTIFICATE OF MAILING**<br>CCP, § 1013(a)<br>Cal. Rules of Court, rule 2(a)(1) | CASE NUMBER:<br><br>BH004213 |

I, the below-named Executive Officer/Clerk of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that this date I served:

| | |
|---|---|
| ☐ Order Extending Time | ☒ Order re: Writ of Habeas Corpus |
| ☐ Order to Show Cause | ☐ Order to Serve Responding Party |
| ☐ Order for Informal Response | ☐ Order re: |
| ☐ Order for Supplemental Pleading | ☐ Copy of Petition for Writ of Habeas Corpus for the<br>Attorney General |

I certify that the following is true and correct: I am the clerk of the above-named court and not a party to the cause. I served this document by placing true copies in envelopes addressed as shown below and then by sealing and placing them for collection; stamping or metering with first-class, prepaid postage; and mailing on the date stated below, in the United States mail at Los Angeles County, California, following standard court practices.

August 10, 2007
DATED AND DEPOSITED

JOHN A. CLARKE, Executive Officer/Clerk

By: _Joseph M. Pulido_ , Clerk
    Joseph M. Pulido

Alfonso Carranza
E-30803
San Quentin State Prison
San Quentin, California 94974

Department of Justice- State of California
Office of the Attorney General
110 West A Street, Suite 1100
San Diego, California 92101
Attn: Ms. Cynthia Lumely

# EXHIBIT D

ORIGINAL

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

COURT OF APPEAL - SECOND DIST.

F I L E D

OCT – 2 2007

JOSEPH A. LANE          Clerk

E. HOLLISTOCK        Deputy Clerk

| | |
|---|---|
| In re | B202483 |
| | (Super. Ct. No. A539854) |
| ALFONSO CARRANZA | |
| on Habeas Corpus. | |

ORDER

THE COURT*:

The petition for writ of habeas corpus filed herein September 28, 2007 has been read and considered. The petition is denied. (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 667; *In re Dannenberg* (2005) 34 Cal.4th 1061.)

*PERLUSS, P.J.,          JOHNSON, J.,          ZELON, J.

# EXHIBIT E

MC-275

Name  ALFONSO CARRANZA

Address  SAN QUENTIN STATE PRISON

SAN QUENTIN, CA 94974

CDC or ID Number  E-30803

**SUPREME COURT**
**FILED**

OCT 2 6 2007

Frederick K. Ohlrich Clerk

CALIFORNIA SUPREME COURT  **Deputy**

_____
(Court)

ALFONSO CARRANZA,

Petitioner

vs.

ROBERT AYERS, JR., Warden,

Respondent

PETITION FOR WRIT OF HABEAS CORPUS

No. **S157586**

*(To be supplied by the Clerk of the Court)*

## INSTRUCTIONS—READ CAREFULLY

- **If you are challenging an order of commitment or a criminal conviction and are filing this petition in the Superior Court, you should file it in the county that made the order.**

- **If you are challenging the conditions of your confinement and are filing this petition in the Superior Court, you should file it in the county in which you are confined.**

- Read the entire form *before* answering any questions.

- This petition must be clearly handwritten in ink or typed. You should exercise care to make sure all answers are true and correct. Because the petition includes a verification, the making of a statement that you know is false may result in a conviction for perjury.

- Answer all applicable questions in the proper spaces. If you need additional space, add an extra page and indicate that your answer is "continued on additional page."

- If you are filing this petition in the Superior Court, you need file only the original unless local rules require additional copies. Many courts require more copies.

- If you are filing this petition in the Court of Appeal, file the original and four copies of the petition and, if separately bound, one copy of any supporting documents.

- If you are filing this petition in the California Supreme Court, file the original and ten copies of the petition and, if separately bound, two copies of any supporting documents.

- Notify the Clerk of the Court in writing if you change your address after filing your petition.

- In most cases, the law requires service of a copy of the petition on the district attorney, city attorney, or city prosecutor. See Penal Code section 1475 and Government Code section 72193. You may serve the copy by mail.

Approved by the Judicial Council of California for use under Rule 60 of the California Rules of Court [as amended effective January 1, 2005]. Subsequent amendments to Rule 60 may change the number of copies to be furnished to the Supreme Court and Court of Appeal.

Page one of six

Form Approved by the
Judicial Council of California
MC-275 [Rev. July 1, 2005]

PETITION FOR WRIT OF HABEAS CORPUS

Penal Code, § 1473 et seq.;
Cal. Rules of Court, rule 60(a)

American LegalNet, Inc.
www.USCourtForms.com

6. **GROUNDS FOR RELIEF**

**Ground 1:** State briefly the ground on which you base your claim for relief. For example, "the trial court imposed an illegal enhancement." *(if you have additional grounds for relief, use a separate page for each ground. State ground 2 on page four. For additional grounds, make copies of page four and number the additional grounds in order.)*

See "INSERT A," Ground 1, attached pages 1 through 12; "INSERT B," Ground 2,

pagesd 13 through 21; "INSERT C," Ground 3, pages 22 through 23; and "INSERT D,"

Ground 4, pages 24 through 27.

a. Supporting facts:

Tell your story briefly without citing cases or law. If you are challenging the legality of your conviction, describe the facts upon which your conviction is based. *If necessary, attach additional pages.* CAUTION: You must state facts, not conclusions. For example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or failed to do and how that affected your trial. Failure to allege sufficient facts will result in the denial of your petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.) A rule of thumb to follow is: *who* did exactly *what* to violate your rights at what time *(when)* or place *(where). (If available, attach declarations, relevant records, transcripts, or other documents supporting your claim.)*

b. Supporting cases, rules, or other authority (optional):

*(Briefly discuss, or list by name and citation, the cases or other authorities that you think are relevant to your claim. If necessary, attach an extra page.)*

INSERT A

<center>Ground 1</center>

PETITIONER'S RIGHTS TO STATE AND FEDERAL DUE PROCESS WERE
VIOLATED WHEN THE BOARD OF PAROLE HEARINGS DENIED HIM PAROLE
BECAUSE NO EVIDENCE SUPPORTS THE BOARD'S FINDING AND DECISION
THAT PETITIONER IS UNSUITABLE FOR PAROLE AND POSES A CURRENT
UNREASONABLE THREAT TO PUBLIC SAFETY

On April 19, 2006, Alfonso Carranza ("Petitioner"), appeared before
the Board of Parole Hearings ("BPH") for his initial "Life Term Parole
Consideration Hearing." The BPH found petitioner unsuitable for parole and
that he would pose an unreasonable risk to society or a threat to public
safety if released from prison. The BPH stated that "Nothing that happens
here today will change the findings of the court, we are not here to retry
your case. Our purpose is solely to determine your suitability for parole."
(Exhibit A, Hearing Transcripts ("HT"), p. 9.) However, the record indicates
that the BPH did relitagate the case, mischaracterized it as a first degree
murder, being calculated, and based its decision on unchanging factors, while
ignoring factors that support a finding of rehabilitation and suitability
for parole. The BPH based its decision to deny parole on the following:

1. The offense itself is of sufficient severity for the denial.
And for that reason the inmate is being denied.

2. The inmate is also being denied because he has an escalating
pattern of criminal conduct.

3. The inmate has failed at previous grants of probation and
cannot be counted upon to avoid criminality.

4. The inmate has failed to profit from societies previous
attempts to correct his criminality such attempts include
adult probation as well as your drug rehab.

5. The prisoner has failed to sufficiently participate in self-
help and therapy programming.

6. [T]he panel notes opposition to your finding of suitability
both from the District Attorney's office of Los Angeles County
as well as the victim's next of kin.

7. The prisoner needs therapy, programming and self-help in
order to face, discuss, understand, and cope with stress
in a non destructive manner as well as to get further insight

<center>1.</center>

»INSERT A

into the crime. Until progress is made the prisoner continues to be unpredictable and a threat to others.

(Exhibit A, HT at p. 83-86.)

After denying Petitioner parole, Deputy Commissioner Thompson commended Petitioner for the following:

> [H]e did remain disciplinary free and he has been involved in counseling his peers and the Spanish speaking inmates as well as adjustment issues. And he was noted and commended for that by the church group, I believe it is Jubilee Christian church. And he has a number of letters thanking him for his help and his cooperation in various events. I think they all show a willingness to be socialized and try to have empathy for other people. Which is to be commended and hopefully built on as a good foundation for future life or future contacts. And I think all in all he has made some educational efforts, he did get an equivalency degree. And he has taken English as a second language which makes him a good role model for Spanish speaking inmates who are trying to interface and interrelate to an English speaking, American English admittedly, but an English speaking community. And I think that is all commendable.

(Exhibit A, HT at 86-87.)

The BPH's reason to deny parole must be supported by "some evidence" pertinent to the "relevant standards" promulgated by the BPH to comply with constitutional due process. (In re Rosenkrantz, supra, 29 Cal.4th at pp. 657-658 & 675-677; see also In re Dannenberg, supra, 34 Cal.4th at pp. 1071, 1084, 1095, fn. 16.) This requires a BPH panel's decision to deny parole to "have some rational basis in fact." (Scott II, 133 Cal.App.4th at p. 590, fn. 6.) As the administrative record of the BPH's review and consideration of the pleadings make clear, there simply is no such rational basis supporting the BPH's decision to deny Petitioner parole.

This is another case which demonstrates the BPH's boiler-plate denial of using the gravity of the offense as the basis to deny parole regardless of a prisoner's efforts and showing of rehabilitation. Putting aside the pre-commitment factors and, commitment offense, "all other factors indicate

[Petitioner] is suitable for release on parole." (<u>Scott II</u>, <u>supra</u>, 133 Cal.App.4th at 594.) The California First Appellate District Court cautioned the Governor about a reversing a grant of parole based solely on the commitment offense or other pre-commitment factors:

> Reliance on such an immutable factor "without regard to or consideration of subsequent circumstances" may be unfair [citation] and "runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation." [Citation.] The commitment offense can negate suitability only if circumstances of the crime reliably established by evidence in the record rationally indicate that the offender will present an unreasonable public safety risk if released from prison. Yet, the predictive value of the commitment offense may be very questionable after a long period of time. [Citation.] Thus, denial of release solely on the basis of the gravity of the commitment offense warrants especially close scrutiny.

(<u>Id.</u> at pp. 594-595.) Where such scrutiny reveals that the [BPH] "did not fulfill" the requirement "to consider all other relevant factors," the decision cannot stand. (<u>Id.</u> at p. 595.) Such is the case here.

1. The Facts of the Commitment Offense Do Not Provide a Reasonable Basis to Deny Parole.

The BPH's mischaracterization of Petitioner's commitment offense does not make it "some evidence" to support a finding of unsuitability for parole. In relying on the commitment offense to deny parole, the BPH stated:

> Multiple victims were attacked, injured and one was killed during the offense. The offense was carried out in a dispassionate and calculated manner, which demonstrates an exceptional callous disregard for human suffering. The motive for the crime was inexplicable. The sad part of my position [Commissioner Lee] is that I truly do not know what occurred out on the street nor does the Deputy Commissioner. We are only privy to what is submitted before us. The inmate's version is totally at odds with the information we have received in our packets.

(Exhibit A, HT p. 82.)

The BPH cannot base their decision on uncertainty and then used that uncertainty to recharacterize the second degree murder, commitment offense;

INSERT A

as a first degree, calculated, murder. As clarified by Petitioner's attorney,

Michael Satris:

> We don't have two counts of attempted murder in this case,
> as the District Attorney characterized it. We have a finding
> of attempted voluntary manslaughter and that is critical
> because that shows that this isn't the kind of cold calculated
> attempt to kill three people that the District Attorney is
> now trying to promote in a retrial of the case. The
> manslaughter finding or attempted manslaughter does indicate
> apparent acceptance either a provocation or unreasonable
> belief in the need for self-defense. And there is substantial
> evidence of course in the record that would support this
> (HT 61-62). ... All right so I would ask the board to do
> what it indicated in the vary outset of this hearing of what
> it was going to do. Which is to consider Mr. Carranza
> [Petitioner] for parole in accordance with Penal Code Section
> 3041 and its own rules and regulations. That Penal Code
> Section provides that the board should normally grant a
> prisoner or set a parole date for a prisoner at his first
> parole hearing (HT 64). ... Under the boards rules in terms
> of multiple victims to start with that is a factor that leans
> toward a finding of unsuitability for parole. But what is
> important is that is only if that offense shows he presents
> a continuing danger at this point. Because we are talking
> about present dangerousness when we are talking about
> suitability for parole. The record makes it very plain in
> this case that kind of entrenched criminality at that time
> was a the product of a kind of destructive lifestyle he was
> living involving drugs and weapons (HT 65). ... In terms
> of pre offense factors. You have no juvenile record, ...
> lacks any significant history of violent crime. And what
> you have is no violent criminality outside of this offense.
> This is his single act of criminal violence (HT 66). ...
> Institutional behavior has institution activities indicated
> an enhanced ability to function within the law upon release.
> And you see that first of all with the behavior of the
> remarkable record he has of being disciplinary free (HT 67).
> ... He has his plans for what is most realistic, really the
> only realistic plan for the future is he is going to be
> deported to Mexico. And he is fully prepared for that. He
> has his wife ready to move as need to be back there (HT 69.)

(Exhibit A, HT 61-69.)

"[T]he [BPH] is required to consider whether the prisoner committed

the crime as the result of significant stress in his or her life." (Scott

II, supra, 133 Cal.App.4th at 596, quoting with emphasis In re Rosenkrantz,

supra, 29 Cal.4th at p. 679.) a failure to do so "is arbitrary and capricious

4.

INSERT A

...." (Ibid.) The BPH's denial here was thus arbitrary and capricious, for they failed to consider the evidence of the considerable stress that Petitioner was experiencing at the time, which includes being addicted to drugs and alcohol, while being confronted by the victims in a altercation. As petitioner explained in his written version of the offense, Petitioner was not the instigator and was under influence:

> On the evening of November 30, 1985 I went to the La Casa Blanca bar. I started to play pool, drink beer, and snort cocaine. When I got into an argument with Raul Munoz [victim] instead of trying to calm the situation down I responded at his [the victim's] level. In my macho mentality I thought it was considered we[a]k to back down from violence. After the heated argument Mr. Munoz left the bar and I stayed to continue to play pool. Just before the bar closed I went outside and saw Mr. Munoz and two men coming at me. Mr. Munoz was cursing at me and I reached over and I was quick to shoot — And I overreacted, []. ... I was living a life that was out of control. ...

(Exhibit A, HT 21-22.)

Though the BPH did mention that "[t]he information apparently in the packets seem to indicate at trial the witnesses did indicate there was an ongoing dispute that apparently on at least two occasions an attempt to solve this particular dispute in fact it seems to indicate there was a point and time where both sides shook hands[]" (HT 82-83), and that "the victim left the bar and went and got his brothers," (HT 16), the BPH ignored the fact that the jury rejected the prosecutor's version of the crime when it found Petitioner guilty of a less capable offense than charged and argued by the District Attorney's office. Furthermore, the BPH recognized that Petitioner's "usage in regards to cocaine[]" (HT 84), at the time of the offense, the BPH decision studiously avoided notice of the evidence of stress that the record spread before them. The BPH not only ignored the evidence that Petitioner was experiencing a significant amount of stress at the time of the offense, but that the stress had built up over a long period of time.

INSERT A

(HT 84.) (See Scott II, supra, 133 Cal.App.4th at p. 596, quoting Cal. Code Regs., tit. 15, §2402, subd. (d)(4) ["the prisoner's 'motivation' for the offense tends to show suitability when it was the result of significant stress in his life, especially if the stress has built over a long period of time'"].)

The fact that the BPH describes the commitment offense as "dispassionate and calculated" (HT 82), does not change the analysis. As the on Court has stated: "'All second degree murders by definition involve some callousness - i.e., lack of emotion or sympathy, emotional insensitivity, indifference to the feelings and suffering of others. [Citation.] As noted, however, parole is the rule, rather than the exception, and a conviction of second degree murder does not automatically render one unsuitable.'" (Scott II, supra, 119 Cal.App.4th at p. 891.)

As brutal as Petitioner's homicidal conduct may have been, it did not go beyond what caused that conduct to constitute second degree murder, he did nothing beyond what accomplished the killing to "cruelly or callously exacerbate[] the victim's suffering." Parole authorities may use the factors in Petitioner's case, shooting the victim, to aggravate his term, but that manner of death does not disqualify a prisoner from parole. As the California Court of Appeals, First Appellate District, noted, the BPH's observation that "[t]he offense itself is of sufficient severity for the denial" (HT 83), "could be repeated annually until [Petitioner] dies or is rendered helpless by the infirmities of sickness or age." (Scott II, supra, 133 Cal.App.4th at p. 595.) The manner in which Petitioner shot at the victim is not atypical for a murder case, and hardly acts to "distinguish this crime from other ... murders as exceptionally callous." (In re Smith, supra, 114 Cal.App.4th at p. 367.) As the California Supreme Court has noted on more

INSERT A

than a score of occasions, "murder is seldom pretty." (See, e.g., People v. Hinton (2006) 37 Cal.4th 839, 896.) The BPH's denial of parole to such murders is contrary to the statute.

The BPH failed to conduct an individualized assessment of all required factors. Clearly, the facts at hand do not meet the requirements set forth by the regulations and the courts to justify the BPH's finding of unsuitability for parole. As the record shows, Petitioner's crime merely satisfies the bare minimum requirements for finding of a second degree murder. He did not torture Mr. Munoz, or lie in wait for him; he did not prolong his suffering, or kill him in order to rob him or incite a race war. His crime, while terrible, does not rise to the level of callousness present in Dannenberg, where after a long period of marital disharmony, the defendant bludgeoned his wife repeatedly with a pipe wrench and then drowned her or allowed her to drown in the bathtub; or Rosenkrantz, where defendant purchased an Uzi and, one week after provocation, shot the victim numerous times at close range and then remained a fugitive for 24 days; or Van Houten, where defendant assisted with multiple stabbings of the victim with a knife and bayonet, after the victim witnessed her husband receiving the same fate, all an effort to incite a race war. See Van Houten, 116 Cal.App.4th at 365. Not only does Petitioner's crime fail on its own to constitute "some evidence" that he is a continuing threat to public safety, but the BPH erred by failing to consider all of factors required by the regulations. Post-commitment facts are essential to determining suitability of parole. The BPH failed to consider Petitioner's perfect post-commitment record, positive psychological and forensic evaluations, exemplary in-prison work record, extensive self-help and therapy, and post release offer of housing and employment in Mexico, and therefore cannot justify his denial of parole.

7.

INSERT A

In another recent opinion, the Honorable Judge Marilyn H. Patel in Martin v. Marshall, No. C-05-3486 MHP, ---F.Supp.2d---, 2006 WL 1344584 (N.D. Cal. May 17, 2006), Judge Patel held that (?) sole reliance on the circumstances of petitioner's offense and conduct prior to the offense in denying parole constituted a due process violation, and (2) denial or parole under California's then-existing no-parole policy for murderers denied the inmate his due process right to be heard by an impartial decision-maker. Judge Patel further found that California inmates have a federally-protected due process liberty interest in parole.

2.
3.
&
4.
The Facts of Petitioner's Escalating Pattern of Criminal Conduct; His Failure at Previous Grants of Probation; and His Failure to Profit from Societies Previous Attempts to Correct His Criminality, Do Not Provide Some Evidence That Petitioner is a Current Unreasonable Risk to Public Safety.

The BPH also points to Petitioner's pre-commitment offense behavior. "The inmate began to use cocaine heavily in California. And began to sell cocaine apparently to support his habit. As far as previous contacts the inmate as far as we know has no juvenile contacts. ... 1980. He also has, was arrested I should say for drunk driving in the following month in April. The inmate was ordered to attend a drug and alcohol program at that time. In 1984 the inmate was in possession of a controlled sustains. ..." (HT 14.) In 1984 Petitioner was arrested for possession of gun and cocaine. In 1987 Petitioner was arrested for possession of cocaine and received six years in Federal Prison. (HT 15.) These charges do not rise to the level anticipated in the Regulations which define "Previous Record of Violence" as "previous occasions [prisoner] inflicted or attempted to inflict serious injury on a victim." 15 CCR § 2402(b)(2); see also Van Houten, 116 Cal. App.4th at 353. Possession of cocaine is not assault and Petitioner's arrest for possession of weapon was not an attempt to inflict injury, of any severity,

INSERT A

on anyone. No reasonable interpretation (Rosenkrantz, 29. Cal.4th at 680) of these facts can transform them into becoming "some evidence" of a "Previous Record of Violence."(15 CCR § 2402(b)).

Courts have also made clear that the evidence cited by the Executive must be relevant and probative to the factors that such evidence is being used to support. For instance, in Smith, the Governor had pointed to evidence indicating that "the crime was not an isolated incident, but rather the culmination of 'a continuing pattern' of personal drug use, social instability, and violence against Garner." Smith, 114 Cal.App.4th at 367. The court held that though there was some evidence of drug use, such evidence was not relevant to a determination of the key inquiry -- whether the inmate would pose a current, unreasonable threat to public safety.

> [T]he observation is more historical backdrop than a reflection of the circumstances surrounding commission of the offense: its manner, scope, and motivation. Indeed, there is no evidence that Smith shot Garner while he was under the influence, and no evidence that he abused her immediately before the shooting or even during the days and weeks before it. Thus, the Governor's observation does not tend to distinguish Smith's offense as especially grave.

(Id. at 368.)

5.  There No Evidence That Petitioner Has Failed to Sufficiently Participate in Self-Help and Therapy Programming to Support a Finding of Unsuitability for Parole.

In another recent parole case, the court held that the Board's observation that the inmate had not gained an ability to speak English and that he had failed to upgrade his vocational training was not relevant to support a conclusion that "'he would pose an unreasonable risk of danger to society or threat to public safety if released from prison.' Nothing in the record indicates that defendant's criminality or ability to support himself was affected by any limitation of his vocational or language skills." In re Deluna (2005) 126 Cal.App.4th 585, 598; Cf. Van Houten, 116 Cal.App.4th

INSERT A

at 353 (inmate's previous arrest record did not constitute "some evidence" of a threat to public safety because the alleged acts did not involve serious injury or attempted serious injury to a victim).

6. The Fact That The District Attorney's Office and Victim's Next of Kin Opposes Parole Does Not Constitute "Some Evidence" That Petitioner Currently Poses An Unreasonable Risk to Public Safety.

The BPH cited the District Attorney' Office and Victim's next of kin opposition to a finding of suitability to deny Petitioner parole. (HT 86.) Public outcry cannot be used to determine whether an inmate is suitable for parole. (In re Powell (1988) 248 Cal.Rptr. 431; In re Fain (1983) 139 Cal.App.3d 295.) Furthermore, because Petitioner had no notice that this factor would be used against him, this factor is unconstitutionally vague. (United States v. Doremus, 888 F.2d 630, 634 (9th Cir. 1989) [A statute (or regulation) is void for vagueness : if it fails to give adequate notice to people of ordinary intelligence concerning the conduct it proscribes, or if it invites arbitrary and discriminatory enforcement.].)

7. There is No Evidence to Support the BPH's Finding that Petitioner Needs Programming and Self-Help in Order to Face, Discuss, Understand, and Cope With Stress in a Non Violent Manner.

Finally, the BPH panel found that Petitioner "needs therapy, programming, and self-help in order to face, discuss, understand and cope with stress in a non destructive manner as well as to get further insight into the crime. Until progress is made the prisoner continues to be unpredictable and a threat to others." (HT 86.)

Petitioner has been disciplinary free his entire time in prison. He has shown that he can cope with stress in a non-destructive manner. In In re Smith, Cal.App.4th at page 371, the court held that evidence that a prisoner used intoxicating substance 20 years prior is not some evidence

INSERT A

that he is currently dangerous.

> [W]e conclude that Smith's past desire for and use of drugs
> not by itself reasonably established current unsuitability
> because there is no additional evidence to complete a chain
> of reasoning between his past drug use and a finding that
> because of it he currently poses an unreasonable risk of
> danger if released. In other words, in the absence of some
> evidence to support a reasonable belief that Smith might
> start using drugs again, the fact that he used drugs
> extensively more than 20 years ago does not by itself
> represent some evidence that he is currently dangerous.

Same holds true in the instant case. There is no reasonable basis to believe

that Petitioner might start using alcohol and drugs if released. The BPH

is asserting authority that it does not possess, denying parole because a

prisoner continues to be unpredictable. "According to a Task Force of the

American Psychiatric Association, '[n]either psychiatrist nor anyone else

have demonstrated an ability to predict the future violence or dangerousness.

[Citation] As our Supreme Court has also noted, 'the same studies which proved

the inaccuracy of psychiatric prediction [of dangerousness] have demonstrated

beyond dispute the no less disturbing manner in which such prophecies

consistently err: they predict acts of violence which will not in fact take

place ('false positive'), thus branding as 'dangerous' many persons who are

in reality totally harmless. [Citation]" (People v. Burnick (1975) 14 Cal.3d

306, 327.)

    Under the clearly established framework of Allen and Greenholtz,

"California's parole scheme gives rise to a cognizable liberty interest in

release on parole." McQuillion v. Duncan, 306 F.3d 895, 902 (9th Cir. 2002).

The scheme creates a presumption that parole release will be granted unless

the statutorily defined determinations are made. (Id.; Biggs v. Terhune,

334 F.3d 910, 915-916 (9th Cir. 2003) (finding initial refusal to set a parole

date for prisoner with 25-to-life sentence implicated prisoner's liberty

interest.) In sum, the structure of California's parole scheme, with its

INSERT A

mandatory language and substantive predicates, gives rise to a federally protected liberty interest in parole such that an inmate has a federal right to due process in parole proceedings.

For the foregoing reasons, the Court should reverse the BPH's findings and order the BPH to set Petitioner's term within the Matrix guidelines for second degree murder. (See Exhibit B, CCR-15 § 2403(c).)

INSERT B

Ground 2

THE BOARD OF PAROLE HEARINGS VIOLATED LEGISLATIVE INTENT AND PETITIONER'S STATE AND FEDERAL DUE PROCESS RIGHTS WHEN THEY BASED THEIR DECISION TO DENY PETITIONER PAROLE BEYOND THE GUIDELINES ON THE SAME FACTORS THAT WENT INTO FORMULATING THE GUIDELINES IN THE FIRST PLACE.

On April 19, 2006, Alfonso Carranza ("Petitioner"), appeared before the Board of Parole Hearings ("BPH") for his initial "Life Term Parole Consideration Hearing." In its decision to deny Petitioner parole for four-years, the BPH stated:

> The panel has reviewed all information received from the public and relied on the following circumstances in concluding the prisoner is not suitable for parole and would pose an unreasonable risk to society or a threat to public safety if released from prison. Multiple victims were attacked, injured and one killed during the offense. The offense was carried out in a dispassionate and calculated manner. The offense was carried out in a manner, which demonstrates an exceptional callous disregard for human suffering. The motive for the crime was inexplicable or very trivial in relationship to the offense. The sad part of my position is that I truly do not know what occurred out on the street nor does the Deputy Commissioner. We are only privy to what is submitted before us. The inmate's version is totally at odds with the information we have received in our packets. .... The inmate is also denied because he has an escalating pattern of criminal conduct. ... The inmate failed at previous grants of probation and cannot be counted upon to avoid criminality. ... The prisoner has failed to sufficiently participate in self-help and therapy programming. ... In regards to inmate's parole plans I think they are sufficient. .... However the panel notes opposition to your finding of suitability both from the District Attorney's office of Los Angeles County as well as the victim's next of kin.
> ...

(Exhibit A, Hearing Transcripts, pp. 82-85.)

This case presents interesting issues concerning the procedures and guidelines used by the BPH in reaching and explaining its decisions concerning parole. The issues arise because the BPH has designed procedures (Pursuant to Cal. Penal Code §3041 (a)) that are suppose promote rationality in its decision-making process and to enhance understanding of the that process by all concerned, especially prisoners. The key ingredients of

INSERT B

the procedures are (a) the use of a Matrix table of guidelines as an aid in deciding the appropriate length of time a prisoner should serve without good-time credit, and then calculating the good-time credit toward that term; and (b) a requirement that a prisoner denied parole receive in writing the reasons for the decision. These aspects of the BPH's guidelines and procedures are detailed in In re Rosenkrantz (2002) 29 Cal.4th 616, 653-654; Cal. Codes of Regs. tit. 15 ("CCR-15") § 2400-2411. (Exhibit B.)

The guideline table sets forth suggested length of time to be served prior to parole for various combinations of two variables: 1) the severity of the offense, and 2) the characteristics of the offender in relation with the victim. The precise issues raised by this case are (a) whether, in determining suitability for parole, the BPH must use the offense for which the prisoner was convicted, or can use the offense the BPH concludes he or she has committed based on the BPH's understanding of facts that allegedly occurred, and (b) whether the BPH can use factors that went into formulating the guidelines for setting terms (in mitigation or aggravation) as the stated reason for denying parole.

As brutal as Petitioner's homicidal conduct may have been, by the BPH's own guidelines, petitioner's term "shall normally" be set at his initial parole hearing, which was held in April 19, 2006. Petitioner Minimum Eligible Parole Date (MEPD) is set at March 15, 2007. As will be shown below, Petitioner should have been found suitable for parole and his term should have been set somewhere in the range of 15 to 19 years, which can be reduced with good conduct credit. (Exhibit B, CCR-15 § 2410.)

The BPH's own guidelines requires the BPH to determine the category most closely related to the circumstances of the crime, and impose the middle base term reflected in the matrix unless the panel finds

circumstances in aggravation or mitigation. (CCR-15 § 2403.) The criteria set forth in 15 CCR-15 § 2403(c) describes three circumstances and victim situations to be used in determining the category most closely related to the crime being reviewed for setting terms:

### CIRCUMSTANCES

A. Indirect

Victim died of causes related to the act of the prisoner but was not directly assaulted by prisoner with deadly force; e.g., shock producing heart attack; a crime partner actually did the killing.

B. Direct or Victim Contribution

Death was almost immediate or resulted at least partial from contributing factors from the victim; e.g., victim initiated struggle or had goaded the prisoner. This does not include victim acting in defense of self or property.

C. Severe Trauma

Death resulted from severe trauma inflicted with deadly intensity; e.g., beating, clubbing, stabbing, strangulation, suffocation, burning, multiple wounds inflicted with a weapon not resulting in immediate death or actions calculated to induce terror in the victim.

### OFFENDER'S AND VICTIM'S RELATIONSHIP

I. Participating Victim

Victim was accomplished or otherwise implicated in a criminal act with the prisoner during which or as a result of which the death occurred, e.g., crime partner, drug dealer, etc.

II. Prior Relationship

Victim was involved in a personal relationship with prisoner (spouse, family member, friend, etc.) which contributed to the motivation for the act resulting in death. If the victim had a personal relationship but prisoner hired and/or paid to commit the offense, see Category IV.

III. No prior relationship

Victim had little or no relationship with prisoner, or motivation for act resulting in death was related to the accomplishment of another crime, e.g., death of victim during robbery, rape, or other felony.

INSERT B

(CCR-15 § 2403(c), Matrix of Base Terms for Second Degree Murder on or after November 8, 1978.) (Exhibit B, p. 76.)

CCR-15 § 2407 provides Adjustments for Other Offenses:

(a) General. Effective January 1, 1979, Penal Code Section 669 was amended to permit the court to impose sentences for other crimes to be served consecutively to a life sentence (Stats. 1978, Ch. 579). Since the court has discretion to order that the sentences for more than one crime be served consecutively, the board shall consider the court's action in determining the adjustment pursuant to this section.

(b) Multiple Convictions.

(1) General. The board shall not add adjustments for convictions for which the prisoner has been pardoned or which have been reversed by an appellate court.

(2) Consecutive Life Sentences Imposed by the Court. If the court imposed consecutive life sentences the board shall determine the base crime and base term as provided in Section 2403(a). The board shall add adjustments for remaining life crimes. The adjustment for each remaining life crime shall be a period of time commensurate with the nature of the crime but no less than the period of parole ineligibility for the crime. In no case will the parole date for consecutive sentences be earlier than the parole date for the concurrent sentences.

(3) Concurrent Life Sentences Imposed by the Court. If the court imposed concurrent life sentences, the board may add an adjustment because prisoner has been convicted of more than one crime. The suggested adjustment is greater of:

(A) Time served on the nonbase life crime prior to reception on the base offense; or

(B) The following adjustment:

1. First degree murder: 13 years for a first degree murder committed on or after November 8, 1978.

2. Second degree murder: 8 years for second degree murder committed on or after November 8, 1978.

3. One-half the period of parole ineligibility for other life crimes.

(4) Consecutive Nonlife Sentences Imposed by the Court. If the court imposed consecutive nonlife sentences the Board shall not add additional adjustment for nonlife crime.

(5) Concurrent Nonlife Sentences Imposed by the Court. If the court imposed concurrent nonlife sentences, the board may add an adjustment because the prisoner has been convicted of more than one crime. The suggested adjustment is the greater of:

(A) Time served for nonlife crime prior to reception on the life offense; or

(B) One-half the determinate term imposed by the court; or

(C) One-half the term that would be established under Section 227 (e) for crimes which carry a sentence of one year and one day.

16.

(CCR-15 § 2407.) This section was completed ignored or overlooked.

The record shows that the BPH did not follow its own guidelines and Matrix. Instead, the BPH based its decision to deny parole on the same factors that went into formulating the guidelines.

The BPH's guidelines recognize that there will be adjustment to be made for elements that go beyond what is necessary to convict for second degree murder. These factors do not preclude a finding of suitability. (See CCR-15 § 2411, Fixing a Parole Date.) (Exhibit B, p. 77-78.)

In Little v. Hadden, 504 F.supp. 558, 561, a federal court addressed the same type of abuse that occurred in this case:

> [I]t is unreasonable and impermissible for the Commission to base a decision to continue beyond the guidelines on the same factors that went into formulating the guidelines in the first place. No one disputes that this was a serious crime, but the factors of seriousness indicated by this record are included in the guidelines themselves. ... It is clear to the Court from the record in this case that the Commission has attempted to continue Little in custody beyond the guidelines because of its ad hoc decision regarding the seriousness of the offense, but the factors relied upon are either unsupported by the record or were already considered in formulating the guidelines. ... In short, the Commission's decision is arbitrary and capricious because it is not based on anything in the record before it. Moreover, it reflects an abuse of discretion because it attempts to continue Little's confinement beyond the guidelines without the statutory required good cause.

(See also, Lupo v. Norton, 371 F.Supp. 156 (1974).)

Petitioner's right to a presumption parole release date, Legislative intent, includes "behavioral" credits for participation with "good conduct" under California Penal Code § 2900.5 and CCR-15 § 2900. The BPH's failure to set petitioner's parole release date abrogates this whole Legislative mandate for prisoners with term-to-life sentences. Failure to set a term at the earliest possible time, initial hearing, also precludes Petitioner from participating in self-help programs located at the minimum security

INSERT B

level part of the prison, including family visits, which are attended to keep family ties strong and to assist the prisoner reentry into the family and community.

In sum, the executive's implementation of the parole system in California has turned upside down the legislative contemplation that murderers normally be found suitable for parole at their earliest parole suitability hearing, which is to be held 13 months before the prisoner becomes eligible for parole (Cal. Penal Code § 3041(a)), and released at a time proportionate to the individual's culpability. Instead of honoring the legislative mandate to normally parole murderers, the BPH had arbitrarily established a policy of almost never permitting parole to them. Consequently, Petitioner has not been afforded federal and state constitutional due process guaranties in the course of the executive's refusal to follow their own guidelines. (See Hicks v. Oklahoma (1980) 447 U.S. 343 [arbitrary deprivation of a state statute affecting life and liberty constitutes a violation of federal due process].)

"The measure of atrociousness is not general notions of common decency or social norms, for by that yardstick all murders are atrocious. ... 'All second degree murders by definition involve some callousness – i.e. lack of emotion or sympathy, emotional insensitivity, indifference to the feelings and suffering of others.' Rather, the inquiry is whether among murders the one committed by [the inmate] was particularly heinous, atrocious or cruel." In re Gray, 151 Cal.App.4th 379, 404 (2007), citing In re Lee, 146 Cal.App.4th 1400 (2006) (italics omitted).

California courts, interpreting the California parole suitability guidelines, have found decisions to deny parole unsupported by some evidence in cases where the petitioner perpetrated the killing on facts much worse

18.

INSERT B

than this case. In each case, the petitioner acted out of emotional stress
or others reasons that were more trivial than this case.

For example, In re Copper, supra, petitioner killed his wife with
a sledgehammer by hitting her in the neck five or six times. She suffered
for 20 to 30 minutes before she died. Cooper then hid the body and covered
up his crime. Nonetheless, the Court of Appeal found that "some evidence"
consistent with the California parole scheme did not support the decision
denying suitability.

In In re Barker, 151 Cal.App.4th 346, 353-354, 372-375 (2007), Barker
helped his friend kill his father and grandfather: the friend shot the
father, who was watching television, in the head three times and shot the
mother two times. The petitioner struck the grandfather on the head three
or four times with a chisel and then shot him in the head with a rifle.
Nonetheless, this was insufficient to support a finding of unsuitability.
"Some evidence" did not support denial.

In In re Lawrence, 150 Cal.App.4th 1511, 1518-1519 (2007), the
petitioner was convicted of first degree murder for killing her lover's
wife by wounding her in the hand, arm, leg, and neck, and then stabbing
her to death with a potato peeler. "Some evidence" did not support the
decision denying suitability.

In In re Elkins, 144 Cal.App.4th 475, 480-481, 496-499 (2006), the
petitioner beat a friend with a bat until he was dead. He did this while
his friend was a sleep. He dumped the body down the side of hill. "Some
evidence" did not support the decision denying suitability.

In In re Weider, 145 Cal.App.4th 570, 575-576 (2006), the petitioner
killed his victim in the course of a suicidal rage in the middle of a bar
and also shot two other patrons, one twice. Weider had gone out to his

- 19. -

INSERT B

truck and returned with a gun. Id. at 588-589 ("Weider's act of simply going out to his car to retrieve the murder weapon does not reflect the type of heinous, atrocious, or cruel behavior .... rationally indicat[ing] he will present an unreasonable public safety risk if released from prison."). "Some evidence" did not support the decision denying suitability.

In In re Lee, 143 Cal.App.4th at 140, the petitioner went to a restaurant to collect a payment and decided he would kill the debtor if he did not pay. When the debtor indicated he would not pay, petitioner fired five times, hitting the debtor twice, but also killed the debtor's wife by shooting her in the head. "Some evidence" did not support the decision denying suitability.

In each of these cases, California appellate courts have interpreted California law to require more evidence that a crime is especially heinous, atrocious or cruel, or exceptionally callous, when the commitment offense itself is the basis for a finding of unsuitability. "[W]here there is no convincing evidence that the state Supreme Court would decide differently, a federal court is obligated to follow the decisions of the state's intermediate appellate courts." Nelson v. City of Irvine, 143 F.3d 1196, 1206-1207 (9th Cir. 1998). Accord, Assurance Co. of America v. Wall & Associates LLC of Olympia, 379 F.3d 557, 560 (9th Cir. 2004). The California courts' authoritative interpretation of the parole standard governing petitioner's liberty interest refutes the Board's finding in this case.

The BPH may not replace the legal standards for parole with its own personal and political ones. (See, e.g., United States v. Lee (1882) 106 U.S. 196, 220.)

For the forgoing reasons, the Court should find that the BPH violated Petitioner's state and federal due process when it failed to follow its

20.

INSERT B

own guidelines and instead based its decision to deny parole on the same factors that went into formulating the guidelines in the first place, deeming the guidelines as unconstitutionally vague as applied. The court should order the BPH to a hold a new hearing within 30 days, follow its own guidelines, and set Petitioner's term within the guidelines set forth for second degree murder. (See Exhibit B, § 2403(c).)

INSERT C

Ground 3

THE BOARD OF PAROLE HEARINGS' RELIANCE ON MULTIPLE VICTIMS WHERE INJURED OR KILLED AS A REASON TO DENY PAROLE FOR FOUR-YEARS VIOLATES THE STATE AND FEDERAL DOUBLE JEOPARDY AND PETITIONER'S DUE PROCESS BECAUSE PETITIONER HAS ALREADY RECEIVED AND SERVED SEPARATED TERMS FOR THE MULTIPLE-COUNTS. BY THE DOCTRINES OF RES JUDICATA AND COLLATERAL ESTOPPEL, THE BOARD IS PROHIBITED FROM USING MULTIPLE VICTIMS AS A REASON TO DENY PAROLE FOR MULTIPLE-YEARS.

On October 31, 1988, in the Los Angeles County Superior Court, a jury convicted Petitioner of second-degree, attempted murder, and attempted manslaughter. Petitioner was sentenced to a determinate term of 14 years and a consecutive, indeterminate term of 17 years-to-life.

On March 15, 1997, after serving his determinate sentence, Petitioner began to serve his 17 years-to-life sentence for the second degree murder. Petitioner's Minimum Eligible Parole Date ("MEPD") is set at March 15, 2007.

On April 19, 2006, pursuant to California Penal Code § 3041(a), Petitioner appeared before the Board of Parole Hearings ("BPH") and was denied parole for four years. In their decision, the BPH stated:

This is the inmate initial hearing. The District Attorney has indicated that five years is the appropriate denial time. I will indicate in a separate decision the hearing panel finds that the prisoner has been convicted of murder as well as attempted homicide and it is not reasonable to expect parole would be granted in the next four years. Sir I will tell you we had discussions about this particular area. But Mr. Satris does indicate the obvious. You were not given the sentence of life without possibility of parole, you are attempting at this point and time to better yourself. I don't believe five years is appropriate. I think four years is the appropriate amount to get together the things that you need to get together.

(Exhibit A, HT 87.)

The California Code of Regulation Title 15 ("CCR-15") § 2407(b)(4) mandates that "If the court imposed consecutive nonlife sentences the Board shall not add an additional adjustment for the nonlife crime." CCR-15 § 2407(b)(5) states, "If the court imposes concurrent nonlife sentences, the board may add an adjustment because the prisoner has been convicted of more

22.

than one crime. The suggested adjustment is the greater of: (A) Time served for the nonlife crime prior to reception on the life offense; or (B) One-half the determinate term imposed by the court; or (C) One-half the term that would be established under Section 2271(e) for crimes which carry a sentence of one year and one day." (Exhibit B, pp. 76-77.)

The record clearly shows that the BPH abused it discretion and violated Petitioner's rights to be free from double jeopardy or a duel use of the commitment offense. By the doctrines of res judicata and collateral estoppel, the BPH is precluded from reconsidering whether the gravity of Petitioner's nonlife offenses provides a basis for denying him parole. (See, e.g., U.S. v. Schwartz, 785 F.2d 673, 681-682 (9th Cir.).)

The Double Jeopardy Clauses prohibition against prosecution for same offense limits the power of a court, or parole board, to alter sentences. (See, e.g., U.S. v. Arrellano-Rios, 799 F.2d 520, 524-25 (9th Cir. 1986) [defendant who served one-year sentence for aiding and abetting drug crimes could not have sentence increased after related weapons conviction vacated nor could case be remanded to provide government with chance to increase sentence for aiding and abetting drug crime.].)

For the forgoing reasons, the court should find that the BPH violated Petitioner's due process when it denied him parole for four years.

23.

INSERT D

Ground 4

PETITIONER WAS DENIED A FAIR AND IMPARTIAL PAROLE HEARING
WHEN THE BOARD OF PAROLE HEARINGS RELIED ON OPPOSITION FOR
PAROLE FROM THE DISTRICT ATTORNEY'S OFFICE AND VICTIM'S NEXT
OF KIN AS A REASON TO FIND PETITIONER UNSUITABLE FOR PAROLE.
THE VICTIM'S NEXT OF KIN'S FEELINGS, CONCERNS, AND OTHER
STATEMENTS WERE ALREADY CONSIDERED DURING THE SENTENCE STAGE
AND THEIR PRESENCE, ALONG WITH THE DISTRICT ATTORNEY'S OFFICE
PRESENCE, CREATES A CONTAMINATION BY EXTRANEOUS INFLUENCES
IN THE PAROLE PROCEEDINGS.

On October 31, 1988, in the Los Angeles County Superior Court, a jury convicted Petitioner of second-degree, attempted murder, and attempted manslaughter. After considering the statements from the District Attorney's office and victim's next of kin, the court sentenced Petitioner to a determinate term of 14 years and a consecutive, indeterminate term of 17 years-to-life.

On March 15, 1997, after serving his determinate sentence, Petitioner began to serve his 17 years-to-life sentence for the second degree murder. Petitioner's Minimum Eligible Parole Date ("MEPD") is set at March 15, 2007.

On April 19, 2006, pursuant to California Penal Code § 3041(a), Petitioner appeared before the Board of Parole Hearings ("BPH") and was denied parole for four years. In their decision, the BPH stated:

> ... [T]he panel notes opposition to your finding of suitability both from the District Attorney's office of Los Angeles County as well as the victim's next of kin. ... The district Attorney has indicated that five years is the appropriate denial time. I will indicate is a separate decision the hearing panel finds that the prisoner has been convicted of murder as well as attempted homicide and it is not reasonable to expect parole would be granted in the next four years. ...

(Exhibit A, HT 87.)

Petitioner has a right to a parole hearing by an impartial panel. The Board of Parole Hearings (BPH) has a the responsibility of protecting this right to ensure that the parole applicant receives a fair and impartial hearing.

INSERT D

Petitioner contends that he did not receive a fair and impartial hearing because the BPH was unfairly influenced by the District Attorney's office and victim's next of kin. The District Attorney's office and victim's next of kin will always oppose Petitioner's release.

A decision based on a few facts that will always form the basis for denying parole, amounting to a permanent and virtually automatic denial of parole in a contravention of due process, is clearly arbitrary and capricious. "The presence of a large measure of discretion in a parole system ... does not alter the fundamental due process limitation against capricious decision-making. A legislative grant of discretion does not amount to a license for arbitrary behavior. When the Parole Board bases its decision on factors that bear no rational relationship to rehabilitation or deterrence, it transgresses the legitimate bounds of its discretion." In re Fain (1983) 139 Cal.App.3d 295, 307 (quoting Block v. Potter (3rd Cir. 1980) 631 F.2d 233, 236-37).

The BPH systematically denies parole to all life prisoners by unreasonably finding that the release of almost every life prisoner would jeopardize public safety. The Board always gives a multiple year denial of parole when the District Attorney office or victim's next of kin opposes parole at the initial parole hearing. The Board almost never sets a parole date at the prisoner's initial hearing; rather, it repeatedly postpones the setting of a parole date for the overwhelming majority of prisoners, and rarely grants a life prisoner a parole date no matter how many times it considers the prisoner for release or how much time he has served. The BPH currently grants parole to a very small percentage of eligible lifers — and even more rarely to those who are from another country. (See, e.g., In re Rosenkrantz, supra, 29 Cal.4th at p. 685 [Board granted parole to murderers

25.

INSERT D

1% of time in its last 4800 hearings].)

In sum, the BPH implementation of the parole system in California has turned upside down the legislative contemplation that murderers normally be found suitable for parole at their earliest eligibility and released at a time proportionate to the individual's culpability. Instead of honoring the legislative mandate to normally parole murderers, the executive has arbitrarily established a policy of almost never permitting parole to them, especially if the District Attorney's office or next of kin opposes parole. Consequently Petitioner has not been afforded federal and state constitutional due process guaranties in the course of the executive's refusal to grant parole to those who have opposition for parole. (See Hicks v. Oklahoma (1980) 447 U.S. 343 [arbitrary deprivation of a state statute affecting life or liberty constitutes a violation of federal due process].) The implementation of the parole law by the executive branch in a manner that disregards both the spirit and the letter of the law also arbitrarily violates the separation of powers doctrine contained in California Constitution, article III, section 3. Finally, an executive practice of parole denial that imposes greater punishment on a prisoner ex post facto violates his right to due process of law. (See, e.g., Young v. Weston (9th Cir. 1999) 176 F.3d 1196 [although law may not be ex post facto on its face, it can be ex post facto as applied]; Rogers v. Tennessee (2001) 532 U.S. 451 [149 L.Ed.2d 697, 121 S.Ct. 1693] [retrospective change in law detrimental to criminal defendant effected by other than legislative/regulatory means implicates due process].)

The contemporary and historical recidivism rate for murderers paroled in California historically is about 2%; the recidivism for other felons paroled in California has been as high as 70% — the highest in the nation. Prisoners as old as Petitioner, particularly after service of long prison

26.

terms, virtually never return to prison after they parole. The various life prisoners who have been paroled, whether by court order or otherwise, overall have performed admirably well on parole and demonstrate that the BPH's refusal to grant parole have needlessly caused excessive imprisonment that not only retarded the prisoners' continued rehabilitation and imposed gratuitous pain and suffering on them and their loved ones at a time when the prison system is in crisis due to over-population, but have done considerable damage to the public fisc - all without any measurable increase to public safety and in fact contrary to the interest in public safety.

For the forgoing reasons, Petitioner prays that the Court declare the rights and duties of the parties; grant equitable relief, which requires the BPH to conform their practice of holding parole hearings to the dictates of section 3041 and all statutory, regulatory and constitutional requirements as set forth in the decision of the courts; and all other relief necessary to promote the ends of justice.

# EXHIBIT F

S157586

# IN THE SUPREME COURT OF CALIFORNIA

### En Banc

---

In re ALFONSO CARRANZA on Habeas Corpus

---

The petition for writ of habeas corpus is denied.

George, C. J., was absent and did not participate.

Werdegar

_____

Acting Chief Justice